UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:12-cr-00160-JAW |
| | ) | |
| MALCOLM A. FRENCH, et al. | ) | |

**ORDER DENYING MOTION FOR NEW TRIAL**

The Defendants were found guilty of numerous crimes in January 2014 following a three-week jury trial.  Over one year later, they request an evidentiary hearing and new trial, claiming that a juror may have failed to honestly answer a material voir dire question, and had he answered truthfully, it would have provided a valid basis for a challenge for cause.  To determine whether the juror did in fact fail to honestly answer a material voir dire question, the Defendants request that the Court bring in the juror and interview him.  Having received an investigative report and testimony from the involved witness about his prior relationship with the juror and having considered the potential pitfalls from questioning the juror, the Court concludes that no further evidentiary hearing, specifically a proceeding involving questioning of the juror, is warranted.  Finally, the Court concludes that the evidence does not come close to establishing that the juror failed to honestly answer a material voir dire question or that a positive response would have been a valid basis for a challenge for cause.  The Court denies their motion for new trial.

# I.    BACKGROUND

## A.    Indictment, Trial and Verdict

On September 14, 2012, a federal grand jury indicted Malcolm A. French, Rodney Russell, Kendall Chase and Haynes Timberland, Inc. for a series of federal crimes relating in general to their alleged involvement with a marijuana growing operation in Maine.[1]  *Indictment* (ECF No. 2).  On November 13, 2013, a grand jury issued a superseding indictment.  *Superseding Indictment* (ECF No. 187).  Jury selection was held on January 8, 2014 and a jury trial commenced immediately after selection.  *Minute Entry* (ECF No. 281).  The trial took place from January 8, 2014 through January 24, 2014.  *Minute Entry* (ECF No. 308).  On January 24, 2014, the jury returned verdicts finding Malcolm French, Rodney Russell, and Kendall Chase guilty of engaging in a conspiracy to manufacture marijuana, finding Malcolm French and Rodney Russell guilty of manufacturing marijuana, finding Malcolm French, Rodney Russell, and Haynes Timberland, Inc. guilty of managing or controlling a drug-involved premises, finding Malcolm French and Rodney Russell guilty of harboring illegal aliens, and finding Malcolm French, Rodney Russell, and Kendall Chase guilty of engaging in a conspiracy to distribute marijuana.  *Jury Verdict Form* (ECF No. 311).

## B.    Motion for New Trial

On October 3, 2014, Malcolm French filed a motion for new trial.  *Def.'s Mot. for New Trial (F.R. Crim. P. 33(a))* (ECF No. 440) (*French Mot.*).  On October 6, 2014,

---

[1]    Other Defendants were also indicted but are not relevant to the pending motion.

Rodney Russell joined Mr. French's motion and on October 10, 2014, Kendall Chase did as well. *Def. Rodney Russell's Reply to Def. Malcolm French's Mot. for New Trial (F.R.Crim.P. 33(a))* (ECF No. 438); *Def. Chase's Notice of Joinder to Def. French's Mot. for New Trial Dated Sept. 30, 2014* (ECF No. 447). On October 23, 2014, the Government filed an objection to the Defendants' motion for new trial. *Gov't's Objection to Def.'s Mot. for New Trial* (ECF No. 453) (*Gov't's Opp'n*). On November 4, 2014, Mr. French filed a reply to the Government's opposition. *Def.'s Reply to the Gov't's Objection to Mot. for New Trial (F.R. Crim. P. 33(a))* (ECF No. 456) (*French Reply*). Also on November 4, 2014, Haynes Timberland, Inc. joined the Defendants' motion for new trial. *Def. Haynes Timberland, Inc.'s Joinder of Def.'s Mot. for New Trial Pursuant to F.R. Crim. P. 33([a])* (ECF No. 457). The Court heard oral argument on March 17, 2015.[2] *Minute Entry* (ECF No. 487).

## II.   THE PARTIES' POSITIONS

### A.   The Defendants' Motion

The Defendants' motion for new trial is based on an allegation of juror misconduct during voir dire and they ask for an evidentiary hearing to determine whether the verdicts should be vacated. *French Mot.* at 1-7. The Defendants claim that one of the jurors, Juror Number 79, failed to respond truthfully during voir dire as to whether he knew Steve Koenig, one of the Government's witnesses. *Id.* at 3.

---

[2]   To satisfy counsel's anticipated curiosity as to who ordered the preparation of the transcript, the Court ordered the court reporter to prepare a certified transcript of the March 17, 2015 hearing in order to make certain that it was accurately quoting the proceedings.

The Defendants say that Juror Number 79 denied knowing Mr. Koenig, when in fact he knew him.  *Id.*  Juror Number 79 was named foreman of the jury.  *Id.*

The Defendants maintain that Mr. Koenig was a "key witness" for the Government and that Juror Number 79 not only knew Mr. Koenig, but had also directly consulted with him concerning fisheries habitat restoration on land owned by Mr. French and Haynes Timberland, Inc.  *Id.* at 3, 5.  In fact, Defendants claim, Juror Number 79 had a "personal interest in the outcome of the trial" because he "for literally years, ha[d] crusaded for the cause of improving fish habitat and passageways in the state of Maine."  *Id.* at 5.  The Defendants assert that Mr. French testified at trial that "he felt certain groups were 'hostile environmental groups' in their approach to fisheries problems in Maine."  *Id.* at 5-6.

Finally, the Defendants say that the forfeiture allegations in the Superseding Indictment "made it clear that the Government was seeking to force [Mr.] French and Haynes Timberland to forfeit large tracts of land—land which had culverts and streams that [Juror Number 79] would have no doubt viewed as highly valuable in his crusade to restore Maine fisheries habitat."  *Id.* at 6.  The Defendants claim:

> From [Juror Number 79]'s perspective as a juror and advocate of Maine fisheries habitat protection, a verdict of guilty was a victory for Maine fisheries habitat because there was ample reason to suspect that forfeited lands would be taken from French's hands and placed into the trusted hands of the same federal and/or state government entities that he had collaborated with closely in the past.

*Id.*

The Defendants also say that Juror Number 79 listed his occupation only as "biologist" in the juror questionnaires.  *Id.* at 3.  However, they subsequently learned

that Juror Number 79 was a biologist for the National Park Service and therefore an employee of the federal government, "no small fact in a case prosecuted by the federal government." *Id.* at 3-4.  Moreover, they assert that Juror Number 79's field of biology focuses on fisheries and fish passages and that he had "an <u>identical</u> interest with Koenig in protecting Maine fish and restoring Maine fish habitat, particularly the Eastern Brook Trout." *Id.* at 4 (emphasis in original).  They claim that Juror Number 79 "is the author of publications concerning Maine fish habitat studies . . . and has been a speaker at conferences discussing these same issues." *Id.* at 4-5.  They also say that Juror Number 79 worked with Scott Craig of the U.S. Fish and Wildlife Service's Maine Fisheries Resource Office, and that Mr. Craig worked with Mr. Koenig on salmon restoration projects.  *Id.* at 5.  Indeed, the Defendants allege that Mr. Koenig "had spoken with [Juror Number 79] <u>directly</u> in the past for the specific purpose of consulting with him about some of the <u>very projects undertaken for fisheries habitat restoration on French and Haynes Timberland's lands</u>." *Id.* (emphasis in original).

Citing the vital importance of an impartial jury, the Defendants say that the First Circuit has set forth a "binary test for determining whether a party should be granted a new trial based on juror dishonesty." *Id.* at 2 (citing *Sampson v. United States*, 724 F.3d 150, 164-65 (1st Cir. 2013)).  First, the moving party must establish that "'the juror failed to answer honestly a material voir dire question.'" *Id.* (quoting *Sampson*, 724 F.3d at 164).  Second, the moving party must establish that "'a truthful response to the voir dire question would have provided a valid basis for a challenge

for cause.'" *Id.* (quoting *Sampson*, 724 F.3d at 165).  The Defendants maintain that they have met the *Sampson* binary test and that the Court should order an evidentiary hearing to "determine whether to vacate his sentence and order a new trial based on newly discovered evidence of juror dishonesty." *Id.* at 7.

### B.     The Government's Opposition

The Government disagrees.  *Gov't's Opp'n* at 1-12.  First, the Government points out that "[w]ell in advance of jury selection, juror questionnaires were made available to all the parties for their review" and in his questionnaire, Juror Number 79 "disclosed, among other things, his occupation, his employer and his duties at his place of employment." *Id.* at 2 (citing *Sealed Ex.* 1).

Next, the Government reviews the jury voir dire process, including the Magistrate Judge's direct question to Juror Number 79 as to whether he knew anyone on the witness list, to which he replied, "No, I don't." *Id.* at 3 (quoting *Tr. of Proceedings* 131:22-24 (ECF No. 399) (*Voir Dire Tr.*)).  Furthermore, the Government observes that the Magistrate Judge informed Juror Number 79 that there was a witness list on his seat and he should leaf through it to see if he recognized any names, and that Juror Number 79 "never indicated that he knew any of the named witnesses." *Id.*

The Government also notes that the Magistrate Judge asked a broad question of the potential jurors as to whether they harbored any "philosophical, moral, social, political, or other beliefs or views that would interfere with their ability to follow the law as instructed by the court?" *Id.* (quoting *Voir Dire Tr.* 133:4-7).  To that general

6

question, the Government says, the Magistrate Judge stated that "no one has responded in the affirmative." *Id.* (citing *Voir Dire Tr.* 133:7-8).

The Government dismisses the Defendants' claims of bias on the part of Juror Number 79 first because it says the information about Juror Number 79 was either actually revealed on his juror questionnaire or readily available prior to trial and in either case, is not newly discovered evidence. *Id.* at 6-7. Second, the Government presses the point that none of the Defendants sought to ask Juror Number 79 about any biases that he might have harbored. *Id.* at 7. Jurors, the Government argues, "cannot be faulted for not answering a question that they were not asked." *Id.* Furthermore, the Government contends that even though the Defendants describe Juror Number 79 as being on a crusade, they have produced no evidence proving this speculative allegation. *Id.*

The Government is skeptical about the Defendants' contention that Juror Number 79 must have known Mr. Koenig because he knew Scott Craig and Scott Craig knew Juror Number 79. *Id.* at 8-9. First, the Government says that it is purely speculative and second, the Government maintains that all of this information was available before trial. *Id.* Next, the Government asserts that the Defendants' allegations about the supposed relationship between Juror Number 79 and Steve Koenig are arguments only, not supported by any evidence, and should be disregarded. *Id.* at 9. In fact, following receipt of the Defendants' motion, the Government had Mr. Koenig interviewed and it says that the Defendants' "characterization of the 'interpersonal relationship' between Juror #79 and Koenig is

overstated." *Id.* at 10. The Government reveals that after trial, Mr. Koenig "exchanged two or three e-mails with Juror #79 concerning a tour of some of Koenig's conservation projects." *Id.* at 11. But the Government observes that these contacts took place after trial and could not have affected either Juror Number 79's voir dire responses or the verdict itself. *Id.*

### C.   The Defendants' Reply

In their reply, the Defendants assert that they have demonstrated that Mr. Koenig and Juror Number 79 had been in touch before trial about work on Mr. French's land. *French Reply* at 2. They stress that they did not know about this pretrial contact until after trial and learned about this post-trial contact only when the Government interviewed Mr. Koenig after trial. *Id.* & n.1. They say that Mr. Koenig told the Government after trial that "he had contact with Juror #79 in roughly 2005 or 2006 about use of a 'grip hoist' or 'come-along.'" *Id.* at 2. The Defendants emphasize that "[i]t is also very important to note that this contact was about Koenig's work on land owned by Malcolm French." *Id.* In short, the Defendants say:

> Koenig, a key trial witness, admits to having had conversations with the foreman of French's jury prior to the trial. This contact with Juror #79 was not simply about the weather or sports, but instead concerned work on the <u>land of Defendant Malcolm French</u>.

*Id.* at 3 (emphasis in original). The Defendants contend that Mr. Koenig's failure to recognize Juror Number 79 during the trial does not answer whether Juror Number 79 recognized him. *Id.*

## III.   LEGAL PRINCIPLES

### A.   Legal Standard

### 1.   The Constitutional Right to an Impartial Jury

The Sixth Amendment of the United States Constitution guarantees defendants in a federal criminal trial the right to an "impartial jury."  U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . .").  "An impartial jury is one 'capable and willing to decide the case solely on the evidence before it.'"  *Sampson*, 724 F.3d at 163 (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)).  "Voir dire is a singularly important means of safeguarding the right to an impartial jury."  *Id.*  "A probing voir dire examination is '[t]he best way to ensure that jurors do not harbor biases for or against the parties.'"  *Id.* at 163-64 (quoting *Correia v. Fitzgerald*, 354 F.3d 47, 52 (1st Cir. 2003)).  Furthermore, "[t]he party seeking to upset the jury's verdict has the burden of showing the requisite level of bias by a preponderance of the evidence."  *Id.* at 166.

### 2.   An Honest Mistake or a Dishonest Response

In *Sampson*, the First Circuit established two requirements for when dishonest answers at jury empanelment may justify setting aside a verdict: "first, that the juror failed to answer honestly a material voir dire question"; and, second, that an honest answer "would have provided a valid basis for a challenge for cause."  *Id.* at 164-65 (internal citations and quotation marks omitted).  Regarding the first requirement, the Supreme Court in *McDonough* addressed a juror in a products liability case who during voir dire failed to reveal that his son was injured as a result of an exploding

9

tire.  464 U.S. at 549-55.  The *McDonough* Court discussed whether the juror's failure to respond was "mistaken, though honest" as opposed to a failure to answer honestly. *Id.* at 555-56.  The Supreme Court emphasized that the party moving for new trial must demonstrate "that a juror failed to answer honestly a material question on *voir dire.*"  *Id.* at 556.  "[A] voir dire question is material if a response to it 'has a natural tendency to influence, or is capable of influencing,' the judge's impartiality determination."  *Sampson*, 724 F.3d at 165 (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)).

In *Sampson*, the First Circuit expanded upon the *McDonough* distinction between an honest mistake and intentional dishonesty:

> Of course, a juror, during voir dire, may make honest, but mistaken responses.  This category includes situations in which, for example, the juror misunderstands the wording of the question, fails to recall the correct response, or is not asked a question that would necessitate disclosure of the relevant information.  We do not explore here the effect of honest but mistaken voir dire responses.  For present purposes, it suffices to say that in the absence of dishonesty, post-trial relief, if available at all, will require a more flagrant showing of juror bias.

*Id.* at 164 n.8; *see also United States v. Fuentes*, No. 2:12-CR-50-DBH, 2013 U.S. Dist. LEXIS 115459, at *18-19 (D. Me. Aug. 15, 2013).  As the First Circuit wrote in *Sampson* and the district court observed in *Fuentes*, an honest but mistaken response may still entitle a defendant to a new trial but only if the defendant has made "a more flagrant showing of juror bias."  *Id.*

### 3.    Valid Basis for a Challenge for Cause

"The second part of the binary test requires a finding that a truthful response to the voir dire question 'would have provided a valid basis for a challenge for cause.'"

*Sampson*, 724 F.3d at 165 (quoting *McDonough*, 464 U.S. at 556). "Jurors normally are subject to excusal for cause if they are biased or if they fail to satisfy statutory qualifications." *Id.* Here, as in *Sampson*, "only bias is relevant." *Id.* In making a bias determination, the First Circuit resisted the temptation to create categories of bias. *Id.* Instead, it directed the trial courts to ask whether the juror was "'capable and willing to decide the case solely on the evidence.'" *Id.* (quoting *McDonough*, 464 U.S. at 554). It observed that the Supreme Court warned that "'hints of bias [are] not sufficient'" and only "'[d]emonstrated bias in the responses to questions on *voir dire* may result in a juror's being excused for cause.'" *Id.* (quoting *McDonough*, 464 U.S. at 554). The First Circuit also noted that "bias is not a pedagogical conception but rather a state of mind" and "[a]ny inquiry into potential bias in the event of juror dishonesty must be both context specific and fact specific." *Id.*

> With these principles in mind, the *Sampson* Court set down the test:
>
> [W]hether a reasonable judge, armed with the information that the dishonest juror failed to disclose and the reason behind the juror's dishonesty, would conclude under the totality of the circumstances that the juror lacked the capacity and the will to decide the case based on the evidence (and that, therefore, a valid basis for excusal for cause existed).

*Id.* at 165-66. To this end, the First Circuit listed some of the factors that the trial court might consider: (1) "the juror's interpersonal relationships"; (2) "the juror's ability to separate her emotions from her duties"; (3) "the similarity between the juror's experiences and important facts presented at trial"; (4) "the scope and severity of the juror's dishonesty"; and (5) "the juror's motive for lying." *Id.* at 166. The First Circuit further explained that while "any one of these factors, taken in isolation, may

be insufficient to ground a finding of a valid basis for a challenge for cause, their cumulative effect must nonetheless be considered."  *Id.*

## IV.  DISCUSSION

### A.   What the Defendants Knew or Should Have Known at Voir Dire

In *McDonough*, the Supreme Court was careful to point out that "it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination."  464 U.S. at 555.  The *Sampson* binary test implicitly requires defendants to have asked the right questions of the juror during voir dire.  *See Sampson*, 724 F.3d at 164-65 (an honest answer "would have provided a valid basis for a challenge for cause").  In 1989, the Second Circuit asked whether the defendant "was prevented from intelligently exercising his peremptory and causal challenges because of the juror's intentional nondisclosure." *United States v. Colombo*, 869 F.2d 149, 151 (2d Cir. 1989).

### 1.   What the Defendants Knew or Should Have Known About Juror Number 79

Preliminarily, the Court asks what information the Defendants either possessed or, in the exercise of due diligence, should have possessed about Juror Number 79.  The answer is that the Defendants either actually knew or should have known through the voir dire process virtually all of the information they now claim justifies a new trial.

In their motion, the Defendants write:

> Information from the "Juror List" provided to counsel prior to jury
> selection indicated that [Juror Number 79] was a "biologist." More
> particularly, [Juror Number 79] is a biologist for the <u>federal</u> National
> Park Service. This is no small fact in a case prosecuted by the federal
> government. Moreover, [Juror Number 79] is a federal biologist with a
> focus on fisheries and fish passages. Exhibits A-J. These facts may not
> appear to have any particular bearing on the outcome of the typical
> marijuana trafficking case, but they are particularly relevant to the
> facts of this case and the Magistrate's impartiality determination at jury
> selection.

*French Mot.* at 3-4 (emphasis in original). The Court is not entirely clear what the Defendants' point is here. Exhibits A through J of Defendants' motion externally confirm through outside publications that Juror Number 79 was a biologist working for the National Park Service with a focus on fisheries and fish passages and the Defendants seem to imply that they were required to perform external research in order to determine these facts about Juror Number 79. If they are now saying that they were not given access to this information about Juror Number 79 before jury selection, this is factually incorrect.

Before trial, each potential juror was required to complete a juror questionnaire that was made available to the parties. Juror Number 79 completed such a questionnaire. *Gov't's Opp'n* Attach. 1. Based on Juror Number 79's responses, the parties knew the following about Juror Number 79:

(1)   His residence address;

(2)   His age;

(3)   How long he had lived in the state of Maine;

(4)   His place of birth;

(5)   His occupation;

(6)    His employer;

(7)    His employer's address;

(8)    His spouse's occupation;

(9)    He was a salaried employee of the United States Government;

(10)   The absence of any prior felonies;

(11)   The absence of any pending felony charges;

(12)   His marital status;

(13)   His number of children;

(14)   His prior jury service;

(15)   His level of education; and

(16)   A general description of his duties at work.

*Id.* at 1-3.  Among other things, a cursory review of Juror Number 79's completed questionnaire would have confirmed much more than just that he was a "biologist." The completed questionnaire revealed, among other things, that he was a biologist working for the federal government not far from Township 37 in the natural resources field and that his duties included working in the field of "wildlife management."  *Id.* at 2.  The Defendants' claim that they did not know this information is simply inaccurate.

If the Defendants had been troubled during jury selection by the presence on the jury of a federal employee working in the natural resources field, specifically in wildlife management, they could have asked the Court to inquire further as to the specific nature of his duties and ascertained whether his wildlife management

included fisheries and fish passages, and whether he knew anything about and had any views about the salmon restoration projects in Washington County.

Alternatively, before trial, they could have done the outside research they did after trial. Each of Exhibits A through J predates the trial and by the Court's facial review, there is no indication that any of the information about Juror Number 79 that the Defendants now claim was unknown to them would have been unavailable with due diligence before trial.

Comparing the information about Juror Number 79 that the Defendants complain they did not know during jury selection with the information that they actually knew or should have known with the exercise of due diligence, the Court finds that the Defendants have failed to demonstrate that they did not actually know or, with the exercise of due diligence, could not have found out virtually all of the information about Juror Number 79 that now forms the basis of their motion for new trial. *McDonough*, 464 U.S. at 555 (noting that "it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination").

### 2. What the Defendants Knew or Should Have Known About Steve Koenig

In their motion, the Defendants assert that "[u]pon information and belief from evidence only discovered after the verdict in this case, [Juror Number 79] knew Koenig and had directly communicated with Koenig in the past, despite [Juror Number 79]'s claim at jury selection that he did not know Koenig." *French Mot.* at 5.

15

To answer whether the Defendants had enough information at the time of jury selection to link Juror Number 79 with Steve Koenig, the Court has to know what the Defendants knew about Steve Koenig before jury selection. The Court therefore reviews how Steve Koenig came to be called as a witness.

The Government filed a trial brief and a witness list in this case on December 31, 2013, a supplementary trial brief on January 2, 2014, and a second supplementary trial brief on January 6, 2014. *Gov't's Trial Br.* (ECF No. 246); *Gov't's Witness List* (ECF No. 248); *Supplemental Trial Br.* (ECF No. 259); *Second Supplemental Trial Br.* (ECF No. 265). Steve Koenig's name is not mentioned in any of these documents. None of the Defendants mentioned Mr. Koenig's name in their pretrial memoranda. *Def. Haynes Timberland, Inc.'s Trial Br.* (ECF No. 250); *Def. Malcolm A. French's Trial Br.* (ECF No. 251); *Def. Rodney W. Russell's Trial Br.* (ECF No. 256); *Def., Kendall Chase's Trial Br.* (ECF No. 258).

The name Steve Koenig first appears in Court filings on Rodney Russell's witness list. *Def. Rodney Russell's Witness List* at 1 (ECF No. 268) (*Russell Witness List*). Mr. Koenig also appears on Malcolm A. French's witness list. *Def.'s Witness List* at 1 (ECF No. 272). From these filings, the Court is able to conclude that at least two of the Defendants were aware of Steve Koenig and this conclusion is confirmed at least as to Mr. French by the trial testimony of Mr. Koenig and Mr. French. *Partial Tr. of Proceedings* (ECF No. 393) (*Koenig Trial Test.*); *Partial Tr. of Proceedings* (ECF No. 362) (*French Trial Test.*).

16

Mr. Koenig's trial testimony revealed that since 2001 he had been Executive Director of Project SHARE, which stands for Salmon Habitat and River Enhancement. *Koenig Trial Test.* 3:23-25, 4:8-9. Project SHARE, Mr. Koenig said, has a mission to restore habitat in five Down East salmon rivers, including the Dennys, East Machias, Machias, Pleasant and Narraguagus. *Id.* 4:1-7. Mr. Koenig had performed salmon restoration work in Township 37, which contains the Old Stream sub-watershed of the Machias River, one of the best areas for salmon in the state of Maine. *Id.* 7:4-13. After Haynes Timberland, Inc. and Malcolm and Barbara French assumed ownership of the area of Township 37 once owned by Champion International Paper Company or International Paper Company, Mr. Koenig sought the Frenches out. *Id.* 7:14-8:18. He said that he had some interactions with Barbara French but that Malcolm French was usually his contact. *Id.*

Mr. Koenig explained that his work entails—among other things—dealing with landowners to rebuild culverts on salmon rivers and streams so that the salmon are better able to pass through, what he called "connectivity." *Id.* 4:17-24. Project SHARE did this type of culvert restoration work on land owned by Haynes Timberland, Inc. and/or Malcolm and Barbara French in 2006, 2007 and 2009. *Id.* 7:4-6, 10:3-23, 11:6-8, 13:24-18:8. As is common, Mr. French supplied his own crew, in his case, Cold Stream Contracting, to actually perform the culvert work. *Id.* 11:6-8. Mr. Koenig oversaw the physical construction of the culvert project. *Id.* 11:2-5. Typically, the landowner will bill Project SHARE for the culvert work, and in Mr. French's case, initially the invoices came from Cold Stream Contracting and later

17

from Haynes Timberland, Inc.  *Id.* 12:21-13:2.  Although Mr. French was not present on the culvert construction site on a regular basis, he was there on occasion.  *Id.* 12:17-20.  Some of the Township 37 roads were gated and in order to gain access to a gated road within Haynes Timberland land in Township 37, Mr. Koenig testified that he could contact either Mr. French or a forester named Scott MacPherson, or they would walk around the gate.  *Id.* 37:16-38:4.

In addition to Mr. Koenig's testimony, Mr. French testified that he had worked with Steve Koenig.  *French Trial Test.* 45:18.  Mr. French said that he had "seen what Steve Koenig was doing getting grant money."  *Id.* 48:14-15.  In fact, Mr. Koenig's activity was the inspiration for Mr. French's suggestion to Rodney Russell that he write grant proposals for purposes similar to Project SHARE and led to the creation of Old Stream Conservation.  *Id.* 48:6-25.  Mr. French freely admitted that he was involved with Mr. Koenig regarding the siting of this culvert work on Haynes Timberland land from 2005 through 2009, that Mr. French billed Mr. Koenig for the culvert work, and that the culvert work was profitable.  *Id.* 67:4-69:4.

Based on Mr. Koenig's testimony, the Court finds that Malcolm French knew Steve Koenig before Mr. Koenig testified at trial, knew that Mr. Koenig was involved with salmon restoration, had authorized him to perform salmon restoration work on culverts on Haynes Timberland land in Township 37, had visited the site of the culvert construction, had opened up the Haynes Timberland gates so that Mr. Koenig could gain access to the Haynes Timberland land, and had authorized the billing of

Project SHARE for the work done by Cold Stream Contracting or Haynes Timberland crews.

The Court concludes that at least Mr. French knew enough about Mr. Koenig to make the potential connection between Mr. Koenig and Juror Number 79 that he now asserts is grounds for a mistrial. Furthermore, as Executive Director of a recipient of government grants, some public information about Steve Koenig and Project SHARE's activities must have been available publicly or, to make the obverse point, there is no evidence in this record that substantial information about Steve Koenig was unavailable to all of the Defendants in this case, either by simply asking Mr. French, by asking Mr. Koenig, or by performing cursory background research.

## B.   Did Juror Number 79 Falsely Deny that He Knew Steve Koenig?

The transcript of the voir dire confirms that when the Magistrate Judge asked him whether he had any positive responses to any of the prior questions, Juror Number 79 said that he had none and, when she asked him to review a list of witnesses, Juror Number 79 did not say that he knew Steve Koenig. *Voir Dire Tr.* 131:16-132:3, 133:4-8.[3]   As noted earlier, the law distinguishes between an intentionally dishonest juror and an honest but mistaken one. *Sampson*, 724 F.3d at 164 n.8.   Intentional dishonesty "demonstrates bias," *id.* at 164; an honest mistake

---

[3]      Juror Number 79 took the place of Juror Number 118, who had been excused. *Voir Dire Tr.* 131:8-21.   When he did so, the Magistrate Judge asked him whether he had any positive responses to the questions previously asked. *Id.* 131:22-23.   He replied, "No, I don't." *Id.* 131:24.   The Magistrate Judge then told Juror Number 79 that Juror Number 118 had left her list of witnesses and that he could "pick that up and leaf through it." *Id.* 131:25-132:1.   She said: "If you missed a name, you might hit upon something." *Id.* 132:1-2.   Juror Number 79 did not respond further.

"will require a more flagrant showing of juror bias." *Id.* at 164 n.8. The first question the Court must answer is whether there is evidence of either in the case of Juror Number 79.

### 1.   The Court's Voir Dire

To assess whether Juror Number 79 failed to make a truthful response to the Court's questions, the Court examines exactly what was asked.  The Magistrate Judge presided over the voir dire process.  At the outset, she stressed the reason for the voir dire and the need to respond truthfully:

> Everyone in this country under our [C]onstitution is entitled to a jury trial by a fair and impartial jury of 12 individuals.  This morning's exercise is our attempt to obtain that fair and impartial jury, and that's the reason for all these questions, and that's why it's so imperative that you answer truthfully and honestly to all these questions and that we ascertain if there's any reason why you personally couldn't be a juror in the case.

*Voir Dire Tr.* 4:4-11.   After questioning the potential jurors about their prior knowledge of the case, the attorneys and the parties, she turned to the witnesses and had the Deputy Clerk pass out witness lists to the potential jurors.  *Id.* 89:15-16.  She instructed the potential jurors:

> I have very extensive lists of people who are potential witnesses in this case.  Now, you were told it was a lengthy trial.  Obviously, there are many witnesses.  Just because a name appears on this list does not mean the person will necessarily testify in this case.  They may not be here personally to testify.  They may be the subject of another witness' testimony, but involved in the case.
>
> So what I thought we would do is go over this list name by name, and I'll do it in groups of five, but I thought it'd be easier for you if you could follow along with the written - - <u>seeing the name in writing and see if anybody knows any of these people.</u>

*Id.* 89:19-90:5 (emphasis added).  The Magistrate Judge began to read the list of witnesses and after reading groups of names, she asked: "[D]oes anyone know any of those people?"  *Id.* 90:6-14.

The list of witnesses supplied to the potential jurors were not marked as exhibits.  However, comparing the order of the witnesses with the parties' witness lists, even though the Magistrate Judge did not identify the witnesses as Government witnesses, she began by reading the names on the Government's witness list. *Compare Gov't's Witness List* at 1-4, *with Voir Dire Tr.* 90:6-98:15.  Once she completed the Government's witness list, she turned to Defendant Russell's witness list, which she did not identify as being Mr. Russell's list.[4]  *Compare Russell Witness List* at 1-4, *with Voir Dire Tr.* 98:15-105:24.  Steve Koenig's name appeared on Mr. Russell's list, and the Magistrate Judge announced Mr. Koenig's name to the potential jurors. *Voir Dire Tr.* 103:23-104:2.

For many, but not all of the names on the Government's list, the Government supplied some basic information about the witnesses.  For example, if the witness was a member of law enforcement, the list noted that fact and the Magistrate Judge read it to the potential jurors: "And we'll start: Bob Carter, who's with the Maine Warden Service; Alan Curtis, who's with the Maine Warden Service . . . ." *Id.* 90:6-8. On the Government's list, if the person was affiliated with a business, the list named the business and the Magistrate Judge read this fact to the potential jurors: "Jerry

---

[4]       This supposition is confirmed by an interchange among the Magistrate Judge, Assistant United States Attorney Casey and Attorneys Steven Peterson and William Maddox, who represented Mr. Russell.  When one of the jurors asked about Paul Cook, who was on Mr. Russell's list, Mr. Casey deferred to Attorneys Peterson and Maddox. *Voir Dire Tr.* 104:3-16.

Davis with the Griffin Greenhouse Supply Company; and James Hartzell with Premiere Horticulture." *Id.* 91:10-11. For other witnesses, however, the list contained only the person's name: "Scott Lufkin; Anthony Giordano; Jay Haynes; Ginger Maxwell . . . ." *Id.* 98:11-12.

Mr. Russell's witness list contained only the potential witness's name and no further information. *Russell Witness List* at 1-4.[5] The Magistrate Judge read the following group of potential witnesses from Mr. Russell's witness list: "Kelley Boothby; Mike Russell; Eric Foster; Zach Richardson; Steve Koenig; Bruce Saunders; Alysa Roberts; Annette Lease; George Hartmann; Paul Cook; Lindon Brown; and Jennifer Robertson." *Voir Dire Tr.* 103:23-104:1. She then asked: "Anybody know any of them?" *Id.* 104:1-2. Occasionally, she would ask: does the name "ring any bell?" *See, e.g., id.* 90:18-19.

Now and again, one of the jurors would indicate that that he or she might know one of the witnesses and a colloquy between the Magistrate Judge and the potential juror would take place in open court in which the Magistrate Judge would inquire how the potential juror knew the potential witness. *See, e.g., id.* 93:12-13. Once that issue was explored, the Magistrate Judge would ask:

> Do you feel if he were a witness, that would affect your ability to be an impartial juror?

*Id.* 94:1-2.

### 2. The Defendants' Evidence that Juror Number 79 Knew Steve Koenig before Trial

---

[5] Likewise, Mr. French's witness list included the names of ten witnesses, seven of whom were only identified by name, including Mr. Koenig, and no further information. *French Witness List.*

In their motion, the Defendants assert that "there is considerable evidence to suggest that [Juror Number 79] in fact knew Steve Koenig . . ., a key witness, and that the basis for this relationship with Koenig would influence his decision in the trial." *French Mot.* at 3.

The first question is whether there is any direct evidence that Juror Number 79 knew Steve Koenig. In their motion, the Defendants assert:

> Upon information and belief from evidence only discovered after the verdict in this case, [Juror Number 79] knew Koenig and had directly communicated with Koenig in the past, despite [Juror Number 79]'s claim at jury selection that he did not know Koenig. In particular, Koenig had spoken with [Juror Number 79] <u>directly</u> in the past for the specific purpose of consulting with him about some of the <u>very projects undertaken for fisheries habitat restoration on French and Haynes Timberland's lands</u>.

*Id.* at 5 (emphasis in original). The Defendants initially cited no authority for their "information and belief" that Juror Number 79 and Mr. Koenig knew each other before jury selection and that Mr. Koenig had spoken with Juror Number 79 about the fisheries restoration projects that Mr. Koenig was undertaking in Township 37. *Id.*

### a. The Morgan Affidavit of the July 14, 2014 Telephone Conversation between Malcolm French and Steve Koenig

After the Government pointed out the lack of substantiation of the Defendants' allegations, *Gov't's Opp'n* at 9-10, in their reply, the Defendants attached an affidavit from Attorney Matthew D. Morgan, one of Mr. French's defense counsel. *French Reply* Attach. 1 *Aff. of Matthew D. Morgan, Esq.* (*Morgan Aff.*). In his affidavit, Attorney Morgan describes a conversation he had with Malcolm French after the

verdict in which Mr. French told Attorney Morgan that after the verdict, Mr. French had spoken to Mr. Koenig "about on-going land management issues on his lands."[6] *Id.* ¶ 5.  Attorney Morgan says that Mr. French told him that Mr. French asked Mr. Koenig whether Mr. Koenig knew Juror Number 79, referring to Juror Number 79 by name and without mentioning that he served as a juror.  *Id.* ¶ 6.  Attorney Morgan says that Mr. French told him that Mr. Koenig responded, "I've talked to him.  I don't remember if I've ever met him."  *Id.* ¶ 7.  Attorney Morgan further said that Mr. French told him that Mr. Koenig explained that "his talks with Juror #79 involved work that was performed on French's property."  *Id.* ¶ 8.

### b.    The Agent Richards October 8, 2014 Interview of Steve Koenig

On October 8, 2014, after the Defendants' motion but before their reply, the Government asked Special Agent Jonathan Richards to interview Mr. Koenig and Special Agent Richards did so twice over the telephone.  *Gov't's Opp'n* Attach. 2 *Investigative Report.*  According to the report, Mr. Koenig said:

(1) That he had "no clue" who any of the jurors were at the time of trial;

(2) That in 2005 or 2006, there "was contact with [Juror Number 79] regarding a piece of equipment known as [a] 'grip hoist' which is used for pulling heavy objects";

---

[6]     Attorney Morgan says that the French-Koenig conversation was recorded over the jail phone and counsel for Mr. French requested and obtained a copy of the recording from the jail.  *Morgan Aff.* ¶ 5. The Defendants, however, elected not to supply the Court with either a copy of the recording or a transcript of the recording.  That said, the Government provided the Court with a partial transcript of the French-Koenig conversation at the March 17, 2015 hearing.  *Gov't's Ex.* 8.

(3) That he could not recall if he learned about Juror Number 79 from Scott Craig, a United States Fish and Wildlife biologist, or another intermediary, but that he knew the juror's name as a biologist for the federal government;

(4) That he and Juror Number 79 had no conversations about Township 37 or Mr. French;

(5) That Project SHARE is leading the state of Maine in this type of work and that Mr. Koenig gets asked questions about the work from a lot of people;

(6) That the conversation about the use of the "grip hoist" was with Scott Craig, not Juror Number 79 directly;

(7) That Mr. Koenig did not recognize Juror Number 79 at the trial, was not sure if they had ever met, had never had coffee together, and only knew each other's names; and

(8) That Mr. Koenig was still not sure whether he and Juror Number 79 had ever met but if they had met, it would have been only in a meeting setting.

*Id.* at 1-3.

Finally, around September 2014, Juror Number 79 contacted Mr. Koenig to ask if he could use him as a resource for restoration projects, and in September and October 2014, Juror Number 79 wrote him two or three emails about a potential tour

25

of work that Project SHARE was doing and the use of "open bottom arches." *Id.* at 2-3.

### c.    Steve Koenig's March 17, 2015 Testimony

During the hearing on two post-trial motions, the Defendants called Mr. Koenig as a witness.  Mr. Koenig testified that he has been educated as an aquatic ecologist and that he was hired as Executive Director of Project SHARE in 2001.  *Tr. of Proceedings* 11:21-24 (ECF No. 498) (*Oral Argument Tr.*).  After he became Executive Director, he was in touch with Malcolm French about doing work in Township 37 and in part of Township 31 on land that either Mr. French or his company owned.  *Id.* 12:11-17.  The work involved what ecologists call "ecological road stream crossings," which ease passage for native brook trout and Atlantic salmon.  *Id.* 12:18-24.  Mr. Koenig explained that the work typically involved the removal of old culverts, which present passage issues for these fish, and replaced them with newly-designed passageways; the work also involved the removal of remnant dams, and the addition of what ecologists call "woody debris."  *Id.* 13:3-10.

As part of his work, Mr. Koenig said that he occasionally is in touch with federal employees, including those at the U.S. Fish and Wildlife Service, NOAA, and Natural Resource Conservation Service.  *Id.* 13:11-19.  Mr. Koenig confirmed that "somewhere around 2008," Project SHARE was "dealing with the remnant dam removals and the large woody debris additions," and it was "looking for a piece of equipment" to assist the work.  *Id.* 13:24-14:3.  Mr. Koenig said that through one of his contacts at U.S. Fish and Wildlife, Project SHARE learned that Acadia National

Park and the Appalachian Mountain Club had used a piece of equipment to do similar work. *Id.* 14:3-7. Accordingly, Project SHARE "made a contact" to try and identify the piece of equipment and where it could get it (i.e., a grip hoist). *Id.* 14:7-9.

Mr. Koenig was asked whether in the course of doing that, he had contacted Juror Number 79 by phone; he replied:

> I don't know when the first time that I personally made contact, so it's hard to remember what contacts were made via a U.S. Fish and Wildlife Service employee versus when I eventually made a direct contact. I actually don't know.

*Id.* 14:12-17. Mr. Koenig acknowledged that he had direct contact with Juror Number 79 "at some point." *Id.* 14:18-21. But when asked again whether he had been in touch with Juror Number 79, Mr. Koenig equivocated because he was not certain whether he had spoken with Juror Number 79 or whether his contact at U.S. Fish and Wildlife had spoken with Juror Number 79 and relayed the information about the grip hoist back to Mr. Koenig:

> And, again, it's hard - - it's hard for me to remember what I did versus what went through a particular fish and wildlife service employee.

*Id.* 14:22-15:3.

On direct examination, Mr. Koenig was asked about both his direct and his indirect contacts with Juror Number 79:

> Now, do you have any estimate as to - - prior to January of 2014 when you would have either had direct contact - - telephone or face-to-face, I guess - - or indirect contact through this other fish and wildlife service employee with Juror [Number] 79?

*Id.* 16:15-19. Responding to both direct and indirect contacts, Mr. Koenig said:

> Again, I don't know how many times the U.S. Fish and Wildlife Service person would have chatted, but it probably could have been in the range of two or three times a year kind of thing. And then eventually when they actually did a number of surveys associated with Acadia, there would have - - they would have had a lot more contact.

*Id.* 16:22-17:2. To place a date on the grip hoist contact, Mr. Koenig said that he looked up the date that Project SHARE purchased a grip hoist and found that it was April 2008 and he concluded that "sometime preceding that would have been the first contact." *Id.* 17:6-8.

On questioning by the prosecutor, Mr. Koenig said that he did not think that he had ever actually met Juror Number 79 face to face prior to trial. *Id.* 18:5-10. He said it was possible they had met each other at a meeting but he could not recall. *Id.* 18:8-10. Mr. Koenig testified that he did not think he and Juror Number 79 had ever been "formally introduced" to each other. *Id.* 18:11-14. In fact, he did not think that he and Juror Number 79 had ever had a cup of coffee together. *Id.* 18:15-21.

Mr. Koenig stated that the first time he had ever heard Juror Number 79's name was probably in 2008 when Project SHARE purchased the grip hoist. *Id.* 20:5-11. He agreed that he had been in discussions with someone from U.S. Fish and Wildlife, who knew Juror Number 79. *Id.* 20:12-16. He was asked whether he had had direct contact with Juror Number 79 as opposed to indirect contact through the U.S. Fish and Wildlife employee and he replied:

> There's one incidence that I may have that I can't recall if the communication was through the fish and wildlife service employee or it may have been me directly with him. There's one - - one incidence in trying to parse this out there could have been a direct phone call with me. . . . But I can't say for sure.

*Id.* 21:4-13.  Mr. Koenig did not recall any emails or other correspondence with Juror Number 79 about the grip hoist between 2008 and January 2014, but he could not say for sure.  *Id.* 21:14-17.  Mr. Koenig confirmed that when he testified at trial, he did not recognize anyone on the jury.  *Id.* 22:1-3.

Toward the end of his testimony, Mr. Koenig reviewed the Government's Exhibit 8, a partial transcript of his July 14, 2014 phone conversation with Mr. French, and agreed that he told Mr. French, "I've talked to [Juror Number 79], I don't remember if I've ever met him."  *Id.* 26:16-27:6.  Mr. Koenig explained that "there was a road crossing that [he] was asked by inland fish and wildlife to help manage, and there likely was a conversation with regard to that because it abutted Acadia and there were some things downstream."  *Id.* 27:10-13.

Upon further questioning by the Court, Mr. Koenig explained that in "2013ish" he "probably" talked to Juror Number 79 about "a road crossing."  *Id.* 29:17-30:5.  Mr. Koenig elaborated that "they were going to have a project, and there was a downstream - - something that's affecting the . . . site, so we probably talked probably about five or ten minutes about it.  But, again, I can't say for sure duration."  *Id.* 29:18-21.

### d.    Defense Inferences

Apart from this direct evidence of Juror Number 79's pretrial knowledge of Mr. Koenig, the Defendants rest their case on a string of inferences:

(1)    Juror Number 79 was "a federal biologist with a focus on fisheries and fish passages," *French Mot.* at 4;

(2)    Steve Koenig worked at Project SHARE in Township 37 on culverts and streambed restoration and the target species of Project SHARE's work were Atlantic salmon and Eastern Brook Trout, *id.*;

(3)    Project SHARE was "the only organization in all of New England that performed this kind of salmon restoration work with a 'Section 10' federal permit," *id.*;

(4)    Juror Number 79 had "an <u>identical</u> interest with Koenig in protecting Maine fish and restoring Maine fish habitat, particularly the Eastern Brook Trout," *id.* (emphasis in original);

(5)    Juror Number 79 is "the author of publications concerning Maine fish habitat studies, a repeatedly cited source of authority for such articles, and has been a speaker at conferences discussing these same issues," *id.* at 4-5;

(6)    Juror Number 79 has worked with Scott Craig of the United States Fish and Wildlife Service's Maine Fisheries Resource Office, *id.* at 5;

(7)    Scott Craig has worked with Steve Koenig on salmon restoration projects in Township 37, *id.*;

(8)    Scott Craig and Steve Koenig were listed as authors on reports that named Malcolm French as a cooperating landlord, *id.*;

(9)     Scott Craig and Steve Koenig appeared as part of a podcast in which Mr. French's son discussed the improvements to Township 37 from Project SHARE, *id.*; and

(10)    Juror Number 79 has also worked with the United States Fish and Wildlife Service, the Maine Department of Inland Fisheries and Wildlife, and the United States Forest Service in his efforts to restore Maine fisheries habitat. *Id.*

### 3.      The Defense Obligation to Obtain Information That Objectively Should Have Been Obtained at Voir Dire

Again, the Court asks the question that the Supreme Court posed in *McDonough*: whether "counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination." 464 U.S. at 555.

Here, trial counsel chose to present the Magistrate Judge and the potential jurors with a string of names to be read to the jury venire. The name, "Steve Koenig," unanchored by any further description, is someone who could have lived and worked anywhere. The Defendants have not claimed they did not know more about Mr. Koenig than just his name and the defense has admitted that their case would be much stronger if they had been more specific at voir dire, informing the prospective jurors where Mr. Koenig lived or, more significantly, his affiliation with Project SHARE, Salmon Habitat and River Enhancement.[7] If the Defendants had been more specific in the information provided to the jury venire, they would have at least

---

[7]     Attorney McKee conceded this point during oral argument. *See Oral Argument Tr.* 52:7-11 ("Absolutely.  More identifying information, I would definitely be in a better position").

31

complied with *McDonough*.  But they elected to run just a name by the jury venire and they now seek to blame the juror for their lack of specificity.  Furthermore, if defense counsel had any compunctions about whether Juror Number 79 knew Mr. Koenig, they could have brought this fact to the attention of the Magistrate Judge and asked her to bring Juror Number 79 to sidebar for questioning.

The Court notes that the defense failure to insist on greater specificity is more confounding because of what they knew or should have known about Juror Number 79.  If they thought that Juror Number 79 might know Mr. Koenig, it is curious that they presented so little information to him about Mr. Koenig and failed to seek further inquiry.  Under *McDonough*, the law imposes an obligation on counsel to obtain the information that objectively they should have obtained from Juror Number 79 during voir dire.  The policy behind this obligation seems apparent.  Defense counsel should not be encouraged to give potential jurors the barest of clues about prospective witnesses and then, disappointed by the verdict, be allowed to demand a new trial because the jurors did not pick up on their vague references.  The Court concludes that by running just a name by the jury in these circumstances, the Defendants failed to meet their own obligations under *McDonough*.

### 4.    Juror Number 79's Indirect Knowledge of Steve Koenig

The Court rejects the Defendants' claim of Juror Number 79's inferential knowledge of Mr. Koenig.  It requires a giant leap to conclude that by virtue of the fact that Mr. Koenig and Juror Number 79 shared some professional interests and that they both knew a man named Scott Craig, they must have known each other.

### 5.    Juror Number 79's Direct Knowledge of Steve Koenig

The evidence establishes a few clear facts about the pretrial relationship between Steve Koenig and Juror Number 79.  First, there is no proof that they had ever actually formally met.  Mr. Koenig did not recognize Juror Number 79 during the trial even though Juror Number 79 was the foreman of the jury and would have been closest within the jury to Mr. Koenig when he testified.  Indeed, Mr. Koenig said that he was not sure if they had ever met and if they had, it would have been at a meeting only.  He denied that he ever had coffee with Juror Number 79 and said that they would have only known each other's names.

### a.    Direct Contact From 2008 to 2014 About the Grip Hoist

Having had the opportunity to evaluate Mr. Koenig as a witness, the Court does not find that Mr. Koenig had any direct contact with Juror Number 79 from 2008 to 2014 about the grip hoist.  Mr. Koenig's testimony on this point was muddled by defense counsel's question, which included both direct and indirect contacts.[8]  The issue is not whether Mr. Koenig knew someone who contacted Juror Number 79 for information.  Such indirect contacts would not be grounds for imputing bias on the part of Juror Number 79.  Indeed, there is no evidence that when the U.S. Fish and Wildlife Service employee approached Juror Number 79 about the grip hoist that he

---

[8]    Attorney McKee's question was:

> Q. Now, do you have any estimate as to - - prior to January of 2014 when you would have either had direct contact - - telephone or face-to-face, I guess - - or indirect contact through this other fish and wildlife service employee with Juror 79?

*Oral Argument Tr.* 16:15-19.

ever even mentioned Mr. Koenig's name.  The Court accepts Mr. Koenig's testimony that he does not actually know whether he had any direct contact with Juror Number 79 regarding the grip hoist equipment issue and Mr. Koenig's lack of memory is insufficient evidence to require further investigation on this issue.

### b.    Direct Contact in 2013

During Mr. Koenig's March 17, 2015 testimony, however, he recalled a new incident, which took place in "2013ish" in which he had direct telephone contact with Juror Number 79.  The Court accepts Mr. Koenig's recollection that there was a town site for which he had acted as project manager and that he had spoken to Juror Number 79 about that project around 2013.  Mr. Koenig recalled that the project abutted Acadia National Park and there was something downstream that affected the Acadia National Park site.  The Court accepts Mr. Koenig's testimony that the conversation between Juror Number 79 and him lasted about five to ten minutes.  The Court finds that this was the only demonstrated direct contact between Steve Koenig and Juror Number 79 before trial.

### c.    Steve "Kane-nig" or "Co-nig"

When the defense called Steve Koenig to testify on March 17, 2015, in accordance with standard procedure as he took the witness stand, he stated his name and spelled his last name for the record.  *Oral Argument Tr.* 9:21-23.  Notably, Mr. Koenig pronounced his last name "Kane-nig," a variant of a more common pronunciation, "Co-nig."  Hearing Mr. Koenig's pronunciation, the Court inquired of

counsel whether they recalled how the Magistrate Judge read his name off the witness list—"Kane-nig" or "Co-nig." None could recall. *Id.* 48:2-7, 79:18-23.

Following the hearing, the Court conducted its own research and asked the court reporter whether the audio recording for the voir dire exists, and after the court reporter confirmed that it did, the Court listened to the audio recording of this portion of the voir dire. The Court distinctively heard the Magistrate Judge read the name "Koenig" as "Co-nig," not "Kane-nig." *Order on Audio of Voir Dire* at 1 (ECF No. 490). The Court issued an order and gave the parties seven days to listen to the audio recording and to object to the Court's conclusion. *Id.* The Court informed counsel that otherwise, the Court would consider the Magistrate Judge's pronunciation of Steve Koenig's name during voir dire in this Order. *Id.* None objected.

Having listened to the audio recording of the voir dire, the Court finds that the Magistrate Judge pronounced Steve Koenig's name as "Co-nig," not "Kane-nig," during jury voir dire. During voir dire, Juror Number 79 would have read the name on the witness list, Steve Koenig, and would have heard the Magistrate Judge pronounce the last name as "Co-nig."

The Court views this as additional evidence that Juror Number 79's failure to disclose his knowledge of Mr. Koenig was neither an honest mistake nor a dishonest response. *See* Section IV.B.6, *infra*. Mr. Koenig said that he had never to his knowledge met Juror Number 79 and may have spoken to him once on the telephone in 2013. As Mr. Koenig uses a variant pronunciation of his last name, the Court finds when Juror Number 79 spoke to Mr. Koenig in 2013, Juror Number 79 would have

known his last name as "Kane-nig." Thus, when Juror Number 79 read "Koenig" and heard "Co-nig," he would have had less reason to connect that name with a Steve "Kane-nig" with whom he had spoken once on the telephone.

### 6.     Honest Mistake, Dishonest Response or Neither

In the facts presented by the parties, the Court easily concludes that there is no convincing evidence that Juror Number 79 deliberately lied or even made an honest mistake about knowing Steve Koenig. The Court has found that there is no probative evidence that Mr. Koenig spoke directly to Juror Number 79 regarding the grip hoist. The Court has found that Juror Number 79 spoke once on the telephone to Mr. Koenig around 2013 when Mr. Koenig contacted him to discuss a project on property that abutted Acadia National Park and that this conversation lasted about five to ten minutes. The Court has found that there is no evidence that Mr. Koenig and Juror Number 79 had ever met, had ever been introduced to each other, or would have recognized each other. Especially given the difference in pronunciation of Mr. Koenig's last name, there is simply no evidence that when asked at voir dire, Juror Number 79 made the connection between the naked name, Steve Koenig, and a man with whom he had spoken once around 2013 for five to ten minutes.

Even if Juror Number 79 somehow recognized the name, Steve Koenig, that does not mean that Juror Number 79 was required to give an affirmative response. The Magistrate Judge asked the jury venire whether they knew the potential witnesses, not whether they knew of them.

What Juror Number 79 knew by the time he was seated in the forty-person box is that the Magistrate Judge was interested in whether the jurors' knowledge of a potential witness was casual or as a "close personal friend." *Voir Dire Tr.* 98:22-23. She had repeatedly asked whether the potential juror's knowledge would affect the juror's ability to be an impartial juror. *See, e.g.*, *id.* 99:8-9. Juror Number 79 had heard the Magistrate Judge describe the standard by which she was evaluating the potential for bias on the part of the jurors. If he thought that Steve Koenig was the same Steve Koenig that he had talked to on one occasion (and this is a supposition), Juror Number 79 may well and properly have concluded that his one contact was so casual that he did not "know" Mr. Koenig, a man he had never actually met, within a reasonable interpretation of the Magistrate Judge's inquiry.[9] On its face, this situation is distinct from cases where potential jurors supply deliberately false answers on the assumption that they know better than the law whether they are biased.

---

[9] These same points apply to Attorney Sharon's contention during his March 17, 2015 argument: that even if Juror Number 79 had not recognized Mr. Koenig's name during voir dire, he must have recognized it when Mr. Koenig actually took the stand and testified. If so, Attorney Sharon asserted that Juror Number 79 was obligated during trial to bring this information to the Court's and parties' attention, and that the Court should question Juror Number 79 to clarify the state of his knowledge during trial. *Oral Argument Tr.* 82:11-83:8.

First, whether Juror Number 79 recognized Mr. Koenig as the same person with whom he had spoken for five to ten minutes in 2013 is speculative, and the Court is not confident that questioning Juror Number 79 about what he remembers regarding what he knew during trial in January 2014 will clarify, not confuse the issue. Second, even if Juror Number 79 had realized that Mr. Koenig was the same person with whom he had had a short telephone conversation, Juror Number 79 could well have concluded that this conversation did not make Mr. Koenig a close personal friend and, in any event, would not have affected Juror Number 79's ability to be fair and impartial. Finally, if Juror Number 79 had brought this short telephone conversation to the Court's attention during trial, it would not have been a viable basis for excusing Juror Number 79 for cause.

Nor should the Court ignore the context of jury selection. Having completed juror questionnaires under penalty of perjury, having been screened by security, having entered an impressive federal courtroom, having been sworn to tell the truth in a court of law, having been presented with instructions about the imperative to tell the truth so that the parties receive a fair and impartial trial, in the presence of a federal judge, two federal prosecutors, and in this case, five defense lawyers, the potential jurors, including Juror Number 79, must have known that this was very serious business. As the Second Circuit observed,

> Knowingly lying during the *voir dire* violated, *inter alia*, 18 U.S.C. § 1621, and subjected the juror to possible criminal contempt pursuant to 18 U.S.C. § 401, as well as to possible substantial restitution claims by the government. *Cf. United States v. Hand*, 863 F.2d 1100 (3d Cir. 1988). It exhibited a personal interest in this particular case that was so powerful as to cause the juror to commit a serious crime.

*Colombo*, 869 F.2d at 151. This does not mean that potential jurors will never willfully lie or make honest mistakes in responding to voir dire inquiries.[10] But the incentive for potential jurors to be scrupulously honest is apparent.

In short, the Court does not find that the facts in this case establish that Juror Number 79 "failed to answer honestly a material voir dire question." *Sampson*, 724 F.3d at 164-65.

## C.     Valid Basis for Challenging for Cause

---

[10]      The *Colombo* case is an example. In *Colombo*, a potential juror lied about whether her brother-in-law was a government lawyer and admitted to another juror that she did not mention this fact during voir dire because she wanted to sit on the case. 869 F.2d at 150. The juror explained her motivation by saying that she lived near one of the places where criminals had gathered to discuss their robbery plans. *Id.*

The First Circuit also "requires a finding that a truthful response to the voir dire question 'would have provided a valid basis for a challenge for cause.'" *Id.* at 165 (quoting *McDonough*, 464 U.S. at 556). Here, the Court turns to the curious circumstance under which Mr. Koenig was called to testify at trial and the substance of his testimony.

### 1.   A Defense Witness Called by the Prosecution

As the Court has noted, Mr. Koenig's name did not appear on the Government's witness list, but on Defendant Russell's and Defendant French's lists. Yet, the Government called him as a witness during its case in chief. The parties have not explained how this came to happen. However, from the Court's perspective, Mr. Koenig's credibility was never attacked by any of the lawyers, both prosecution and defense, and his testimony was at least as helpful, if not more so, to the defense as to the prosecution.

### 2.   A Needle in the Haystack

To place Mr. Koenig's testimony in context, the Government presented an overwhelming case that someone was growing marijuana in the middle of Township 37. The evidence of a significant grow operation was so irrefutable that none of the defense lawyers attempted to disprove its existence. *See Oral Argument Tr.* 55:23-56:4 ("THE COURT: My thought about the defense in this case was as follows: No one on the defense side, to my knowledge, ever denied that there was a significant marijuana grow operation in the middle of Township 37. MR. MCKEE: That's correct, Your Honor"). Instead, the defense challenged the Government to prove that

their respective clients knew about or were involved in the grow operation. Attorney McKee's opening statement eloquently and succinctly captured the essence of the defense. He told the jury that his client owned about 80,000 acres of land and that the marijuana grow operation consisted of perhaps ten acres. *Partial Tr. of Proceedings* 2:13-17 (ECF No. 481). In his memorable words, simply because his client owned the haystack did not mean he was responsible for the needle. *Id.* 2:18-21, 11:12-19.

One of the key points the defense attorneys made repeatedly and effectively is that if the Defendants had operated a ten-acre marijuana grow operation in Township 37, they would have fenced it off, kept it hidden, and not allowed strangers to wander about the property. Thus, for example, Mr. French called as a witness a man named Francis Janusz, who ran a bear hunting operation, and who was given express permission by Mr. French to go anywhere on Township 37 without restriction. *Partial Tr. of Proceedings* 4:15-22, 6:21-24, 9:20-25, 10:6-11:7 (ECF No. 480). In short, the Defendants contended that if they had been doing something illegal on Mr. French's private land, they would have tried to keep it a secret.

### 3. Steve Koenig's Testimony and the Needle in the Haystack Defense

Although called by the Government, Mr. Koenig provided significant support for the "needle in the haystack" defense and for the defense in general. First, Mr. Koenig had no apparent bias as a witness. *See Oral Argument Tr.* 59:6-12 ("THE COURT: And unlike Mr. McTague, there was never an issue about [Mr. Koenig's] credibility. MR. MCKEE: Correct, nor - - correct, nor was there today, I think, in

terms of him providing information to the court.  Nobody's attacking him as being on one side or the other.  He's come before us and provided the information that he had").  As Executive Director of Project SHARE, Mr. Koenig presented his testimony in an even-handed and factual way.  None of the attorneys attempted to discredit him.

Second, he was clearly appreciative of Mr. French as the new owner of Township 37 for his willingness to allow Project SHARE on Haynes Timberland property.  In fact, he testified that "it's a privilege for me to be able to work on private land."  *Koenig Trial Test.* 8:19-23.

Third, Mr. Koenig confirmed that Mr. French had given Project SHARE permission to enter onto Township 37 and to oversee significant construction projects involving the use of heavy excavating equipment over the course of a number of years, including much of the time that the Government alleged that the Defendants were involved in growing marijuana in Township 37.  *Id.* 8:19-16:5.

It is true that not all of Mr. Koenig's testimony was favorable to the Defendants; Mr. Koenig linked Cold Stream Contracting to Mr. French and the Government had argued that Cold Stream Contracting was the entity that had made purchases of materials consistent with a marijuana grow.  *Id.* 16:13-24.  But this testimony was grounded in documents and never contested.  Mr. Koenig also said that Project SHARE never ordered such items as Promix, Rabbit Gard, and camouflage clothing and tarps, *id.* 29:4-30:21, which the Government elsewhere contended Mr. French or Mr. Russell had ordered and were consistent with a marijuana grow operation.

But on cross-examination by Attorney McKee, Mr. Koenig admitted that Mr. French had never told him that there were areas that he could not go, that whenever he had needed access through a gate, Mr. French had allowed him through, and that in 2008 and 2009, he had been "around and about" Township 37 to oversee the placements of stream culverts. *Id.* 39:7-42:20. On further cross-examination by Attorney Maddox on behalf of Rodney Russell, Mr. Koenig expanded upon the significant scope of the culvert projects, generating noise, the presence of high school and college interns, and extensive permitting by multiple state and federal agencies. *Id.* 43:1-54:2. Attorney Silverstein asked no questions on behalf of Mr. Chase. *Id.* 54:4-5. Attorney Marjerison brought out on behalf of Haynes Timberland, Inc. that Mr. Koenig had given tours of the culvert projects and invited federal agencies and congressional staffers to the sites. *Id.* 54:23-55:5. Mr. Koenig also confirmed that what is known as the Stud Mill Road, a major dirt road, runs through Township 37 and it is used by commercial logging trucks, hunters, fishermen, and other recreational users. *Id.* 56:22-57:9.

### 4.    Summary:  Steve Koenig Testimony

It is difficult to understand the Defendants' claim that Mr. Koenig was a "key witness," at least for the Government.[11]  *French Mot.* at 3. Mr. Koenig had no personal knowledge directly relevant to the existence of a marijuana conspiracy. His testimony about Project SHARE's culvert operations was factual, straightforward,

---

[11]    The example the Court posed during oral argument on March 17, 2015 was a records custodian or an authenticating witness. *Oral Argument Tr.* 60:11-14. If it turned out that a juror failed to reveal knowing a non-controversial witness, whose sole function at trial was to authenticate documents, it is doubtful that a court would conclude that the failure to disclose would justify a new trial.

and unchallenged.   From the Court's perspective, to the extent Mr. Koenig's testimony assisted either side of the case, it dovetailed with the defense theory about the needle in the haystack and the improbability of a major marijuana grower allowing an independent third party and his invitees unrestricted access to land around the grow site.   Furthermore, Mr. Koenig painted Mr. French and Haynes Timberland, Inc. as good individual and corporate citizens who allowed a conservation organization access to their private land for salmon restoration purposes.

The First Circuit has been careful to note that even if a defendant could show that a juror had not answered all questions truthfully at voir dire, this does not necessarily constitute reversible error.  *United States v. Huguenin*, No. 90-1795, 1991 U.S. App. LEXIS 32842, at *9 (1st Cir. Dec. 4, 1991).  The *Huguenin* Court quoted *McDonough*:

> [A] party must . . . show that a correct response would have provided a valid basis for a challenge for cause.  The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Id.* (quoting *McDonough*, 464 U.S. at 556).  Here, even assuming arguendo that Juror Number 79 should have mentioned that he had spoken with Mr. Koenig, given the non-controversial nature of his testimony and the absence of any controversy about whether he was being honest and forthright, the Court does not conclude that Juror Number 79's prior knowledge of Mr. Koenig would have affected Juror Number 79's impartiality so as to affect the fairness of this trial.

### 5.   Possible Defense Strategy

In their motion, the Defendants declare that the proclaimed identity of relationship between Mr. Koenig and Juror Number 79 was that they both cared about stream restoration and that Juror Number 79 would have been inclined to convict the Defendants in order to allow the Government to forfeit Mr. French's Township 37 holdings and preserve salmon and brook trout habitat. *French Mot.* at 5-6. As the Court has elsewhere noted, it views this contention with skepticism.

It is just as logical (or illogical) to infer that the defense was pleased that Juror Number 79 was on the jury because he would hear testimony from Mr. Koenig that was very favorable to Mr. French, including his willingness to cooperate with Project SHARE's efforts to preserve fish habitat. The defense is not required to reveal their trial strategy, even now, and during oral argument on March 17, 2015, Attorney McKee denied that it was a conscious defense strategy to slip Juror Number 79 into the jury in the hope that he would be favorably disposed to Mr. French. *Oral Argument Tr.* 66:11-12 ("I simply did not entertain that issue at all"). But if Attorney McKee did not even entertain the notion at trial that Juror Number 79 might be favorably disposed to Mr. French and Haynes Timberland, Inc. because of their cooperation with salmon restoration efforts, there is no reason to entertain his belated contention that Juror Number 79 would have been unfavorably disposed to Mr. French and Haynes Timberland, Inc. because of an elusive theory of land forfeiture.

44

Based on this record, if Juror Number 79 consciously failed to disclose his knowledge of Mr. Koenig, there is no telling what his motive for doing so might have been.

### 6.    For Cause Challenge

This brings the Court to the penultimate question: whether, if Juror Number 79 had said that he knew Mr. Koenig, it would have justified a challenge for cause.[12] In *Sampson*, the First Circuit discussed the standard by which a trial court should evaluate a challenge for cause:

> [W]hether a reasonable judge, armed with the information that the dishonest juror failed to disclose and the reason behind the juror's dishonesty, would conclude under the totality of the circumstances that the juror lacked the capacity and the will to decide the case based on the evidence (and that, therefore, a valid basis for excusal for cause existed).

724 F.3d at 165-66.  As previously discussed, the First Circuit has been careful to note that even if a defendant could show that a juror had not answered all questions truthfully at voir dire, this does not necessarily constitute reversible error. *Huguenin*, 1991 U.S. App. LEXIS 32842, at *9.

In *Sampson*, the First Circuit listed a number of factors that may be relevant in determining whether a juror "has both the capacity and the will to decide the case solely on the evidence."  724 F.3d at 166.  Those factors include (1) "the juror's interpersonal relationships"; (2) "the juror's ability to separate her emotions from her

---

[12]    The Court reaches this issue despite the fact that it has found that the Defendants have not demonstrated that Juror Number 79 was either deliberately dishonest or honestly mistaken in his failure to respond.  The Court is assuming arguendo in its "for cause" analysis that Juror Number 79 should have revealed that he "knew" Steve Koenig and made an honest mistake in failing to respond.  The Court is unconvinced that Juror Number 79 deliberately concealed his knowledge of Mr. Koenig.

duties"; (3) "the similarity between the juror's experiences and important facts presented at trial"; (4) "the scope and severity of the juror's dishonesty"; and (5) "the juror's motive for lying." *Id.*

In *Sampson*, the First Circuit helpfully cited cases containing examples of each factor.   For "the juror's interpersonal relationships," the *Sampson* Court cited *Colombo*, 869 F.2d at 151-52, and *United States v. Scott*, 854 F.2d 697, 698-700 (5th Cir. 1988).   In *Colombo*, a potential juror deliberately refused to reveal that her brother-in-law was a government lawyer and admitted to a fellow juror that she had done so in order to be seated on a jury involving those who allegedly plotted their crimes at a business near her residence.  869 F.2d at 151-52.  In *Scott*, a potential juror failed to disclose that his brother was a deputy sheriff in the office that performed some of the investigation of the case being tried.  854 F.2d at 698.  Here, in the circumstances of this case, Juror Number 79's failure to reveal that he knew Steve Koenig does not approach the facts in *Colombo* or *Scott*.

The second factor is when a juror finds it difficult to separate emotions from a duty to be objective.  The First Circuit cited two cases.  *See Dennis v. Mitchell*, 354 F.3d 511, 518-19 (6th Cir. 2003); *Burton v. Johnson*, 948 F.2d 1150, 1158-59 (10th Cir. 1991).  In *Dennis*, a death penalty case for murder occurring during a robbery, the Sixth Circuit affirmed the denial of a petition for writ of habeas corpus even though a female juror failed to disclose that contemporaneous with jury selection, she was soon to sign a criminal complaint as the victim in a case involving gross sexual imposition.  354 F.3d at 518-19.  In *Burton*, the Tenth Circuit affirmed the granting

of a new trial where the defendant had been charged with shooting and killing her husband and the defense was the "battered woman's syndrome."  948 F.2d at 1151. The juror failed to reveal that she and her children had been and at the time of the trial were still victims of abuse.  *Id.* at 1154.  There is no evidence and no argument that Juror Number 79 fits into this category.

The third factor is the similarity between the juror's experiences and important facts presented at trial.  In *Sampson*, the First Circuit cited two cases as examples. In one, *United States v. Torres*, 128 F.3d 38 (2d Cir. 1997), the defendants were on trial for money laundering and structuring deposits to avoid the $10,000 reporting requirements and the potential juror admitted that she had engaged in structuring deposits to avoid the $10,000 reporting requirement.  *Id.* at 41-42.  The First Circuit also cited *Burton* on this point as well.  By contrast, the similarity between Juror Number 79 and Steven Koenig—fish restoration—was unrelated to the central issue in this case—a marijuana grow conspiracy.

The fourth factor is the scope and severity of the juror's dishonesty.  Again, the First Circuit cited two cases.  In the first, *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998), a death penalty case involving hostage-taking and murder, a juror denied that any of her relatives or close friends had ever been the victim of any crime, and denied that any of her relatives or close friends had ever been accused of crimes other than traffic offenses.  *Id.* at 972.  In fact, her brother had been pistol-whipped and shot in the back of the head, and it turned out that the juror and her siblings had been kidnapped by her father when she was a child, that she had been attacked at

knifepoint by her cousin, that she was the victim of countless burglaries, that her husband had been arrested on rape charges just a month before trial, and numerous other members of her family had been in serious trouble with the law. *Id.* at 975, 979-81 (describing her first denial as "just the tip of Pinocchio's nose"). The second case, *Scott*, is the case where the potential juror failed to reveal his brother's employment with a law enforcement agency investigating the case. 854 F.2d at 697-98. Here, Juror Number 79's failure to reveal his contact with Steve Koenig is far less significant and troubling than the juror denials in *Dyer* and *Scott*.

The final factor is the juror's motivation for lying. The First Circuit cited *McDonough*, and *Skaggs v. Otis Elevator Co.*, 164 F.3d 511 (10th Cir. 1998). In *McDonough*, the Supreme Court addressed a "mistaken, though honest response to a question." 464 U.S. at 555. In *Skaggs*, a civil action, a voir dire question should have elicited the potential juror's history of lawsuits, but the juror failed to mention them. 164 F.3d at 514. The Tenth Circuit observed that the evidence failed to establish that the juror's non-disclosure was motivated by a desire to obtain a seat on the jury and that he may have been motivated by personal embarrassment about his personal financial difficulties and subsequent litigation. *Id.* at 518.

Here, the Defendants spin a tale about why Juror Number 79 might have failed to admit that he knew Mr. Koenig. *French Mot.* at 5-6. They claim that Juror Number 79 "for literally years, has crusaded for the cause of improving fish habitat and passageways in the state of Maine," that Mr. French had "made it known as part of his testimony that he felt certain groups were 'hostile environmental groups' in their

approach to fisheries problems in Maine," and that the forfeiture allegations in the

Superseding Indictment "made it clear that the Government was seeking to force

French and Haynes Timberland to forfeit large tracts of land." *Id*. The Defendants

assert:

> From [Juror Number 79]'s perspective as a juror and advocate of Maine
> fisheries habitat protection, a verdict of guilty was a victory for Maine
> fisheries habitat because there was ample reason to suspect that
> forfeited lands would be taken from French's hands and placed into the
> trusted hands of the same federal and/or state government entities that
> he had collaborated with closely in the past. There can be no question
> that such an ulterior motive would have colored [Juror Number 79]'s
> views as a juror and would have been sufficient grounds for a challenge
> for cause at jury selection.

*Id*. at 6.

The Court views with utter skepticism the Defendants' arguments about Juror

Number 79's motivations as unsupported and rank speculation at best. First, there

is no evidence at all that Juror Number 79 was engaged in any type of "crusade" as

the Defendants allege. Second, the Defendants quote the trial testimony of Mr.

French about "hostile environmental groups," but obviously, Mr. French had not

given that testimony at the time of jury selection and there is no reason to believe

that Juror Number 79 knew anything about Mr. French or his attitudes toward

environmental groups when he answered the voir dire questions.[13] Third, although

the Defendants assert that Juror Number 79 was motivated by the prospect of a land

forfeiture to the state or federal government, the truth is that the Magistrate Judge

---

[13]    Among the questions Juror Number 79 denied was any knowledge of Malcolm French, Haynes
Timberland, Inc. and the other Defendants and the Defendants have presented no evidence that this
was untrue. *See Voir Dire Tr.* 9:8-14, 76:12-14, 131:16-24.

did not mention the forfeiture issue to the jury during voir dire.  *Voir Dire Tr.* 8:15-10:9.  On this record, Juror Number 79 would not have known anything about the forfeiture issue when he responded to the voir dire questions.[14]

The Defendants have presented no good reason as to why Juror Number 79 would have hidden his knowledge of Steve Koenig.  Their arguments about his motivations are simply manufactured out of thin air.

Based on the First Circuit's teaching in *Sampson*, there is no basis to conclude that if the Magistrate Judge had been presented with the fact that (1) Juror Number 79 had spoken with Steve Koenig one time in approximately 2013 for five to ten minutes, (2) they had spoken about a project that abutted Acadia National Park, (3) they were both generally involved in fisheries restoration, (4) they had never met, (5) they would not recognize each other, (6) Mr. Koenig was listed as a defense witness but might be called as a prosecution witness, and (7) nothing Mr. Koenig was likely to say was going to be controversial, a reasonable trial judge would have sustained a challenge for cause because there would have been no valid basis to "conclude under the totality of the circumstances that the juror lacked the capacity and the will to decide the case based on the evidence (and that, therefore, a valid basis for excusal for cause existed)."  *Sampson*, 724 F.3d at 165-66.

## D.     The Right to a Hearing

### 1.      General Legal Principles

---

[14]     The seated jurors did not learn about the forfeiture issue until after the guilty verdicts.

This brings the Court to the last issue, which in the Court's view is the most difficult: whether in the circumstances of this case the Defendants have a right to a hearing in which Juror Number 79 is questioned. In their motion, the Defendants demand an evidentiary hearing. *French Mot.* at 7. They maintain that they have presented a "non-frivolous" claim justifying a hearing. *French Reply* at 1. In their reply, the Defendants expand on this request and say that they would like the Court to "conduct an evidentiary hearing and interview Juror #79 and Steve Koenig." *Id.* at 3. As Mr. Koenig testified at the March 17, 2015 hearing, this part of the Defendants' request has been satisfied. Nevertheless, the Defendants would still like the Court to require that Juror Number 79 subject himself to questioning about the nature of his prior relationship with Mr. Koenig and to answer why he did not respond affirmatively that he knew Mr. Koenig.

The Government acknowledges that the threshold for holding such a hearing is "not particularly high." *Gov't's Opp'n* at 5. Yet, the Government points to a "'presumption of jury impartiality,'" *id.* (quoting *United States v. Barshov*, 733 F.2d 842, 851 (11th Cir. 1984)), and the concern that the Court not "'intru[de] into the sphere of jury privacy.'" *Id.* (quoting *Neron v. Tierney*, 841 F.2d 1197, 1205 (1st Cir. 1988)). It also cites caselaw that suggests a trial court is not required to hold such a hearing unless the defendant has made a "'colorable showing of extrinsic evidence that the court must investigate the asserted [jury] impropriety.'" *Id.* (quoting *United States v. Davis*, 15 F.3d 1393, 1412 (7th Cir. 1994)).

There is language in some cases that suggests a trial court must hold an evidentiary hearing whenever there is an allegation of juror impropriety.  In *Smith v. Phillips*, 455 U.S. 209 (1982), for example, the Supreme Court wrote that "[t]his Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."  *Id.* at 215.  The *Smith* Court went on to say:

> Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.  Such determinations may properly be made at a hearing like that ordered in *Remmer* [*v. United States*, 347 U.S. 227 (1954)] and held in this case.

*Id.* at 217.  Indeed, in *Smith*, the Supreme Court wrote that "[p]reservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury."  *Id.* at 216 (internal citations and quotation marks omitted).  Two years later, in *McDonough*, Justice Blackmun, joined by Justices Stevens and O'Connor in concurrence, stressed that the right to a hearing must rest in the discretion of the trial judge:

> [I]t remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred.

464 U.S. at 556-57.

The First Circuit has instructed that if a "nonfrivolous suggestion is made that a jury may be biased or tainted by some incident, the district court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so,

whether it was prejudicial." *United States v. Gaston-Brito*, 64 F.3d 11, 12 (1st Cir. 1995) (internal citations and quotation marks omitted). The First Circuit has emphasized, however, that the trial court "has 'discretion to determine the extent and type of investigation requisite to a ruling on the motion [for mistrial].'" *Id.* (quoting *United States v. Doe*, 513 F.2d 709, 712 (1st Cir. 1975)).

### 2.    A Fair Hearing

The Court has a number of concerns about the fairness of hauling Juror Number 79 into court and demanding that he testify to what he was thinking during jury voir dire over one year ago. First, if the name Steve Koenig was unfamiliar to Juror Number 79 on January 8, 2014, when the jury was selected, it is not now. Mr. Koenig testified at the trial and, through his testimony, Juror Number 79 learned specifics about Mr. Koenig's background, his role in Project SHARE, and his work in Township 37, and this information would be difficult for Juror Number 79 to erase from his memory. In addition, Mr. Koenig confirmed that Juror Number 79 has been in touch with him since the verdict to use him as a consultant for fisheries work. *See Investigative Report* at 2-3. Juror Number 79 would be asked to do what many people find difficult: look back in time and separate out what they knew then from what they know now.

Second, although the parties have been intensely involved in the circumstances surrounding the January 8, 2014 voir dire, there is no indication that Juror Number 79 has given jury selection a moment's thought since then. The Court is deeply concerned about the fairness of bringing Juror Number 79 into court, confronting him

with the Magistrate Judge's list of witnesses, pointing out that Steve Koenig was on the list, and demanding that he explain whether and how he knew Mr. Koenig before jury selection and why he failed to reveal his knowledge.

Third, it is very difficult well over a year after the jury voir dire to recreate what exactly happened at the voir dire. To be fair to Juror Number 79, at the very least, it would be important for him to know exactly what the Magistrate Judge told the jury venire and allow him to recapture what he might have thought when he heard and read Mr. Koenig's name in light of the judge's instructions.

Fourth, many individuals would find the contemplated hearing nerve-racking in the extreme. Having sat on a three-week trial, having acted as foreman of the jury, having deliberated with other members of the jury, and having issued a verdict finding the Defendants guilty of numerous serious federal crimes, the foreman would find himself back in the same court over a year later, presided over by the same judge, looking at the same federal prosecutors, the same five defense lawyers, and the same Defendants. There is no telling how Juror Number 79 would respond to the prospect of such an inquisition, but many people would find the experience daunting and confusing. He might, for example, be concerned enough to demand the right to counsel or invoke his Fifth Amendment right to remain silent, especially given there is the theoretical possibility of criminal liability attached to this issue.[15] *Colombo*,

---

[15]     Although the Court rejected the Defendants' unsupported theory that Juror Number 79 had an "ulterior motive" to fail to reveal his prior relationship with Mr. Koenig, this part of the defense argument is premised on the accusation that Juror Number 79 deliberately misled the Court during voir dire. *French Mot.* at 5-6 ("There is a significant reason why [Juror Number 79] would not have wanted to reveal a relationship to Koenig: it would have demonstrated that [Juror Number 79] had a personal interest in the outcome of the trial in this case").

869 F.2d at 151 ("Knowingly lying during the *voir dire* . . . subjected the juror to possible criminal contempt pursuant to 18 U.S.C. § 401").

Fifth, even looking at the Defendants' motion in a most genial way, they have not alleged a "smoking gun" lie by Juror Number 79 and they have filed it late. This case is not like most others that the Court has reviewed. The Ninth Circuit in *Dyer* addressed juror lies so egregious and obvious that the appeals court described her as Pinocchio. 151 F.3d at 979-81. Here, the Defendants' allegations against Juror Number 79 are much more ambiguous and speculative. Furthermore, most issues of juror misconduct are brought to the Court's attention during voir dire, during trial, or immediately thereafter.[16] Here, the Defendants did not file their motion for new trial until October 3, 2014, nearly nine months after jury selection.

Finally, the Supreme Court held last year that Rule 606 of the Federal Rules of Evidence prohibits a court from receiving evidence about what was said during jury deliberations. *Warger v. Shauers*, 135 S. Ct. 521 (2014) (interpreting FED. R. EVID. 606(b)). Accordingly, any inquiry of Juror Number 79 would be circumscribed. *United States v. Powell*, 469 U.S. 57, 67 (1984) ("Courts have always resisted inquiring into a jury's thought processes").

### 3.    Resolution

For the reasons just reviewed, the Court will not schedule an evidentiary hearing at which Juror Number 79 is called to testify. The situation was different

---

[16]     In *United States v. Meader*, 118 F.3d 876 (1st Cir. 1997), for example, where the trial judge brought the juror in for questioning, the jury handed down the verdict on March 27, 1996 and defense counsel alerted the court to a possible issue of juror bias on April 19, 1996. *Id.* at 878.

regarding Mr. Koenig.  At least Mr. Koenig was aware of the issue and presumably gave the matter some thought before his testimony during the March 17, 2015 hearing, both from his conversations with defense counsel and with the Government investigator, so that none of this would come as a surprise to him.  By contrast, there are obvious drawbacks to an evidentiary hearing in which Juror Number 79 is questioned.

One important policy consideration is the impact of post-verdict juror questioning, not only on this juror, but also on jurors as a whole.  It is for good reason that the First Circuit has cautioned against direct contact with jurors after a verdict. *Meader*, 118 F.3d at 878 (describing "First Circuit authority strongly disfavoring direct contact with jurors"); *United States v. Kepreos*, 759 F.2d 961, 967 (1st Cir. 1985).  "The restrictions on post-verdict contact and the limitations on juror testimony about deliberations, Federal Rule of Evidence 606(b), exist to protect important interests in the finality of the verdict and the privacy of the deliberations." *United States v. Walsh*, 75 F.3d 1, 8 (1st Cir. 1996).  The First Circuit has limited such post-trial juror contacts to "'extraordinary situations.'" *Dall v. Coffin*, 970 F.2d 964, 972 (1st Cir. 1992) (quoting *Kepreos*, 759 F.2d at 967); *see also United States v. Swan*, No. 1:12-cr-00027-JAW-02, 2013 U.S. Dist. LEXIS 110915 (D. Me. Aug. 7, 2013) (declining co-defendant's request to interview jurors who participated in trial resulting in guilty verdict of co-defendant).  If the rule were otherwise, disappointed litigants, especially criminal defendants facing the life-changing consequences of an

adverse verdict, would routinely seek to challenge not only the soundness of the verdict itself, but also the integrity of the jurors who issued it.

Although the Court could require Juror Number 79 to appear before the Court, *see Meader*, 118 F.3d at 878, it also has the discretion not to bring in Juror Number 79. *See United States v. Boylan*, 898 F.2d 230, 258 (1st Cir. 1990) ("The trial judge may, but need not, convene a fullblown evidentiary hearing"). For example, in the First Circuit case of *Neron*, the defendant claimed that his "son had dated a woman who later became a juror." 841 F.2d at 1203. The First Circuit found that the trial court's refusal to recall the juror was sound, as the defendant "was obliged to make a more cogent showing before it became constitutionally imperative to recall the juror . . . [and] embodied evidence so sparse, a pyramiding of inferences so fragile, a thesis so speculative, as to envelop the bias/misconduct charge in a miasma of doubt." *Id.* This case is no different.

Moreover, as a consequence of Mr. Koenig's testimony on March 17, 2015, the Court narrowed the factual question of his pre-trial direct contacts with Juror Number 79. First, the Court determined that Mr. Koenig did not speak directly to Juror Number 79 before 2013 and that he spoke to him only once in 2013 for five to ten minutes. Second, although the Defendants charged that Mr. Koenig and Juror Number 79 actually discussed the Township 37 project itself, the Court found that there is no evidence of any discussion between Mr. Koenig and Juror Number 79 about the project in Township 37. Third, the First Circuit instructs this Court to conduct an "adequate inquiry" concerning the Defendants' allegations, *Gaston-Brito*,

64 F.3d at 12, and this Court has concluded that the investigative report and the March 17, 2015 hearing were sufficient to allow the proper resolution of this motion. Having heard and evaluated Mr. Koenig's testimony, as well as the additional evidence presented by the parties, the Court concludes that it has "fashion[ed] a responsible procedure for ascertaining whether misconduct actually occurred and if so, whether it was prejudicial." *Boylan*, 898 F.2d at 258. The Court need not bring in Juror Number 79.

### E.   Summary

In *McDonough*, then Justice Rehnquist wrote:

> To invalidate the result of a 3-week trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give. A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination.

464 U.S. at 555. To invalidate the result of the Defendants' nearly three-week trial where they have failed to demonstrate that Juror Number 79 was mistaken at all, much less dishonestly so, is "to insist on something closer to perfection than our judicial system can be expected to give." *Id.*

## V.   CONCLUSION

The Court DENIES Defendants' Motion for New Trial (F.R. Crim. P. 33(a)) (ECF No. 440).[17]

---

[17]   At Mr. French's motion, the Court sealed his motion for new trial and upon motion of the other parties, their subsequent filings. *See Mot. to File Def.'s Mot. for New Trial Under Seal* (ECF No. 439); *Order* (ECF No. 443). The parties have suggested redacted versions of their filings, but the Court

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of April, 2015

---

intends to issue an order, directing the parties to make certain changes in those filings.  Once the Court has issued the redaction order and the parties have complied with it, this Order will be unsealed as currently drafted.  If the parties wish to move the Court to seal any part of this Order, they must act quickly.