UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA     )
                             )
          v.                 )          1:12-cr-00160-JAW
                             )
MALCOLM A. FRENCH, et al.    )

**ORDER DENYING DEFENDANTS' SUPPLEMENTAL
MOTIONS FOR NEW TRIAL**

The Government committed a *Brady*[1] violation by failing to disclose to the defense a pre-indictment meeting among a prime Government witness, his wife, and the Government in which the wife expressed concerns about the witness' mental state following a traumatic brain injury. Nevertheless, the Court concludes that most of the information from this meeting was already available or became known to the Defendants at trial, and they have not established by a reasonable probability that, had the meeting and its contents been disclosed to the defense, the result of the proceeding would have been different. The Court denies the Defendants' motions for new trial.

I.     **BACKGROUND**

A.     **Superseding Indictment, Trial and Conviction**

On September 14, 2012, a federal grand jury indicted Kendall Chase, Malcolm French, Haynes Timberland, Inc. and Rodney Russell for a set of federal crimes.

---

[1]     *Brady v. Maryland*, 373 U.S. 83 (1963). In this opinion, the Court uses the standard shorthand expression, *Brady* violation, to describe a failure of the prosecutor to disclose material evidence favorable to an accused upon request.

*Indictment* (ECF No. 2).  On November 13, 2013, a grand jury issued a superseding indictment against Kendall Chase for conspiracy to manufacture 1,000 or more marijuana plants, manufacturing 1,000 or more marijuana plants, and conspiracy to distribute and possess with the intent to distribute marijuana.  *Superseding Indictment* (ECF No. 187).  The grand jury also indicted Mr. Russell for conspiracy to manufacture 1,000 or more marijuana plants, manufacturing 1,000 or more marijuana plants, maintaining a drug-involved place, harboring illegal aliens, and conspiracy to distribute and possess with the intent to distribute marijuana.  *Id.*  In addition, the grand jury indicted Malcolm French for conspiracy to manufacture 1,000 or more marijuana plants, manufacturing 1,000 or more marijuana plants, managing and controlling a drug-involved place, harboring illegal aliens, and conspiracy to distribute and possess with the intent to distribute marijuana.  *Id.*  Finally, the grand jury also indicted Haynes Timberland, Inc. for managing and controlling a drug-involved place.[2]  *Id.*

The case went to trial from January 8, 2014 through January 24, 2014.  On January 24, 2014, the jury returned verdicts finding Malcolm French, Rodney Russell, and Kendall Chase guilty of engaging in a conspiracy to manufacture marijuana, finding Malcolm French and Rodney Russell guilty of manufacturing marijuana, finding Malcolm French, Rodney Russell, and Haynes Timberland, Inc. guilty of managing or controlling a drug-involved premises, finding Malcolm French and Rodney Russell guilty of harboring illegal aliens, and finding Malcolm French,

---

[2]     Haynes Timberland, Inc. was a business entity owned in part by Malcolm French.  *Partial Tr. of Proceedings* 106:12-15 (ECF No. 362).

Rodney Russell, and Kendall Chase guilty of engaging in a conspiracy to distribute marijuana. *Jury Verdict Form* (ECF No. 311).

   **B.    The Pending Motions**

On January 21, 2015, Kendall Chase moved for a new trial alleging that the Government had failed to comply with its *Brady* obligations by failing to disclose a meeting that Kelley McTague, Winston McTague's wife, had with Joel Casey, the Assistant United States Attorney (AUSA) in this case, before Mr. McTague's grand jury testimony, in which Ms. McTague "expressed her concerns about Mr. McTague's mental health."[3] *Def. Chase's Mot. for New Trial* at 4 (ECF No. 461) (*Chase Mot.*). On January 29, 2015, February 4, 2015, and February 13, 2015, Malcolm A. French, Rodney Russell and Haynes Timberland, Inc. respectively joined in Mr. Chase's motion for new trial.[4] *Def.'s Supplemental Mot. for New Trial* (ECF No. 465) (*French Mot.*); *Def. Rodney Russell's Supplemental Mot. for New Trial (F.R.Crim.P. 33(a))* (ECF No. 468) (*Russell Mot.*); *Def. Haynes Timberland, Inc.'s Joinder in Def. Kendall Chase's Mot. for New Trial, Def. Malcolm French's Supplemental Mot. for New Trial, and Def. Rodney Russell's Supplemental Mot. for New Trial* (ECF No. 472) (*Haynes Mot.*). The Government responded on February 9, 2015. *Gov't's Objection to Def. Chase's Mot. for New Trial, Def. French's Supplemental Mot. for New Trial, and Def.*

---

[3]     The exact date of this meeting is not a matter of record. The Government provided as an exhibit a portion of a transcript of Mr. McTague's grand jury testimony and the transcript confirms that Mr. McTague testified before the grand jury on January 13, 2010. *Gov't's Ex.* 2. As the meeting took place in anticipation of Mr. McTague's grand jury testimony, the Court concludes that the meeting took place either in late 2009 or early 2010.

[4]     On October 6, 2014, Mr. Russell moved to vacate the conviction and for new trial on a different basis. *Def. Rodney Russell's Mot. to Vacate Conviction and Mot. for New Trial (F.R.Crim.P. 33(a))* (ECF No. 441). The Court denied this motion on January 28, 2015. *Order Denying Def.'s Mot. to Vacate Conviction and Mot. for New Trial* (ECF No. 463).

*Rodney Russell's Supplemental Mot. for New Trial* (ECF No. 469) (*Gov't's Opp'n*).  On February 19, 2015 and February 23, 2015, Malcolm French and Kendall Chase respectively replied to the Government's opposition.  *Def.'s Reply to Gov't's Objection to Def.'s Supplemental Mot. for New Trial* (ECF No. 473) (*French Reply*); *Def. Chase's Reply to the Gov't's Response Regarding the Withheld McTague Information* (ECF No. 476) (*Chase Reply*).  The Court heard oral argument on March 17, 2015.[5]  *Minute Entry* (ECF No. 487).

### C.    Affidavit of Kelley McTague

Accompanying the replies of Mr. French and Mr. Chase is an affidavit of Kelley McTague.  *French Reply* Attach. 1 *Aff. of Kelley McTague*; *Chase Reply* Attach. 1 *Aff. of Kelley McTague* (*McTague Aff.*).  In relevant part, Ms. McTague stated:

> 4.  I asked Winston's lawyer, Matthew Erickson, in writing, to set up a meeting because I felt Winston had a compromised mental state and that testifying would not be good for his health.
>
> 5.  The meeting was with the United States Attorney and investigators before Winston's Grand Jury testimony.
>
> 6.  The meeting lasted 15 minutes.  Present at the table were Joel Casey (the US Attorney), Jonathan Richards (the case agent), Winston McTague, myself, and perhaps others.
>
> 7.  In this meeting, I expressed my concerns about my husband's mental health and capabilities.
>
> 8.  My focus was to make it clear to the government that Winston's traumatic brain injury from the motorcycle accident in 2007 left him in a very compromised mental position and the stress from testifying is something that I feared would be detrimental for his health.

---

[5]    To satisfy counsel's anticipated curiosity as to who ordered the preparation of the transcript, the Court ordered the court reporter to prepare a certified transcript of the March 17, 2015 hearing in order to make certain that it was accurately quoting the proceedings.

9.  I intended to educate the government that the stress from the trial would be too much for Winston.

10. I informed them that Winston has a tendency to exaggerate things.

11. At the time of the meeting, Winston was suicidal.

12. I described how Winston saw things in his mind which he described as "movies in his head" and that, at the time, he was very paranoid.

13. The government listened to my concerns but I didn't change their minds.  They asked no specific questions in response to my concerns.

*Id.* at 1-2.

## II.    THE PARTIES' POSITIONS

### A.    The Defendants' Motions

Kendall Chase filed the lead motion.  *Chase Mot.* at 1-7.  Mr. Chase begins with reiterating some basic principles of federal criminal law about the Government's obligation to disclose evidence, including impeachment evidence, and the requirements to establish a *Brady* violation.  *Id.* at 1-4.  Mr. Chase explains the circumstances under which he learned about the prosecutor's interview with Ms. McTague:

> After [Mr. McTague's trial] testimony, and, indeed, nearly nine months after the jury verdict, Mrs. Kell[e]y McTague revealed to Mrs. Jan Chase that she had a meeting with the United States Attorney and investigators prior to Winston [McTague]'s Grand Jury testimony wherein she expressed her concerns about Mr. McTague's mental health.

*Id.* at 4.  He repeats the context and substance of the prosecutor's interview with Ms. McTague, which Ms. McTague described nearly verbatim in her affidavit.  *Compare*

*id.* at 4-5, *with McTague Aff.*  Mr. Chase says that the Government never provided him or the other Defendants with information about this meeting.  *Chase Mot.* at 5.

Mr. Chase asserts that Mr. McTague was "the primary witness linking Mr. Kendall Chase to the marijuana operation."  *Id.*  He goes on to say that Ms. McTague's information "could have been used to impeach the credibility of the government's key witness and his ability to accurately recall information."  *Id.* at 6.  Mr. Chase claims that Mr. McTague's credibility "was central to the conviction of Mr. Chase" and that Mr. McTague "could have been questioned as to his bias against the defendants," "how the extraordinary stress being placed on him affected the movies in his head," and "[m]ost importantly, . . . [the defense] could have questioned Mr. McTague as to his exaggerations and how that tendency affected his ability to accurately recall the extent of Mr. Chase's participation and the scale of the alleged endeavor."  *Id.*  Mr. Chase ends by asserting that disclosure of this information would have resulted in a "weaker case" for the Government, and would have allowed the defense to discredit Mr. McTague "in the jury's eyes and a different verdict would have resulted."  *Id.* at 6-7.  In the motion, Mr. Chase requested a testimonial hearing to develop this new evidence.  *Id.* at 7.

In Mr. French's supplemental motion, he notes that on September 28, 2012, his counsel sent the Government a letter demanding "any exculpatory evidence material to guilt or punishment."  *French Mot.* at 1.  Mr. French says that the "deliberate withholding of this material information is a violation of the fundamental

rule from *Brady v. Maryland* and the only appropriate remedy in light of this deliberate violation is for this Court to grant Defendant a new trial." *Id.* at 1-2.

Mr. French notes that Mr. McTague was asked whether any "family members had expressed concerns about his ability to accurately and truthfully remember events" and that Mr. "McTague denied, incredibly, any such concerns had ever been expressed." *Id.* at 6. Mr. French emphasizes that this testimony by Mr. McTague was not only inaccurate, but also the person presenting this information to the Government was Mr. McTague's wife, who "expressed these very concerns to the prosecutor who would elicit major pieces of testimony from [him]." *Id.*

Mr. French argues that once the Court concludes that the evidence the Government failed to turn over is material, "because its withholding undermines confidence in the verdict and created a fundamentally unfair trial process," the Court "does not need to ask itself whether a different verdict would have resulted if this evidence had been provided, but only needs to find that this evidence was withheld and that this withholding undermines confidence in the verdict and fairness in the trial." *Id.* at 7.

In his supplemental motion, Mr. Russell also notes that like Mr. French, his counsel had demanded all *Brady* material be disclosed to the defense. *Russell Mot.* at 1-3. He joins Mr. Chase and Mr. French in arguing that the information "create[d] a fundamentally unfair trial process." *Id.* at 3. Haynes Timberland, Inc. adopted the arguments pressed by the other Defendants. *Haynes Mot.* at 1.

**B.    The Government's Opposition**

7

In its response, the Government "concedes that it did not provide defense counsel with information about the brief meeting that occurred with McTague's spouse prior to McTague's testimony before the grand jury." *Gov't's Opp'n* at 3. Nevertheless, the Government argues that the defense "had the information that McTague's spouse provided." *Id.* at 10. The Government questions how Ms. McTague's concerns about her husband's mental state would have been admissible under the rules of evidence. *Id.* It further asserts that even if Ms. McTague's information had been admissible, it would have been cumulative. *Id.* at 10-11. Finally, the Government argues that extensive additional evidence corroborated Mr. McTague's testimony. *Id.* at 11-12.

## C.    The Defendants' Replies

In reply, Mr. French counters that the prosecutor's interview with Ms. McTague was not cumulative, and therefore, not immaterial, because it "would have produced impeachment evidence never disclosed to the defense." *French Reply* at 2-3. According to Mr. French, without this evidence, he "could only generally suggest that Winston McTague's memories were false or challenge Winston McTague's basic truthfulness." *Id.* at 4-5. Furthermore, he contends that the Government's claim of sufficient corroboration is merely an impermissible "sufficiency of the evidence" argument and does not controvert his assertion that evidence of the interview "undermine[d] confidence in the jury's verdict." *Id.* at 6.

In Mr. Chase's reply, he points out that because the Government concedes that it did not disclose information regarding the prosecutor's interview with Ms.

McTague, the Court need only resolve "whether the suppressed evidence was material (and thus prejudicial) to the defense." *Chase Reply* at 1-2. Similar to Mr. French's argument, Mr. Chase contends that the evidence was both material and prejudicial because he "would have opened an entirely new line of impeachment by highlighting for the jury Mr. McTague's tendency to overstate, overestimate, and amplify information." *Id.* at 3. Mr. Chase also agrees with Mr. French that the Government's sufficiency of the evidence argument "is improper" in this context. *Id.*

## III.   LEGAL PRINCIPLES

In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In *United States v. Connolly*, 504 F.3d 206 (1st Cir. 2007), the First Circuit set forth the three components of "an authentic *Brady* violation": (1) "[t]he evidence at issue (whether exculpatory or impeaching) must be favorable to the accused;" (2) "that evidence must have been either willfully or inadvertently suppressed by the government;" and (3) "prejudice must have ensued." *Id.* at 212.

In *Connolly*, the First Circuit clarified that a *Brady* violation is judged differently than other motions for new trial that are based on freshly discovered evidence. *Id.* at 212-13. To prevail on a typical newly-discovered evidence motion for new trial, a defendant must establish four elements, the so-called *Wright* test: (1) "that the evidence was unknown or unavailable to him at the time of trial;" (2) "that

his failure to learn of it did not result from a lack of due diligence;" (3) "that the evidence is material, not merely cumulative or impeaching;" and (4) "that its availability is likely to bring about an acquittal upon retrial." *Id.* at 212 (citing *United States v. Huddleston*, 194 F.3d 214, 218 (1st Cir. 1999); *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir. 1980)).

By contrast, when a defendant has made a "colorable claim that he would have had access to the newly discovered evidence but for the government's failure to disclose it," a "more defendant-friendly standard applies." *Id.* The movant "still must establish the first two elements of the *Wright* test"; namely, (1) that the evidence was unknown or unavailable to him at the time of trial; and (2) that his failure to learn of it did not result from a lack of due diligence. *Id.* at 213. However, the last two elements of the *Wright* test "are replaced with the unitary requirement that the defendant establish 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Also, "the *Wright* test demands an *actual* probability that the result would have differed, whereas the *Brady* test speaks in terms of something less - - a merely theoretical (but still reasonable) probability." *Id.* (emphasis in original). Finally, the *Wright* test discounts "merely impeaching" evidence as "immaterial," but the *Brady* test allows the consideration of "undisclosed impeachment evidence" and focuses the question on whether "it suffices to undermine confidence in the outcome of the trial." *Id.*; *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("[T]he question is not whether the defendant would more

10

likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence"); *Bagley*, 473 U.S. at 682 (explaining that a "reasonable probability" is one "sufficient to undermine confidence in the outcome" of trial). "'This somewhat delphic 'undermine confidence' formula suggests that reversal might be warranted in some cases even if there is less than an even chance that the evidence would produce an acquittal.'" *United States v. Paladin*, 748 F.3d 438, 444 (1st Cir. 2014) (quoting *Conley v. United States*, 415 F.3d 183, 188 (1st Cir. 2005)).

Furthermore, when addressing materiality in the context of *Brady*, although not a distinct element as under the *Wright* test, *Kyles* instructs courts not to conduct "a sufficiency of evidence test.  A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." 514 U.S. at 434-35.  Instead, a defendant must show "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.  Said another way, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *Kyles*, 514 U.S. at 435 (quoting *Bagley* with approval).  At the same time, "[t]he strength of impeachment evidence and the effect of suppression are evaluated in the context of the entire record to determine materiality.  Evidence is immaterial where it is cumulative or merely impeaches a witness on a collateral issue." *Paladin*, 748 F.3d at 444.  In addition, "'suppressed

11

impeachment evidence has little probative value if additional evidence strongly corroborates the witness' testimony the suppressed evidence might have impeached.'" *Id.* (quoting *Conley*, 415 F.3d at 189). "[T]he burden to demonstrate the materiality of undisclosed evidence rests squarely with" the Defendants. *Id.* at 445.

## IV.   WINSTON MCTAGUE'S TESTIMONY

### A.   Direct Testimony

The Government called Winston McTague as its witness and he testified over two days and was extensively and effectively cross-examined. *Partial Tr. of Proceedings* (Jan. 13, 2014) (ECF No. 414) (*McTague Test. I*); *Partial Tr. of Proceedings* (Jan. 14, 2014) (ECF No. 415) (*McTague Test. II*). Mr. McTague testified that he was involved in the cultivation of marijuana with Kendall Chase and a man named Mike Smith. *McTague Test. I* 4:25-5:8. Mr. McTague said that he first met Mr. Chase in 1993 or 1994 during motorcycle trips to New York. *Id.* 6:3-6. They became friends and grew marijuana together in Danforth, Maine. *Id.* 6:12-21. He said that after he began growing marijuana with Mr. Chase, someone (perhaps Mr. Chase) introduced him to Malcolm French and Mr. McTague began growing marijuana on Mr. French's land in the town of LaGrange, Penobscot County, Maine. *Id.* 9:3-19. This was in 2005. *Id.* 9:20-21.

Mr. McTague said that he grew the marijuana in a swamp near Mr. French's camp in LaGrange. *Id.* 10:13-11:13. He testified that they "made egg-shaped wire cages" with a "weed barrier" at the bottom running up about one foot on the sides and half a bale of Promix in it. *Id.* 11:14-19. He estimated that there were between 500

12

and 1,000 marijuana plants at the LaGrange property. *Id.* 12:14-19. He described harvesting the marijuana and placing it in a drying shack on the LaGrange property. *Id.* 12:20-13:9. He stated that all of the participants helped build the drying shack and that the lumber came from Mr. Chase's portable lumber mill. *Id.* 13:16-14:1. After deleaving the marijuana plants, cutting the buds off, and getting rid of the stalks, Mr. McTague testified the marijuana was ready to bag. *Id.* 14:6-14.

Mr. McTague recalled that he was involved in a discussion about the marijuana operation for the year 2006. *Id.* 14:17-23. The conversation took place at Malcolm French's camp and the participants included Mike Smith, Kendall Chase, and Kevin Chase (Kendall Chase's brother). *Id.* 12:24-25, 14:17-15:9, 16:1-4. The conversation was about growing marijuana on Mr. French's company property in Township 37 in Washington County, Maine. *Id.* 16:1-11. Mr. McTague said that he worked with the same people on the marijuana grow operation in both LaGrange and Township 37 during the year 2006. *Id.* 16:15-22.

Mr. McTague described Mr. Chase and Mike Smith as "the brains" of the operation; they were the ones who knew how to grow marijuana and how to "make it good." *Id.* 17:1-4. Mr. McTague testified in detail about the cultivation of marijuana plants, where he stayed when he worked in Township 37, where they obtained the materials for the marijuana grow, and how to protect the plants from slugs and woodland animals. *Id.* 19:2-21:3. Around harvest time, either Mike Smith or Kendall Chase would tell the others when the plants were ready to harvest. *Id.* 20:11-18. Mr. McTague remembered one large shipment of Promix in particular, which was

delivered in front of Berg's T-shirt business; Mr. McTague, Mike Smith, Kevin Chase, and Kendall Chase all loaded the Promix into a trailer and took it to Township 37. *Id.* 21:4-15.

Mr. McTague helped with the harvesting, and placing the marijuana in buckets, which was transferred into trash cans. *Id.* 21:16-23. Malcolm French and Kendall Chase and others bagged the marijuana. *Id.* 21:16-21. Mr. McTague sold ounces of the marijuana, but Kendall Chase and Mike Smith sold larger amounts of marijuana; Mr. McTague testified that the going price was $20,000 for 10 pounds. *Id.* 21:24-22:16.

During the 2006 harvest, Mr. McTague injured his right shoulder trying to lift a tree that was blocking a woods road in Township 37. *Id.* 23:5-14. After that injury, he found it difficult to continue working and he gave up. *Id.* 23:21-24:1. After he stopped working, Mr. McTague went to Mike Smith and asked him about being paid for his work on the marijuana grow, stating to Mr. Smith that he was supposed to have been paid $1,000 per week and was also supposed to be given some marijuana. *Id.* 26:12-23. He had incurred some hospital bills for treatment of his shoulder injury and had been unable to pay them; in fact, he testified that he is still paying those bills. *Id.* 26:24-27:3.

Also, after he had stopped work on the marijuana grow, he saw a Promix trailer go by, and as a result, he and Mike Smith rode together to Township 37. *Id.* 27:4-15. When they got to the south gate of Township 37, they parked their motor vehicle and walked to where the Promix trailer was parked. *Id.* 27:16-19. The Promix trailer

14

was sitting to the south side of the area of the 2006 grow.  *Id.* 27:20-22.  Mr. McTague saw people unloading the Promix and testified that the new area of marijuana grow was two to three times larger than the one he had worked on in 2006.  *Id.* 27:25-28:23. At some point, Mr. McTague returned to Township 37 by himself and observed both white and what he thought were Mexican people working in the swamp.  *Id.* 30:1-31:13.  He recognized Kendall and Kevin Chase but no one else.  *Id.* 31:14-16.

On June 27, 2007, Mr. McTague was involved in a motorcycle accident.  *Id.* 31:25-32:3.  He was in the hospital and was laid up for several months.  *Id.* 32:4-7. He was prescribed three medications he was still using as of the trial.  *Id.* 32:10-19. He went to Mike Smith and asked for help paying his medical bills and Mr. Smith gave him 13 pounds of marijuana.  *Id.* 32:20-33:1.  Mr. McTague got no additional financial help from other members of the marijuana conspiracy, a fact that made him "[m]ad."  *Id.* 33:2-5.

In response to this lack of financial help, he decided to tell the police about the Township 37 marijuana grow operation and he sent in a confidential tip on the computer.  *Id.* 33:10-15.  A year later, having heard nothing, he sent in another one. *Id.* 33:16-21.  This time some drug agents visited him.  *Id.* 33:24-34-1.

### B.    Cross-Examination

#### 1.    Malcolm French

Mr. McTague was cross-examined by each of the Defendants' counsel, first by Attorney McKee on behalf of Malcolm French.  *Id.* 34:25-55:8.  Mr. McTague admitted that he had previously worked for Mr. French, hauling logs, around 2004 or 2005.  *Id.*

35:3-11. He said he hauled just three loads of logs for Mr. French. *Id.* 36:11-12. He denied being fired by Mr. French in 2004 or 2005. *Id.* 36:17-20. But he agreed that he had complained about not being paid by Mr. French for the three loads he had hauled. *Id.* 36:21-37:2.

Mr. McTague conceded that even though he was involved with Mr. Chase and Mike Smith in a marijuana grow operation before he became involved with the French operation, he had failed to mention this fact to law enforcement until just a few weeks before trial. *Id.* 37:10-38:3. Mr. McTague agreed that he had been lying to the Government about his involvement in the earlier marijuana grow operation. *Id.* 37:25-38:17. Mr. McTague protested that his earlier involvement was just "innocent detail," that he was not hiding this information from the Government, but that he had "just remembered" it two to three weeks ago. *Id.* 39:2-23. He later admitted that he had acknowledged to the police on December 17, 2013 that he had lied to them. *Id.* 48:10-49:7.

When asked about when he had worked on the Danforth operation, Mr. McTague said that it "could have been 1995." *Id.* 40:13-18. He also said that he "[could not] tell you dates" and that it "could have been" 2003 or 2004. *Id.* 40:19-25.

Mr. McTague conceded that from 2003 to 2006, he had been paid for his work either in money or in marijuana and that he had not reported that income to the Internal Revenue Service. *Id.* 42:1-7.

Mr. McTague was also asked about why he had reported the tip to law enforcement. He admitted that he had told law enforcement that he was making the

tip to protect his 12- and 8-year-old daughters from people with marijuana.  *Id.* 42:11-23.  But he also acknowledged that in fact he "wasn't in it to protect anybody, no."  *Id.* 42:24-43-2.  He then said that his protection of his family was "part of the truth."  *Id.* 43:3-7.  Mr. McTague agreed that he had told law enforcement that he had gone "undercover" to act as an investigator.  *Id.* 43:8-11.  But he conceded that he was "pretty screwed up then," *id.* 43:12-14, and he admitted that the part about his being an investigator was not true.  *Id.* 44:8-9.

Mr. McTague was also asked about telling law enforcement in October 2009 that he had been hired by Kendall Chase to stack lumber and remove bark, and that he was going to learn what was going on with the marijuana operation.  *Id.* 44:19-45:7.  Mr. McTague admitted that that story conveyed to law enforcement was not true.  *Id.* 45:7-10.

On direct examination, Mr. McTague had said that he had been interviewed by an agent named Steve Sicard, a person he agreed was a big fellow from DEA.  *Id.* 7:20-23.  On cross-examination, however, Mr. McTague could not remember Steve Sicard, did not recall that he was a special agent with DEA, and denied that he had testified as such.  *Id.* 47:1-11.

Mr. McTague agreed that he had lost some of his memory as a result of the motorcycle accident.  *Id.* 47:25-48:2.  He said that there are some things he can remember and some he cannot.  *Id.* 48:3-6.  His ability or inability to recall certain events included those that occurred in 2006.  *Id.*

17

Mr. McTague agreed that he was testifying under a grant of immunity from the Government. *Id.* 52:7-8. He said that a grant of immunity means that "as long as I don't lie, can't get busted." *Id.* 52:11-13. But he also admitted that the Government had agreed not to prosecute him for his involvement over a number of years in marijuana grow operations. *Id.* 52:14-53:12. He also agreed that the person who would decide whether he told the truth was Joel Casey, the lead federal prosecutor in the case. *Id.* 53:13-16. He also confirmed that, despite his earlier involvement with Malcolm French, when he was shown photographs of the individuals who had been potentially involved in the marijuana grow operation, he had not been able to pick out Malcolm French. *Id.* 54:2-55:8.

### 2.   Rodney Russell

Mr. McTague was then cross-examined by Attorney Peterson on behalf of Rodney Russell. *Id.* 55:14-57:12. Mr. McTague agreed that he had never mentioned Rodney Russell's name to any of the law enforcement officers. *Id.* 56:16-19. In fact, he said: "I don't know him, and I haven't seen him around when I was there." *Id.* He agreed that he did not recognize Mr. Russell when he was shown his photograph. *Id.* 57:8-10.

### 3.   Kendall Chase

Mr. McTague was then cross-examined by Attorney Silverstein on behalf of Kendall Chase. *Id.* 57:17-83:2; *McTague Test. II* 3:20-36:23. On cross-examination by Attorney Silverstein, Mr. McTague revealed that he had been diagnosed with traumatic brain injury as a result of the 2007 motorcycle accident. *McTague Test. I*

18

57:17-21.   Mr. McTague said that his life has changed "100 percent" since the accident.  *Id.* 57:22-24.  He explained that he has suffered short-term memory loss and that all of his memories were "like a movie."  *Id.* 57:25-58:3.  Even though he agreed that he gets mixed up sometimes, he insisted that he remembered what he remembered.  *Id.* 59:6-10.  Mr. McTague conceded that his head injury has caused him to keep worrying and thinking about the same thing over and over again.  *Id.* 65:25-66-4.  He also agreed that some of his thoughts are "like a movie that keeps replaying in [his] head."  *Id.* 66:5-11.  Mr. McTague also testified about the impact the motorcycle accident has had on his life:

> Q. Now, you made an interesting comment the other day and that kind of stuck with me, and you were asked about whether you were mad by Mr. Casey, and you said, I'm stuck in this world.  What did you mean by that?
> A. I mean, my life ended on 6/27/07, all of my past is erased, everything. I have nothing.
> Q. You mean for memories?
> A. No, I have nothing anymore.

*McTague Test. II* 25:5-12.

Mr. McTague agreed that he did not want his wife and their daughters to know about his being extensively involved in the marijuana grow operations and about his cooperation with the police.  *McTague Test. I* 63:16-65:6.  He had told his wife that he was involved in growing a little bit of marijuana but not that he was involved more extensively.  *Id.* 64:21-65:6.  Mr. McTague admitted that he had not remembered his earlier marijuana involvement when he told the grand jury that the only two seasons during which he had been involved in cultivating marijuana were in 2005 and 2006.  *McTague Test. II* 15:11-16:7.

Mr. McTague was questioned closely about the 2006 discussion at Mr. French's camp about next year's harvest and plans to expand the operation to Township 37. *McTague Test. I* 70:24-72:12.  He agreed that in 2009 he had told the officers that during the 2006 camp visit, Mr. French had told him where to go hunting the next day and while he was hunting, he snooped around and "saw four fellows dressed in camouflage[,] harvesting marijuana plants." *Id.* 72:13-73:3.  But Mr. McTague said that his conversation with the police had taken place when he was still "freshly injured" and agreed he was "all screwed up." *Id.* 73:2-7.  He later acknowledged that his statement about seeing people cultivating marijuana while he was at the French hunting camp was a lie. *McTague Test. II* 4:20-24.  He agreed that he had repeated that lie even when he met with AUSA Casey around Thanksgiving of 2009, and even though AUSA Casey had instructed him to tell the truth.  *Id.* 4:25-5:13.  He also acknowledged that when he told the officers that he had overheard the conversation at the French hunting camp while in bed, he was not telling the truth; in fact, he was in the same room, peeling marijuana. *McTague Test. I* 81:4-82:6.   He also admitted that he had repeated that lie when he was subpoenaed to testify under oath before the grand jury on January 13, 2010. *McTague Test. II* 12:12-15:10.

Mr. McTague was asked about his testimony before the grand jury in which he testified that he had spoken to Kendall Chase after the hunting camp conversation and Mr. Chase had told him that they would get him involved.  *Id.* 16:11-21.  He acknowledged that his grand jury testimony on that point was a lie too.  *Id.* 16:22-23.

Mr. McTague was then asked whether he told the grand jury that Malcolm French had promised him a camp in East Grand and Millinocket, Maine and Mr. McTague denied so testifying. *Id.* 19:5-8. However, after being shown a portion of his grand jury testimony, Mr. McTague admitted that he had so testified before the grand jury. *Id.* 19:25-20:2.

Mr. McTague testified that during the motorcycle accident in 2007, he had "hit the roof of a car [go]ing 87 miles an hour with [his] face." *McTague Test. I* 73:10-19. Since then, he had remembered things funny and explained that his memories "come and go." *Id.* 74:1-4. In fact, Mr. McTague produced a doctor's note from his wallet, which he carries at all times, that explained he often gets confused. *McTague Test. II* 6:6-7:15.

Mr. McTague also said that after he spoke with law enforcement and was told that he could get a lawyer, he contacted Kendall Chase and demanded $10,000 so that he could retain a lawyer. *Id.* 26:12-27:3. Mr. McTague was closely questioned about his use of the nickname, "Red Patch." *Id.* 27:11-29:22. Mr. McTague explained that "Red Patch" was his old CB handle (i.e., he used to call himself that on the trucker radio). *Id.* 27:13-22. Mr. McTague conceded that while using the Red Patch nickname, he had told Mr. Chase via text message that if he did not come up with $10,000, he would recover his memory when DEA came. *Id.* 30:1-31:3.

### 4. Haynes Timberland, Inc.

Mr. McTague was then cross-examined by Attorney Marjerison on behalf of Haynes Timberland, Inc. *Id.* 38:8-49:9. On cross-examination by Attorney

Marjerison, Mr. McTague was asked about the 13 pounds of marijuana that he claimed Mike Smith had given him and was later stolen. *Id.* 38:11-39:9. Although Mr. McTague expressed some confusion about the dates, he agreed that he failed to tell the Government that the 13 pounds of marijuana had been stolen until his last meeting with the Government. *Id.* 39:7-13. Mr. McTague claimed that Bruce Smith was the person who stole the marijuana. *Id.* 40:17-20.

Mr. McTague conceded that in addition to prescribed medication, he has been using medical marijuana. *Id.* 40:24-43:1. He admitted that his doctor had concerns about his use of medical marijuana, but he insisted that what has happened since has "proved him wrong." *Id.* 42:24-43:5.

Mr. McTague testified that when he was involved in the motorcycle accident, he was not wearing a helmet. *Id.* 43:14-15. Mr. McTague was also questioned regarding his friends and family's opinion of his memory since the accident. The following exchange took place:

> Q. And people have told you you're different since this . . . motorcycle accident; is that correct?
> A. 100 percent.
> Q. Yeah. And, in fact, people - - your friends and family have tried to tell you that you're misremembering events that occurred prior to the accident, correct?
> A. My peers telling me now?
> Q. Let me re - - I'll withdraw the question. I'm going to rephrase it. Okay? I'm not trying to confuse you. Your friends and family have told you you have difficulty remembering accurately events that occurred prior to the accident, correct?
> A. No, nobody's - - family hasn't told me that, no.
> Q. Okay. Well, don't they try to help you remember what - - things that happened that you can't remember?
> A. Well, yeah.

*Id.* 44:18-45:11.

Mr. McTague could not remember whether the Government had asked him questions about his medical treatment following his motorcycle accident, or whether the Government had requested medical records regarding his treatment. *Id.* 46:8-21. Although this testimony was confusing, Mr. McTague at one point said that he had shown the medical explanation card to the Government, but they had told him that they did not want to see it. *Id.* 47:9-16.

Following up on Mr. McTague's testimony from the day before, Attorney Marjerison asked him about his memories being like a movie. Even though Mr. McTague had testified the day before that his memory was like a movie playing in his head, he denied having said "movie." *Compare McTague Test. I* 58:2-3 ("Short-term memory loss and all my memories are like a movie"), *with McTague Test. II* 44:8-11 ("Nah, I didn't say a movie").

### C.    Redirect Examination

On redirect examination, AUSA Casey asked Mr. McTague about certain text messages he had written to Mr. Chase concerning his demand for $10,000 cash. *McTague Test. II* 49:19-52:7.

### D.    Recross-Examination

#### 1.    Malcolm French

On recross-examination by Attorney McKee, Mr. McTague was asked about his reference to an insurance payment in his text messages to Mr. Chase, and Mr. McTague explained that the reference to insurance was to his "bike money." *Id.*

52:15-53:4.  Mr. McTague was asked whether he was blaming people for not getting his bike insurance money and he replied: "I don't know what I was doing."  *Id.* 53:5-7.  Mr. McTague also confirmed that he had been charged and convicted of operating under the influence as a result of the June 27, 2007 motorcycle accident.  *Id.* 54:2-19.

He was also questioned closely about the number of people who were involved in building the drying shack on Mr. French's LaGrange property and potential contradictions with his grand jury testimony about Malcolm French's participation in the building of the shack.  *Id.* 57:21-61:9.

### 2. **Rodney Russell**

Attorney Peterson asked no further questions on recross-examination on behalf of Rodney Russell.  *Id.* 61:11-12.

### 3. **Kendall Chase**

Mr. McTague was then questioned by Attorney Silverstein on behalf of Mr. Chase about his memory problems, and ultimately, he agreed that when he texted Mr. Chase, he was basically threatening him if Mr. McTague did not receive $10,000. *Id.* 61:18-63:6.

### 4. **Haynes Timberland, Inc.**

Attorney Marjerison asked no further questions on recross-examination on behalf of Haynes Timberland, Inc.  *Id.* 63:10-12.

### E. **Re-redirect Examination**

AUSA Casey asked no further questions on re-redirect examination.  *Id.* 63:13-14.

## V.   DISCLOSED AND NON-DISCLOSED DISCOVERY INFORMATION; EVENTS FOLLOWING TRIAL

### A.   Not Disclosed

In his January 21, 2015 motion, Mr. Chase set forth in detail the contents of the non-disclosed conversation among Ms. McTague, Mr. McTague, Attorney Erickson, AUSA Casey, and Agent Jonathan Richards in late 2009 or early 2010. *Chase Mot.* at 4-5.  On February 19, 2015, after the filing of Mr. Chase's motion, Mr. French and Mr. Chase filed Ms. McTague's affidavit with the Court.  *McTague Aff.*

Ms. McTague's affidavit establishes that she asked Attorney Erickson to set up a meeting because she "felt Winston had a compromised mental state and that testifying would not be good for his health."  *Id.* ¶ 4.  During the fifteen minute meeting, Ms. McTague says she made the following points to the prosecution:

(1) That she was concerned about Mr. McTague's "mental health and capabilities";

(2) That his "traumatic brain injury" from the 2007 motorcycle accident "left him in a very compromised mental position and the stress from testifying is something that [she] feared would be detrimental for his health";

(3) That stress from testifying at trial "would be too much" for him;

(4) That he had "a tendency to exaggerate things";

(5) She may have said that he was suicidal as of the time of the meeting;[6]

---

[6]      In her affidavit, Ms. McTague stated that "[a]t the time of the meeting, Winston was suicidal." *McTague Aff.* ¶ 11.  During oral argument, AUSA Lowell observed that, unlike other paragraphs within Ms. McTague's affidavit where she said she "intended" to inform or "informed" the Government

(6) That he was "very paranoid" as of the time of the meeting; and

(7) That he "saw things in his mind[,] which he described as 'movies in

his head.'"

*Id.* ¶¶ 7-12.  She also said that the Government "listened to [her] concerns but [she] didn't change their minds.  They asked no specific questions in response to [her] concerns."  *Id.* ¶ 13.

## B.    Disclosed Information About Winston McTague

In its opposition, the Government provided the Court with excerpts of the discovery information about Mr. McTague that it provided defense counsel.  *Gov't's Opp'n* at 3-9.  These are submitted under Government Exhibits 1 through 3A.

### 1.    Government Exhibit 1

Government Exhibit 1 is a Report of Investigation dated December 2, 2009 authored by Special Agent Steven Sicard.  It reveals the following information about Mr. McTague:

---

of certain information during this meeting, "[p]aragraph 11 does not say I informed the government that at the time of the meeting Winston was suicidal."  *Tr. of Proceedings* 136:20-25 (ECF No. 498) (*Oral Argument Tr.*).  According to AUSA Lowell, "this doesn't indicate that that was information that she conveyed" during the meeting.  *Id.* 137:2-3.

As AUSA Lowell notes, it is difficult to know whether Ms. McTague was saying that she told the investigators at the meeting that Mr. McTague was suicidal as of late 2009 or early 2010, or whether she was conveying that she was privately worried that her husband was suicidal around that time.  Of course, AUSA Lowell was present at the March 2, 2015 meeting, and he could have, but did not clarify this issue.  *See* Section V.C, *infra* (summarizing the March 2, 2015 meeting with Ms. McTague).

For purposes of ruling on this motion, the Court assumes that the reason for Ms. McTague's affidavit was to inform the Court what she told the authorities about Mr. McTague in late 2009 or early 2010, not what she privately thought.  Therefore, the Court has inferred that when she met with AUSA Casey and Agent Richards in late 2009 or early 2010, she told them that she was concerned Mr. McTague was suicidal and that this information should have been disclosed to the defense.

(1) That due to his motorcycle accident, his memories will "come and go,"

    and

(2) That he "sometimes . . . has difficulty remembering exact dates."

### 2.    Government Exhibit 2

Government Exhibit 2 is excerpts from Mr. McTague's grand jury testimony of January 13, 2010.  It reveals:

(1) That the motorcycle accident took place on June 27, 2007;

(2) That he suffered "pretty severe injuries" as a result of the motorcycle accident, including brain injuries;

(3) That he was "still not recovered" from his motorcycle accident;

(4) That he had had difficulty remembering the events before the motorcycle accident and due to his brain injury, things were coming back slowly; and

(5) That he remembered the things he had told the grand jury and he had "[n]o doubt at all" as to the truth of what he conveyed to the grand jury.

### 3.    Government Exhibits 3 and 3A (Voicemail #1)

Government Exhibit 3 is a voicemail message to AUSA Joel Casey from Winston McTague on November 9, 2009; Exhibit 3A is a transcript of that voicemail message.  It reveals that he told AUSA Casey:

(1)    That he was "the only reason they found Kenny Chase and Malcolm French's pot deal";

(2)     That he followed them through the woods and spied on them;

(3)     That he had his window open when he was going to sleep and heard them talking about "all kinds of different things";

(4)     That he has a brain injury;

(5)     That he was operating his motorcycle at 80 miles an hour when a car pulled out in front of him;

(6)     That he was not wearing a helmet at the time of the accident;

(7)     That he is under three different medications for his head injury;

(8)     That he suffers from "bad, bad headaches";

(9)     That his doctor has told him the only thing that will stop the headaches is Methadone;

(10)    That his brain doctor gave him a card that says he has "sustained a brain injury" and "may become confused [and] disoriented";

(11)    That if he is exposed to excessive stimuli, noise, or threatening situations, he can have emotional outbursts;

(12)    That he "can't figure this stuff out";

(13)    That he is afraid of getting killed, his wife getting raped, or his house getting burned;

(14)    That the medicine has "restored [his] memory somewhat";

(15)    That although he is healing from this, his "brain is still mush"; and

(16)    That "[s]ome days are better than others."

### 4.  Government Exhibits 3 and 3A (Voicemail #2)

Government Exhibit 3 contains a second voicemail message from Winston McTague to AUSA Casey dated November 9, 2009; Exhibit 3A is a transcript of that second voicemail message.  In addition to some information Mr. McTague repeated from his earlier message that day, it reveals:

(1) That he thinks his memory is straightened out somewhat from the medicine; and

(2) That he wanted to make sure "we get these bastards."

### C.  Kelley McTague: The March 2, 2015 Interview

Shortly before the March 17, 2015 oral argument, the Government filed a synopsis of a March 2, 2015 in-person, fifty minute interview of Kelley McTague by AUSA Lowell and Special Agent Kelly.  *Gov't's Ex.* 6 *Report of Investigation* (Mar. 2, 2015) (*March 2, 2015 Investigation*).  The synopsis was admitted into evidence without objection at the oral argument.

The synopsis began by providing some background into how Ms. McTague's interview with AUSA Casey and Agent Richards came to the attention of the Defendants.  Ms. McTague revealed that she and Jan Chase, Kendall Chase's wife, had been very close friends for years after meeting through their husbands.  *Id.* at 2. Ms. McTague acknowledged that she cares for Jan Chase's well-being and she is worried about who will care for Ms. Chase.  *Id.* at 4.  Ms. McTague also said that, during the trial, Ms. Chase telephoned her and asked whether she would be willing to testify about her husband's mental health status.  *Id.* at 2.  Ms. McTague and Ms.

Chase agreed to meet to further discuss the matter. *Id.* During this meeting, Ms. McTague told Ms. Chase that she would not testify about her husband's mental health status, but she told Ms. Chase about the meeting with AUSA Casey and Agent Richards in which she said she had tried to get them to understand Mr. McTague's mental health status. *Id.* Ms. McTague did not go into further detail about the meeting with AUSA Casey and Agent Richards. *Id.*

Also during this meeting, Ms. Chase told Ms. McTague that she had seen a television interview in which Ms. McTague had interviewed Mr. McTague about his brain injury. *Id.* Ms. McTague informed Agent Kelly and AUSA Lowell that she had been the chair for the Acquired Brain-Injury Advisory Council since 2009 and she acknowledged that she had conducted a television interview of her husband a while back. *Id.* Ms. McTague thought the television interview had aired in March during Brain Injury Awareness month, but she could not recall the year. *Id.*

Turning back to the 2009-10 interview, Ms. McTague said that during this meeting, she had expressed her concern to the Government about the negative impact testifying might have on her husband's health as well as her concerns about alleged death threats made against her family. *Id.* at 3. She also discussed her husband's paranoia and his tendency to exaggerate. *Id.*

About six months after the trial, Ms. Chase called Ms. McTague again and asked her about the 2009-10 interview with the Government. *Id.* After speaking with Ms. Chase about what she remembered, Ms. McTague went to a lawyer's office and told the lawyers what she recalled. *Id.* The lawyers typed up an affidavit, which

30

Ms. McTague said was accurate, and she signed it.  *Id.*  During the meeting with the lawyers, Ms. McTague was not asked how Mr. McTague was doing or whether she thought his testimony was truthful.  *Id.*

During the March 2, 2015 meeting, Ms. McTague elaborated on some of the points in her affidavit.  *Id.*  She said the purpose of asking for the Government meeting in 2009-10 was to address her concern about the stress of testifying and its impact on the mental well-being of her husband.  *Id.*  But she also wanted to address threats made against her family.  *Id.*  She explained that Mr. McTague had told her that the Hells Angels had made death threats against the family and that there was a contract put out on them by Mr. Chase.  *Id.*  Mr. McTague also told her that they (unknown who "they" were) were using helicopters to follow the McTagues.  *Id.*  Ms. McTague thought that Mr. McTague was exaggerating about the helicopters but was still concerned about the family's safety.  *Id.*

Regarding Mr. McTague's reference to "movies in his head," Ms. McTague stated that her husband told her that situations/scenarios would run through his mind and he could not get them to stop.  *Id.* at 3-4.  She said the example of a movie in his head that Mr. McTague used was of a child not coming home and a parent thinking of all the worst case scenarios of where the child could be.  *Id.* at 4.  She later said that Mr. McTague's ability to control the movies in his head had improved by 2014.  *Id.*

Ms. McTague said that Mr. McTague can absolutely tell the truth, but that he fills in parts that he cannot remember in order to make the story complete in his

mind.  *Id.*  She denied ever saying that Mr. McTague was incapable of telling the truth.  *Id.*  She noted that Mr. McTague's mental health had improved since 2009.  *Id.*  She also stated that he was suicidal in 2009 but that he had improved by 2014 and that he is more stable now.  *Id.*

In addition, Ms. McTague said that Mr. McTague was doing a lot of drugs, crack and cocaine, while in the woods and that he was high all the time.  *Id.*  She did not say when he was in the woods.  *Id.*  She was not able to speak to his memory while he was in the woods, but she said that before that time, his memory was always good.  *Id.*

Ms. McTague told AUSA Lowell and Agent Kelly that she believes marijuana should be legal and that it is crazy that Kendall Chase will be going to jail for something she believes will soon be legal.  *Id.*  She believes in the medical benefits of marijuana, but she said that her personal beliefs about marijuana had not affected her affidavit.  *Id.*

Ms. McTague also explained that she told the defense lawyers that she would not testify about her husband and the lawyers had told her that her affidavit would likely keep her out of court.  *Id.*  She was unaware that she had been listed as a potential witness at the trial.  *Id.*

### D.    The March 30, 2010 Television Interview

At oral argument, the Government introduced a disc of a television interview of both Mr. and Ms. McTague by a local television reporter that took place on March 30, 2010.  *Gov't Ex.* 7, 7A.  During the interview, both Ms. McTague and Mr.

32

McTague discussed the impact his brain injury has had on their lives.  *Id.*  The contents of the televised interview do not add anything new, but the interview confirms that Mr. and Ms. McTague were not attempting to hide his brain injury and discussed publically the impact his traumatic injury had had upon him and their family.

### E.      The March 17, 2015 Hearing

On March 17, 2015, the Court held a hearing on this motion.  At a pre-hearing conference, the Court indicated to counsel that it would allow the lawyers to present the testimony of witnesses at the hearing, including Ms. McTague.  However, the parties decided to rest on exhibits rather than presenting testimony.

## VI.    DISCUSSION

As a threshold matter, the Court concludes that the Government's failure to disclose to the defense Ms. McTague's interview with AUSA Casey and Agent Richards constitutes a *Brady* violation.[7]  The evidence would have been favorable to the Defendants and the Government conceded in its opposition memorandum that it did not disclose it to the defense.  The Court turns to whether the violation requires a new trial for the Defendants.

### A.      Evidence Unknown or Unavailable to Defendants at Trial

---

[7]      The Government never explained why it failed to reveal this *Brady* information to the defense. The failure to do so has resulted in the Defendants' post-trial motion, the Government's subsequent investigation, the Government's post-trial memorandum, the holding of an oral argument, and the issuance of this extensive decision.  All of this would have been avoided if only the Government had simply disclosed the meeting and its contents to the defense.

For the Defendants to meet their burden, they must first satisfy the first two prongs of the *Wright* test—that the "evidence was unknown or unavailable to [them] at the time of trial" and the Defendants' failure to learn about it did not result from a lack of due diligence. *Connolly*, 504 F.3d at 212-13.

Based on the record, the Court concludes that the Defendants have not sustained their burden to demonstrate that they did not actually know about the 2009-10 meeting at the time of trial or in the exercise of due diligence could not have found out. The Defendants' claim fails on this ground alone. *United States v. Carpenter*, No. 14-1286, 2015 U.S. App. LEXIS 5109, at *51 (1st Cir. Mar. 20, 2015) ("'[W]e have no discretion to grant a motion for a new trial if any one of the four factors is lacking'") (quoting *United States v. Hernandez-Rodriguez*, 443 F.3d 138, 143 (1st Cir. 2006)).

The record reflects that Ms. McTague and Ms. Chase were close friends and during her March 2, 2015 interview, Ms. McTague revealed that during the January 2014 trial, Ms. Chase contacted her and asked her whether she would be willing to testify about her husband's mental health status. Ms. McTague met with Ms. Chase and at that meeting, Ms. McTague told Ms. Chase about the 2009-10 meeting with AUSA Casey and Agent Richards during which she tried to get the Government to understand his mental health status.

Six months post-verdict, Ms. Chase contacted Ms. McTague again and asked her about the 2009-10 meeting with the Government. This is significant because it confirms that Ms. McTague had told Ms. Chase about the 2009-10 meeting during

the trial in January 2014 and Ms. Chase must have been following up on information she already knew.

It is possible, but unlikely, that when Ms. Chase contacted Ms. McTague during the trial, she was acting purely on her own and that she never communicated any of this information to defense counsel. It is more likely that she was acting as an emissary for defense counsel when she did so. After all, the purpose of Ms. Chase's contact during trial was to see if Ms. McTague would testify as a witness at the trial about her husband's mental health and the approach to Ms. McTague would have a greater likelihood of success if made by her close friend than by a defense lawyer. Moreover, when Ms. Chase contacted Ms. McTague post-trial, she was clearly acting as an agent for the defense, a fact confirmed by her request that Ms. McTague meet with the defense lawyers.

But the overriding point is that Ms. Chase was readily able to discover the 2009-10 interview during the trial. Mr. Chase listed Ms. McTague as a potential trial witness. *Def., Kendall Chase, Witness List* at 1 (ECF No. 283). There is no suggestion that Ms. McTague was hiding her 2009-10 meeting with the Government. To the contrary, she freely told Ms. Chase about the meeting during the trial, reconfirmed it after trial, met with lawyers for both the defense and the Government after trial and discussed the meeting, and reduced the meeting and its contents to a sworn affidavit.

To resolve the motion for new trial, the Court is loath to definitively determine that the defense actually knew about the 2009-10 interview during the trial. Neither the Defendants nor the Government elected to call as a witness at the March 17, 2015

35

hearing the one person who knows the answer to this question and who is not bound by an obligation to maintain client confidences: Jan Chase. Even the Court could draw an inference that Ms. Chase must have told the defense lawyers about her meeting with Ms. McTague during trial, but the Court must assume that the defense lawyers would not have filed a motion for new trial based on newly discovered evidence if they had the evidence all along.

The Court instead turns to whether the defense in the exercise of due diligence should have known about the 2009-10 interview. Here, the fact that Ms. Chase was able without any apparent difficulty to elicit this information from Ms. McTague during and after trial establishes that if the Defendants had exercised due diligence concerning the potential testimony of their own listed witness, they could have discovered it too simply by interviewing her.[8]

The Court concludes that the Defendants' motion must fail because they have failed to establish the first two elements of the *Wright* test: that "the evidence was unknown or unavailable to [them] at the time of trial" and that the Defendants' assumed failure to learn about it did not result from a lack of due diligence. *Connolly*,

---

[8]   The report of the March 2, 2015 Lowell-Kelly interview of Ms. McTague states:

> [Ms.] McTague also stated that she believes marijuana should be legal and that it is crazy that CHASE will be going to jail for something that will soon be legal. She believes in the medical benefits of marijuana. She is also close friends with Jan Chase, cares for her well-being, and wonders who will care for her as she (Chase) has [redaction].

*March 2, 2015 Investigation* at 4. At the same time, she stressed that her attitudes toward marijuana had not affected the contents of her affidavit. *Id.* Ms. McTague's attitudes toward marijuana, toward the prosecution of Mr. Chase, and toward her friend Ms. Chase, all suggest that Ms. McTague would have been willing to speak freely with defense counsel had she been approached.

504 F.3d at 212-13.  Even though the Defendants' motion must be denied for this reason alone, the Court proceeds forth in this decision to address the merits of the other factors.

## B.    The Prejudice Prong: A Reasonable Probability of a Different Result

### 1.    Actual Knowledge

Under the *Connolly* formulation, as previously noted, the Defendants must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.* at 213 (internal citations and quotation marks omitted).  In other words, as the Supreme Court stated, the question is whether in absence of the undisclosed evidence, the Defendants nonetheless "received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles*, 514 U.S. at 434.

To resolve this issue, the Court begins by comparing the contents of the 2009-10 meeting with the Government's disclosures and the Court concludes that the defense actually knew almost all of what Ms. McTague informed AUSA Casey and Agent Richards in 2009-10.  Her statements that he had a traumatic brain injury from the June 27, 2007 motorcycle accident and that he was in a "compromised mental state" and "a very compromised mental position" are found in the disclosed material.  *See Gov't's Ex.* 2 (Mr. McTague suffered "pretty severe injuries" as a result of the June 27, 2007 motorcycle accident, including brain injuries, and he has difficulty remembering due to his brain injury); *Gov't's Ex.* 3, 3A (he has a brain injury, he was operating his motorcycle at 80 miles per hour before the accident, he

37

was not wearing a helmet at the time of the accident, he suffers from "bad, bad headaches," his brain doctor had given him a card that said he has "sustained a brain injury" and "may become confused [and] disoriented," and his "brain is still mush"). Her concern that testifying would be stressful and "detrimental for his health" is more generally echoed in the doctor's note about his potential for confusion and disorientation and the disclosure that "[i]f [he] is exposed to excessive environmental stimuli, noise or threatening situations, this exposure may result in behavior outbursts." *Gov't's Ex.* 3, 3A. Her statement that he was "very paranoid," although not revealed using that term, is consistent with his stated fears of "getting killed," his "wife getting raped," and his "house getting burned." *Id.*

### 2.    Undisclosed Information

What is not directly revealed in the disclosed material is (1) that Mr. McTague had a tendency to exaggerate, (2) that he was suicidal, (3) that he saw things as movies in his head, (4) that he thought helicopters were following both him and his family, and (5) that these concerns were coming from Mr. McTague's wife.

The Defendants complain that the non-disclosed information would have been admissible as impeachment evidence: "This information could have been used to impeach the credibility of the government's key witness and his ability to accurately recall information." *Chase Mot.* at 6. Under *Connolly*, "undisclosed impeachment evidence, if it suffices to undermine confidence in the outcome of the trial, may carry the day." *Connolly*, 504 F.3d at 213.

### a.    Cross-examination of Mr. McTague on What the Government Failed to Disclose

38

A detailed review of Mr. McTague's actual testimony establishes that on cross-examination, defense counsel presented the jury with substantially all of what the Government failed to disclose, and therefore, the Government's failure to disclose was not prejudicial to the Defendants. *See Paladin*, 748 F.3d at 447 ("A prejudicial *Brady* violation has not been effected . . . where the defendant already had available to him evidence that would have allowed for impeachment on the same or similar topics").

Mr. Chase says that Mr. McTague could have been questioned about his bias against the Defendants. *Chase Mot.* at 6. But Ms. McTague did not tell AUSA Casey at the 2009-10 meeting that Mr. McTague was biased against the Defendants. Furthermore, the Government revealed to the Defendants that on November 9, 2010, Mr. McTague had left a message with the Government in which he stated that he wanted to make sure "we get these bastards." *Gov't's Ex.* 3, 3A. Mr. McTague was cross-examined regarding his anger against the Defendants and specifically about his "we get these bastards" voicemail message to AUSA Casey. *McTague Test. II* 23:15-24:12.[9]

Mr. Chase also says that Mr. McTague could have been questioned about "how the extraordinary stress being placed on him affected the movies in his head." *Chase Mot.* at 6. But Ms. McTague did not tell the Government that stress affected the movies in his head. Her affidavit says that she told the Government that she was worried that the stress from testifying at trial "would be detrimental for his health"

---

[9]     During oral argument, Mr. Chase's counsel, Attorney Sharon, indicated that he no longer stood by the "bias" argument for the reasons pointed out to him by the Court. *Oral Argument Tr.* 104:18-105:7 ("I don't hold to it anymore").

and would be "too much for Winston." *McTague Aff.* ¶¶ 8-9. Furthermore, the Government had disclosed to the Defendants that "[i]f [Mr. McTague is] exposed to excessive environmental stimuli, noise or threatening situations, this exposure may result in behavior outbursts," a disclosure that stress can have an effect on him. *Gov't Ex.* 3, 3A.

Regarding "movies in his head," Ms. McTague described to the Government "how Winston saw things in his mind which he described as 'movies in his head' and that, at the time, he was very paranoid." *McTague Aff.* ¶ 12. Even though the Government did not disclose this statement to the defense, the phrase came out repeatedly during cross-examination of Mr. McTague:

> Q. In your terms of your ability to think, how has it changed for you?
> A. Short-term memory loss and all my memories are like a movie.
> Q. What do you mean by that?
> A. That I have to see them and think about it and dwell on it.
> Q. So what do you mean you have to see it and think about it and dwell on it? What does that mean?
> A. Brain injury talks.
> Q. Well, we need to understand what you mean by that because we're not familiar with brain injury talk.
> A. Things come and go.
> Q. What do you mean you have to see?
> A. You have to look into your head and see it.
> Q. You mean you try to get a - - like an image in your mind of what happened?
> A. Right, right.
> Q. And if you have an image in your mind of what happened, then you figure that's something that you can remember?
> A. No, I don't figure. I remember it.

*McTague Test. I* 57:25-58:20. Defense counsel repeated the phrase periodically and closely questioned Mr. McTague about it:

> Q. So tell us about that. What do you mean - -

> A. About what?
> Q. - - you can't stop thinking and worrying and bothering over and over?
> A. Just what it sounds like.
> Q. So is it like a movie that keeps replaying in your head?
> A. Just can't stop thinking about it, ayuh.
> Q. But each time it replays, it comes out differently, doesn't it?
> A. No.

*Id.* 66:5-14.

> Q. In other words, your memory comes and goes; is that correct?
> A. Ayuh.
> Q. And you described yesterday to the jury that when you're looking at your memory, it's [like looking] at a film or a movie; is that correct?
> A. Nah, I didn't say a movie.
> Q. Did you say a film?
> A. I don't know if I did or not.

*McTague Test. II* 44:5-13.  In light of the fairly extensive trial testimony about movies in his head, the Defendants have not explained why knowing what Ms. McTague had told the Government about this phrase would have made a difference at trial.

It is true that the fact that Mr. McTague was suicidal did not come out at trial. At the same time, Ms. McTague's statements about Mr. McTague's suicidality are confusing.  In her affidavit, she states: "At the time of the meeting, Winston was suicidal." *McTague Aff.* ¶ 11.  However, when she met with AUSA Lowell and Agent Kelly on March 2, 2015, she said that "he was suicidal in 2009, but . . . he improved by 2014 and is more stable now."  *March 2, 2015 Investigation* at 4.

Cross-examination of Mr. McTague on his past suicidal ideation would have been dicey for the defense.  Even though defense counsel are generally allowed substantial leeway in cross-examining key witnesses, whether Mr. McTague was actually suicidal after the motorcycle accident would have faced Rule 403 problems.

The relevance is tangential to his credibility and, although it could indicate the severity of his physical and mental injuries, the record is replete with such evidence, including Mr. McTague's statement that "my life ended on 6/27/07, all of my past is erased, everything. I have nothing." *McTague Test. II* 25:9-10. This evidence, elicited on cross-examination, establishes that following the accident, Mr. McTague was (and perhaps still was) severely depressed. The difference between his severe depression, which he admitted, and his past suicidality is not sufficient to carry the day for the Defendants. Finally, although this evidence might have signaled the significance of Mr. McTague's brain injury, it may well have generated sympathy for him and resentment against the defense lawyers. The Court does not conclude on the suicidality issue that a reasonable probability exists that "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Connolly*, 504 F.3d at 213 (internal citations and quotation marks omitted).

Mr. Chase also asserts that "[m]ost importantly, had the defense been in possession of this information, they could have questioned Mr. McTague as to his exaggerations and how that tendency affected his ability to accurately recall the extent of Mr. Chase's participation and the scale of the alleged endeavor." *Chase Mot.* at 6. Mr. French echoes this point. *French Mot.* at 5-6. He says that Mr. McTague was "permitted to testify at confusing length about various alleged events while maintaining that although he was someone who could not remember everything, everything he did remember was true and accurate." *Id.*

But the record here is filled with Mr. McTague admitting to exaggerations and with his difficulty recalling past events.   By the Court's count, during cross-examination, Mr. McTague admitted that he had lied at least six times.   Nor were the lies white lies or lies unrelated to the conspiracy.   He admitted he had (1) lied to the Government and to the police about his earlier involvement in the Danforth marijuana grow operation with Mr. Chase, *McTague Test. I* 37:25-38:17, 49:5-7; (2) lied about performing an investigation of the LaGrange marijuana operation when he was visiting the French camp, *id.* 44:8-9; (3) lied about seeing people cultivating marijuana when he visited the French camp, *McTague Test. II* 4:20-24; (4) lied about overhearing the co-conspirators talk about expanding to Township 37 while he was in bed, when in fact he was in the living room peeling marijuana, *McTague Test. I* 81:4-82:6; (5) lied about taking a job with Mr. Chase to find out more about the marijuana grow operation, *id.* 45:7-10; and (6) lied about saying that Mr. Chase had told him he would get him more involved.   *McTague Test. II* 16:22-23.   Mr. McTague even admitted lying under oath before a grand jury about being in bed and overhearing conversations, *id.* 12:12-15:10, and about Mr. Chase's promise to get him more involved.   *Id.* 16:18-23.   As a deliberate lie is more serious than an exaggeration, the multiple admissions about deliberate lies, some under oath, eclipse evidence of prior exaggerations.

Moreover, during his testimony, Mr. McTague repeatedly affirmed that the motorcycle accident had badly affected his memory.   In fact, at least twice during his testimony, his difficulty with memory was on display; he denied that he had testified

to what the transcripts clearly later establish he did say.  He denied testifying that he had been interviewed by an agent named Steve Sicard, but the transcript of his prior testimony, which occurred on the same day as his subsequent denial, establishes that he did so testify.  *Compare McTague Test. I on Direct Examination* 7:20-23 ("Q. Okay.  You met another agent named Steve Sicard?  A. Yeah.  Q. Big fella from DEA?  A. Yeah"), *with id. on Cross-Examination* 47:1-11 ("Q. Do you know a gentleman by the name of Steven Sicard?  A. No.  Q. Do you remember a gentleman by the name of Special Agent Steven Sicard, United States Department of Justice, DEA?  A. No.  Q. Did you not testify about 20 minutes ago that you knew Mr. Sicard because he was a big guy and he was an agent who interviewed you?  A. No.  Q. Those words never passed your lips?  A. Not here").  Also, even though Mr. McTague had testified the day before that his memory was like a movie playing in his head, he denied having said "movie."  *Compare id.* 58:2-3 ("Short-term memory loss and all my memories are like a movie"), *with McTague Test. II* 44:8-11 ("Nah, I didn't say a movie").

### b.   Kelley McTague's Meeting as Grounds for Cross-Examining Winston McTague

Mr. French also says he was in the dark about "why his wife was so concerned about his ability to testify at trial that she sought out a meeting with the Government to warn them that he should not testify."  *French Mot.* at 6.  It is unclear how Ms. McTague's concerns about her husband's mental state and their meeting with the Government would have been admissible during Mr. McTague's testimony.  To ask Mr. McTague about what Ms. McTague had said about him to the Government would

have invited hearsay.  FED. R. EVID. 801.  It is difficult to see how such cross-examination would be proper.[10]

Mr. French's next point is that Mr. McTague was specifically asked about "whether or not family members had expressed concerns about his ability to accurately and truthfully remember events" and that Mr. McTague "denied, incredibly, any such concerns had ever been expressed."  *French Mot.* at 6.  First, it is true that when asked this question, Mr. McTague denied it.  *McTague Test. II* 44:24-45:8.  However, elsewhere in his testimony, Mr. McTague admitted that he had been told since the accident that he was "mixing things up" and that family members were indeed trying to help him remember past events.  *McTague Test. I* 59:14-16 ("Q. Do people - - have you been told since the accident that you're mixing things up?  A. Oh, yeah"); *McTague Test. II* 45:9-11 ("Q. Okay.  Well, don't they try to help you remember what - - things that happened that you can't remember?  A. Well, yeah").  Defense counsel were able to establish through cross-examination that Mr. McTague did have difficulty with his memory and had lied repeatedly.  For example, on cross-examination the following appears:

> Q. Well, tell us about your mind being screwed up back then.
> A. I hit the roof of a car doing 87 miles an hour with my face.  What do you suppose it did?
> Q. I'm sorry.  I didn't under - - I didn't hear you.  Say it again?

---

[10]    The distinctions here seem apparent.  On cross-examination, a witness might be asked if he thinks he is losing his mind but not whether his wife thinks he is losing his mind or whether his wife has told other people that she thinks he is losing his mind.

During oral argument, Attorney Sharon acknowledged that the defense would not have been able to ask Mr. McTague about what his wife said.  *Oral Argument Tr.* 113:2-13 ("THE COURT: [Y]ou're not going to try and pull out McTague's - - Mrs. McTague's testimony through Mr. McTague? MR. SHARON: No, I don't think I could. . . . I'm not sure I could even question him on what his wife says").

A. I hit the car doing 87 miles an hour with my face.  What do you suppose it did?

Q. That was part of the motorcycle accident?

A. Yep.

Q. All right.  Well, fortunately, I've not been through that.  So tell us, what did it do to your mind?

A. I had a traumatic brain injury.

Q. Well, I understand that.  But did it cause you to get mixed-up?

A. Oh, yeah.

Q. Did it cause you to remember things funny?

A. Yep.

Q. And not remember things, right?

A. No, they come and go.

Q. Okay.  Did it cause you to make up stuff?

A. No.

Q. So if you lied, that wouldn't have been attributable to your head injury?

A. I suppose it could have been.

Q. Could have been, huh?  Or maybe you knew you were lying and that was your plan, correct?

A. Could be.

*McTague Test. I* 73:10-74:12.

By this and similar testimony  previously discussed, the Defendants were more than able to make the point to the jury that Mr. McTague had experienced a profound traumatic brain injury, that he misremembered things, that people had told him that he had misremembered things, and that, even when he remembered things, he had lied.  As the Defendants themselves suggest, Mr. McTague's denial that members of his family and friends had told him that he was misremembering things and could not truthfully recall things is counterbalanced by other evidence in the record.  Based on their cross-examination of Mr. McTague, a jury could well have concluded, as the Defendants now assert, that his denial that "any such concerns had ever been expressed" was "incredibl[e]."  *French Mot.* at 6.

Furthermore, Mr. French overstates what Ms. McTague told the Government at their meeting and what Mr. McTague actually testified to at trial. Although Ms. McTague told the Government that Mr. McTague had a tendency to exaggerate, she did not tell the Government that Mr. McTague was misremembering events before the motorcycle accident. In fact, she told AUSA Lowell and Agent Kelly that Mr. McTague "can absolutely tell the truth." *March 2, 2015 Investigation* at 4. She acknowledged that he had a tendency to "fill in parts" he did not remember but denied that she ever said that he was "incapable of telling the truth." *Id.* The lines between these statements are thin and the Court is not convinced that the difference between the numerous lies Mr. McTague admitted and his misremembering events is significant.

Mr. French also claims that he "never knew to ask him questions . . . about "his extreme paranoia, who he thought was watching him, and why." *French Mot.* at 6. But, once again, the Government disclosed to the defense that Mr. McTague was afraid of getting killed, his wife getting raped, or his house getting burned. *Gov't's Ex.* 3. Although this disclosure does not use the word, "paranoia," Mr. McTague's fears are consistent with this condition.

At trial, defense counsel wisely elected not to proceed into certain disclosed areas, including his concern for being killed, his wife being raped, or his house being burned, presumably because such evidence could have backfired against their clients, either causing sympathy for Mr. McTague or raising a question as to whether Mr. McTague was reasonably concerned that the Defendants were capable of such

47

violence.  Even though the defense did not use the disclosed information about Mr. McTague's paranoia, they insist that they would have used non-disclosed information, specifically Ms. McTague's statement that Mr. McTague thought "they" were "using helicopters to follow the McTagues." *March 2, 2015 Investigation* at 3. According to Attorney McKee, this information regarding helicopters would not have been cumulative because it went to an area not previously discussed during cross-examination—mental illness and Mr. McTague being "delusional" as stated by Attorney Peterson—and could have also been used to challenge AUSA Casey's closing argument that Mr. McTague "knows what he knows." *Oral Argument Tr.* 125:9-11, 125:22-126:10, 133:4-10; Section VI.C.6.a, *infra*.[11]  In Attorney McKee's evocative phrase, the defense was deprived of arguing that Mr. McTague had engaged in "magical thinking" about helicopters in the air. *Oral Argument Tr.* 125:7-10.

First, the Court addresses Attorney McKee's contention that this evidence would not have been cumulative.  Although Attorney McKee and Attorney Peterson

---

[11]     The Government questioned whether Ms. McTague revealed this information relating to helicopters in 2009-10, or whether it came out for the first time on March 2, 2015.  Ms. McTague's affidavit makes no mention of helicopters, and although Ms. McTague stated during the March 2, 2015 interview that the purpose of the 2009-10 meeting was to articulate her concerns for her family's safety, the affidavit makes no mention of this either.

     If Ms. McTague told AUSA Casey and Agent Richards about helicopters in 2009-10 and the Government had disclosed the interview, the defense would have been made aware of it.  However, if she did not mention the helicopter comment but the Government revealed the substance of the interview, the defense could easily have obtained the helicopter information by interviewing Ms. McTague.  Whether a *Brady* violation extends not only to what the Government knew but what the defense could reasonably have discovered is unclear.

     Here, there is an ambiguity on this point in the Government's synopsis of the Kelley McTague March 2, 2015 interview.  But the Defendants decided not to put Ms. McTague on the stand on March 17, 2015 and were satisfied with the record, including the ambiguity.  As the burden falls on the Defendants, the Court does not resolve that ambiguity in their favor.  However, in fairness to the Defendants, the Court has assumed that Ms. McTague told the Government about the helicopters in 2009-10.

argued this information would have covered a new topic not previously discussed during cross-examination—delusional thinking—the Court disagrees. This information is in line with other information that the Defendants knew before and during trial; namely, information suggesting that Mr. McTague was prone to exaggerate and suffered from paranoia. In fact, even Ms. McTague viewed this information as an exaggeration. *March 2, 2015 Investigation* at 3 ("[Ms.] McTague believed Winston to be exaggerating about the helicopters, but was still concerned about her family's safety"). Furthermore, at the very least, questioning Mr. McTague regarding these helicopters would have been a similar topic to evidence and information already obtained by the Defendants. *See Paladin*, 748 F.3d at 447 ("A prejudicial *Brady* violation has not been effected . . . where the defendant already had available to him evidence that would have allowed for impeachment on the same or *similar topics*") (emphasis added).

Even if not cumulative, for argument's sake, how the comments would have been admitted into evidence is another matter. If the defense had known that he feared he and his family were being followed by helicopters, they could have questioned him about this so-called fantasy or "magical thinking." What he would have responded is anyone's guess. If he had admitted everything (which he may well have done), the defense would have had additional rebuttal arguments about AUSA Casey's "knows what he knows" argument. AUSA Casey harped on the point during his closing argument that Mr. McTague repeatedly stated during his testimony that he "knows what he knows" and at the March 17, 2015 hearing, Attorney McKee

49

argued that had the defense been able to bring out during cross-examination that Mr. McTague thinks he "knows he saw helicopters," the Defendants could have challenged AUSA Casey's point that he accurately "knows what he knows."

There are problems with this argument. First, the Court observes that this rebuttal argument about Mr. McTague's credibility would have been only incremental. The defense had a stockpile of credibility ammunition to use against Mr. McTague and they used it to full effect during their closings. Second, for purposes of challenging Mr. McTague's credibility, the difference between paranoid and magical thinking is thin; it is unclear whether Ms. McTague was saying that her husband actually saw helicopters and thought they were following his family and him, an example of paranoid thinking, or that her husband simply imagined non-existent helicopters, an example of magical thinking. Third, AUSA Casey conceded during his closing argument, right after his "knows what he knows" point, that he (AUSA Casey) "does not expect you to accept Mr. McTague's testimony at face value." *Partial Tr. of Proceedings* 6:3-4 (ECF No. 471) (*Casey Closing Argument*). Fourth, there was evidence at trial suggesting that Mr. McTague did not accurately know what he claimed he did, including his misremembering his earlier testimony about movies in his head and Agent Sicard.

Finally, questions about helicopters could well have been chancy. The door would have been opened to Mr. McTague's concerns about retribution from the Defendants, particularly Mr. Chase. In other words, if Mr. McTague had acknowledged that he had worried about being followed by helicopters, he likely

would have explained that Kendall Chase was the source of his concern, which is what he told his wife.  Again, Mr. McTague's worries, reasonable or not, were connected directly to Kendall Chase and Mr. Chase's supposed connections with the Hells Angels.  Given the substantial inroads defense counsel made on Mr. McTague during cross-examination, questioning him about his concerns regarding his and his family's safety may well have been seen as piling on and would have run a significant risk of planting seeds that the Defendants were not as upstanding and benign as they seemed.

### c.    Kelley McTague's Impeachment Testimony

In their motion and at oral argument, the Defendants argued that they may have called Ms. McTague as a witness and that the Government's *Brady* violation prevented them from doing so.  *French Mot.* at 6 n.2 ("The meeting with Kell[e]y McTague and her cogent and personal observations of his exaggerations, extreme paranoia, and the movies he saw in his head would have solved this problem . . . .").

If Mr. McTague had admitted these exaggerations, gap filling, and the helicopter worries, the defense would not have been allowed to call Ms. McTague to recite what he had already admitted.  If he denied these matters, the Court doubts that the defense would have been allowed to call Ms. McTague to testify that in her opinion, he exaggerated and filled in gaps.  The Defendants would have had to convince the Court that Ms. McTague's testimony was not impermissible character evidence.  FED. R. EVID. 404.  If the Defendants had asked Ms. McTague about specific instances in which Mr. McTague had exaggerated or filled in gaps, they would have

run afoul of Rule 608(b). FED. R. EVID. 608(b). She may have been able to give an opinion about her husband's reputation for truthfulness or her personal observations about her husband's troubles since his motorcycle accident. FED. R. EVID. 608(a). But on this record, it is unclear what she would have said. If directly asked, she may have said—as she did on March 2, 2015—that he "can absolutely tell the truth," a response that would have hardly advanced the defense.

If Mr. McTague denied the helicopter comment, it is possible that the defense would have been allowed to ask Ms. McTague whether he had ever told her that he was worried that a helicopter was trailing the McTague family. But again, this impeachment evidence would not have been unalloyed. The Government may have been allowed to follow up and explore the context, namely, Mr. McTague's fear of Mr. Chase, a subject the defense carefully avoided during trial.[12]

Indeed, Ms. McTague's March 2, 2015 interview with AUSA Lowell and Agent Kelly confirms the wisdom of defense counsel. Ms. McTague told AUSA Lowell and Agent Kelly that there were two reasons she had requested the meeting with the Government: (1) her concern about Mr. McTague's mental health, and (2) her worry about death threats against the McTague family, especially given Mr. Chase's alleged connections with the Hells Angels and Mr. McTague's claim that Mr. Chase had put out a contract on them with the Hells Angels. *March 2, 2015 Investigation* at 3.

---

[12]    Although it is difficult to retrospectively rule based on the evidence now before the Court, if all of this had all blossomed during trial—asserted "magical thinking" of pursuing helicopters and Mr. McTague's concerns about Mr. Chase's vengeance and his alleged affiliations with the Hells Angels— the Court may well have declined to allow either the defense or the Government to present evidence on this side-issue under Rule 403, especially in light of the defense's significant erosion of Mr. McTague's credibility from uncontested evidence.

Finally, in another respect, Ms. McTague's testimony would have been harmful to the Defendants, especially Mr. Chase. Mr. McTague testified that he and Kendall Chase had been friendly and had grown marijuana together even before the French operation began. Again, Mr. Chase did not testify and the only testimony about a friendship between Mr. Chase and Mr. McTague had come from Mr. McTague, whose credibility and memory had been attacked by the defense. In her March 2, 2015 meeting, Ms. McTague confirmed that she had met Jan Chase through Mr. McTague and Mr. Chase and that the two women had become "very close friends . . . after meeting through their husbands." *Id.* at 2. Assuming Ms. McTague had testified, her close friendship with Ms. Chase would have corroborated Mr. McTague's testimony about his long-term friendship with Mr. Chase.

In short, if the Government had revealed the *Brady* information about what Ms. McTague told AUSA Casey and Agent Richards about Mr. McTague in 2009-10, her usefulness as an impeaching witness for the defense would have been narrow and counterbalanced.

### d.   Kelley McTague as a Non-Impeaching Witness

As previously discussed, if the Defendants had known about Ms. McTague's visit to the Government, they may have called her as a witness to confirm the changes in Mr. McTague after the motorcycle accident. *See Oral Argument Tr.* 97:18-98:4, 114:6-115:7 (Attorney Sharon indicated during oral argument that he may have attempted to call Ms. McTague to testify regarding her observations of her husband had the Court allowed it). In addition, the Defendants would likely have been able

to elicit from Ms. McTague that she had approached the Government with her concerns, even if what she told the Government may have been inadmissible.  If the defense had been allowed to bring out one of Ms. McTague's reasons for going to the Government, namely, concerns about Mr. McTague's mental health, the Government would likely have been allowed to bring out the second reason, namely, her concerns about family safety and death threats.

Nevertheless, under any scenario, the Defendants would likely have been allowed to present Ms. McTague's testimony about her personal observations concerning her husband's mental state, changes in his ability to recall, his tendency to exaggerate, paranoia, and other matters, and perhaps that she had met with the Government about her concerns.  The jury may have given her testimony special weight because as Mr. McTague's wife, she would have had a unique and close perspective on him.

There are a couple of caveats.  First, even without knowing that Ms. McTague approached the Government, the Defendants had to have known that Ms. McTague witnessed the changes in Mr. McTague that were a matter of record before trial and were evident on the stand.  Mr. Chase listed her as a witness and there has been no claim that she was unavailable to the defense or that they could not have secured essentially the same information, including the visit to the Government, had they asked.  Second, although Ms. McTague's testimony about her husband's pre- and post-accident mental condition would have had special convincing power, the evidence that Mr. McTague suffered a significant brain injury as a result of his June

27, 2007 motorcycle accident was so overwhelming that her testimony would have been cumulative.

### e.   Summary

In sum, to assess the damage from the Government's non-disclosure, the Court has compared what was and what was not disclosed before trial and with what came out during Mr. McTague's testimony during trial.   The Court concludes that defense counsel already knew or, during cross-examination of Mr. McTague, found out virtually all of the information that Ms. McTague imparted to AUSA Casey and Agent Richards in 2009-10.   What defense counsel did not know was that Mr. McTague's wife had come to the Government to express concerns about his testifying before the grand jury.   But defense counsel have not explained how her visit to the Government would have been admissible through cross-examination of Mr. McTague, nor have they convinced the Court that had Ms. McTague been allowed to testify, her testimony would have established a reasonable probability that the result of the trial would have been different.

### C.   Corroborating Evidence

The First Circuit has explained that "'suppressed impeachment evidence has little probative value if additional evidence strongly corroborates the witness' testimony the suppressed evidence might have impeached.'"   *Paladin*, 748 F.3d at 444 (quoting *Conley*, 415 F.3d at 189).   The Court turns to the strength of the evidence that corroborated Mr. McTague's testimony.

### 1.   The Rest of the Government's Case

Although the Government's case against these Defendants began with Winston McTague, it did not end there. In fact, the Government presented massive amounts of evidence that, as described below, "strongly corroborate[d]" Mr. McTague's testimony. *Id.* The Government called twenty-nine additional witnesses and introduced 308 exhibits and stipulations, many with multiple subparts. *Witness List* (ECF No. 309); *Ex. List* (ECF No. 310). The evidence that someone was engaged in a large scale marijuana grow operation in the middle of Township 37 was indisputable.[13] In fact, none of the Defendants ever challenged the fact that there was such an operation in Township 37. Their defense was that they were not involved in the marijuana grow and someone else must have been growing the marijuana. In Attorney McKee's memorable words during his opening statement on behalf of Mr. French: just because you own the haystack does not make you responsible for the needle. *Partial Tr. of Proceedings* 2:18-21, 11:12-19 (ECF No. 481).

There was also evidence of a marijuana grow on Mr. French's land in LaGrange. But here the defense was more convoluted. When he testified, Mr. French said that in the summer of 1999, he had moved a feller buncher, a grapple skidder and a delimber to his property in Otis, Maine. *Partial Tr. of Proceedings* 15:3-8 (ECF No. 362) (*French Test.*). He received word that his three pieces of equipment had

---

[13]     During the March 17, 2015 hearing, the following interchange took place between the Court and Attorney McKee:

> THE COURT:  My thought about the defense in this case was as follows: No one on the defense side, to my knowledge, ever denied that there was a significant marijuana grow operation in the middle of Township 37.
> MR. MCKEE:  That's correct, Your Honor.

*Oral Argument Tr.* 55:23-56:4.

caught fire and had burned. *Id.* 15:9-22. He thought it was arson. *Id.* 16:23-17:3. Mr. French thought initially that one of the camp lot owners had burned his equipment because he was getting opposition to his clear-cutting operations from them. *Id.* 16:7-18.

Mr. French said that in 2003, he discovered marijuana growing on his property in LaGrange. *Id.* 17:8-18:12. Mr. French said that he reported it to a game warden, Ron Dunham, who told him that he had contacted the DEA, but they were busy and that they were "just going to let it go." *Id.* 17:23-18:4.

Then in 2005, Mr. French discovered another marijuana grow operation on his property in LaGrange. *Id.* 18:13-15. Mr. French said he was very much concerned about the marijuana grow operation but based on his 2003 experience, he decided not to contact the game warden. *Id.* 20:8-13. Mr. French received a visit from Mike Smith, who told him that the LaGrange marijuana was owned by a motorcycle group, which went by the name of Red Patch. *Id.* 28:23-29:10. Mr. Smith told Mr. French that the Red Patch gang knew about the Otis fire, were angry that someone had taken their marijuana, and wanted to make sure he did not go to the police. *Id.* The gang demanded reparations in the amount of $35,000 and Mr. French testified that he agreed to pay the $35,000. *Id.* 30:19-31:23. However, he paid in the form of Promix, fencing, and tarps, which he ordered through his business. *Id.* 31:24-40:6.

But the Government had more than merely Winston McTague to link the Defendants to the marijuana grows in both LaGrange and Township 37. The Government presented the testimony of Moises Soto, a naturalized United States

citizen originally from Mexico, who testified that Mr. French hired him to recruit Mexican workers to clean marijuana. *Partial Tr. of Proceedings* 10:3-12 (ECF No. 369). Mr. Soto obtained Mexican workers through a contact and they worked in Township 37 for two seasons. *Id.* 25:5-6. Throughout his testimony, Mr. Soto identified Mr. French and Mr. Russell as being involved in the operation. *Id.* 9:5-87:7.

The Government also presented the testimony of Miguel Roblero, an illegal Mexican worker, who was recruited to work on the marijuana grow by Mr. Soto, and who identified Mr. French, Mr. Chase, and Mr. Russell as participating in various capacities in the marijuana grow operation. *Partial Tr. of Proceedings* 12:6-85:11 (ECF No. 370) (*Roblero Test.*).

The Government presented the testimony of Fai Littman, a childhood friend of Rodney Russell's son, who testified that he bought marijuana from Malcolm French and from Rodney Russell. *Partial Tr. of Proceedings* 13:14-27:6 (ECF No. 411) (*Littman Test. I*); *Partial Tr. of Proceedings* 3:20-56:3 (ECF No. 412) (*Littman Test. II*). Mr. Littman testified that he purchased marijuana from Mr. Russell in half-pound increments for $1,250 per half pound and from Mr. French in five pound deliveries for $12,500 a delivery. *Littman Test. I* 13:14-17:7; *Littman Test. II* 3:20-6:8. The Government also presented the testimony of Jared Flewelling, a young man, who broke into Mr. French's camp and stole marijuana from a plastic garbage can. *Partial Tr. of Proceedings* 3:19-7:15 (ECF No. 416).

In addition, the Government introduced, through testimony of foundational witnesses, business records from Cold Stream Contracting, one of Mr. French's businesses, and business records from Northern Tool & Equipment that confirmed the ordering and delivery of significant quantities of Promix, a mile and a half of Rabbit Gard, mossy oak tarps, propane heaters, and other items consistent with a large marijuana grow. *See, e.g.*, *Partial Tr. of Proceedings* 3:21-23, 8:15-9:1 (ECF No. 427) (Duncan Page, owner and manager of Louis E. Page, Inc., discussing the request he received for a mile and a half of Rabbit Gard); *Gov't's Ex.* 161(a) (email request for a mile and a half of Rabbit Gard); *Gov't's Ex.* 167 (propane heaters and mossy oak tarps). In fact, the Government presented the testimony of Linda Archer, a long haul trucker, who in 2007 made three deliveries of large quantities of Promix to a Haynes Timberland warehouse in Washington County. *Partial Tr. of Proceedings* 6:23-9:2 (ECF No. 417) (*Archer Test.*). Ms. Archer identified the people who unloaded the Promix from her trailer as Malcolm, a younger Malcolm, Kendall, Jake and Rodney, and she confirmed that two of the people in the courtroom were two of the people who unloaded the Promix. *Id.* 11:24-12:9, 44:10-25.

### 2. Winston McTague and Rodney Russell

Mr. Russell's claim that the failure of the Government to produce *Brady* material in his case caused a reasonable probability of a different result is a non-starter. Mr. McTague testified that he did not know Mr. Russell:

> Q. Is it fair to say now that you've never, ever once ever said that Rodney Russell had anything to do with anything?
> A. I don't know him, and I haven't seen him around when I was there.

Q. He was never involved in anything that you're talking about here today in court[?]
A. I don't know about the 2000 - - I don't know about the one they got busted on, but he weren't there when I was working there.
Q. And you worked there until 2007 and - -
A. 2006.
Q. Well, you went back down there in 2007 and checked it out.
A. Yeah.
Q. And at no point, even in 2009 when you talked to this - - the government, you never brought his name up.
A. Nope.
Q. And when shown a photograph of him in this photo book that was talked about, you didn't recognize him.
A. Nope.

*McTague Test. I* 56:16-57:10.   Mr. Russell testified in his own defense and he confirmed that he had never met Mr. McTague:

Q. Okay.  I want to ask you about some other names of people here.  Winston McTague - -
A. Never met him.
Q. - - you've heard - -
A. Never met him.  Thank God he said he'd never met me, too.
Q. Okay.  So you don't - - you don't know anything about him.
A. Not a thing.

*Partial Tr. of Proceedings* 13:14-22 (ECF No. 364) (*Russell Test.*).

Based on this testimony, the Court readily concludes that there is no reasonable probability that the result of the proceeding would not have been different as regards Mr. Russell.  For the Government's case against Mr. Russell, Mr. McTague performed only the role of tipster, alerting the Government to the existence of marijuana grows in LaGrange and Township 37, the existence of which was irrefutably established by other evidence.  Mr. McTague did not link Mr. Russell to the conspiracy; other witnesses did.  Therefore, Mr. McTague's credibility and the Government's *Brady* violation did not "put the whole case in such a different light as

60

to undermine confidence in the verdict" as regards Mr. Russell.  *Kyles*, 514 U.S. at 435.

### 3.    Winston McTague and Malcolm French

Mr. McTague did implicate Malcolm French as a participant in the conspiracy, and therefore, his testimony and his credibility were likely considered by the jury in assessing the Government's case against Mr. French.  However, there was an abundance of evidence that linked Mr. French to the marijuana conspiracy, and thus, strongly corroborated Mr. McTague's testimony.  The evidence included the location of the marijuana grows on land that Mr. French or his businesses owned, the size of the operations, which made it less conceivable that Mr. French would have been unaware of them, the use of Mr. French's businesses to purchase enormous quantities of equipment and material used in the operation, the confirmed presence of Mr. French during marijuana-related operations, such as unloading Promix, the confirmed presence of marijuana in an outbuilding owned by Mr. French at his LaGrange camp, the testimony of one witness who said that he actually purchased significant quantities of marijuana from Mr. French, the testimony of Moises Soto that Mr. French had contracted with him to provide illegal labor for the marijuana operation, and the testimony of Miguel Roblero that Mr. French was one of the people who checked on the operation in Township 37.

In the Court's view, it is not reasonably probable that the result of the proceeding would have been different as regards Mr. French, because the cumulative impact of the evidence implicating Mr. French in this conspiracy would have

overwhelmed any incremental impact that the disclosure of Ms. McTague's visit to the Government in 2009-10 would have had on Mr. McTague's credibility. *See Paladin*, 748 F.3d at 448 (explaining that evidence of the defendant's guilt "was overwhelming and did not depend on [the witness'] credibility").

### 4.   Winston McTague and Haynes Timberland, Inc.

Haynes Timberland, Inc. was Malcolm French for purposes of this case, and the Court's conclusion as to Mr. French applies with equal force to Haynes Timberland, Inc.

### 5.   Winston McTague and Kendall Chase

Of the four *Brady* violation motions, Mr. Chase's raises the most serious issue. Mr. McTague was the prime witness to identify Mr. Chase as having been involved in the marijuana grow conspiracy. Mr. McTague named Mr. Chase as one of the brains behind the marijuana grow operation and placed him at the center of the conspiracy at least at its outset and during its early years. To assess the strength of the Government's case against Mr. Chase, the Court turns to the Government's evidence that corroborated Mr. McTague's testimony implicating Mr. Chase.

First, there is ample evidence that Mr. Chase knew Malcolm French as early as 2005 or 2006, *French Test.* 82:18-86:15, and knew and became friends with Rodney Russell no later than 2007. *Russell Test.* 10:17-11:23. This testimony puts Mr. Chase in the same circle of people who organized and operated the conspiracy.

Next, Mr. McTague testified that he met Mr. Chase in the mid-1990s and that they started growing marijuana together in Danforth, Maine in Washington County.

*McTague Test. I* 6:3-21. Two witnesses corroborated Mr. Chase's involvement in a marijuana growing operation in 2003. The first was Captain Richard Rolfe of the Washington County Sheriff's Office. *Partial Tr. of Proceedings* 3:25-4:1 (ECF No. 418). Captain Rolfe confirmed that on September 22, 2003, he investigated a marijuana grow operation in Danforth, Maine. *Id.* 7:12-21. The marijuana grow was in an "extremely remote" location and involved approximately 65 marijuana plants. *Id.* 8:3-18.

The second was Garry Higgins, who at the time of his trial testimony was an investigator with the Penobscot County District Attorney's Office but who in 2003 had served as a member of the Maine Drug Enforcement Agency. *Partial Tr. of Proceedings* 9:25-10:23 (ECF No. 449). He confirmed that he and other law enforcement officers found a large amount of marijuana located in a marijuana processing area at Mr. Chase's residence in 2003, including camouflage tarps, black garbage bags, and four 32-gallon plastic garbage cans. *Id.* 11:1-12:12.

Two other witnesses placed Mr. Chase in activity involving the marijuana grow. The first was Linda Archer, the trucker who delivered Promix to the operation's Washington County warehouse three times in 2007. *Archer Test.* 7:19-24, 8:19-9:2. Ms. Archer identified Mr. Chase as one of the people who unloaded the Promix from her trailer all three times, *id.* 9:7-9; 12:3-9; 21:10-17, and in court, she identified Mr. Chase as one of the men who unloaded the Promix. *Id.* 44:10-25.

The second was Gerald Davis, the manager at Griffin Greenhouse, which had sold Cold Stream Contracting thousands of dollars' worth of Promix between 2007

and 2009. *Partial Tr. of Proceedings* 4:21-5:5, 6:5-13, 11:6-8, 11:20-13:1, 35:14-25 (ECF No. 426). Through Mr. Davis, the Government introduced Griffin Greenhouse records, which had as contact numbers, the telephone numbers of both Rodney Russell and Kendall Chase. *Id.* 36:4-20, 80:6-11; *Casey Closing Argument* 14:14-16; *Compare Gov't Ex.* 173(c)-(d) (phone numbers and records of Ken and Jan Chase), *with Gov't Ex.* 156 (numerous Griffin Greenhouse records containing, as contact numbers, the Chase phone numbers).

Another witness was Miguel Roblero, the illegal worker from Mexico. Mr. Roblero testified that he had worked in Washington County for two seasons and he identified Mr. Chase as one of the men at the marijuana grow operation along with Scott, Malcolm, Rod, Kevin and Bobby. *Roblero Test.* 12:7-9. Mr. Roblero said that Mr. Chase helped move pallets into the woods after Mr. Roblero and other immigrant workers painted the bags of soil that were on the pallets. *Id.* 23:7-24:6. He also said that Mr. Chase put tags or stickers on the plants to indicate that they were ready to harvest. *Id.* 31:12-32:5. Mr. Roblero also said that when he returned to work on the marijuana grow operation the next year, "Kendall and Kevin" were there only once a week, and they had been around more the prior year. *Id.* 50:4-7. Mr. Roblero testified that Mr. Soto told him that Kendall and Kevin had had a disagreement with Malcolm. *Id.* 50:13-15. Mr. Roblero stated that when Mr. Chase was there, he helped them plant and put down poison. *Id.* 50:16-20. Mr. Roblero also identified Mr. Chase in the courtroom. *Id.* 74:12-18.

With this evidence, the Court concludes that the incremental impact of the disclosure of Ms. McTague's visit to the Government in 2009-10 did not create a reasonable probability that the result of the trial would have been different as regards Mr. Chase.[14]   *See United States v. Gonzalez-Gonzalez*, 258 F.3d 16, 22-23 (1st Cir. 2001) (reasoning that any alleged *Brady* violation based on witness' testimony would not have changed the outcome because "the sheer volume of evidence . . . rules out any reasonable likelihood that the jury's ultimate decision was affected by [witness]'s testimony.  This was not a close case").

### 6.   Winston McTague and the Closing Arguments

#### a.   Winston McTague and the Government's Closing Argument

During its closing, the Government's attorney recited Mr. McTague's testimony in detail.  *Casey Closing Argument* 4:2-5:21.  However, the prosecutor acknowledged:

> Now, you know Winston has a brain injury.  You listened to him for several hours.  You know he gets confused.  You know he lied about how he became involved in this marijuana conspiracy; he admitted as much on the witness stand.  But he knows what he knows.  Remember he told you that?  I know what I know.

*Id.* 5:22-6:2.  The prosecutor's argument echoed Mr. McTague's own testimony.  *McTague Test. I* 70:10 ("What I know I know and what I don't I don't, ayuh").

The prosecutor emphasized to the jury that the Government "does not expect you to accept Mr. McTague's testimony at face value."  *Casey Closing Argument* 6:3-

---

[14]   As the Court pointed out earlier, if the defense had called Ms. McTague as a witness, part of her testimony would likely have corroborated the long and close friendship between Mr. McTague and Mr. Chase.

4.   The closing argument then went on at length to describe the evidence that corroborated Mr. McTague.  *Id.* 6:6-37:11.  At the end, the federal prosecutor argued that the Government's case "does not rise and fall on the word of one person."  *Id.* 37:5-7.

### b.   Winston McTague and the Defense

### i.   Attorney McKee's Closing Argument

During their closing arguments, the defense highlighted Mr. McTague's weakness as a witness as a significant flaw in the prosecution's case.  For example, Attorney McKee told the jury that Mr. McTague had "lied repeatedly to the grand jury." *Partial Tr. of Proceedings* 22:13-14 (ECF No. 478) (*McKee Closing Argument*). Attorney McKee stressed:

> [W]hen you raise your right hand and tell lies in one place and then you come in here and you expect you all to agree that this is, in fact, the truth now, wasn't the truth then - - back then, it's a little hard to stomach.

*Id.* 23:1-5.  He went on:

> [I]t's kind of the question that you always want to ask, well, Mr. McTague, when you raise your right hand, how are we supposed to tell when you're lying and when you're telling the truth?  Because you raise your right hand either way and swear to tell the truth each time and yet you admit that you lied under oath repeatedly to another proceeding.

*Id.* 23:6-11.  Attorney McKee also pointed to the contradiction between Mr. McTague's contention that his "real goal was to get these marijuana guys off the streets so they don't, you know, get involved with his nephews and nieces" and his later testimony that "he'd been selling marijuana" and "received at one point 13 pounds of marijuana." *Id.* 23:17-23.  Attorney McKee characterized these statements as

"bizarre; they're strange; and, most importantly, they're just flatly untrue and unreliable." *Id.* 23:23-25. Attorney McKee asked the jury whether "with folks like Winston McTague or Miguel Roblero, are you going to kind of take that to the bank and feel certain like, you know what, that's - - that's it right there? Are you going to rely on that for a serious case like this?" *Id.* 31:9-12.

### ii.  Attorney Silverstein's Closing Argument

Attorney Silverstein vigorously attacked Mr. McTague's memory and credibility:

> The poor man has suffered a brain injury from an accident that may or may not be avoidable, whatever, but he suffered it, and he's left with the effects. And, you know, I'm sorry for him, but in a case as big as this, and the government brings him in on subpoena, puts him up before you, and offers him as their biggest piece of reliable evidence, it needs to be questioned.
>
> Now, I am not going to try and beat him up here as an individual. The man's got memory problems. There are - - at this point in time, they're organic. He can't help it, and he's probably, in his mixed-up, confused way, trying to please them as best he can.

*Partial Tr. of Proceedings* 13:7-18 (ECF No. 479) (*Silverstein Closing Argument*). He continued:

> But, you know, even a fella who has memory issues you should hold to a standard that does not excuse him for knowingly lying to you folks and to others.

*Id.* 14:4-6. Attorney Silverstein pointed out that Mr. McTague wanted to protect his daughters "from these criminals in the world, of which we find out later he is one." *Id.* 14:12-14. In addition, Attorney Silverstein repeatedly accused Mr. McTague of

lying, including saying that "all of it" was "a big lie" and characterizing his testimony as "I lied, I lied, I lied."  *Id.* 14:15-16:17.

### c.   Observations

The tenor of these closing arguments reflects the strength of the evidence about Mr. McTague.  It was apparent that the defense had made significant inroads into Mr. McTague's credibility and reliability as a witness.  The Government backpedaled on Mr. McTague and emphasized not his truthfulness and accuracy, but the independent evidence that strongly corroborated critical parts of his testimony.  Based on the evidence before the jury and the skilled and telling cross-examinations by defense counsel, the defense simply skewered Mr. McTague's honesty, reliability, and motivations, and they were able to argue to the jurors that they should reject the Government's case based on his untrustworthy and inconsistent testimony.

### 7.   Conclusion

From the Court's perspective, the additional *Brady* information about Ms. McTague's statements to the Government would have been marginally incremental and merely cumulative.  Collectively, the defense in this case had ample ammunition to undercut Mr. McTague's credibility, the Defendants were represented by extremely able and effective lawyers, and the defense as a whole made such serious inroads into Mr. McTague's credibility that the additional information from the 2009-10 interview would have affected his believability only on the edges of the margins.  The impact of their successful cross-examination of Mr. McTague, however, was muted by the additional evidence presented at trial that strongly corroborated critical aspects of

his testimony.  In short, the Defendants have failed to establish "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *Connolly*, 504 F.3d at 213 (quoting *Bagley*, 473 U.S. at 682).

## VII.  CONCLUSION

The Court DENIES Defendant Chase's Motion for New Trial (ECF No. 461); Defendant's Supplemental Motion for New Trial (ECF No. 465); Defendant Rodney Russell's Supplemental Motion for New Trial (F.R.Crim.P. 33(a)) (ECF No. 468); Defendant Haynes Timberland, Inc.'s Joinder in Defendant Kendall Chase's Motion for New Trial, Defendant Malcolm French's Supplemental Motion for New Trial, and Defendant Rodney Russell's Supplemental Motion for New Trial (ECF No. 472).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of April, 2015