UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:12-cr-00160-JAW |
| | ) | |
| MALCOLM A. FRENCH, et al. | ) | |

**ORDER ON DEFENDANT MALCOLM A. FRENCH'S MOTION FOR DISCOVERY OF *BRADY* MATERIAL**

The Court dismisses without prejudice Defendant's motion for discovery of *Brady*[1] material. The Government has represented that it has turned over to Mr. French all the written reports responsive to his requests for information. To the extent the law might require the Government to disclose exculpatory or impeaching evidence material to sentencing that has not been reduced to writing, the Court concludes that Mr. French has failed to demonstrate that the additional information, if it exists, would be material to any sentencing issue.

**I.     BACKGROUND**

On September 14, 2012, a federal grand jury indicted Malcolm A. French and others for a series of federal crimes relating to their alleged involvement with a marijuana growing operation in Maine. *Indictment* (ECF No. 2). On November 13, 2013, a grand jury issued a superseding indictment. *Superseding Indictment* (ECF No. 187). On January 24, 2014, at the close of a jury trial that lasted from January 8, 2014 through January 24, 2014, the jury returned verdicts finding Mr. French

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

guilty of engaging in a conspiracy to manufacture marijuana, of manufacturing marijuana, of managing or controlling a drug-involved premises, of harboring illegal aliens, and of engaging in a conspiracy to distribute marijuana. *Jury Verdict Form* (ECF No. 311).

After delay caused primarily by the Defendants' post-trial motions, the Court has scheduled a sentencing hearing for September 30, 2015 for all Defendants. *Notice of Hr'g* (ECF No. 538). On June 5, 2015, Malcolm French filed a motion for discovery of so-called *Brady* material. *Def.'s Mot. for Disc. of* Brady *Material* (ECF No. 521) (*Def.'s Mot.*). On June 8, 2015, the Government responded in opposition to Mr. French's motion. *Gov't's Objection to Def.'s Mot. for Disc. of* Brady *Material* (ECF No. 526) (*Gov't's Opp'n*). On June 12, 2015, Mr. French filed a supplemental memorandum in support of his motion for the discovery of *Brady* material, narrowing his request. *Def. Malcolm French's Suppl. Mem. in Supp. of Def.'s Mot. for Disc. of* Brady *Material* (ECF No. 529) (*Def.'s Suppl. Mem.*). On June 22, 2015, the Government filed a supplemental response in opposition to Mr. French's supplemental memorandum. *Gov't's Resp. to Def.'s Suppl. Mem. in Supp. of Mot. for Disc. of* Brady *Material* (ECF No. 534) (*Gov't's Suppl. Opp'n*).

## II.  THE PARTIES' POSITIONS

### A.  Defendant's Request

In his initial motion, Mr. French wrote that after new counsel entered his appearance, it "became apparent upon discussion with the defendant that there might be exculpatory evidence relevant to sentencing issues within the possession of

the government which has possibly not yet been provided." *Def.'s Mot.* at 1. In his supplemental memorandum, Mr. French limited the material he is seeking to:

1) A report by a Warden who examined Mr. French's boots on September 22, 2009 while he was detained by the side of the road;

2) A report of statements made by Warden Ron Dunham to Garry Higgins regarding whether Mr. French stated to Warden Dunham that Mr. French told him that he was threatened in connection with pot-growing before 2009; and

3) A report about the marijuana grown in LaGrange.

*Def.'s Suppl. Mem.* at 1-4. Mr. French says that a report on his boots would show two sets of foot tracks at the side of the road were not his, that the statements Mr. French made to Warden Dunham relate to the leadership enhancement under the Sentencing Guidelines, that Mike Smith's threat would be exculpatory, and that the LaGrange marijuana grow is relevant to drug quantity. *Id.*

### B. The Government's Response

In its response, referring to two letters requesting discovery that defense counsel sent the Government, the Government argues that Mr. French "offers no non-speculative explanation as to how the items listed in the two letters would be material to any sentencing issues" and it contends that he "offers no legal authority upon which the Court could endorse the fishing expedition that he proposes to go on." *Gov't's Opp'n* at 1. The Government quoted the First Circuit case of *United States v. DeCologero*, 530 F.3d 36, 64-65 (1st Cir. 2008) as confirming that *Brady* did not create

"a general constitutional right to discovery in a criminal case." *Id.* at 2 (quoting *DeCologero*, 530 F.3d at 64) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)). Instead, in order to establish a violation of *Brady*, "a defendant must provide the court with some indication that the materials to which he or she needs access contain material and potentially exculpatory evidence." *Id.* (quoting *DeCologero*, 530 F.3d at 64-65). Moreover, the Government observes that its obligations under *Brady* only extend "to information in its possession, custody, or control. . . . While a prosecutor must disclose information maintained by government agents even if the prosecutor herself does not possess the information, this duty does not extend to information possessed by government agents not working with the prosecution." *Id.* (quoting *United States v. Hall*, 434 F.3d 42, 55 (1st Cir. 2006) (citations omitted)).

Once Mr. French narrowed his discovery requests in his supplemental filing, the Government responded specifically to his three points. Regarding the boot report, the Government says it "does not know whether or not the boot exam occurred" and, regardless, it "provided the defendant pre-trial with reports from both law enforcement witnesses [Mr. French] claims were present for the alleged examination." *Gov't's Suppl. Opp'n* at 2. Regarding the Warden Dunham report, the Government says it learned about the conversation between Warden Dunham and Mr. French during the latter's testimony at trial. *Id.* at 4. As such, the Government contends the information was unknown to the Government before trial, yet known to the Defendant at that time, and so it cannot constitute *Brady* material. *Id.* Finally, regarding the LaGrange search, the Government says it "provided the information

4

that [it] had regarding" the search, and points out that agents who did not write reports "were at least identified in the reports that were written as being present." *Id.* at 6. Moreover, the Government asserts it "cannot be faulted for failing to turn over a document that was not prepared or failing to turn over a non-existent report . . . ." *Id.* (citing United States v. Alverio-Meléndez, 640 F3d. 412, 424 (1st Cir. 2011)).

### III.  DISCUSSION

#### A.  Legal Standards

To establish a *Brady* violation, "a defendant must make three showings. The evidence at issue (whether exculpatory or impeaching) must be favorable to the accused; that evidence must have been either willfully or inadvertently suppressed by the government; and prejudice must have ensued." *United States v. Alverio-Meléndez*, 640 F.3d at 424 (internal punctuation and citation omitted). The Government's disclosure obligations under *Brady* extend beyond trial to a sentencing hearing. *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963) ("A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him *or reduce the penalty* helps shape a trial that bears heavily on the defendant") (emphasis supplied). Finally, "evidence is not suppressed if the defendant either knew, or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *Ellsworth v. Warden*, 333 F.3d 1, 6 (1st Cir. 2003) (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)).

#### B.  The Requested Discovery

##### 1.  The September 22, 2009 Boot Examination

5

### a. Further Background

Turning to Mr. French's first request, in his May 21, 2015 letter to the Government, Mr. French's counsel noted:

> R_00698 – Two footwear cases were collected by Jeffry Ingemi and then given to David Simmons, DS-2 and DS-3. There were no further reports of those casts, or comparison testing with respect to Malcolm French or any other alleged co-conspirators. There is also a report missing regarding Mr. French's footwear being checked by a Warden during Mr. French's initial stop in the T-37 investigation.

*Def.'s Mot.* Attach. 1 *Letter from Atty. Thomas F. Hallett to AUSA Joel B. Casey*, at 2 (*Hallett May 21, 2015 Letter*). In his initial response of May 22, 2015, AUSA Casey stated that "there was no expert analysis conducted concerning footwear or heavy equipment track comparison, thus there is no report to provide to you." *Id.* Attach. 2 *Letter from AUSA Joel B. Casey to Atty. Thomas F. Hallett*, at 1 (*Casey May 22, 2015 Resp.*). In his response, Attorney Hallett clarified that he was not just seeking any expert analysis. *Id.* Attach. 3 *Letter from Atty. Thomas F. Hallett to AUSA Joel B. Casey*, at 1 (*Hallett June 1, 2015 Letter*). Attorney Hallett asserted that game warden examined Mr. French's boots on September 22, 2009, when Mr. French was detained at the side of the road. *Id.* Attorney Hallett wrote that "I am looking for a report on that activity, and if there is no such report, please have one generated by the appropriate Warden." *Id.*

By letter dated June 3, 2015, AUSA Casey responded: "The only report that the Government has in its possession, custody or control concerning Mr. French's detention on the side of the road on September 22, 2009 was provided in discovery. (R_00235). There is no mention of a Game Warden being present." *Def.'s Suppl.*

6

*Mem.* Attach. 1 *Letter from AUSA Joel B. Casey to Atty. Thomas F. Hallett*, at 2 (*Casey June 3, 2015 Resp.*). In his supplemental response, Mr. French noted:

> Despite the government's position that no warden was present at the time of Mr. French's detention on September 23, 2009 at the side of the road, the report of Warden Brad Richard, R-06742-44 states that Warden Richard was at the side of the road and spoke to MDEA Agent Rolfe who was detaining Mr. French. Warden Richard's report mentions "two sets of foot tracks in the road," but has no mention of checking defendant's boots. Footwear casts were made of footprints at the Township 37 ("T-37") marijuana grow. Warden Richard looked at defendant's boot tread, said something to Agent Rolfe and then drove off on his four-wheeler.

*Def.'s Suppl. Mem.* at 2. Mr. French explained that he is requesting "an Order that the exculpatory information be provided regarding Warden Richard's examination of defendant's boots and any conclusion that defendant's boots did not match foot tracks, and the nature of the foot tracks seen, as well as a comparison to any casts." *Id.* at 2.

On June 22, 2015, the Government filed a supplemental response and stated that the first the Government had heard that Maine Game Warden Brad Richard examined Mr. French's boots on September 22, 2009 "was in the defendant's recent discovery letters." *Gov't's Suppl. Opp'n* at 1. The Government represented that it had "produced in discovery the report of S/A Rolfe, as well as the report of Warden Brad Richard" and the neither "contains any reference to an examination of the defendant's boots." *Id.* Instead, the Government points out that it is "the *defendant* who claims to have known about this alleged examination" and despite the fact Mr. French knew about this information and the fact Special Agent Rolfe testified at trial, Mr. French asked no questions at trial concerning the boot examination. *Id.* at 1-2 (emphasis in original).

7

### b. Discussion

Assuming that Mr. Ford is correct that on September 22, 2015, while speaking with MDEA Special Agent Richard Rolfe, Maine Game Warden Brad Richard approached Mr. French, examined his boots, commented to Special Agent Rolfe, and drove off, this incident is not mentioned in either Special Agent Rolfe's or Warden Richard's reports, both of which the Government supplied to Mr. French. In Attorney Hallett's June 1, 2015 letter and his supplemental memorandum, he requests that the Government generate a report if none exists. *Hallett June 1, 2015 Letter* at 1; *Def.'s Suppl. Mem.* at 2.

As the First Circuit has noted, "an implicit prerequisite of any *Brady* violation is that favorable, material evidence actually exists." *Alverio-Meléndez*, 640 F.3d at 424 (quoting *United States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008)). In the context of a fingerprint report, the First Circuit observed that "because no fingerprint analysis report existed, the government did not commit a *Brady* violation in failing to turn over such a report." *Id.* In short, "[t]he failure to create exculpatory evidence does not constitute a *Brady* violation." *Id.*; *see United States v. Werth*, 493 F. App'x 361, 366 (4th Cir. 2012) ("While the government is obligated to disclose favorable evidence in its possession, it is not required to create evidence that might be helpful to the defense.") (citations omitted).

In his supplemental memorandum, Mr. French cites *United States v. Rodriguez* for the proposition that, even if the Government does not possess a report, it is obligated to disclose exculpatory and impeaching information. *Def.'s Suppl.*

8

*Mem.* at 2 (quoting *Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007)). In *Rodriguez*, when one of the government's critical witnesses testified, she admitted she had lied "about everything" in her initial meetings with the government, but she said that she was now telling the truth. *Rodriguez*, 496 F.3d at 223. The Government failed to reveal the substance of the witness's lies on the ground that there were no notes of the interviews. *Id.* The Second Circuit wrote that "[f]rom the fact that the Government is not required to make notes of a witness's statements, it does not follow that the Government has no obligation to inform the accused of information that materially impeaches its witness." *Id.* at 225.

Although authoritative in the Second Circuit, *Rodriguez* does not extend to the First Circuit and no other circuit has cited it with approval. To the extent that *Rodriguez* holds that the Government must disclose information even though it is not in a tangible form, this holding runs counter to the First Circuit's guidance that the Government is not required to generate a report where none exists.

At the same time, assuming that the First Circuit would be uneasy about the Government refusing to disclose a critical witness's prior lies, even under *Rodriguez* the standard for disclosure remains materiality. In *Rodriguez*, the Second Circuit noted that "[t]he disclosure obligations of *Brady* and *Giglio* apply only to impeaching or exculpatory information that is of sufficient importance to be deemed 'material.'" *Id.* at 223. The *Rodriguez* Court remanded the case to the trial court for a materiality finding. *Id.*

9

Here, the Court remains unclear why Mr. French's boots would be material to his sentence. Mr. French reiterates in his filings that the Warden's examination of his boots on September 22, 2009 is exculpatory, but nowhere does he explain why he believes the Warden's boot examination would be relevant to his sentence. According to Mr. French's own testimony, he was stopped by Special Agent Rolfe and questioned about the fire at Township 37. *Partial Tr. of Proceedings* 70:17-72:23, 86:18-87:23, 145:13-25 (ECF No. 362) (May 23, 2014) (*Malcolm French Test. I*); *Partial Tr. of Proceedings* 20:24-21:9; 43:21-44:2; 62:3-63:6 (ECF No. 363) (May 23, 2014) (*Malcolm French Test. II*). Mr. French admitted his presence in Township 37 and testified about the content of his conversation with Special Agent Rolfe. How the fact, if it is true, that Mr. French's boots did or did not match nearby boot tracks is simply a mystery. The Court concludes that Mr. French has not sustained his burden of proving that the Warden's boot examination is at all relevant to the calculation of his guideline sentence range or any of the 18 U.S.C. § 3553(a) factors.

Moreover, to the extent that Mr. French's argument is based on a contention that he was unaware of the boot examination, this argument must fail. If Warden Richards and Special Agent Rolfe examined Mr. French's boots on September 22, 2009, Mr. French must have known that they did so, and *Brady* does not apply to information known to the defense. *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002) ("*Brady* applies to material that was known to the prosecution but unknown to the defense.") (citation omitted). Indeed, Special Agent Rolfe testified at trial, and although other defendants cross-examined him, Mr. French elected not to

10

ask Special Agent Rolfe any questions. *Partial Tr. of Proceedings* 14:4-5 (ECF No. 418) (Sept. 5, 2014) (*Special Agent Rolfe Test.*). Moreover, Mr. French himself testified at trial and discussed his encounter with Special Agent Rolfe but never mentioned either the Warden or the boot examination. *Malcolm French Test. I* 70:17-72:23, 86:18-87:23, 145:13-25; *Malcolm French Test. II* 20:24-21:9, 43:21-44:2, 62:3-63:6.

Based on the information in this record, the Court easily concludes that Mr. French is not entitled to the discovery he seeks about the Warden's or the Special Agent's impressions of his footwear on September 22, 2009 because such a report does not exist and because the Government need not generate one in order to comply with *Brady*. To be sure, if Mr. French believes that the issue is important, he is free to call Warden Richards or Special Agent Rolfe at the sentencing hearing now scheduled for September 30, 2015 and question them about this issue. He is not entitled, however, to force the Government to create a report that does not exist, particularly when he had actual knowledge of the event about which he seeks now to obtain information.

### 2. Warden Ron Dunham Report of Conversation with Garry Higgins

#### a. Further Background

Attorney Hallett's May 21, 2015 letter to AUSA Casey does not mention his request for a report of an interview between Warden Ron Dunham and Garry Higgins. *Hallett May 21, 2015 Letter* at 1-4. He did request a report of a conversation between John Richards and Warden Dunham. *Id*. at 3. On June 1, 2015, Attorney Hallett noted:

11

> Request #13, report of statement by Warden Ron Du[n]ham to Gar[r]y Higgins is made because it may reflect on any leadership/organizer role at sentencing. It is believed that Warden Du[n]ham reported that defendant had stated he was threatened in connection with pot growing prior to 2009. Please have a report generated if there is none.

*Hallett June 1, 2015 Letter* at 2. On June 3, 2015, AUSA Casey responded as follows:

> On June 2, 2015, S/A Richards called Warden Dunham who confirmed that he had a conversation with Malcolm French several years ago about Michael Smith growing marijuana on his property. Warden Dunham recalled that he passed this information on to former MDEA SS/A Garry Higgins or former MDEA S/A James Carr. The Government has no reports in its possession, custody or control concerning Warden Dunham . . . having a conversation with Garry Higgins or James Carr.

*Casey June 3, 2015 Resp.* at 3 (footnotes omitted). In Mr. French's supplemental memorandum, he asks the Government to generate a report "if there is none." *Def.'s Suppl. Mem.* at 2. Mr. French goes on to state that "[t]he requested information involves a report of Malcolm French being threatened by Mike Smith concerning a marijuana grow." *Id.* at 3.

        b.    Discussion

Mr. French's request for a non-existent report does not state a *Brady* violation because the Government is not required to generate a report in order to comply with *Brady*. Also, Mr. French was obviously aware of the conversation with Warden Dunham because he was the person who spoke with Warden Dunham. Furthermore, although Mr. French describes the information as "exculpatory," it is again unclear why. During his trial testimony, Mr. French extensively described his dealings with Mike Smith and his conversations with Warden Dunham. *Malcolm French Test. I* 18:13-40:23. In addition, the Government called Garry Higgins, an investigator for

12

the Penobscot County Sheriff's Office, as a witness at trial to testify about an earlier investigation he had made of a marijuana grow operation that Kendall Chase had been involved in. *Partial Tr. of Proceedings* (ECF No. 449) (Oct. 15, 2015) (*Garry Higgins Test.*). Mr. French elected not to ask any questions at trial of Mr. Higgins. *Id.* 12:15-16.

If he elects to do so, Mr. French is free to testify at his sentencing hearing about Mike Smith's threat or to refer the Court to his trial testimony on the same subject. Mr. French is free to call Warden Dunham as a witness at the sentencing hearing, if he believes that Warden Dunham's recollection of this conversation will assist Mr. French's sentencing arguments. Mr. French may also call Mr. Higgins as a witness at the sentencing hearing, if he believes that it is important to confirm what Warden Dunham told Mr. Higgins. But Mr. French has not explained why a contemporaneous confirmation that Mike Smith threatened him concerning a marijuana grow should lead this Court to impose a more lenient sentence on Mr. French, and in any event, he is not entitled to require the Government to generate a report on a conversation to which he was a party on an issue whose materiality for sentencing purposes he has not established.

### 3. Information Regarding the Marijuana Grow in LaGrange

#### a. Further Background

Mr. French did not request information about the marijuana grow in LaGrange in his initial letter of May 21, 2015. *Hallett May 21, 2015 Letter* at 1-4. Attorney Hallett's June 1, 2015 letter contains the following demand: "Request #14 seeks

13

information regarding the marijuana grown in LaGrange.  It is relevant to the total amount of marijuana calculations."  *Hallett June 1, 2015 Letter* at 2.  The Government's June 3, 3015 response stated:

> The Government has previously provided the only materials it has regarding the law enforcement activity at Mr. French's property in Lagrange.  *See* R_02160, R_02212, R_06263.  S/A Rolfe's report (R_06263) references attached notes and photographs.  The photographs were attached, but according to our records, the notes were not.  I am supplying agent Rolfe's notes with this letter.

*Casey June 3, 2015 Letter* at 4, notes at 6-16.

In his supplemental response, Mr. French acknowledged that "several reports were submitted referencing September 27, 30, and October 21, 2009 searches of the Lagrange property."  *Def.'s Suppl. Mem.* at 3.  However, he states that "[o]ther than S/A Rolfe's report of the old grow 300 yards from the cabin, none of the reports contain any description of the areas searched, how the search was conducted, reference the information provided which triggered the search, or any locations identified as specific grows."  *Id.*  He says that it is "[o]f note, there are only two reports regarding the September 27 and 30 searches despite thirteen officers present on those two dates."  *Id.*  He also notes:

> Agent Burke's report, R_00937, mentions that the search was for an active grow on the Malcolm French Lagrange land.  To the extent that the entire area was searched, and no grow located that evidence is exculpatory and relevant to the government calculations of marijuana quantity for Mr. French's sentencing.  It also reflects on any leader/organizer sentencing issues.

*Id.* at 4.  Mr. French observes that the October 16, 2009 affidavit of Allen A. Weaver stated that "law enforcement was provided with directions to the Lagrange marijuana

grow." *Id.* Finally, Mr. French requests that the Government "provide information on what information the search was based, how the search was conducted, maps or other search devices used, the geographical area covered by the search, and which law enforcement officers searched in what geographical area." *Id.*

On June 22, 2015, the Government responded by noting that it "provided all information it had in its possession, custody or control concerning the search of the defendant's camp in Lagrange." *Gov't's Suppl. Resp.* at 4. The Government represented that it had provided the reports of MDEA Special Agents Jon Richards, Richard Rolfe, Ralph Pineo, JD Burke, and DEA Special Agent Steve Sicard. *Id.* at 5. The Government said that it provided photographs of the search and the affidavit of Special Agent Allen Weaver in support of the search warrant. *Id.*

### b. Discussion

The Court addresses the three searches in 2009 of Mr. French's LaGrange property: September 27, September 30, and October 21. According to the Government, Special Agent Rolfe wrote a report about the searches on September 27 and 30 and the report revealed the location of the search (over a mile past a gate to Mr. French's property and about 300 yards from the French camp near a bog), the results of the search (evidence of an old marijuana grow with about twelve plants with the wire still intact), and the fact that "[n]othing was seized on either walk through the woods." *Gov't's Suppl. Resp.* at 5. As for the October 21, 2009 search, the Government says that on October 1, 2009, Winston McTague gave additional

15

information about the location of the LaGrange grow,[2] but that the agents did not find a large active grow in LaGrange. *Id.* at 6.

Again, the Court is unclear how whatever the agents found (or more precisely did not find) in LaGrange during any of the searches in September and October 2009 would have a significant bearing on Mr. French's sentencing. The Presentence Investigation Report does not use any marijuana seized from LaGrange to fix the drug quantity. *Presentence Report* ¶¶ 26-28. Instead, the Probation Office used the amount of marijuana actually discovered in Township 37 and estimated the other drug quantity by using the amount of Pro Mix, which was used to fertilize the marijuana, to project how much marijuana was being fertilized and thus produced.[3] *Id.*

Furthermore, even though a number of the law enforcement officers who performed the LaGrange searches testified at trial, Mr. French did not ask them to "provide information on what information the search was based, how the search was conducted, maps or other search devices used, the geographical area covered by the

---

[2] Trial Exhibit 152 is an email from Winston McTague dated October 1, 2009; it states in part:

> they have another field in lagrange . . . located at the vey (sic) lower right back part of the land if your standing ain (sic) front of the door of the camp put your hand at three oclock and its that way, and if ya (sic) jump in your truck go to the first t and take a right go to the next t take a right and go till the road comes to were (sic) it looks not used or all grass and look left and were (sic) you can see or wetre (sic) the last point wich (sic) you see the road go walk to there and stop and look to left will be a little hill that is an old skiddar (sic) road and walk to the bottom of the hill and then go to ! the left and keep following the way the water is flowing till you get to a swamp and you will see pot plats (sic) every 15 to 16 feet . . .

[3] The Court notes the discussion of the LaGrange grow site in this order does not address the issues raised in Defendant's pending motion for new trial. *Def.'s Third Mot. for New Trial Pursuant to Fed. R. Crim. P. 33* (ECF No. 554).

16

search, and which law enforcement officers searched in what geographical area."[4] *Def.'s Suppl. Mem.* at 4.  Special Agent Rolfe, who participated in the LaGrange search, testified at trial to the October 21, 2009 search of the LaGrange property and the location of the old marijuana grow.  *Special Agent Rolfe Test.* 12:18-13-24.  Mr. French decided not to ask any questions of Special Agent Rolfe.  *Id.* 14:4-5.  Special Agent Jonathan Richards, who participated in the LaGrange search, testified at trial on January 10 and 13, 2014.  *Partial Tr. of Proceedings* (ECF No. 428) (*Richards Test. I*); *Partial Tr. of Proceedings* (ECF No. 432) (*Richards Test. II*).  On direct examination, Special Agent Richards was questioned about the October 21, 2009 search of the LaGrange property.  *Richards Test. I* 76:6-87:12, 91:15-16.  Mr. French's counsel briefly questioned Special Agent Richards about his search of the LaGrange property on October 21, 2009.  *Richards Test. II* 81:10-82:1.  One other defense lawyer questioned him about the LaGrange search.  *Id.* 83:2-6.  A third law enforcement officer, Steve Sicard, who also participated in the LaGrange search, testified at trial. *Partial Tr. of Proceedings* (ECF No. 542) (July 27, 2015) (*Sicard Test.*).  Special Agent Sicard was questioned about the September 24, 2009 search of Mr. French's residence in West Enfield; Mr. French's counsel questioned him but asked no questions about the October 21, 2009 search in LaGrange.  *Id.* 4:17-17:24, 23:11-25:16.

Mr. French also testified at the trial.  He explained that he had encountered a marijuana grow operation on his land in LaGrange in 2003 and had told law

---

[4] The Court understands a trial is different from a sentencing and defense counsel may have wished for strategic reasons to avoid these questions at trial.  Nevertheless, if in fact the Defendants thought that they had not been provided proper discovery from the Government, they could have raised that issue but did not.

17

enforcement about it.  *Malcolm French I* 17:8-18.  He said that in 2005, he found another marijuana grow operation near his camp in LaGrange, which had been destroyed by a man named Steve Benson, who was clearing land for Mr. French.  *Id.* 100:8-11.  This occasioned a visit from a man named Mike Smith, who demanded $35,000 from Mr. French for missing marijuana on behalf of a gang called the Red Patch gang.  *Id.* 18:13-34:8, 102:7-17.  According to Mr. French, Mr. Smith demanded the $35,000 "reparations" in the form of Pro Mix.  *Id.* 31:3-32:12.

Then in 2007, Mike Smith returned and demanded more money, this time $16,000, on behalf of the same group that had earlier blackmailed him.  *Id.* 36:14-37:3.  Again, the payment, Mr. French said, was in Pro Mix.  *Id.* 34:9-38:11.

Mr. French also admitted that he had a ten-year marijuana habit and had supported the habit by stealing marijuana that he found on his land, and that he knew that the so-called Red Patch gang had been growing marijuana on his property in LaGrange.  *Malcolm French II* 5:18-22, 62:8-15.  Based on Mr. French's trial testimony, he knew there was marijuana growing on his land in LaGrange; he testified, however, it was not his marijuana.

In light of his testimony, the Court is confused about why Mr. French believes that the additional information that he has requested from the Government about the LaGrange searches is material to any sentencing issues.  Again, the Probation Office has not used the actual marijuana in LaGrange to calculate drug quantity; it has used the quantity of Pro Mix that he or his companies purchased to estimate the quantity of drugs for which he is being held responsible.  Looking at the evidence in

18

the light most favorable to the verdict, the jury was not required to accept Mr. French's testimony about the Red Patch gang and Pro Mix reparations and the Probation Office was justified in using Pro Mix quantities to estimate marijuana quantities, since there appears to be a direct correlation.  In addition, the Court is entirely unclear how this information would have any impact on his leadership/organizer role, since there was a great deal of trial evidence that Mr. French was the head of the entire marijuana grow operation.  Again, if Mr. French wishes to call any of the law enforcement officers who performed the LaGrange searches at his sentencing hearing, he is free to do so.

## IV.   CONCLUSION

The Court DISMISSES without prejudice Defendant's Motion for Disclosure of *Brady* Material (ECF No. 521).  The Court has dismissed the motion without prejudice to allow Mr. French, if he chooses to do so, to better explain why the sought-for information is material to his upcoming sentencing.

SO ORDERED.

<u>/s/ John A. Woodcock, Jr.</u>
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 1st day of September, 2015