UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:12-cr-00160-JAW |
| | ) | |
| MALCOLM A. FRENCH, et al. | ) | |

**ORDER DENYING DEFENDANT FRENCH'S THIRD MOTION FOR NEW TRIAL; DEFENDANT CHASE'S AMENDED MOTION FOR NEW TRIAL; AND DEFENDANT RUSSELL'S MOTION FOR NEW TRIAL**

After a multi-week jury trial on January 24, 2014, a federal jury convicted Malcolm French, Rodney Russell, and Kendall Chase of a number of offenses involving the manufacture and distribution of marijuana. On July 31, 2015, Malcolm French filed a third motion for new trial, which Mr. Russell and Mr. Chase soon joined in part. The motion was based on the contents of an anonymous note that Mr. French's son found in late March 2015 in a desk in a scale shack on property owned by Mr. French's business. Bolstered by the anonymous note, Mr. French issued a broadside against the Government's case, alleging egregious discovery violations, perjury of law enforcement officers, perjury of a key Government witness, and prosecutorial misconduct, all of which they claim mandates a new trial. As Mr. French's allegations are so serious, including allegations of prosecutorial misconduct, the Court has undertaken a detailed analysis of his claims.

The Court has concluded (1) that the contents of the anonymous note do not provide a proper basis for a new trial; (2) that much of the contents of the anonymous note are either demonstrably false or unsupported by the extensive record in this

case; (3) that to the extent the anonymous note proclaims Mr. French's actual innocence of the crimes of which he has been convicted, it is manifestly contrary to the jury verdicts in this case and the evidence upon which the verdicts were based; (4) that none of Mr. French's arguments touched on the marijuana grow operation in Township 37, which provides a separate and independent basis for each conviction; (5) that there is no evidence in this record from which the Court could reasonably conclude that law enforcement, the Government witness, or the federal prosecutor knew the information about the Prentiss & Carlisle grow that the Defendants now claim should have been disclosed; and (6) that the forfeiture verdicts accepted the Defendants' current contention that they were not involved in manufacturing marijuana at the LaGrange grow. Accordingly, the Court denies the Defendant's third motion for new trial. Subsumed in the Court's denial of Mr. French's motion for new trial is a denial of Mr. Chase's and Mr. Russell's motions for new trial to the extent they joined Mr. French's motion. Finally, the Court denies Mr. Chase's request for a *Franks*[1] hearing.

## I.   A BRIEF OVERVIEW[2]

The facts underlying Mr. French's motion for new trial are dense and therefore a preliminary overview may be useful. The indictment in this case charged Malcolm French, Rodney Russell, and Kendall Chase with engaging in a conspiracy to manufacture 1,000 or more marijuana plants. It also charged Haynes Timberland,

---

[1]      *Franks v. Delaware*, 438 U.S. 154 (1978).
[2]      As this overview is in the way of an introduction, the Court has not cited the record in support of each statement. In the remainder of the opinion, the Court has cited the record.

Inc. with maintaining a drug involved place.  Mr. French and his wife are the owners of Haynes Timberland.

###   A.   Geography

Two main geographic locations are involved.  The primary focus of the Government's case against all these Defendants was a large marijuana grow on Haynes Timberland property in Township 37 in Washington County, Maine. Washington County is the easternmost county in Maine, bordering Canada to the east, the Gulf of Maine to the south, and three Maine counties to the north, northwest, and west.  Township 37 is in the easternmost part of Maine, fairly close to the Canadian border.  Haynes Timberland's holdings in Township 37 were substantial; Mr. French testified that they owned over 38,000 acres.

The second location was LaGrange, Maine, a town in Penobscot County.  As the crow flies, LaGrange is located about seventy miles west of Township 37.[3] Malcolm French owned property in LaGrange and built a hunting camp on the property around 2003.  Mr. French bought this land in two transactions, a purchase of one parcel in 1990 from Dixie Lands Corporation and a second purchase of three parcels in 1994 from Diamond Occidental Forest, Inc.  *Gov't Exs.* 180, 181.  The deeds for these transfers to Mr. French were admitted into evidence, but they do not establish the size of the combined parcels, *id.*, and the Gordon survey submitted by Mr. French does not delineate the metes and bounds of all the French parcels in LaGrange.

---

[3]      This was Rodney Russell's estimate of the distance between Township 37 and Enfield, a town near LaGrange.  *Partial Tr. of Proceedings* 25:5-11 (ECF No. 364).

Two other parcels are important for purposes of this motion.[4]   First, a parcel owned by the University of Maine abutting Mr. French's LaGrange parcel to the immediate east; based on the Gordon survey, the Court roughly estimates that the University parcel is 1,750 by 3,000 feet.  Abutting the University of Maine parcel, halfway down the University parcel and to its immediate east, there is a lot owned by Prentiss & Carlisle, a Maine timber management company.  The Gordon survey does not show all the boundaries of the Prentiss & Carlisle parcel, but the northern boundary of that parcel is over 4,500 feet long.

In summary, proceeding from west to east, the Gordon survey shows a parcel owned by Mr. French, then a smaller parcel where the French camp is located owned by Mr. French, the University of Maine lot, and midway on the east side of the University parcel are two abutting parcels, the northerly one owned by Mr. French and the southerly one owned by Prentiss & Carlisle.  Still going easterly, Mr. French owns the next parcel as well; this parcel abuts the town lines of both Howland and Edinburgh, Maine.

**B.    Township 37**

The bulk of the Government's case addressed its allegation that Mr. French, Mr. Russell, and Mr. Chase were involved in growing marijuana in Township 37 and distributing that marijuana.  Mr. French's motion, however, does not directly address the Government's Township 37 case.  Nevertheless, in his motion, Mr. French demands a new trial on all charges based on the argument that, if proved true, his

---

[4]     To describe the location of these parcels in words is irreducibly confusing.  To clear up any confusion, the Court refers to the Gordon survey, which is attached as Exhibit 2 to Mr. French's motion.

allegations would have had a spillover effect on the legitimacy of the verdict as a whole.

### C.    LaGrange

The focus of Mr. French's motion is the Government's allegation that he and his co-conspirators were also growing marijuana on Mr. French's LaGrange lot. When law enforcement officials executed a search warrant on his LaGrange property in the fall of 2009, they came upon an old marijuana grow on Mr. French's LaGrange property.  The exact location of this grow is not entirely clear.  Some witnesses said it was about 300 yards from Mr. French's hunting camp and others said it was about a mile from the camp.[5]  In any event, all witnesses agreed that it was located to the west of the French hunting camp.

### D.    Winston McTague and the Location of the LaGrange Grow

A central witness for the Government was a man named Winston McTague. Mr. McTague had tipped off law enforcement about the Township 37 and LaGrange marijuana grows.  At trial, Mr. McTague testified that he had grown marijuana with Kendall Chase in the past and had worked with Mr. French and Mr. Chase on the Township 37 and LaGrange marijuana grows.  He did not implicate Mr. Russell.

Mr. McTague repeatedly described the LaGrange marijuana grow as being on Mr. French's property.  But he also described the location of the LaGrange marijuana grow in reference to the front door of Mr. French's camp.  The front door of the camp

---

[5]     This disparity was never clarified.  It may be that the difference is explained by measuring by straight line as opposed to measuring by travel distance.  For example, the location of the Prentiss & Carlisle grow was said to be one mile as the crow flies and three miles on the ground.

was oriented roughly toward the north.  Mr. McTague said that, if a person stood at the front door of the French hunting camp, the LaGrange grow was located at three o'clock, which would put the grow toward the east, in the direction of the University of Maine and Prentiss & Carlisle lots, and not toward the west, in the direction of the actual location of the LaGrange grow.  He also said that to get to the site, a person had to cross a boundary line marked in red and that the grow site had a drying shack and a green tarp.

### E.    Malcolm French's Testimony

Mr. French took the stand in his own defense.  He testified that he was not involved in either the Township 37 or the LaGrange marijuana grows.[6]  He said that in 2005 Steve Benson, who was hauling brush for Mr. French, came upon the LaGrange grow and that, after Mr. Benson's discovery, a man named Mike Smith came to Mr. French, accused him of disturbing the LaGrange marijuana patch, which Mr. Smith told Mr. French was being operated by the so-called Red Patch Gang.  Mr. French testified that Mr. Smith extorted reparations from Mr. French.

### F.    The Anonymous Note

Mr. French's motion claims that in March 2015, Thomas French, Mr. French's son, discovered an anonymous note in one of his father's business's scale shacks.  The anonymous note claimed—among many other things—that the people who had started the LaGrange grow on Mr. French's land had abandoned that marijuana grow

---

[6]    Although it is not an issue in Mr. French's pending motion, his defense to the Township 37 charge was the needle in a haystack defense.  *See Partial Tr. of Proceedings* 2:18-21, 11:12-19 (ECF No. 481) (*Opening Statement of Att'y McKee*); *Order Denying Defs.' Suppl. Mots. for New Trial* at 56 (ECF No. 500) (*New Trial Mot. Order*).

site and had moved it to "state college land."  After reading the anonymous note, Thomas French set about trying to locate this other marijuana grow.  He found it, not on the University of Maine parcel, but on the Prentiss & Carlisle parcel about a mile from the French hunting camp as the crow flies or three miles over land.

### G.    The Accusation

The heart of Mr. French's accusation is that law enforcement and the federal prosecutor knew all along about the Prentiss & Carlisle grow and that they hid this vital information from the defense.  Mr. French bases his allegations on the following:

(1) Mr. McTague's repeated directions to the LaGrange grow, namely to the east, not west, of the French hunting camp;

(2) Mr. McTague's physical description of the LaGrange grow, including red boundary marks, a green tarp, and a drying shack, none of which was present in the old LaGrange grow;

(3) the disparity in the actual distances between the French hunting camp and the LaGrange grow (about 300 yards to one mile) and the French hunting camp and the Prentiss & Carlisle grow (one mile by straight line or three miles by land);

(3) the AUSA's trial questioning of Mr. McTague, which—according to Mr. French—steered Mr. McTague away from the Prentiss & Carlisle grow and back to the LaGrange grow;

(4) after law enforcement officials had located the LaGrange grow, their continued searching of the area by helicopter for a grow, suggesting that

law enforcement was aware of a second grow somewhere around the French hunting camp; and

5) an allegation that two law enforcement officers actually located the Prentiss & Carlisle grow on October 6, 2009 and failed to report their discovery in their police reports.

In addition to his allegations of prosecutorial misconduct, Mr. French argues that the known and undisclosed existence of the Prentiss grow affected the fairness of the trial in three major ways. First, he contends that it deprived Mr. French of the ability to confirm that there was a second larger marijuana grow not located on his LaGrange property, which would have supported his testimony that the Red Patch gang was behind the grows. Second, he says it deprived him of the ability to cross-examine Winston McTague and law enforcement witnesses about the existence of the Prentiss & Carlisle grow and a supposed conflict with their sworn testimony, which would have eroded their credibility and demonstrated that they had lied. Finally, it is Mr. French's view that the prosecutor's deliberate hiding of the crucial evidence of the Prentiss & Carlisle grow was motivated by the Government's desire to forfeit Mr. French's LaGrange land to the Government itself by convincing the jury that the only marijuana grow in LaGrange was located on Mr. French's land. He claims that the absence of this evidence did not allow the defense to make a persuasive argument of governmental overreaching.

### H.    The Court's Conclusion

The Court emphatically rejects Mr. French's contentions.  First, to the extent that Mr. McTague described the LaGrange grow as being east of the French hunting camp, being after blazed property lines, and containing a green tarp and drying shack, during discovery, the Government turned over to the Defendants Mr. McTague's multiple descriptions of the location of the LaGrange grow.  When he repeated these directions at trial, for whatever reason, defense counsel elected not to cross-examine him on this point.  Mr. French may not complain about the Government hiding information that it supplied him.

Second, the difference between the LaGrange marijuana grow that law enforcement found and Mr. McTague's description of the grow does not prove that law enforcement knew about the Prentiss & Carlisle grow.  What was important to the police is that there was in fact a marijuana grow on Mr. French's LaGrange property located somewhere between 300 yards and a mile from his hunting camp, a fact that no one disputes.  As the LaGrange grow was by all accounts an old grow, it would not be shocking not to find the drying shack or a green tarp.  As for the red boundary marks, if Mr. McTague had turned east to travel west, it would be unremarkable that he encountered some boundary marks on his way to the LaGrange grow.[7]

---

[7]     The Court has previously addressed the significant difficulties Mr. McTague had with his memory following a head injury and has discussed Mr. McTague's credibility issues, which were in full display at trial.  *New Trial Mot. Order* at 46 ("[T]he Defendants were more than able to make the point to the jury that Mr. McTague had experienced a profound traumatic brain injury, that he misremembered things, that people had told him that he had misremembered things, and that, even when he remembered things, he had lied").

9

Third, despite the hyperbolic and aggressive rhetoric in Mr. French's motion, the Court finds no support whatsoever for his claim that law enforcement and the federal prosecutor knew about the Prentiss & Carlisle grow and failed to reveal it. There is, in the Court's view, no basis at all for Mr. French's accusations of unprofessional conduct against the federal prosecutor and the law enforcement officials who investigated this case. The Court firmly and absolutely rejects those false accusations.

In short, the Court concludes that Mr. French's motion must fail because it falls hard of its own weight.

## II.    BACKGROUND

### A.    Superseding Indictment, Trial, and Conviction

On September 14, 2012, a federal grand jury indicted Malcolm A. French, Rodney Russell, Kendall Chase, and Haynes Timberland, Inc. for a set of federal crimes. *Indictment* (ECF No. 2). On November 13, 2013, a grand jury issued a superseding indictment against Kendall Chase for conspiracy to manufacture 1,000 or more marijuana plants, manufacturing 1,000 or more marijuana plants, and conspiracy to distribute and possess with the intent to distribute marijuana. *Superseding Indictment* (ECF No. 187). The grand jury also indicted Mr. Russell for conspiracy to manufacture 1,000 or more marijuana plants, manufacturing 1,000 or more marijuana plants, maintaining a drug-involved place, harboring illegal aliens, and conspiracy to distribute and possess with the intent to distribute marijuana. *Id.* In addition, the grand jury indicted Malcolm French for conspiracy to manufacture

1,000 or more marijuana plants, manufacturing 1,000 or more marijuana plants, managing and controlling a drug-involved place, harboring illegal aliens, and conspiracy to distribute and possess with the intent to distribute marijuana. *Id.* Finally, the grand jury indicted Haynes Timberland, Inc. for managing and controlling a drug-involved place.[8]  *Id.*

The case went to trial from January 8, 2014 through January 24, 2014.  On January 24, 2014, the jury returned verdicts finding Malcolm French, Rodney Russell, and Kendall Chase guilty of engaging in a conspiracy to manufacture marijuana, finding Malcolm French and Rodney Russell guilty of manufacturing marijuana, finding Malcolm French, Rodney Russell, and Haynes Timberland, Inc. guilty of managing or controlling a drug-involved premises, finding Malcolm French and Rodney Russell guilty of harboring illegal aliens, and finding Malcolm French, Rodney Russell, and Kendall Chase guilty of engaging in a conspiracy to distribute marijuana.  *Jury Verdict Form* (ECF No. 311).  As to the drug trafficking conspiracy as a whole, the jury found beyond a reasonable doubt that it involved 1,000 or more marijuana plants; the jury also found beyond a reasonable doubt as to Defendants Malcolm French and Rodney Russell, their individual conduct involved 1,000 or more marijuana plants.  *Id.*

## B.    The Pending Motions

On July 31, 2015, Malcolm French moved for a new trial based on an anonymous note giving rise to newly discovered evidence that the actual LaGrange

---

[8]     Haynes Timberland, Inc. was business entity owned in part by Malcolm French. *Partial Tr. of Proceedings* 106:12-15 (ECF No. 362).

11

grow site is different from the grow site to which Government witness Winston McTague testified and is not located on Mr. French's property. *Def. French's Mot. for New Trial* at 2 (ECF No. 554) (*French Mot.*). Mr. French moved for a new trial on "individual and cumulative" grounds with respect to six legal claims: "(1) newly discovered evidence; (2) newly discovered perjury; (3) government use of perjured testimony; (4) *Brady* violations; (5) mis-characterization of evidence; and (6) prosecutorial misconduct." *Id.* at 3. On August 1, 3, and 5, 2015, Kendall Chase, Rodney Russell, and Haynes Timberland, Inc., respectively, joined Mr. French's motion for new trial. *Def. Chase's Notice of Joinder to Def. French's Mot. for New Trial dated July 31, 2015* (ECF 555); *Def. Rodney Russell's Notice of Joinder to Def. French's Mot. for New Trial dated July 31, 2015* (ECF 556); *Def. Haynes Timberland, Inc.'s Notice of Joinder to Def. French's Motion for New Trial dated July 31, 2015* (ECF 561). On August 7, 2015, the Government responded. *Gov't's Obj. to the Def.'s Third Mot. for New Trial* (ECF 563) (*Gov't's Obj.*). On August 21, 2015, Mr. French replied to the Government's opposition. *Def. Malcom French's Reply to the Gov't's Obj. to the Def.'s Third Mot. for New Trial* (ECF 576) (*French Reply*).

   Two of the defendants later filed amended motions for new trial to distinguish in certain respects their claims from Mr. French's motion and to add new legal claims. On October 8, 2015, Mr. Chase filed an amended motion. *Def. Kendall Chase's Am. Mot. for New Trial* (ECF No. 588) (*Chase Am. Mot.*). On October 13, 2015, the Government responded to Mr. Chase's amended motion. *Gov't's Obj. to Def. Chase's Am. Mot. for New Trial* (ECF No. 589) (*Gov't's Obj. to Chase*). Mr. French himself

responded to Mr. Chase's amended motion and joined Mr. Chase's *Brady* and *French* motions on October 21, 2015. *Def. Malcolm French's Resp. to Def. Kendall Chase's Am. Mot. for New Trial and Joinder of* Brady/Franks *Mot.* (ECF No. 595) (*French's Resp. to Chase*). Finally, on October 18, 2015, Mr. Russell joined Mr. Chase's amended motion for new trial and filed his own motion for new trial.[9] *Def. Rodney Russell's Mot. for New Trial and Withdrawal of all Joinder with Claims the Gov't Suborned Perjury* (ECF No. 590) (*Russell Mot.*). On October 21, 2015, the Government responded to Mr. Russell's amended motion. *Gov't's Obj. to Def. Russell's Mot. for New Trial* (ECF No. 594) (*Gov't's Opp'n to Russell*).

## III. THE PARTIES' POSITIONS

### A    Third Motion for New Trial

#### 1.    Mr. French's Motion

##### a.    Facts Alleged

An anonymous note provides the impetus for Mr. French's motion for new trial. In his motion, Mr. French claims that in late March 2015, Thomas French—the Defendant's son—found a note "claim[ing] that the LaGrange marijuana grow was not, as alleged by the government, and testified to by its witnesses, located on Mr. French's property, but on an adjacent parcel of land." *French Mot.* at 2.[10] Thomas French said he found the note "in a corner, under and to the left of the desk in the

---

[9]    As the title of his motion states, Mr. Russell also filed his own motion for new trial. The Court addressed that motion in a separate order. *Order on Rodney Russell's Mot. for New Trial* (ECF No. 597).

[10]    There are two different paginations of Mr. French's motion, the ECF pagination and the motion's pagination, and the Court refers to the motion's pagination.

scale shack, which is the trailer weighing station in LaGrange, Maine for my father's company." *French Mot.* Attach. 20 *Aff. of Thomas French*, at 1 (ECF 554). He states that the "door [to the scale shack] is never locked." *Id.* In relevant part, the note refers to a grow site instead located "on the state college land." *French Mot.* Attach. 2 *Anonymous Note*, at 1 (ECF 554) (*Anonymous Note*).

According to the Defendant, on May 18, 2015, a private investigator and surveyor working with the defense searched for the site described in the note. *French Mot.* at 4. They discovered a grow site fitting "not only the description of the LaGrange grow in the Note" but also "the description of the LaGrange grow provided by Winston McTague in his tips and grand jury testimony." *Id.* Thus, Mr. French argues there are two distinct grow sites: the so-called "Rolfe Grow," on which his conviction rests, is "about 300 yards from the French LaGrange cabin running to the northwest," *id.* at 7; and the so-called "Prentiss Grow," found pursuant to the note, is "about one mile from the French camp as the crow flies and 3 miles by road and path." *Id.* at 5 (footnote omitted). *See also id.* Attach. 3 *Gordon Survey*, at 1 (ECF 554) (*Gordon Survey*) (survey map showing two grow sites); *id.* Attach. 4 *Aerial Photo*, at 1 (ECF 554) (aerial photograph showing same). For clarity, this Order refers to the former as the Rolfe grow site and the latter as the Prentiss grow site.

Mr. French asserts that there are three major differences between the Rolfe and Prentiss grow sites: distance, direction, and the presence (or absence) of unique markers. The first two relate to location. Regarding distance, the Prentiss grow site is farther from Mr. French's cabin than the Rolfe grow site. *French Mot.* at 5, 7.

Regarding direction, the Prentiss grow site is to the right (south-southeast) of the cabin, and the Rolfe grow site is to the left (northwest). *Id.* at 13. Finally, Mr. McTague's tips and grand jury testimony mentioned the unique markers of a red boundary line and a drying shack with a green tarp. *Id.* at 6-7. While "there are no remains of a drying shack 'near' the [Rolfe] grow, nor is there a 'blazed line,'" *id.* at 7, the Prentiss grow "is near a painted boundary line, and has the remains of a drying shack with a 'fir green' tarp." *Id.* at 5.

Put simply, Mr. French argues that Mr. McTague changed his story about the location of the French conspiracy marijuana grow and that the Government knew, and encouraged, his doing so. According to Mr. French, Mr. McTague referred to the Prentiss grow site in his tips and grand jury testimony and to the Rolfe grow site in his trial testimony. Thus, "[Mr.] McTague provided perjured testimony at trial conforming his testimony to that of [Special Agent] Rolfe's testimony for the purpose of securing the conviction of the defendant . . . ." *Id.* at 7.

Mr. French also accuses the Government of knowing about Mr. McTague's perjury. In particular, he observes that an examination of the chronology of searches pursuant to Mr. McTague's tip reveals that the Government continued searching for grow sites after it had found the Rolfe grow site. *Id.* at 7-8. From this, Mr. French infers the Government did not think it had located the site described in the tip. *Id.* He also objects to the fact that those conducting the later searches, State Police Officer Chad Fuller and Maine Drug Enforcement Agent Jon Richards, did not file

15

reports on their findings.[11]  *Id.* at 8, 13.  Regarding the prosecution, Mr. French alleges Assistant United States Attorney (AUSA) Joel Casey "was conscious of what he was doing" in avoiding the supposed discrepancy in Mr. McTague's testimonies. *Id.* at 15.

### b.  Legal Framework

Noting that "new trial standards vary depending on the evidence," Mr. French sets out three legal standards he deems relevant to the alleged facts.  *Id.* at 16.  First, the *Wright* standard requires that the evidence "was unknown or unavailable to [defendant] at time of trial"; that his "failure to learn of it did not result from lack of due diligence"; that "the evidence is material"; and that "its availability is likely to bring about an acquittal upon retrial."  *Id.* (alteration in original) (quoting *United States v. Connolly*, 504 F.3d 206, 212 (1st Cir. 2007)).

Second, the *Brady* standard as applied "under the Rule 33 new trial rubric" requires that the evidence "at issue (whether exculpatory or impeaching) must be favorable to the accused"; that it "have been willfully or inadvertently suppressed by the government"; and that "prejudice must have ensued."  *Id.* at 17 (quoting *Connolly* 504 F.3d at 212).

Third, the "use of perjured testimony" standard "requires that a defendant 'show that there is a reasonable likelihood that the false testimony could have

---

[11]     In particular, Mr. French argues that on October 6, 2009 Agent Fuller saw no marijuana plants during a helicopter flight over the area described by the tipster, and on that same date Agent Richards found a grow site on the area described by the tipster. *French Mot.* at 8. *See id.* Attach. 13 *Weaver Aff.*, at 165-66. Mr. French later argues that "[n]either [Agent Fuller nor Agent Richards] filed a report on this discovery which would have established that (a) there was a grow, but not on Mr. French's property, or (b) that there was not a grow, and that the location described was not on Mr. French's property." *Id.* at 13.

affected the judgment of the jury.'" *Id.* (quoting *United States v. González-González*, 258 F.3d 16, 22 (1st Cir. 2001)).

Having set out these standards, Mr. French contends there is a disagreement within First Circuit as to which standard applies to his facts: the four-part *Wright* standard or the tripartite *Brady* standard. Specifically, the disagreement focuses on whether *Wright's* requirement of due diligence remains where the new evidence also involves *Brady* violations. Mr. French acknowledges that there is caselaw applying *Wright* in such situations. *Id.* at 19 (citing *Connolly*, 504 F.3d 206; *González-González*, 258 F.3d 16). But he asserts the proper view "simply applie[s] the three pronged U.S. Supreme Court test [(i.e., *Brady*)] rather than the traditional newly discovered evidence standard [(i.e., *Wright*)]," *id.* at 19 (citing *United States v. Conley*, 249 F.3d 38 (1st Cir. 2001); *United States v. Mathur*, 624 F.3d 498 (1st Cir. 2010)). Thus, he "urges this Court to apply the correct standard as set forth in *Conley*, and *Mathur* . . . and not apply a due diligence requirement." *Id.* at 20.

Likewise, on his claim that the Government knowingly used perjured testimony, Mr. French urges the Court not to "us[e] the *Wright* test requirement [of due diligence] in any way, but rather [to] apply the Supreme Court's mandated standard, which is simply whether the use of perjured testimony could in any reasonable likelihood have affected the judgment of the jury." *Id.* at 21 (citing *Giglio v. United States*, 405 U.S. 150 (1972)).

### c.   **Argument**

#### i.   ***Wright* Test**

Although he contends the *Wright* standard is not on-point, Mr. French asserts the fresh evidence (i.e., the anonymous note leading to the new grow site) meets that standard nonetheless. *Id.* at 21. On the first prong, he argues the evidence was unknown to him at the time of trial, given the voluminous record and the unreliability of Mr. McTague. *Id.* at 21-22. On the second prong, he argues that due diligence is a "context-specific concept" to be measured by a standard of "ordinary diligence," *id.* at 22-23 (citations omitted), and that in this context the Government's misrepresentations—as opposed to a lack of due diligence on his part—prevented him from discovering the new grow site. *Id.* at 24-26. On the third prong, he argues the new grow site is material due to its location on college land, which "undercuts the entire theory of the prosecution that [he] was the boss because the grows were always on his land." *Id.* at 27. On the fourth prong, regarding the likelihood of acquittal upon retrial, Mr. French argues in a similar vein that the Government's claim that he provided the land "permeates all other aspects of this case," *id.* at 27, which otherwise rests on scant evidence and unreliable witnesses. *Id.* at 28-32. Thus, he says, the forfeiture would have to be reversed, *id.* at 28, and the conviction would likely be so too. *Id.* at 27-28.

### ii.  *Brady* Test

Mr. French finds *Brady* issues "[i]nherent in the newly discovered evidence, perjury, and mischaracterization claims." *Id.* at 41. Specifically, he points to the Government's failure to provide Special Agent Fuller's report, Special Agent Richards's report, "notes of change in testimony of McTague regarding the location of

LaGrange grow," and "other possible violations pending outcome of current *Brady*

discovery motion." *Id.* Mr. French reminds the Court that a prior *Brady* violation

occurred in this case and urges the Court to consider that violation and the newly

alleged violations cumulatively to "meet the necessary standard requiring a new

trial." *Id.* at 42.

### iii. Perjured Testimony and Prosecutorial Misconduct

Mr. French expounds at length on the unreliability of Mr. McTague, "the

government's central witness," whose dishonesty or confusion "should have been

crystal clear to the government." *Id.* at 32, 35. Mr. French concludes:

> Certainly confidence in the verdict is undermined by perjured trial
> testimony fitting snugly, for the first time, with the prosecutor's case.
> This is not a case where a witness simply changed his testimony, it is a
> case where the testimony was "conformed" to meet with the
> government's theory of the case. It was changed subtly, but markedly,
> and with the assistance of the government's own leading questions. Any
> confidence in the jury verdict has been severely and irreparably
> compromised.

*Id.* at 40. Mr. French argues that in addition to supposedly mischaracterizing the

evidence as described in the above passage, the prosecution "turn[ed] justice on its

head and us[ed] false testimony at closing for corroboration." *Id.* at 44. Mr. French

urges a new trial on these grounds.

### 2. The Government's Opposition to Mr. French's Motion

The Government agrees that the *Wright* test applies to newly discovered

evidence. *Gov't Obj.* at 11. But it applies a different test where Government

suppression of *Brady* material prevented an earlier discovery of such evidence; there,

the Government cites *Connolly* for the proposition that the first two prongs of *Wright*

(unknown at trial, not from lack of due diligence) remain intact while the second two prongs (materiality, likelihood of acquittal upon retrial) merge into a single inquiry: whether there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* Moreover, the Government asserts that if the witness perjured himself and "the government's use of that testimony was unwitting," the *Wright* test applies without alteration. *Id.* at 11-12 (quoting *González-González*, 258 F.3d at 21). If the witness perjured himself and "there is a colorable claim" the government knowingly used that testimony, the *Brady* test applies. *Id.* at 12 (quoting *González-González*, 258 F.3d at 21-22).

At the outset, the Government argues the anonymous note "is inadmissible hearsay and not evidence at all." *Id.* at 2. Addressing Mr. French's claim that Mr. McTague perjured himself by first saying the grow site was to the left of the camp and later saying it was to the right, the Government asserts Mr. McTague's testimony consistently indicated the grow site was to the right. *Id.* at 6-7, 14. Because "the primary factual predicate for [his] motion is not present," the Government urges the Court to deny the motion without a hearing. *Id.* at 13. It also points out that Mr. French bases his motion on facts he had at trial, so his claim cannot constitute newly discovered evidence. *Id.* Regardless, the Government says, the motion is untimely. *Id.*

The Government views Mr. French's *Brady* claims as baseless. It had already produced Special Agent Fuller's helicopter search and the fact that he saw no marijuana in the Weaver affidavit. *Id.* at 9, 17. Further, the Government maintains

that Mr. French misreads Special Agent Richards's statement that he "found the area described by the tipster," also in the Weaver affidavit, as a "smoking gun" showing he had "stumble[ed] upon" the Prentiss grow site. *Id.* at 9. Rather, a "common sense reading" of Special Agent Richards' statement shows that he merely "found what he believed to be the parcel of French land described by the tipster" based on a gate and a sign, which he then offered to corroborate the tip for the purpose of getting a search warrant. *Id.* at 9-10, 14. Finally, the Government has no notes on a change in Mr. McTague's testimony because it denies any such change occurred. *Id.* at 10, 14.

### 3.   Mr. French's Reply

Mr. French renews his arguments regarding the direction (to the left) and distance (far from camp) of the Prentiss and Rolfe grow sites, and he accuses the Government of deliberately misconstruing these points as well as erroneously asserting it is a defendant's duty to discover perjury on cross-examination instead of the Government's duty to disclose such information. *French Reply* at 1-4. He then labels the Government's responses to his *Brady* claims "specious" as "continu[ing] on with the fabrication that [Mr.] McTague was at all times describing the [Rolfe] grow . . . ." *Id.* at 4-5. Moreover, regarding his possession at the time of trial of the facts giving rise to the present motion, Mr. French argues he cannot be made to "sift through thousands and thousands of pages of discovery" in a game of hide and seek for *Brady* material; for similar reasons, he cannot be found to have lacked due diligence. *Id.* at 5-6. Mr. French insists that he would have raised the presence of the Prentiss grow site at trial had he known of its existence, *id.* at 9, and dismisses

the Government's claim that the Prentiss grow site may come into existence since Mr. McTague's tip.  *Id.* at 6-7.

### B.    The Defendants' Amended Motions

#### 1.    Mr. Chase's Amended Motion

In his amended motion for new trial dated October 8, 2015, Leonard Sharon, Mr. Chase's counsel, writes that when United States Attorney Thomas Delahanty II informed him of the nature of Mr. French's allegations against the prosecution, Mr. Sharon's "jaw dropped" and he admitted to being unaware of evidence that would support such allegations.  *Chase Am. Mot.* at 1-2.  Mr. Sharon, on behalf of Mr. Chase, withdraws any claim that the Government suborned perjury.[12]  *Id.* at 2.

Nevertheless, Mr. Chase continues to press his claim of a *Brady* violation.  He submits that for *Brady* purposes the law requires the Court to define the Government "as a collective body that includes all agents working on the case."  *Id.* at 3 (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Casas*, 356 F.3d 104, 116 (1st Cir. 2004); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)).  After making this point, he urges the Court to apply the three-part *Brady* test: (1) exculpatory or impeaching evidence favorable to the accused (2) that was willfully or inadvertently suppressed by the government and (3) prejudice ensued.  *Id.* at 3-4 (citing *French Mot.* at 13). Regarding the first prong, Mr. Chase relies on the evidence in Mr. French's motion and writes that "[t]here is no need to reiterate here the

---

[12]    He also withdraws any claim of prosecutorial vindictiveness.  This withdrawal is relevant to Mr. French's motion to dismiss indictment (ECF No. 583), and for that reason, it will be addressed in a separate order.

22

evidence that was not turned over to the defense." *Id.* at 4. If the Court finds such evidence existed, Mr. Chase invites the Court to find the second and third prongs have been met as well.

Mr. Chase introduces a new legal claim in the form of an alleged *Franks* violation. According to Mr. Chase,

> when a defendant makes a preliminary showing that exculpatory evidence is knowingly and intentionally, or with a reckless disregard for the truth, omitted from an affidavit seeking a warrant; or that false and misleading information is provided to the issuing authority in such an affidavit, the defendant is entitled to an evidentiary hearing to prove such omissions or false inclusions existed.

*Id.* at 5 (citing *Franks*, 438 U.S. at 171-72; *United States v. Cartagena*, 593 F.3d 104, 112 (1st Cir. 2010); *United States v. Nelson-Rodriguez*, 319 F.3d 12, 36-37 (1st Cir. 2003)). Acknowledging that "an offer of proof is required," Mr. Chase again points to the evidence alleged in Mr. French's motion by stating he will rely on "the evidence that is likely to be produced at the hearing on the motions for new trial." *Id.* If the Court were to find "that exculpatory information was wrongfully omitted" based on that evidence, Mr. Chase contends it should scrutinize five affidavits used to provide probable cause for five search warrants. *Id.* at 6. In particular, as Mr. Chase sees it, the Court's task would be to "rewrite the affidavits"—including any exculpatory information and striking any false information—and then decide whether the rewritten affidavits provide probable cause. *Id.* at 6-7. Mr. Chase contends that the Court must void the warrant and exclude the fruits of the search if probable cause no longer exists. *Id.* at 7 (citing *United States v. McLellan*, 792 F.3d 200, 208 (1st Cir. 2015)).

### 2. The Government's Opposition to Mr. Chase's Amended Motion

The Government's opposition characterizes Mr. Chase's amended motion as "rel[ying] upon the notion that the 'Prentiss Grow' existed, that the Government knew that it existed, and that the Government failed to disclose this knowledge." *Gov't's Obj. to Chase* at 1. The Government notes that it has already responded to these allegations and that it "offers nothing further." *Id.*

### 3. Mr. French's Response to Mr. Chase's Amended Motion

Mr. French perceives in Mr. Chase's amended motion an "unusual coupling of the prosecutor and Defendant Chase." *French's Resp. to Chase* at 1. Thomas Hallett, Mr. French's counsel, pieces together an allegation—largely on second- and third-hand authority—that United States Attorney Delahanty pressured Attorney Sharon to file Mr. Chase's amended motion in what amounts to a "collateral attack[]" on Mr. French's third motion for new trial. *Id.* at 2-3. Mr. French clarifies that he does not move for a new trial on a claim of suborning perjury, as Mr. Chase suggests, but on one of knowing use of perjured testimony. *Id.* at 1 n.1, 4. He then rehashes his evidence for that claim. *Id.* at 4-6.

## IV. ANALYSIS OF FACTUAL ALLEGATIONS

### A. The Anonymous Note

The anonymous note found in March 2015 by Mr. French's son is an oddity.[13] It is signed "a friend and neighbor" and the author presents a certain familiarity with

---

[13]    The note is filled with curse words, awkward syntax, grammatical mistakes, and chronological vagueness that make it difficult to understand. Also, the note appears to have been composed on an old-fashioned typewriter, and the "n" key does not strike or strikes faintly. For example, the word

Mr. French and the marijuana grow operations. *Anonymous Note* at 1. The source tells Mr. French that he "was always fair to me," that he "worked with winston and them other guys over many seasons," and that "if you remember seein me on 4 wheeler at east grand maybe." *Id.* If Mr. French knows the identity of the anonymous source, he has not said so.

The anonymous author claims that he worked for a group of marijuana growers that included "winston," presumably Winston McTague. *Id.* The note says that "when he worked for you the first time," a person named Scott (presumably Scott MacPherson[14]) was "the one that got us growing on you in la and otis." *Id.* The Court assumes that "la" refers to LaGrange and that "otis" refers to Otis, a town in Hancock County, Maine.[15] During his trial testimony, Mr. French stated that he owned some property in Otis, Maine. *Partial Tr. of Proceedings* 13:14-18 (ECF No. 362) (*French Test. I*). After burning the marijuana grow in Otis to escape Mr. French's detection, the author says "they was growin on you in la at the same time." *Anonymous Note* at 1. The author asserts that "after the deal in otis scott took off" and that Scott "was afraid youd find out what happend down ther and blame him." *Id.*

---

"things" comes out "thi gs." *Id.* Where the "n" is missing, but it is apparent that the letter should be an "n," the Court inserted an "n."

    Also, the anonymous note does not indicate the gender of the author. The Court has used the masculine for ease of reference.

[14]    Scott MacPherson's name has arisen repeatedly in this case. He appears to have been one of the co-conspirators in the French conspiracy. Tragically, once the conspiracy was revealed, he passed away.

[15]    The parties have not pointed to any trial testimony concerning Otis, Maine. The anonymous source claims that Scott was Mr. French's forester, knew where the French crews were going to cut, and ordered the Otis marijuana grow burned to avoid detection. *Anonymous Note* at 1. The source claims that Scott said that Mr. French had insurance "so it wood be ok." *Id.* The author states that "they didnt grow no more in otis after that." *Id.*

The author mentions another marijuana grow operation, this one in Danforth, Maine, which is located on the eastern side of Washington County. *Id.* The author says that the marijuana operation took place on paper company land "before you got that land to" and he assures Mr. French that "no one new that you got that land." *Id.* The author claims that "some of your guys ripped them off when you was workin there a little bit then they got busted up there" and "they didnt grow up there after but still on you in la." *Id.* The reference to the Danforth marijuana grow is generally consistent with Winston McTague's trial testimony about an older marijuana grow operation in Danforth where Mr. McTague worked with co-defendant Kendall Chase. *Partial Tr. of Proceedings* 6:12-21 (ECF No. 414) (*McTague Trial Test. I*).

As the author tells it, the "benson brothers ripped them off big time in la" and he says that he knows that Mr. French "stepped up and covered from the bensons." *Anonymous Note* at 1. But the author says that Mr. French "shudnt have save ther ass." *Id.* He said "they no fuckin good they steal off your forever." *Id.*

The author explains that "when they got that dirt from the t-shirt guys they made 2 patched one in westly and the other in la." *Id.* This comment is hard to decipher. By the "t-shirt guys," the author may be referring to Robert Berg, a friend of Mr. French, who operated a t-shirt printing business and who pleaded guilty and has been sentenced to acting as an accessory after the fact to the French marijuana conspiracy. *See United States v. Berg*, No. 1:12-cr-00160-JAW, *J.* (ECF No. 573). There was trial evidence that some of the PRO-MIX was delivered to the conspiracy at Mr. Berg's business. *See McTague Trial Test. I* 21:4-13. At trial, Mr. McTague

26

referred to PRO-MIX as "dirt" and in the context of this note, it appears the anonymous author may be doing the same.  *Id.* 27:4-28:14.  The reference to "dirt from the t-shirt guys" may mean PRO-MIX picked up at Berg Sportswear, which figured prominently in the case.  The reference to "westly" is probably to Wesley, Maine, a town in Washington County, and the Court infers that the author is referring to the Township 37 grow, not yet another marijuana grow in Wesley.

As best the Court can interpret it, the author is saying that the people who were growing the marijuana in LaGrange decided to move the growing operation from its then location to somewhere else in LaGrange and to Wesley.  Regarding the Wesley grow, the anonymous author says that the "one down on the airline[16] was in a spruce seamp that they said was you land."  *Anonymous Note* at 1.

Turning to the LaGrange grow, the author says "the one in la they moved back on the state college land.  at the end of the rite hand branch of the gated road closest to howland across painted line in a swamp and small brook."  *Id.*  The Court interprets the reference to "howland" as being to Howland, Maine, a town that abuts LaGrange to the east, northeast.  *See Gordon Survey.*  Thus, according to the author, the people who were growing the marijuana disbanded the operation and moved it toward Howland on state college land across a painted line in a swamp and small brook.  As it turns out, according to the Gordon survey, the University of Maine owns two parcels of land toward Howland from the Malcolm French camp lot.

The author says that:

---

[16]    Maine Route 9, which runs from Bangor to Calais, Maine, is often referred to as the airline.  It runs through Wesley.

> some of the guys you have work for ;you really fucked you over.  you
> must have figured that out by now.  things was good til they had coke
> and crack around all the time.  they was using way to much.  i no winston
> got fucked out of his share and them other guys was always blamin you
> sayin you never made good for all the pot your workers stole.

*Anonymous* Note at 1.  There was trial testimony from Mr. McTague to the effect that he thought he had been cheated by members of the conspiracy and this led him to go to law enforcement about the French conspiracy.  Mr. McTague testified that, after he injured his shoulder while working at the French marijuana grow in Township 37 in 2006, a man named Mike Smith, who was also a member of the conspiracy, promised to pay him one thousand dollars a week and pounds of marijuana.  *McTague Trial Test. I* 23:5-26:23.  Mr. McTague said that he only received thirteen pounds of marijuana from Mr. Smith.  *Id.* 32:25-33:3.  This made him "mad" and he tipped off law enforcement about the French marijuana growing conspiracy.  *Id.* 33:4-15.

The author then refers to Mr. McTague's motorcycle accident.  *Anonymous Note* at 1 ("then he fucked himself up in the bike crash").  This is consistent with Mr. McTague's testimony that on June 27, 2007 he sustained significant injuries, including a head injury, as a result of a motorcycle accident.  *See McTague Trial Test. I* 4:19-5:24; 31:25-32:3.

As the author tells it, "we was all setup good with a patch in la and new ones in westly."  *Anonymous Note* at 1.  He claims that "they were goin to make it rite with winston til scott took over."  *Id.*  Things soured when Scott and his "bad asses" from Buffalo returned and "took over westly."  *Id.*  First, Scott told Mr. McTague that Mr. French had "mide it rite on what the bensons took," but told him that they "couldnt give him his share cause [Mr. French] wasnt takin care of what [his] kid and his

28

buddies stole and blamed all on [Mr. French]." *Id.*  In short, "they was the ones that ripped winston off and blamed all on [Mr. French]." *Id.*  The author admits that they "had la but when winston got hurt the others cut him out of that to." *Id.*

The anonymous author asserts that "we all no you had nothin to do with the grows" and "no one could believe you;d be found guilty." *Id.*  He writes that it is "not rite you gettin fucked over like this." *Id.*

### B.    The French Motion and the Anonymous Note

Mr. French's motion is premised in large part on the accuracy of the contents of the anonymous note.  *French Mot.* at 3-5 (describing contents of the anonymous note).  In the note, the anonymous author makes a series of allegations that fall into two categories: (1) matters related but collateral to Mr. French's main allegation about the location of the Rolfe and Prentiss grows, and (2) matters directly related to his main allegation.  The Court now considers these two categories in turn.

### 1.    Collateral Matters

To bolster the credibility of the anonymous note, Mr. French makes a number of assertions regarding the accuracy of the note's description of the collateral matters.  Upon analysis, the Court concludes that the anonymous note is demonstrably incorrect about these collateral matters and that Mr. French's contentions regarding the note's accuracy are unsupported by the record in this case.

### a.    The Anonymous Note's Allegation that Steve Benson and his Brother Stole Marijuana from the Rolfe Grow

29

In the note, the anonymous author accuses the "benson brothers" of "ripp[ing] them off big time in la." *Anonymous Note* at 1.  In his motion, Mr. French adopts this accusation against the Benson brothers and says that it is consistent with Malcolm French's trial testimony:

> The Note goes on to state that Scott McPherson was involved in both those grows, as was Michael Smith; and references Mr. French having to pay for pot <u>stolen by his workers [Steven Benson]</u> and Mr. French's son's friend [Jared Flewelling].  <u>All of this information is consistent with Malcolm French's testimony at trial where he testified that $35,000 was owed to the growers for the Benson theft . . . .</u>

*French Mot.* at 3-4 (alteration in original) (emphasis supplied).  In fact, the French motion goes further and asserts that Mr. French told Warden Bruce Loring "that [Mike] Smith had extorted $35,000 from Mr. French <u>because Steve Benson stole that much marijuana</u> when he found one of Mike Smith's grow sites about a mile from the cabin." *Id.* at 15 (alteration and emphasis supplied).

A review of the record evidence, including the trial testimony, reveals no support for the anonymous author's and Mr. French's current accusations of theft against the Benson brothers.  At trial, Mr. French called Steve Benson, one of his employees, as a defense witness.  There is no suggestion—on direct or cross-examination—in Mr. Benson's trial testimony that he had anything to do with the marijuana grow operation in either LaGrange or Township 37.  *Partial Tr. of Proceedings* (ECF No. 419) (*Benson Trial Test.*).  Mr. Benson testified that when he was assisting Mr. French in the construction of his LaGrange camp, he came upon a

marijuana grow about a mile to a mile and a half from the site of Mr. French's camp.[17]
*Id.* 7:24-8:6; 9:14-10:2.  Mr. Benson explained that he owned his own dump truck and
had begun to do "a little bit of gravel and groundwork, septic systems and driveways
and stuff like that." *Id.* 5:14-17.  Mr. Benson testified that in 2005, he was working
around Mr. French's camp in LaGrange, clearing out undergrowth and hauling it off.
*Id.* 7:8-20.  He said that Mr. French told him to dump the undergrowth in "the first
big hole I saw." *Id.* 8:18-21.  Mr. Benson dumped about twenty-five to thirty loads of
undergrowth in the ditch and, using a bulldozer, kept pushing the undergrowth into
the woods.  *Id.* 8:24-9:25:8.  Mr. Benson testified that as he kept pushing the debris
back into the woods, he "stumbled onto a marijuana patch." *Id.* 9:18-19.  He testified:
"I didn't really want nothing to do with it.  I didn't walk through it.  I just saw what
there was, and there was roughly 25 to 30 good-sized holes." *Id.* 9:20-24.  Mr. Benson
told Mr. French about the marijuana and said that he "appeared very surprised and
told us to stay away from it." *Id.* 10:3-6.  Mr. Benson did not return to the site.  *Id.*
10:12-14.

Mr. French testified that after the Bensons came upon the marijuana grow in
LaGrange, Mike Smith visited him, told Mr. French that some of the marijuana in
that grow was missing, accused either Mr. French himself or the Bensons of taking
it, and demanded that Mr. French pay the actual growers off.  *French Test. I* 28:23-
31:23.  According to his testimony, Mr. French agreed to pay $35,000 in reparations
to the growers of the marijuana patch: the Red Patch motorcycle gang.  *Id.*  *See id.*

---

[17]     Although Mr. French testified about this 2005 incident, he did not describe the location in
detail.  *French Test. I* 19:19-20:1.

102:7-17.  But, contrary to the contentions of the anonymous author's note and Mr. French's current motion, there were no suggestions at any time that the Benson brothers had made away with the LaGrange marijuana and had then allowed Mr. French to pay for what they had stolen.[18]  In fact, when Mr. French was directly asked about Mr. Benson's involvement in stealing marijuana from the Rolfe grow, he denied it.  *Id.* 101:14-18 ("Q. Okay. So it had nothing to do with Mr. Benson.  A. Not that I am aware of.  Q. Okay.  Is it possible that Mr. Benson stole some of the marijuana?  A. I don't believe so").

Furthermore, although the French motion asserts the Warden Loring testified before the grand jury that Mr. French had told him that Mr. Benson had stolen the marijuana in 2005, *French Mot.* at 15-16 (citing *Test. of Bruce Loring* 5:16-11:10) ("Mr. French went on to tell Warden Loring that Smith had extorted $35,000 from

---

[18]     The Court found one instance where this version of events appeared in the trial transcript. At sidebar, Attorney McKee referred to Mike Smith's—and not Mr. French's—understanding of the events: "I anticipate the witness will testify that Mike Smith paid him a visit, indicated that the marijuana that they had found turned up missing; that they were blaming Malcolm French and/or Steve Benson for that; that *Malcolm needed to make good on that and that money needed to be paid in order to make good on the fact that the marijuana was missing and taken by somebody else, presumably Malcolm French or Steve Benson.*" *French Test. I* 21:11-18 (emphasis added).  No witness ever testified in accordance with Mr. McKee's sidebar statement, and Mr. McKee's statement of what the evidence might be is not evidence.

Also, Mr. McKee called the marijuana "missing"—which could have happened from someone taking the marijuana or driving heavy equipment over the plot—and never stated, in contrast to the anonymous author, that Mr. Benson stole the marijuana.  During his testimony, when he was directly asked whether he thought Mr. Benson stole the marijuana, Mr. French said that he did not believe so. *Id.* at 101:18.   Right after this testimony, Mr. French was asked whether—after Mike Smith approached him—he talked to Steve Benson.  *Id.* 102:18-19.   Mr. French testified, "Not after the conversation with Smith, no, I didn't."  *Id.* 102:20.  He was then asked:

> Q. So you didn't say, hey, Steve, you got me in some hot water here because you backed over those plants, now they think they're stolen?
> A. No.

*Id.* 102:21-24.

Finally, Attorney McKee never asserted during his closing argument that Mr. Benson had stolen the marijuana.  *Partial Tr. of Proceedings* 1-33 (ECF No. 478).  To the contrary, he asserted that "what happened was word got out and that marijuana was destroyed."  *Id.* 4:23-24.

Mr. French because Steve Benson stole that much marijuana when he found one of Mike Smith's grow sites about a mile from the cabin"), the Court reviewed the portion of Warden Loring's grand jury testimony that Mr. French submitted and cited for this proposition. *Id.* Attach. 30, *Test. of Bruce Loring* 5:16-11:10 (*Bruce Loring Test.*). The Court found no support at all in the cited portion of the Warden's testimony for Mr. French's assertion that Warden Loring told the grand jury in this case that Mr. Benson had stolen marijuana. Instead, Warden Loring refers to an account whereby "either [Mr. French] or I'm guessing his workers had accidentally destroyed some marijuana that Mr. Smith had grown." *Bruce Loring Test.* 10:13-15.

Accordingly, the Court rejects the French motion's contention that the evidence in this case is consistent with the allegation in the anonymous note that Mr. Benson had stolen marijuana in 2005 from the LaGrange lot. Instead, the evidence is flatly contrary to this assertion, including Mr. French's own testimony. The Court concludes that there is no evidence in this record to support the veracity of the anonymous note's assertion that the Benson brothers were behind a marijuana theft in 2005.

> **b.    The Anonymous Note's and the French Motion's Accusations About Marijuana Stolen by Persons Other Than the Benson Brothers**

The French motion also states:

> The Note goes on to state that Scott MacPherson was involved in both those grows, as was Michael Smith, among others; and references Mr. French having to pay for pot stolen by his workers [Steven Benson] and Mr. French's son's friend [Jared Flewelling]. All of this information is consistent with Malcolm French's testimony at trial where he testified that $35,000 was owed to the growers for the Benson theft, and $16,000

33

> for Jared Flewelling's theft, and that he bought supplies in that amount for Michael Smith and associates.

*French Mot.* at 3-4 (alterations in original) (emphasis supplied).

Again, Mr. French's allegations about the congruity between the anonymous note's allegations and the trial testimony are not supported by the record. First, the anonymous author claimed that it was Mr. French's own son and his son's friends, not Jared Flewelling, who stole the marijuana. *Anonymous Note* at 1 ("they told him that you are mide it rite on what the bensons took. but they couldnt give him his share cause you wasnt takin care of what your kid and his buddies stole and blamed all on you"). The Court found no evidence at all in this record that Mr. French's son and his son's friends stole any marijuana.[19]

Second, the anonymous note clearly claims that Mr. French had not paid for the marijuana his son and his son's friends had stolen. *Id.* ("you wasnt takin care of what your kid and his buddies stole"). On this point, Mr. French's testimony contradicts the note. Mr. French testified that Mike Smith demanded $16,000 for the marijuana that Jared Flewelling had stolen and that he paid it. *French Test. I* 36:18-37:18.

Third, there is no evidence in this record that Jared Flewelling, who testified at trial about stealing marijuana from Mr. French's garage, was a friend of Mr.

---

[19]     According to the trial testimony of Amanda Gorrell, Thomas French's girlfriend in 2007-2008, Thomas French was aware of and involved in his father's marijuana operation. *Trial Test. of Amanda Gorrell* 5:3-7; 15:1-9, 16:7-9 (ECF No. 410). Ms. Gorrell testified that Thomas French had not only assisted his father in the marijuana operation but also had been growing his own marijuana. *Id.* 6:21-13:7, 18:3-7 (describing Thomas French picking up trash cans and chicken wire for his father and describing Thomas French's separate marijuana growing). If Thomas French was assisting his father in the marijuana operation and if he was growing his own marijuana on the side, it would be surprising for him to steal marijuana.

French's son, Thomas French.  Mr. Flewelling testified that he was at a party when he heard about a large amount of marijuana being stored at a camp in LaGrange. *Test. of Jared Flewelling* 4:4-15 (ECF No. 416).  Other than hearing that the camp was somewhere in LaGrange, Mr. Flewelling "had no clue" as to where the camp was. *Id.* 5:2-4.  He set out to find the marijuana by "going down side roads" and "taking different dirt roads and looking for camps." *Id.* 5:5-7.  Mr. Flewelling went alone.  *Id.* 5:8-9.  Mr. Flewelling found the marijuana in a plastic trash can located in the attic of a barn located on Mr. French's camp property. *Id.* 6:1-23.  Mr. Flewelling had never been to Mr. French's camp before and had not been back since, *id.* 6:14-17, and in fact he did not know who the owner of the camp was. *Id.* 14:14-15.

In short, contrary to the assertions in the French motion, there is no evidence in this record to support Mr. French's current contention that the allegations in the anonymous note about marijuana stolen by Mr. French's son and his son's friends were consistent with the evidence.

### c.    The Anonymous Note's Allegations of Mr. French's Actual Innocence

The author of the anonymous note asserts that "we all no you had nothin to do with the grows.  no one could believe you;d be found guilty." *Anonymous Note* at 1. To his credit, in his motion, Mr. French does not assert that he is actually innocent of the crimes for which he has been convicted, only that because of Government errors, he is entitled to a new trial.

To be clear, however, the Court also emphatically rejects the anonymous author's claim that Mr. French had nothing to do with the marijuana grows in

35

Township 37 and in LaGrange.  As the Court observed in its April 27, 2015 Order, "there was an abundance of evidence that linked Mr. French to the marijuana conspiracy . . . ."  *Order Denying Defs.' Suppl. Mots. for New Trial* at 61 (ECF No. 500) (*New Trial Mot. Order*).  Furthermore, before this note, the Court was unaware of any assertion that Scott MacPherson was running a rogue operation with his Buffalo friends in Township 37, and other than the anonymous note's say-so, the Court is unaware of any evidence supporting this part of the anonymous author's allegations.[20]

In sum, the anonymous note conflicts badly in critical respects with the trial evidence in this case and with the facts that the jury must have resolved in favor of the Government to arrive at its verdicts and that are not disputed by this motion. For this reason, the Court is skeptical about the credibility of this anonymous author.

### 2.    The Core Allegation: the Location of the LaGrange Grows

In his motion, Mr. French focuses on a narrow aspect of the anonymous note: the location of the LaGrange marijuana grow.  Mr. French asserts that, based on this information, "the LaGrange grow was on college property, and not on Mr. French's property as testified to by government witnesses at trial . . ."  *French Mot.* at 4.

### a.    There was a Marijuana Grow on Prentiss & Carlisle Land

---

[20]    There is evidence that Scott MacPherson came from Buffalo, New York.  Malcolm French mentioned Mr. MacPherson's Buffalo origins during his testimony.  *Partial Tr. of Proceedings* 43:1-7; 94:19-22 (*Test. of Malcolm French I*); *Order on Rodney Russell's Mot. for New Trial* at 12-15 (ECF No. 597).  But there is no evidence that Mr. MacPherson was running a rogue operation with his friends from Buffalo.

Mr. French bases this conclusion first on the existence of a marijuana grow on Prentiss & Carlisle land in the area where the anonymous tip claimed it would be.

### i.     The Anonymous Note's Description of the Location of the LaGrange Grow

Mr. French states that "the key piece of information contained in the Note" describes the location of the LaGrange grow:

> the one on la they moved back on the state college land.  at the end of the right hand branch of the gated road closest to howland across from painted line in swamp and small brook . . . .

*French Mot.* at 7 (quoting *Anonymous Note* at 1).

### ii.     Thomas French's Search

Sometime after he discovered the anonymous note, Thomas French, Mr. French's son, undertook a search for the Prentiss grow, but he was unable to locate the grow because the ground was snow-covered.  *Id.* Attach. 20 ¶ 4 (*Aff. of Thomas French*).  He was, however, able to locate a "blazed boundary line."  *Id.*  Then in April 2015, Thomas Ford set out again in search of the Prentiss grow, and he said that he found it.  *Id.* ¶ 5.  He located the "remains of a 'drying shack,' and the 'blazed boundary line.'"  *Id.*  He said that the blazed boundary line was newly-painted orange, but had previously been painted red.  *Id.*  On May 18, 2015, Thomas French returned to the Prentiss grow with a private investigator and surveyor and photographs were taken.  *Id.* ¶ 6.

Thomas French also went to the area where the Rolfe grow had been located.  *Id.* ¶ 7.  He said that he could not locate a drying shack nor did he observe blazed

boundary lines, "since there are no such lines on my father's properties." *Id.* He was able to observe "some wire, felt, and buckets." *Id.*

### iii.   Photographs of the Prentiss Site

Mr. French refers to photographs of the Prentiss site that are submitted as Exhibits 4(a)-(j). *French Mot.* Attach. 5 (*Prentiss Photographs* 4(a)-(j)). Five photographs appear to show marijuana plants growing on the ground. *Id.* 4(a)-(e). A sixth shows two blue plastic pails, a coil of cable, and a larger grey bucket, and part of what may be a plastic trash barrel. *Id.* 4(f). Three more photographs show what seems to be the remains of a small building of some sort. *Id.* 4(g)-(i). Finally, there is a photograph of perhaps seven tanks perhaps of propane lying on the ground. *Id.* 4(j).

### b.   What Winston McTague Told the Government About the Location of the LaGrange Grow

On October 21, 2009, law enforcement executed a search warrant on the French LaGrange camp and property. *French Mot.* Attach. 12 (*Report of Richard Rolfe*). Mr. French says that before they executed this warrant, law enforcement had received six anonymous tips, four of which included information about location of the LaGrange grow.[21] *French Mot.* at 5. Mr. French attached a note dated September 22, 2008:

> I followed them and they went to a swamp way below the camp by a freshly marked red land boundary line ware they had a big tarp covard building, with drying put and [illegible], and the swamp was big and full of pot plants they were harvesting

---

[21]   Mr. McTague's tips contain numerous spelling and grammatical errors. They are reproduced here without alteration.

*Id.* Attach. 6 *McTague Tip*, at 1 (*McTague Tip I*).  He attached a second note dated

October 9, 2008:

> they went to malcombs camp in lagrange.  if you leave his camp, you
> come to the first t, and take a right, then the next t take a right and stay
> on that road till it takes a sharp left and there it turns to grass, then
> walk to the fist coner and there will be a older skidder trial that goes
> staight down the hill, you go to the bottom of that hill and then bere to
> the left till you come to a big swamp and it is full of pot, they even have
> a big green tarp coverd drying shack right beside a freshly painted red
> land boundry line, its huge, it must be 16 x 40 and full of pot

*Id.* Attach. 7 *McTague Tip*, at 1 (*McTague Tip II*).  He attached a third note dated

September 26, 2009:

> now malcomb has a camp in lagrange main, the land is gated and
> whenyou go you should drop a unit by helacopter to suprise them thay
> are probly destroying evidence right now and they have a field of pot
> there that is bigger than the one in wesley!it is, if your stnding in the
> camp front door put youre hand at 3 oclock an way down by a red land
> line maked with red paint is the drying shack and a huge field

*Id.* Attach. 9 *McTague Tip*, at 1 (*McTague Tip III*).  He attached a fourth note dated

October 1, 2009:

> they have another field in lagrange me at malcomb frenches camp lot
> wich is 1 or 2000 acres, and the garden and drying shack is located at
> the vey lower right back part of the land if your standing ain front of the
> door of the camp put your hand at three oclock and its that way,and if
> ya jump in your truck go to the first t and take a right go to the next t
> take a right and go till the road comes to were it looks not used or all
> grass and look left and were you can see or wetre the last point wich you
> see the road go walk to there and stop and look to left will be a little hill
> that is an old skiddar road and walk to the bottom of the hill and then
> go to ! the left and keep following the way the water is flowing till you
> get to a swamp and you will see pot plats every 15 to 16 feet and just the
> same way as wesley garden cause they planted both

*Id.* Attach. 10 *McTague Tip*, at 2 (*McTague Tip IV*).  Mr. French also attached notes

dated December 11, 2008, *id.* Attach 9, and October 30, 2009, *id.* Attach. 11, but

neither of these notes contains a physical description of the LaGrange marijuana grow by his own concession.  *Id.* at 6.  Mr. French says that there are commonalities among the directions supplied in the other four notes: (1) a red boundary line, (2) a big green tarp, and (3) a drying shack.  *Id.* at 6.

### c.   What Law Enforcement Found

Mr. French says that when law enforcement went to the LaGrange property on September 27 and 30, 2009, a group consisting of Special Agent Rolfe and of officers Bridges, Betters, Fuller, Crabtree, Woodman, Richards, Burke, and Loring, "spent two days searching the French LaGrange land looking for the grow site described in McTague's anonymous tips."  *Id.* at 6-7.  Mr. French concedes that these officers "located a grow site about 300 yards from the French LaGrange cabin running to the northwest, along a swamp," but he says there "was no mention of remnants of a drying shack, or a red blazed boundary line."  *Id.* at 7.

Mr. French then says that law enforcement did not stop searching the LaGrange area for the second grow that had been described by Mr. McTague.  *Id.* at 8.  He points out that in his October 16, 2009 affidavit, Special Agent Allen Weaver described an October 6, 2009 helicopter flight over LaGrange conducted in part by Special Agent Chadwick Fuller.  *Id.* (citing Attach. 13 *Aff. of Allen Weaver, Sr.* ¶ III(9) (*Weaver Aff.*)).

Mr. French claims that "[e]ven more damning" is Special Agent Richards' statement to Special Agent Weaver that he had "found the area described by the tipster" on October 6, 2009.  *Weaver Aff.* ¶ III(8).  Mr. French asserts that it "is obvious

that neither Fuller nor Richards were talking about the Rolfe grow since the Rolfe grow was discovered ten days before the helicopter flight and Richards search." *French Mot.* at 8.

### d.   Special Agent Rolfe's Trial Testimony

Mr. French says that when Special Agent Rolfe testified at trial, he said the Rolfe grow was in a bog area about 300 yards from the French camp.  *Id.* at 7. Specifically, Mr. French cites at length from Special Agent Rolfe's trial testimony about the October 21, 2009 search of Mr. French's property in LaGrange during which Special Agent Rolfe testified about searching the location of the Rolfe grow "approximately 300 yards" from Mr. French's camp.  *Id.* at 9 (citing *Partial Tr. of Proceedings* 12:18-13:21 (ECF No. 418) (*Test. of: Richard Rolfe*) (*Rolfe Test.*)).

### e.   Winston McTague's Grand Jury Testimony

"It is Mr. French's position that McTague provided perjured testimony at trial conforming his testimony to that of S/A Rolfe's testimony for the purpose of securing the conviction of the defendant and causing the forfeiture of defendant's land."  *Id.* at 7.  To make his point, Mr. French first points to Mr. McTague's grand jury testimony on January 13, 2010.  *Id.* at 10.  During that testimony, Mr. McTague described the location of the LaGrange grow:

> Q. Did you find them?
> A. Oh, yes.
> Q. Where did you find them?
> A. Right in the swamp down in the bottom of the land.
> Q. Was this still on Malcolm's land?
> A. Yes.
> Q. And about how far away from the camp was this spot, as best you can recall?

41

A. It was three-quarters, half mile.

*Id.* Attach. 26 *Grand Jury Test. of Winston McTague* 14:5-13.[22]  He also described the

drying shack and fir green tarp:

> Q. Was the structure painted?
> A. No. It was a tarp.
> Q. Just a big green tarp over it?
> A. Yes.
> Q. What color green was it?  Was it like florescent green tarps or was it
> - -
> A. It was the same color as fir trees.

*Id.* 19:17-23.

### f.      Special Agent Richards' Grand Jury Testimony

Combined with the contents of Mr. McTague's tips, Mr. French contends that

Mr. McTague's grand jury testimony confirms that Special Agent Richards provided

"false" testimony to the grand jury concerning the location of the marijuana grow:

> Q. Where was that marijuana grow located in relation to the camp?
> A. About a half, three-quarters of a mile along a swamp that actually
> goes in front of the camp.
> Q. And when you executed the search warrant at the camp years later
> after Mr. McTague first observed this, were you able to find any evidence
> of a marijuana grow in that area?
> A. Yes, we was [sic] actually.  With his description  - - after we found the
> grow and then looking at his description that he gave later, we found
> the grow that he was actually talking about.

---

[22]      Mr. French's citation of this testimony is garbled.  *French Mot.* at 10.  It reads:
A. Right in the swamp **down in the bottom** of the land.
Q. Was this still Malcolm's land?  About how far away from the camp was this spot, as best you can recall?
A. It was **three-quarters, half mile**.
*Id.* (emphasis in motion).  As is evident, in his memorandum Mr. French omits Mr. McTague's response to the question "Was this still on Malcolm's land?"  *Id.*  Mr. McTague's answer was "yes."  *Id.*
        This is no small omission because Mr. French's argument has been that Mr. McTague had identified a second grow that was in fact located on Prentiss & Carlisle land "about one mile from the French camp as the crow flies and 3 miles by road and path," *French Mot.* at 5, not on Mr. French's land.

*Id.* at 11 (quoting *Grand Jury Test. of Jonathan Richards* 28:18-29:3).[23]  Mr. French

notes that "[t]he swamp in front of the camp leads only to the Rolfe grow."  *Id.*

### g.      Winston McTague's Trial Testimony

Mr. French recites Mr. McTague's trial testimony as to the direction of the

location of the LaGrange marijuana grow:

> Q. Showing you what's been previously introduced as Exhibit 124, do
> you recognize the place depicted in that photograph?
> A. Yep.
> Q. What is that place?
> A. That's the camp.
> Q. I'm sorry, sir.  Can you talk into the microphone?
> A. That's Malcolm's camp.
> Q. Now, where was the marijuana grow in relation to Malcolm's camp?
> A.  Standing  at  the  front  door,  it  was  that  way  -  -  (witness
> demonstrating).
> Q. So if you stand at the front door, is it off to your left or to your right?
> A. It's down to your right and down.
> Q. And - - and where was it down to your right?
> A. In a swamp.

*McTague Trial Test. I* 10:22-11:13.[24]  Mr. French asserts that Mr. McTague's prior

descriptions  placed  the  LaGrange  grow  being  "**down  to  the  left  (southeast)**."

*French Mot.* at 12 (emphasis in motion).  Mr. French cites the September 26, 2009

McTague note as saying that the location of the marijuana grow was "hand at three

o'clock."  *Id.* (quoting *McTague Tip IV*).

---

[23]      Again, the French motion garbles the testimony.  In the memorandum, Mr. French quotes
Special Agent Richards as saying:

> A.  Yes, we was [sic] actually.  With his description that he gave later, we found the grow that
> he was actually talking about.

*French Mot.* at 11.  This time, counsel's misquotation is not as significant.  The correct testimony
makes it more clear that Special Agent Richards found the marijuana grow (likely the Rolfe grow) and
then compared what he had found to Mr. McTague's later description of the location of the grow.
[24]      In his memorandum, quoting Mr. McTague's trial transcript, Mr. French inserted the
following: "It's down to your right [north-northwest] and down."  *French Mot.* at 12.  The insertion—
"north-northwest"—does not appear in the trial transcript and the Court has struck it.

Mr. French also observes that the distances between the Rolfe and Prentiss grows and the French camp are different. Mr. French accuses the prosecutor of "supplying testimony" to Mr. McTague that falsely identified the LaGrange grow as being "near" the French camp. *Id.* He cites selectively from Mr. McTague's trial testimony, which is excerpted in full here:

> Q. With respect to the marijuana plants growing near Malcolm's camp, are we talking about dozens of plants, hundreds of plants, thousands? Can you give us some idea of what you remember?
> A. Well, there was just - - it wasn't nowhere near as big as the one down in LaGrange. There's just those different little holes, probably a hundred. I don't know.
> Q. The one near Malcolm's camp, you said probably a hundred?
> A. Oh, no, that's more than that down there, but Danforth was just little holes.
> Q. Ok, focusing on Malcolm's camp . . .
> A. Yeah.
> Q. - - - can you give us a sense of how many plants were growing near Malcolm's camp?
> A. It must have been more than 500, a thousand. I couldn't tell you the number.

*McTague Trial Test.* 12:3-19.

Mr. French concludes:

The differences in the stories create much different location outcomes. When standing in the doorway with your hand pointing to the 3 o'clock position per the tips and grand jury testimony, the grow location is down to the **left** (south-southeast) in a swamp ¾ miles away. (Grand Jury testimony and tip information). Trial testimony puts the grow "near" the camp, to the **right** (northwest) (hand pointing to the 9 o'clock position) and down in a swamp, coincidentally exactly where the Rolfe grown is located. The trial testimony was changed to coincide entirely with the testimony of S/A Rolfe in order to locate the grow on French's property. The grand jury testimony and prior tips are unmistakeably [sic] inconsistent with S/A Rolfe's testimony regarding the location. More disturbing is that the government had located, on October 6, 2009, the Prentiss grow as described by McTague at grand jury and in his tips.

44

*French Mot.* at 13.

### h.    An Allegation of Prosecutorial Misconduct

From this, Mr. French makes the manifestly serious allegation that Assistant United States Attorney Joel Casey engaged in a "conscious falsification of material evidence" by leading Mr. McTague into describing that the LaGrange marijuana grow was located on Mr. French's property, near his camp, and to the right of the cabin, "so that the land could be forfeited." *Id.* at 15.

### i.    The LaGrange Prior Grows

Finally, Mr. French disavows any suggestion that he was connected to the prior LaGrange marijuana grows. *Id.* at 15-16.  In support of this contention, he cites Warden Bruce Loring's grand jury testimony in which Warden Loring testified that in 2007, after Jared Flewelling stole marijuana from Mr. French's camp, Mr. French denied to the Warden that he was connected to the marijuana and instead laid the blame on Mike Smith. *Id.* at 15.  Mr. French repeats the allegation (which the Court has rejected as unsupported by the evidence) that Steve Benson stole marijuana from Mike Smith's grow site. *Id.*  Warden Loring also described Mr. French as being "genuinely afraid" of Mr. Smith and at one point "on the verge of tears." *Id.* at 16.

## V.    DISCUSSION

### A.    Mr. French's Motion

#### 1.    Legal Standard

Mr. French argues that, in assessing his motion for new trial, the Court should apply the stricter standard for a *Brady* violation instead of the less stringent *Wright*

45

standard for newly-discovered evidence.[25]  *French Mot.* at 16-24.  The Court views the arguments and counterarguments about the appropriate standard to apply to this motion as intriguing but unnecessary; it need not resolve whether the *Wright* or *Brady* standard is applicable because the Court has concluded that no violation occurred justifying application of either line of caselaw.  Moreover, for Mr. French's allegation that the Government has knowingly used perjured testimony, the Court has reviewed the facts under the proposed standard of whether "the use of perjured testimony could in any reasonable likelihood have affected the judgment of the jury." *French Mot.* at 21 (citing *Giglio*, 405 U.S. 150).  Again, if Mr. French's motion fails under this strict standard, the Court does not need to reach whether it would succeed under a lesser standard.

### 2.   Mr. French's Position

As the Court understands it, Mr. French is contending that the Government became aware sometime in the fall of 2009 that there was a large marijuana grow located about a mile as the crow flies or about two-and-a-half to three miles by land southeast of the French camp in LaGrange on a plot of land that Mr. French did not own.  *French Mot.* at 1-2.  He also alleges that even though Special Agent Fuller and

---

[25]     In his motion, Mr. French makes the unusual and unavailing argument that the First Circuit erred in deciding *United States v. González-González*, 258 F.3d 16 (1st Cir. 2001), and that this Court should "apply the correct standard." *French Mot.* at 19-20.  Mr. French is free to make that argument. But this Court is not free to chart its own path in the face of contrary First Circuit precedent.  As an inferior court within the First Circuit, this Court is duty-bound to apply the teachings of the First Circuit Court of Appeals.  Mr. French's argument that the First Circuit erred must be made to the First Circuit itself.

Special Agent Richards located the Prentiss grow on October 6, 2009, the Government failed to disclose this information to the defense. *Id.* at 13.[26]

Mr. French sees the significance of the allegedly undisclosed Prentiss grow in a number of ways. First, he contends that Mr. McTague lied when he testified about the location of the marijuana grow, describing it as "near" the French camp, when in fact it was at least a mile (or three) from the camp and not on Mr. French's property. *Id.* at 11-13. Second, Mr. French claims that Mr. McTague's trial testimony differed from his prior statements on the location of the marijuana grow. *Id.* Third, he accuses the federal prosecutors of deliberately steering Mr. McTague away from the Prentiss grow and toward the Rolfe grow in an effort to place the marijuana grow on Mr. French's property. *Id.* at 13-15. Finally, implicit in Mr. French's motion is the argument that the existence of the Prentiss grow is consistent with Mr. French's trial testimony that Mike Smith and the Red Patch gang were responsible for the Rolfe grow. Thus, Mr. French describes the information about the Prentiss grow as both exculpatory as to Mr. French and impeaching as to Mr. McTague and the law enforcement officers.

### a.   The Marijuana Grows

Piecing together the timeline of the various marijuana grows in this case is somewhat difficult. Mr. McTague testified that he first became involved in marijuana

---

[26]     Mr. French's position on Special Agent Fuller's helicopter search is perplexing. Mr. French first writes that "on October 6, 2009 S/A Fuller was present during a helicopter flight over the described grow area, and determined that '…[n]o marijuana plants were detected in the area described by the tipster.'" *French Mot.* at 8 (citing *Weaver Aff.* ¶ III(9)) (alterations in original). Yet, later, Mr. French writes that "[o]n October 6, 2009 S/A Fuller, and S/A Richards located the Prentiss Grow described by McTague in his anonymous 'tips.'" *Id.* at 13.

growing "in the early days" with Kendall Chase, one of the Defendants, in the Washington County town of Danforth near East Grand Lake, Maine. *McTague Trial Test. I* 6:3-24.[27]

The parties agree that at some point, someone began planting marijuana at a site near Malcolm French's camp in LaGrange, Maine. This was the marijuana grow site that Steve Benson happened upon in 2005 while disposing underbrush he had removed from around the French camp. *Benson Trial Test.* 7:9-10:14. This is what has been referred to as the Rolfe grow site. Mr. French himself testified that he became aware of Rolfe grow site in 2005 when he was informed of the marijuana grow by Mr. Benson. *French Test. I* 18:16-18, 19:19-20:3. Although Mr. French told Mr. Benson not to return to the Rolfe grow site, he did not then tell the warden about this discovery. *Id.* 20:2-9. The Rolfe grow site is also the marijuana grow site that Captain Rolfe and others discovered on September 27 and September 30, 2009 when they searched the French camp property and confirmed on October 21, 2009 during another search of the French property. *French Mot.* Attach. 12 *Richard Rolfe Report*, at 1-2 (*Rolfe Report*).

There is also evidence of a third grow site called the Prentiss grow site, in addition to the Rolfe and Township 37 grow sites, that is not on land owned by Mr. French or his company. This is a grow site with a drying shack and discarded propane tanks. *See French Mot.* Attach. 4 *Aerial Photo.*

---

[27]   When Captain Richard Rolfe of the Washington County Sheriff's Office testified, he recalled investigating Kendall Chase and the Danforth marijuana grow in 2003. *Partial Tr. of Proceedings* 7:12-9:25 (ECF No. 418) (*Rolfe Trial Test.*).

Finally, as the Court has noted elsewhere, the Defendants did not dispute that there was in fact an active marijuana grow in Township 37 on land owned by Mr. French's business,[28] and that Mr. French was directly involved in the Township 37 marijuana grow. *New Trial Mot. Order* at 61 ("[T]here was an abundance of evidence that linked Mr. French to the marijuana conspiracy").

### b.      The Prentiss Grow and Winston McTague

There is no reason for this Court to accept the accuracy of the contents of an anonymous note found by the Defendant's son tucked into a desk at his father's company's weighing station over a year after the convictions in this case. The Court has already concluded that a number of the other claims in the anonymous note are demonstrably false or unsupported by the record. The anonymous note is not evidence and would not be admissible under the Rules of Evidence. It is an astonishingly slim reed upon which to base a motion for new trial and to make serious allegations of prosecutorial misconduct.

Furthermore, even assuming that Thomas French found a marijuana grow located on Prentiss & Carlisle land in the spring of 2015, there is no direct evidence linking that marijuana grow with this case. Malcolm French himself testified that Mike Smith and his Red Patch gang were growing marijuana on Mr. French's land without his permission. *French Test. I* 19:24 (stating that he was very much surprised to learn from Steve Benson about the marijuana grow in 2005). It would be

---

[28]      Mr. French's defense counsel acknowledged during oral argument on March 17, 2015 that "[n]o one on the defense side . . . ever denied that there was a significant marijuana grow operation in the middle of Township 37." *Tr. of Proceedings* 55:23-56:4 (ECF No. 498).

unremarkable for unknown persons to have operated a similar unauthorized marijuana grow on Prentiss & Carlisle land. This anonymous author, who is apparently convinced that Mr. French is innocent of the charges of which he has been convicted and that a miscarriage of justice has occurred, appears to have used the Prentiss & Carlisle marijuana grow to spin a tale in an attempt to right what he perceives is a wrong.

In short, the Court knows nothing about the author of this note and declines to accept the truthfulness of its allegations as a basis to overturn verdicts that—unlike this note—were based on the testimony of witnesses who identified themselves, who testified under oath, who were subject to cross-examination, and on evidence that was introduced under the Rules of Evidence, all of which was presented in a multi-week trial in federal court, resulting in jury verdicts.

### c.    The Government's Knowledge of the Prentiss Grow

Contrary to Mr. French's position, there is no evidence in this record that the Government was aware of the actual existence of the Prentiss grow before Mr. French filed his motion. An analysis of the record allows no conclusion that the Government was aware of this Prentiss grow in 2009 and elected to hide its existence from the defense.

The Government had received Mr. McTague's September 2009 and October 2009 emails, which describe the LaGrange marijuana patch as being at "three o'clock" when standing at the French camp. *See McTague Tip III* at 1; *McTague Tip IV* at 2. At the same time, Mr. McTague repeatedly told law enforcement that the marijuana

grow was located on Mr. French's LaGrange property. The October 9, 2008 note references Mr. French's camp in LaGrange: "they went to malcombs camp in lagrange." *McTague Tip II* at 1. The September 26, 2009 note indicates that the marijuana grow is on Malcolm French's gated land: "now malcomb has a camp in lagrange main, the land is gated and whenyou go you should drop a unit by helacopter to suprise them thay are probly destroying evadence right now and they have a field of pot there that is bigger than the one in wesley!" *McTague Tip III* at 1. The October 1, 2009 note identifies the grow as being in LaGrange: "they have another field in lagrange me . . . at the vey lower right back part of the land." *McTague Tip IV* at 2.

When the Government called Mr. McTague to testify before the grand jury on January 10, 2010, the AUSA directly asked him whether the marijuana grow was on Mr. French's land and Mr. McTague confirmed that it was:

> Q. Was this still on Malcolm's land?
> A. Yes.
> Q. And about how far away from the camp was this spot, as best you can recall?
> A. It was three-quarters, half mile.

*Id.* Attach. 26 *Grand Jury Test. of Winston McTague* 14:9-13. Again, Mr. McTague reiterated, this time under oath, that the marijuana grow in LaGrange was on Mr. French's land.

Mr. McTague's trial testimony was consistent with his tips and grand jury testimony that the LaGrange marijuana grow was on Mr. French's property:

> Q. Did you eventually start working on marijuana growing operations in Penobscot County?
> A. Yes.
> Q. Do you remember whose land you were growing that marijuana on?

51

> A. It was Malcolm's.
> Q. And when did you start doing that, what year?
> A. It was '05 with Malcolm.

*McTague Trial Test. I* 9:14-21.  Mr. McTague identified a photograph of the French camp in LaGrange.  *Id.* 10:22-11:4.

When asked specifically about the location of the marijuana grow in relation to the French camp, Mr. McTague testified in a manner consistent with his earlier emails:

> Q. Now, where was the marijuana grow in relation to Malcolm's camp?
> A. Standing at the front door, it was that way - - (witness demonstrating).
> Q. So if you stand at the front door, is it off to your left or to your right?
> A. It's down to your right and down.
> Q. And - - and where was it down to your right?
> A. In a swamp.

*Id.* 11:5-13.  This trial testimony is fully consistent with Mr. McTague's September 26 and October 1, 2009 notes that describe the location of the marijuana grow by stating that if a person is standing at the French camp, the marijuana grow is to the right or at three o'clock.[29]  *McTague Tip III* at 1; *McTague Tip IV* at 2.

In his motion, Mr. French accuses the Government of knowing about the Prentiss grow as of October 2009 but not providing this information to the defense.

---

[29]       In his motion, Mr. French makes the nonsensical assertion that Mr. McTague's reference to three o'clock places the marijuana grown to the southeast of the camp.  *French Mot.* at 12 ("Prior statements always had McTague standing in the camp front door and the grow being **down to the left (southeast)**, ('hand at three o'clock')") (emphasis in motion).  The Court rejects this part of the French argument as beyond strained.  To credit this part of Mr. French's argument, the Court would have to literally turn Mr. McTague around so that he was facing the door of the French camp, rather than facing out from the door, when he described the marijuana grow as being at three o'clock.  People tend to give directions in relationship to where they are heading.  Here, in this part of the argument, Mr. French would have Mr. McTague give directions as if he were heading into the French camp.  The Court thus rejects Mr. French's contention that Mr. McTague was inconsistent on this point by earlier suggesting the grow was to the left and at trial suggesting it was to the right.

*French Mot.* at 8.  He bases this accusation on Special Agent Weaver's search warrant affidavit dated October 16, 2009 in which Special Agent Weaver refers to a helicopter flyover by Maine Drug Enforcement Agent Chadwick Fuller:

> MDEA S/A informs me that on October 6, 2009, a law enforcement helicopter flew to the location in LaGrange described by the tipster in the above reference postings.  MDEA S/A Fuller took digital photographs of the camp described by the tipster.  No marijuana plants were detected in the area described by the tipster.  S/A Fuller provided me with the property description and GPS coordinates referenced in Section 1, above, and took the photographs of the French Camp attached hereto as Exhibit A.

*Weaver Aff.* ¶ III(9).

But this note states that Special Agent Fuller found "[n]o marijuana plants" from his helicopter search, *id.*, and not that they located a second marijuana grow as Mr. French's motion alleges at one point.  Given Mr. McTague's tip that there was a marijuana grow located on Mr. French's property, there is no reason to believe that Special Agent Fuller would have flown a helicopter over Prentiss & Carlisle land— land that does not even abut the parcel of Mr. French's land on which the Rolfe grow was located, as it is separated from that land by a parcel owned by the University of Maine—to determine whether someone was growing marijuana on Prentiss & Carlisle land.

The Court also rejects Mr. French's allegation that "[e]ven more damning" is Special Agent Richard's statement to Special Agent Weaver that he had "found the area described by the tipster."  *French Mot.* at 8.  The full cited paragraph reads:

> MDEA S/A Richards informs me that on October 6, 2009, he drove to Lagrange, Maine and found the area described by the tipster.  Access to

the parcel of property described by the tipster was gated, with sign that read "Access by Permission Only – M.A. French, Lagrange, Maine."

*Weaver Aff.* ¶ III(8).  Here, Special Agent Richards is obviously discussing accessing Mr. French's land, not Prentiss & Carlisle land.  There is simply no indication that Special Agent Richards accessed Mr. French's land and then wandered across the University of Maine parcel to search—without a warrant—Prentiss & Carlisle land, at which point he located the Prentiss grow.

The only suggestion that the Government could have known about the Prentiss grow comes from Mr. McTague's rather convoluted description of the location of the LaGrange grow.  Like much of his testimony, Mr. McTague's description of the location of the LaGrange grow is dense and difficult to follow.  *See, e.g.*, *McTague Tip II* at 1 ("if you leave his camp, you come to the first t, and take a right, then the next t take a right and stay on that road till it takes a sharp left and there it turns to grass, then walk to the fist coner and there will be a older skidder trial that goes staight down the hill, you go to the bottom of that hill and then bere to the left till you come to a big swamp and it is full of pot . . . ").  A careful parsing of Mr. McTague's description might lead an investigator to conclude that he was discussing a different parcel from the Rolfe grow.  Against this conclusion is Mr. McTague's repeated contention that the grow was on Mr. French's land and the fact that law enforcement had searched Mr. French's parcel and found no other marijuana grow.  In fact, the first suggestion that there was another grow located off Mr. French's land was the anonymous note.

54

In short, the Court rejects Mr. French's contention that the Government knew about the Prentiss grow before and during the trial and failed to reveal this information to the defense.

### d.      What the Defense Knew

As it was unclear what information the Government had released to the defense in discovery, the Court asked counsel for the Government and defense to list the revealed discovery.[30]  Based on the parties' responses, the Court concludes that the defense had all the Government information regarding the location of the LaGrange grow before trial.  Specifically, the defense had all of Mr. McTague's email tips, the Rolfe report, the Weaver search warrant affidavit, and the grand jury testimony of Mr. McTague, Special Agent Richards, Warden Loring, and Fai Littman.

Although the defense now claims that they were blindsided by Mr. McTague's description of the location of the marijuana grow, the defense had Mr. McTague's many descriptions available to it, including not only all of the email tips, but also his grand jury testimony.  However, none of the defense lawyers elected to question Mr. McTague about the accuracy of his description of the location of the LaGrange grow. Thus, the defense had in their possession at the time of trial Mr. McTague's repeated description of the location of the marijuana grow and simply—presumably for good reason—elected not to use it.

### e.      False Government Testimony

---

[30]      On October 8, 2015, the Court received an email from AUSA Casey representing that counsel have conferred, and referencing the exhibits attached to the French motion, they agree that the Government provided the following exhibits to the defense in discovery: ECF Attachments 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 26, 27, 28, 29, 30, and 31.

In highly-charged language, Mr. French accuses various Government witnesses of lying about their knowledge of the Prentiss grow. The Court rejects these accusations, however colorfully expressed. There is no evidence in this record that any Government witness or law enforcement officer knew about the Prentiss grow before the trial of this case. The Government agents and witnesses could not reveal or testify to unknown information.

### f.    Alleged Prosecutorial Misconduct

The Court also rejects Mr. French's accusation of professional misconduct against AUSA Casey. Apart from accusations of discovery violations that the Court has rejected, Mr. French's main contentions are (1) that AUSA Casey deliberately steered Mr. McTague away from the Prentiss grow and toward the Rolfe grow in order to bolster the Government's forfeiture against Mr. French's LaGrange camp and (2) that he misrepresented known facts about the Prentiss grow during his closing argument. *French Mot.* at 11-15, 42-44.

### i.    The Closing Argument

The Court turns to the second point first. To provide context, the Court quotes from AUSA Casey's closing argument to the jury: "In time, Winston was introduced to Malcolm by Kendall, and he began working for Malcolm, Kendall, and others growing marijuana on Malcolm's land in LaGrange, not far from Malcolm's camp. He told you this was around 2005." *Partial Tr. of Proceedings* 4:8-12 (ECF No. 471) (*Closing Argument of Joel Casey*) (*Casey Closing*). Nearly all of these statements are found in Mr. McTague's testimony. Mr. McTague testified that he thought Kendall

Chase introduced him to Malcolm French. *McTague Trial Test. I* 9:3-10.   Mr. McTague testified that in 2005, he began working on a marijuana grow operation in Penobscot County on Malcolm French's land. *Id.* 9:14-21.   Furthermore, AUSA Casey's statement that the LaGrange marijuana grow where Mr. McTague worked was "near" the French camp is fully justified by the witness testimony that the Rolfe grow was located about 300 yards from French's camp.

Again, assuming that AUSA Casey thought that Mr. McTague was referring to the Rolfe grow, AUSA Casey had the right to echo that reference in his closing argument:

> Also consider that Winston has always maintained in those tips that there was a grow near Malcolm's camp in LaGrange.  And when Special Agent Richards and Richard Rolfe went there to execute a search warrant, what did they find?  They found a marijuana grow, an old abandoned marijuana grow with those hoop baskets, just like the kind that were found out in Township 37.

*Id.* 7:17-23.  AUSA Casey was careful to describe the Rolfe grow as "an old abandoned marijuana grow."  There is nothing improper about AUSA Casey's argument.

### ii.   Deliberate Steering

Mr. French accuses AUSA Casey of deliberately steering Mr. McTague away from describing the accurate location of the Prentiss grow.  The relevant section of the transcript reads as follows:

> Q. With respect to the marijuana plants growing near Malcolm's camp, are we talking about dozens of plants, hundreds of plants, thousands? Can you give us some idea of what you remember?
> A. Well, there was just - - it wasn't nowhere near as big as the one down in LaGrange.   There's just those different little holes, probably a hundred.  I don't know.
> Q. The one near Malcolm's camp, you said probably a hundred?

A. Oh, no, that's more than that down there, but Danforth was just little holes.

Q. Ok, focusing on Malcolm's camp . . .

A. Yeah.

Q. - - can you give us a sense of how many plants were growing near Malcolm's camp?

A. It must have been more than 500, a thousand.  I couldn't tell you the number.

*McTague Trial Test. I* 12:3-19.

The Court does not agree with Mr. French that AUSA Casey's questioning represented an attempt by the federal prosecutor to direct Mr. McTague away from the Prentiss grow and toward the Rolfe grow.  First, Mr. French's argument assumes that AUSA Casey was aware of the Prentiss grow at the time of trial, and the Court has concluded there is no evidence to support that assumption.  Second, there was in fact a marijuana grow near the French camp, according to some witnesses about 300 yards from the French camp.  Third, the Court views AUSA Casey's questions as an attempt to focus a wandering witness.  The first question asked Mr. McTague how many marijuana plants were located in the grow near Mr. French's camp, and Mr. McTague inexplicably answered that "it wasn't nowhere near as big as the one down in LaGrange."  As AUSA Casey was asking about the LaGrange grow, Mr. McTague's response was confused at best.  The next question tried to direct Mr. McTague by asking about the number of plants in the grow "near Malcolm's camp," and Mr. McTague answered by referring to Danforth, which was the old grow that Mr. Chase and Mr. McTague had worked together on in the "old days."  Finally, AUSA Casey managed to draw Mr. McTague's attention to the precise question: How many marijuana plants were located in the Rolfe grow?

58

Obviously if Mr. McTague had no knowledge of a marijuana grow near Mr. French's camp, he could have said so. But, as the Court has noted, the record in this case contains evidence that Mr. McTague was aware of the Rolfe grow and in fact had worked on it in 2005. When AUSA Casey asked Mr. McTague to describe the location of the marijuana grow, Mr. McTague answered in a manner consistent with his earlier notes and testimony that, standing at the door of the French camp, the grow was located "to your right and down." *Id.* 11:5-11.

In the context of this motion, Mr. McTague's answer has assumed an outsized significance. But in the absence of evidence that AUSA Casey was aware of the Prentiss grow at the time of trial, AUSA Casey's questions were merely an attempt to direct a witness to the only known marijuana grow. Moreover, none of the exceptionally competent defense counsel in this case pursued any follow-up questions with Mr. McTague about the location of the LaGrange marijuana grow despite the discrepancy between the location of the Rolfe grow and Mr. McTague's testimony about how to get to it.

One reason trial counsel either did not notice or elected not to pursue Mr. McTague's location testimony may have been Mr. McTague himself. The Court previously discussed Mr. McTague's unusual weaknesses as a witness. *See New Trial Mot. Order.* The Court concluded in its April 27, 2015 Order that the record of the trial "is filled with Mr. McTague admitting to exaggerations and with his difficulty recalling past events." *Id.* at 43. As the Court described, the defense lawyers did an admirable and effective job undercutting Mr. McTague's credibility. In fact, although

AUSA Casey argued to the jury that Mr. McTague "knows what he knows," *Casey Closing* 5:22-6:2, he also conceded during his closing argument that he did "not expect you to accept Mr. McTague's testimony at face value." *Id.* 6:3-5. Moreover, AUSA Casey emphasized evidence that corroborated Mr. McTague's testimony. *New Trial Mot. Order* at 65-66 (citing *Casey Closing* 6:6-37:11). With so much other ammunition against Mr. McTague, if they noticed the location discrepancy, defense counsel may have wisely decided not to pursue a line of cross-examination that could have revealed to the jury the existence of yet another, more active marijuana grow.

In any event, the Court rejects Mr. French's argument that AUSA Casey engaged in any professional misconduct.

### g.   The Rolfe Grow, the Red Patch Gang, and the Forfeiture Verdicts

Mr. French's final complaint is that the failure of the Government to reveal the existence of the Prentiss grow deprived Mr. French from presenting corroborating evidence consistent with his Red Patch Gang theory of the case. There are several problems with this theory.

First, the argument assumes the veracity of the contents of the anonymous note, and for reasons the Court has described in detail, the Court has rejected the credibility of this unknown author.

Second, assuming that the people involved in the Rolfe grow abandoned that location and moved the marijuana operation to a different location, perhaps the Prentiss grow, this fact would not corroborate Mr. French's contention that Mike Smith and his so-called Red Patch Gang made that decision. It would be equally

plausible that once Mr. French learned that Mr. Benson had stumbled upon the Rolfe grow, which by any account was located near Mr. French's camp, that it was past time for him to move the marijuana grow operation to a less incriminating location.

But the most significant point is that far from depriving the defense of the argument that the evidence was insufficient to confirm Mr. French's involvement in the Rolfe marijuana grow, the jury in fact accepted the defense contention that the evidence did not justify forfeiture of Mr. French's LaGrange land based on Mr. French's involvement with the Rolfe grow.  After the guilty verdicts, the Court retained the jury to decide the forfeiture issues.  The jury had found Mr. French guilty of Count I, engaging in a conspiracy to manufacture marijuana.  *Jury Verdict Form* at 1 (ECF No. 311); *Superseding Indictment* at 1-2 (ECF No. 187) (Count I charging Mr. French and others with a conspiracy to "manufacture . . . a Schedule I controlled substance, specifically, 1000 or more marijuana plants").  The forfeiture issues were specific to each count and to each parcel, distinguishing Township 37 from LaGrange. *Jury Forfeiture Verdict Form* at 1-5 (ECF No. 312).   The jury found that the Government had proved that Mr. French had used Township 37 to manufacture marijuana, but the jury also found that the Government had not established that it was more likely than not that Mr. French had manufactured marijuana in LaGrange:

> 1. We, the Jury, unanimously find by a preponderance of the evidence, that the following real and personal property was used to commit, or to facilitate the commission of, the drug manufacturing conspiracy charged in Count One of the Superseding Indictment for which Malcolm French was convicted:
>
>    . . .

61

(d) A certain lot or parcel of land with any improvements thereon situated in LaGrange, County of Penobscot, State of Maine, more particularly described in a deed from Diamond Occidental Forest, Inc. to Malcolm A. French, and recorded in Book 5614, Page 002 of the Penobscot County Registry of Deeds.

**YES**_____                              **NO**____√_____

(e) A certain lot or parcel of land with any improvements thereon situated in LaGrange, County of Penobscot, State of Maine, more particularly described in a deed from Dixie Lands Corporation to Malcolm French, and recorded in Book 4773, Page 051 of the Penobscot County Registry of Deeds.

**YES**_____                              **NO**_____√_____

*Id.* at 1-2 (emphasis added). Thus, the jury concluded that Mr. French should still forfeit his LaGrange property, not because he manufactured marijuana there, but because he used the LaGrange property to commit or facilitate the commission of the drug possession and distribution conspiracy charged in Count Eleven of the Superseding Indictment. *Id.* at 4-5; *Superseding Indictment* at 7.

The logical inference from these contrasting forfeiture verdicts is that the jury found the Government's arguments about Mr. French's actual involvement in the Rolfe grow to be unconvincing, even by a preponderance of the evidence standard. However, logically based on Jared Flewelling's discovery of a trashcan full of processed marijuana in Mr. French's outbuilding, the jury could well have concluded that Mr. French was using his LaGrange property to store marijuana for distribution.

### h.   The Township 37 Verdict

Nowhere in Mr. French's motion does he address the fact that he was convicted not merely of conspiring to manufacture and distribute marijuana in LaGrange, but

that the heart of the conspiracy was located in Township 37 on land owned by Mr. French's business. The Court previously reviewed the strength of the Government's case against Mr. French and the other co-defendants regarding the marijuana manufacturing operation in Township 37. *New Trial Mot. Order* at 55-69. Suffice it to say that nothing in Mr. French's motion attacks the soundness of the jury's verdicts as they relate to the extensive marijuana grow operation in Township 37. Even if the LaGrange operation were ignored, the nature and scope of the Township 37 operation would justify each verdict on each count. Furthermore, as the Court discussed in its new trial order, any incremental impact of the Defendants' current allegations would not, in this Court's view, have changed the outcome of this trial based on Township 37 evidence alone. *Id.*

### B. Kendall Chase's Amended Motion

Kendall Chase's amended motion for new trial, which differs from Mr. French's by omitting any claim the prosecutor suborned perjury but rests on the same factual allegations, is denied for the reasons set forth in great detail above. The Court now turns to Mr. Chase's motion for a *Franks* hearing.

To be entitled to a *Franks* hearing, "a party must first make two substantial preliminary showings: (1) that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth; and (2) the falsehood or omission was necessary to the finding of probable cause." *United States v. Rigaud*, 684 F.3d 169, 173 (1st Cir. 2012) (citing *Franks*, 438 U.S. at 155-56; *United*

*State v. Hicks*, 575 F.3d 130, 136 (1st Cir. 2009); *United States v. Castillo*, 287 F.3d 21, 25 (1st Cir. 2002)) (internal quotation marks and footnotes omitted).

As with his amended motion for new trial, Mr. Chase premises his motion for a *Franks* hearing on the validity of the factual allegations contained in Mr. French's motion for new trial.[31]  In ruling on Mr. French's motion, the Court rejected those factual allegations and expounded on their inconsistency and unreliability.  The Court therefore concludes that Mr. Chase has failed to meet his burden of a substantial preliminary showing that a false statement or omission in an affidavit was made knowingly and intentionally or with reckless disregard for the truth.  That being the case, the Court does not reach the second *Franks* requirement, as "[f]ailure to make a showing on either element dooms a party's hearing request."  *Rigaud*, 684 F.3d at 173.  The Court denies Mr. Chase's motion for a *Franks* hearing.

### C.    Rodney Russell's Joinder in Kendall Chase's Motion

On October 18, 2015, Rodney Russell filed a motion for new trial and, like Kendall Chase, withdrew his joinder in Malcolm French's motion for new trial to the extent that the French motion alleged that the federal prosecutor had suborned perjury.  *Russell Mot.* at 1.  However, Mr. Russell joined in Mr. Chase's Amended Motion for New Trial.  *Id.*

---

[31]    In particular, Mr. Chase says he "will rely upon the evidence that is likely to be produced at the hearings on the motions for a new trial."  *Chase Am. Mot.* at 5.  The Court has decided the motions for new trial in this written order and has declined to schedule an evidentiary hearing.

64

## VI.     CONCLUSION

The Court DENIES Malcolm French's Third Motion for New Trial Pursuant to FED. R. CRIM. P. 33 (ECF No. 554).  Similarly, as Kendall Chase and Rodney Russell joined the Malcolm French motion, the Court DENIES their motions as well.  *Mot. Joined by Kendall Chase* (ECF No. 555); *Mot. Joined by Rodney Russell* (ECF No. 556).  The Court also DENIES Kendall Chase's Amended Motion for New Trial (ECF No. 588), Rodney Russell's and Malcolm French's joinder to Kendall Chase's Amended Motion (ECF No. 590, 595).

SO ORDERED.


_/s/ John A. Woodcock, Jr._
JOHN A. WOODCOCK, JR
UNITED STATES DISTRICT JUDGE

Dated this 17th day of November, 2015