UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:12-cr-00160-JAW |
| | ) | |
| MALCOLM A. FRENCH, et al. | ) | |

**SENTENCING ORDER ON DRUG QUANTITY**

Addressing objections to the calculation of drug quantity in this marijuana conspiracy, the Court concludes that the most accurate methodology is to correlate the amount of Pro-Mix, a fertilizer the conspiracy obtained in large amounts, to the amount of marijuana produced by the conspiracy. Using this methodology and evaluating the trial evidence, the Court assesses each individual defendant's personal responsibility for drug quantity under the United States Sentencing Guidelines.

I.     BACKGROUND

A.     Procedural History

On January 24, 2014, a federal jury found Malcolm French, Rodney Russell, and Kendall Chase guilty of several federal crimes involving a conspiracy to manufacture and a conspiracy to distribute marijuana. *Jury Verdict Form* (ECF No. 311); *Superseding Indictment* (ECF No. 187). The Probation Office (PO) prepared and revised Presentence Investigation Reports on each Defendant. *French PSR*; *Russell PSR*; *Chase PSR*. In making its sentencing guideline calculations, the PO recommended drug quantities for each Defendant. *French PSR* ¶ 29 (1,086.3 kilograms of marijuana); *Russell PSR* ¶ 29 (930.3 kilograms of marijuana); *Chase*

*PSR* ¶ 30 (1,086.3 kilograms of marijuana).   Each Defendant objected to drug quantity calculation. *French PSR*, Obj. 1; *Russell PSR*, Obj. 16; *Chase PSR*, Obj. 6.

On June 2, 2015, the Government filed a sentencing memorandum addressing drug quantity. *Gov't's Consolidated Mem. in Aid of Sentencing* at 1, 3-6 (ECF No. 519) (*Gov't's Mem.*).   On July 30, 2015, July 31, 2015, and August 6, 2015, the Defendants filed responsive memoranda. *Def.'s Mem. in Aid of Sentencing* (ECF No. 550); *Def.'s Corrected Mem. in Aid of Sentencing* at 10 (ECF No. 553) (*Chase Mem.*); *Def. Malcolm French's Mem. in Aid of Sentencing* at 2-6 (ECF No. 551) (*French Mem.*); *Def. Rodney Russell's Sentencing Mem.* at 5-6 (ECF No. 562) (*Russell Mem.*).   On August 12, 2015, the Government filed a reply memorandum addressing drug quantity. *Gov't's Consolidated Reply Mem. in Aid of Sentencing* at 1-6 (ECF No. 571) (*Gov't's Reply*).

On February 3, 2016, Malcolm French filed another sentencing memorandum that—among other things—addressed drug quantity. *Def. Malcolm French's Suppl. Sentencing Mem.* at 1-5 (ECF No. 608) (*French Suppl. Mem.*).   On February 5, 2016, the Government filed another sentencing memorandum also addressing drug quantity. *Gov't's Mem. in Aid of Sentencing* at 1-2 (ECF No. 612) (*Gov't's Suppl. Mem.*).   On March 9, 2016, the Government filed a further sentencing memorandum, again addressing drug quantity in part. *Gov't's Mem. in Aid of Sentencing* at 2-8 (ECF No. 631) (*Gov't's Second Suppl. Mem.*).   Finally, on March 18, 2016, Mr. French filed a second supplemental memorandum addressing drug quantity. *Def. Malcolm*

*French's Second Suppl. Sentencing Mem.* at 1-7 (ECF No. 635) (*French's Second Suppl. Mem.*).[1]

## B.   Brief Background

In 2009, a number of law enforcement agencies investigated allegations that there were marijuana grow operations located in Township 37, Washington County, Maine on land owned by Haynes Timberland, Inc. (Haynes Timberland) and in the town of LaGrange, Maine on land owned by Malcolm French.[2]  Malcolm French, a Co-Defendant, was a co-owner of Haynes Timberland.  *Partial Tr. of Proceedings*, *Test. of: Malcolm French* 106:12-22 (ECF No. 362) (*French Test.*).   Haynes Timberland owned approximately 22,000 acres in Township 37.  *French PSR* ¶ 6.  Mr. French and his wife, Barbara, jointly owned another parcel of land in Township 31 also in Washington County, Maine, where a warehouse was located.  *Id.* ¶ 9; *see Final Order of Forfeiture* (ECF No. 621) (*Final Forfeiture*).  Finally, Mr. French owned a hunting camp in LaGrange, Maine where a marijuana grow site had been located.  *French PSR* ¶ 2; *Final Forfeiture* at 2 (ECF No. 2).

## C.   The Jury Verdict and Drug Quantity

The jury made several findings on drug quantity.  *See Jury Verdict Form* (ECF No. 311).   Regarding Count One, the conspiracy to manufacture 1,000 or more marijuana plants count, the jury found that Mr. French, Mr. Russell, and Mr. Chase had engaged in a conspiracy to manufacture marijuana and that the conspiracy

---

[1]      The parties filed other sentencing memoranda that did not address drug quantity.

[2]      In reciting this factual background, the Court relied on the Malcolm French, Rodney Russell, and Kendall Chase PSRs.  For purposes of this overview, the Court cites only the French PSR because the other PSRs substantially echo the contents of the French PSR.

involved 1,000 or more marijuana plants. *Id.* at 1-2. Regarding Count Two, the manufacture of 1,000 or more marijuana plants count, the jury found Mr. French and Mr. Russell, but not Mr. Chase, guilty of manufacturing 1,000 or more marijuana plants. *Id.* at 3-4. Finally, regarding Count Eleven, the conspiracy to distribute and to possess with the intention to distribute count, the jury found Mr. French, Mr. Russell, and Mr. Chase guilty of a conspiracy to possess with the intent to distribute marijuana, but made no drug quantity finding on this count. *Id.* at 6-7.

### D. The Impact of the Jury Findings on Drug Quantity

For Mr. French and Mr. Russell, the statutory minimum term of imprisonment on Counts One and Two is ten years and the maximum is life, 21 U.S.C. § 841(b)(1)(A), and the statutory maximum term of imprisonment on Count Eleven is twenty years. 21 U.S.C. § 841(b)(1)(C). For Mr. Chase, the maximum term of imprisonment is twenty years; he does not face a mandatory statutory minimum term of incarceration. *Id.*

### E. The PSR's Drug Quantity Calculations

When law enforcement searched Township 37 in September 2009, they seized 2,943 live marijuana plants. *French PSR* ¶ 8.

To calculate the total drug quantity attributable to each Defendant, the PO used as a proxy the quantity of Pro-Mix, a potting soil that the French conspiracy used to fertilize the marijuana plants. *Id.* ¶ 26. The evidence revealed that Mr. French and others purchased Pro-Mix from Griffin Greenhouse in Gray, Maine. *Id.* ¶ 23. The total number of Pro-Mix bags that Griffin Greenhouse supplied Cold

4

Stream Contracting, one of Mr. French's businesses, was 4,590 from March 24, 2006 through February 13, 2009. *Id.* ¶ 24. The French conspiracy planted marijuana in oval or egg-shaped baskets constructed from rabbit or chicken wire, wrapped in weed-prevention cloth, and filled with soil. *Id.* ¶ 13. Noting that witnesses testified that they used between one-half a bag and one and one-half a bag of Pro-Mix for each basket and that between three and six plants were placed into each basket, the PO took a conservative approach. *Id.* ¶ 26. It used one and one-half bags and three plants per basket. *Id.*

Based on this methodology, the PO calculation was basic math: 3,960 Pro-Mix bags were purchased from 2006 through 2008; using one and one half bags per basket, the number of baskets was 2,640; using three plants per basket, the total number of marijuana plants equaled 7,920 marijuana plants from 2006 through 2008. *Id.* Adding the number of marijuana plants found in 2009, the PO calculated the total number of marijuana plants attributable to the French conspiracy to equal 10,863. *Id.* ¶ 27-28. Applying 100 grams per plant, the PO calculated a total drug quantity of 1,086.3 kilograms for both Mr. French and Mr. Chase, *id.* ¶ 28, and a base offense level of 30, between 1,000 and 3,000 kilograms. *Id.* ¶ 28.

As the PO concluded that Mr. Russell did not arrive into the conspiracy before 2007, his drug quantity was slightly lower. The PO calculated the total number of plants from 2007 through 2008 to equal 6,360. *Russell PSR* ¶ 26. The total kilograms was 930.3, which falls between 700 and 1,000 kilograms, for a base offense level of 28. *Id.* ¶ 36.

5

## II.     THE PARTIES' POSITIONS

### A.     The Government's Initial Memorandum

In its initial memorandum, the Government essentially filled in additional background information justifying the PO's approach. *Gov't's Mem.* at 3-6. In support of the calculation, the Government cited trial testimony and exhibits. *Id.*

### B.     Chase Memorandum

In his memorandum, Mr. Chase states that he "vigorously objects" to the PO's drug quantity calculation, indicating that Mr. French would be filing a more detailed objection. *Chase Mem.* at 10. Specifically, however, Mr. Chase argues that "[i]t is wrong to conclude that each and every marijuana plant grown reached a grow potential of 100 grams." *Id.* He says that there are "many environmental factors" for any agricultural venture, including "the amount of precipitation, pests, animals, and mold" that can "all have a negative impact." *Id.*

Mr. Chase also argues that even though the jury determined that he was involved in the growing of marijuana, he should not be held responsible for "the entire drug amount." *Id.* He explains that "[i]f a father teaches his son to hunt, and the son later engages in poaching, surely the father would not be held responsible for the poaching." *Id.* He argues that similarly, "if Mr. Chase assisted or taught others how to grow plants, he should not be held responsible for all future plants." *Id.*

### C.     Initial French Memorandum

Mr. French challenged the PO calculation in several ways. First, he disputes the premise that Pro-Mix bags are an appropriate proxy for the amount of marijuana.

*French Mem.* at 2-3.  He argues that there is "no direct correlation between bags of Pro-Mix and plants cultivated and no witness has testified on this score."  *Id.* at 3. He observes that the PO's resort to bags of Pro-Mix "is a frank recognition of the troubling lack of evidence of any financial proceeds from the marijuana cultivation despite over four years of investigation including forensic auditing by the Internal Revenue Service."  *Id.*  He also notes that another method for calculating drug quantity would be drug sales, but only one witness, Fai Littman, testified about purchasing marijuana from the French conspiracy.  *Id.* at 3.

Mr. French criticizes the use of Pro-Mix on the following bases.  First, he objects to the assumption that "each and every bag of Pro-Mix ordered from Griffin Greenhouses must have been used to cultivate marijuana."  *Id.*  He notes that there was testimony from Miguel Roblero that he painted the white Pro-Mix bags green and took them to the grow site, but no green bags were found at Township 37.  *Id.* at 4.

Next, Mr. French challenges the use of the 100 grams per plant ratio as inaccurate because it improperly applies the ratio to hypothetical plants, not actually existing ones.  *Id.* at 5.  On this point, he says that the cases of *United States v. Stevens*, 25 F.3d 318 (6th Cir. 1994) and *United States v. Blume*, 967 F.2d 45 (2d Cir. 1992) stand for the proposition that the 100 gram per plant ratio may be applied only to actual marijuana plants and not for hypothetical plants.  *Id.*

He concedes that the Government is entitled to use the 100 gram ratio to the 2,943 live marijuana plants found in Township 37 in September 2009, but he

maintains that the use of the 100 gram ratio to hypothetical plants "applies a grossly unrealistic drug quantity to French's sentencing analysis." *Id.* Indeed, he said that he is "prepared to show that significantly lesser marijuana was produced in 2009 and 2008 than the Government claims." *Id.* (footnote omitted).

### D.    Russell Memorandum

In his initial memorandum, Mr. Russell adopted Mr. French's drug quantity arguments. *Russell Mem.* at 6. Mr. Russell also incorporates several of the specific objections to the drug quantity calculation that appeared in his PSR. *Id.* Those objections included: (1) that the bags of Pro-Mix that were purchased in 2007 were for associates of Winston McTague, known as the "Red Patch"; (2) that Mr. McTague's testimony demonstrates that Mr. Russell was not present in 2007 and so the drug quantify for that year should be removed; and (3) that there was a discrepancy between the number of Pro-Mix bags Mr. Roblero said were delivered and the number of Pro-Mix bags found at Township 37 during the September 2009 search. *Russell PSR*, Obj. 16. Also, he contends that the better method of calculating drug quantity would be to confine the analysis to actual marijuana sales, which is limited to the amounts Fai Littman testified about. *Id.* He contends he should be held accountable for only the 2,943 plants found on the day of the police raid. *Id.*

### E.    The Government's Reply

The Government replied first to the Mr. French's argument about the absence of green Pro-Mix bags at Township 37 in September 2009. *Gov't's Reply* at 1. The Government observes that Mr. Roblero testified that they had painted only five or six

pallets of Pro-Mix and that they only painted the four sides of the pallets. *Id.* at 3. In addition, however, the Government notes that other witnesses testified about making multiple deliveries of Pro-Mix to the Township 31 site, and there is no evidence that the Pro-Mix bags in these other deliveries were painted green. *Id.* at 3-4.

The Government disagrees with Mr. French's reliance on the *Stevens* and *Blume* cases. *Id.* at 5. Citing other caselaw, the Government says that the majority of circuits has held that "the equivalency calculation applies to all offenses involving the growing of marijuana, regardless of whether or not live plants are involved." *Id.* (collecting cases).

The Government argues that the First Circuit has upheld drug quantity estimates based on historical data. *Id.* at 5-6 (citing *United States v. Bernier*, 660 F.3d 543, 546 (1st Cir. 2011)). The Government maintains that where the Defendants were involved in growing marijuana between 2006 and 2009, it would be unjust to base their sentences only on the marijuana discovered on site the day of the police search and seizure. *Id.* at 6. Finally, the Government disputes the Defendants' claim that the 100 gram ratio fails to take into account crop variability, noting that it is just as likely that a marijuana plant produced more than 100 grams. The Government asserts that the Guidelines allow for this method of calculation. *Id.*

## F.   Malcolm French's Supplemental Memorandum

On February 3, 3016, Mr. French filed a supplemental memorandum, raising new arguments about the legitimacy of the PO drug quantity calculation. *French*

*Suppl. Mem.* at 1-5.  He claims that the PO method is "demonstrably unreliable because it (1) is incompatible with all the direct and circumstantial evidence and (2) double counts marijuana." *Id.* at 2.

First, Mr. French points out that Mr. Roblero testified that in 2008 three Mexican workers collectively made 50-60 baskets per day for a week or 350-420 baskets in total.  *Id.*  Using 350 baskets and three plants per basket, Mr. French totals 1050 marijuana plants or 105 kilograms grown in 2008, which he says is consistent with Mr. Roblero's testimony that the 2008 grow was smaller than the 2009 grow and with the need for four additional migrant workers the next year.  *Id.* He says that the addition of nine buildings at the Township 37 site is also consistent with a bigger grow in 2009.  *Id.*

Second, Mr. French claims that the "best evidence of the amount of marijuana processed for 2007 is the number of cleaned pounds." *Id.* at 3.  Mr. French notes that the three Mexican workers who were brought in to clean marijuana in 2007 were paid $100 per pound, divided equally including Moises Soto.  *Id.*  Mr. French points to evidence that Mr. Soto sent a total of $15,994.41 to Mexico in 2007.  *Id.* (citing *id.* Attach. 3 *MoneyGram Receipts*).  Including Mr. Soto, the total is $19,993.01 for cleaning the 2007 harvest, which comes out to 199 pounds of marijuana or 90.4 kilograms for 2007.  *Id.*  This contrasts with the PO figure for 2007 of 372 kilograms. *Id.*

Third, Mr. French says that the only witness testimony about the number of marijuana plants in 2006 was Winston McTague.  *Id.*  Mr. McTague, Mr. French says,

estimated the grow amounts in Township 37 and LaGrange at sixty and twenty-five marijuana baskets, respectively. *Id.* at 3-4. By Mr. French's calculations, this results in 255 plants (85 x 3 = 255) or 25.5 kilograms. *Id.* at 4. By contrast, the PO estimated that the 2006 grow equaled 130.5 kilograms—"*five times* the amount actually grown." *Id.* (emphasis in original).

Finally, Mr. French maintains that the PO calculations double count the amount of marijuana. *Id.* Conceding for argument that 4,590 Pro-Mix bales were purchased between 2006 and 2009, Mr. French argues that the total number of plants should be 9,280 as opposed to 10,863. *Id.* Mr. French says that the PO strayed from using Pro-Mix as the basis for calculating in 2009 and used instead the number of plants found in Township 37 in September 2009. *Id.* The number of Pro-Mix bales in 2009 was 630, which under the PO formula, should have produced 1,260 plants or 928 kilograms, not the 2,943 marijuana plants. *Id.* at 4-5.

## G.    The Government's Supplemental Response

The Government first responds to Mr. French's basket counting proposal by noting that it assumes that the French conspiracy started fresh every year without being able to use baskets created in prior years to grow marijuana. *Gov't's Suppl. Mem.* at 1. The Government says that as the conspiracy grew, more baskets were needed each year. *Id.*

The Government sees the $100 per pound argument as flawed because it assumes that the list of wired payments to Mexico was comprehensive. *Id.* The Government is skeptical that a marijuana conspiracy, such as the French conspiracy,

would maintain detailed and accurate payment records.  *Id.*  It points out that the list of MoneyGram payments contradicts Mr. Roblero's testimony.  *Id.* at 1-2.

The Government urges the Court to accept the conservative Pro-Mix calculation as more accurate than Mr. French's basket counting or wire transfer approaches.  *Id.* at 2, 2 n.1.

## H.    The Government's Second Supplemental Memorandum

In its second supplemental sentencing memorandum, the Government reiterated its earlier expressed positions and addressed Mr. French's more recently expressed positions.  *Gov't's Second Suppl. Mem.* at 2-8.  Urging the Court to reject Mr. French's argument that the MoneyGram payments were the best evidence of drug quantity, the Government pointed out that: (1) Mr. French's argument assumes that no marijuana had been processed before the migrant laborers arrived in late 2007, *id.* at 4; (2) the evidence about how long the migrant laborers processed the marijuana in 2007-2008 is equivocal, *id.*; (3) there is a paucity of wire transfer records in 2008 and 2009, *id.* at 4-5; (4) there is no evidence as to the recipients of those wire transfers in Mexico, who may or may not have been relatives of migrant workers involved in the marijuana grow, *id.* at 5-6; and (5) Winston McTague's testimony about the size of the grows in LaGrange and Township 37 suggested much larger operations than Mr. French suggested in his supplemental memorandum.  *Id.* at 7.  The Government also disputes Mr. French's contention that the PO calculation double counts marijuana, noting that the PO was extremely conservative and favorable to the Defendants.  *Id.* at 7-8.

I.      **Malcolm French's Second Supplement Memorandum**

In his second supplemental memorandum, Mr. French argues that there is no evidence that (with the minor exception of Mr. Russell) anyone but the migrant laborers cleaned marijuana from November 2007 to April 2008. *French's Second Suppl. Mem.* at 1. He argues that this supports the $100 per pound of marijuana calculation. *Id.* He also maintains that the payments through MoneyGram are likely accurate reflections of actual payments to the Mexican relatives of the migrant workers. *Id.* at 1-2.

Mr. French next contends that the Court should accept Winston McTague's testimony about the size of the marijuana grows in LaGrange and Township 37. *Id.* at 2-3. Mr. French says that the Court should accept the PSR's unobjected to statement that in 2006, the LaGrange and Township 37 grows consisted of 85 baskets. *Id.* at 3.

Putting its argument about the unfairness of switching from the Pro-Mix method to the actual-number method for 2009, Mr. French observes that if the Court applied the 630 bags of Pro-Mix purchased on February 13, 2009 as part of the formula to determine the actual number of plants found in September 2009, the result would be only .5 bag per basket. *Id.* at 3-4. The mathematical argument runs that the 2,943 plants would have come from about 1,000 baskets, assuming three marijuana plants per basket, and that 630 bags would equal about .5 bag of Pro-Mix per basket. *Id.* at 4. This figure contrasts with the 1.5 bags per basket that the PO used to calculate the preceding years. *Id.*

13

Mr. French contends that one explanation may be that the French conspiracy had Pro-Mix left over from the prior year, which would mean that the PO double counted the Pro-Mix, once by exhausting the bag total in 2008 and again by using the number of actual plants in 2009. *Id.* at 4. He also argues that the use of Pro-Mix as a direct reflection of the number of plants "does not take into account spillage, non-usage, over-usage, theft, use for other purposes, or any host of other uses that could erode the amount of Pro-Mix used for growing marijuana." *Id.* at 4. He urges the Court to "err on the side of caution" and use a lower quantity. *Id.* (citing *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990)). He suggests that by using the 1.5 bales per basket number, the Court would allow a result that would violate his due process rights. *Id.* at 5. He emphasizes that the PO figures come without any evidence of financial benefit. *Id.* at 6 (citing *Walton* 908 F.2d at 1303).

Mr. French urges the Court to accept a different method of calculation based on the number of baskets within Township 37. *Id.* at 6. Mr. French commissioned an investigator to count the number of baskets on all the growing sites. *Id.* at 6-7. The total was 1,045 baskets, which multiplied by three plants per basket equals 3,135 plants or 313.5 kilograms of marijuana. *Id.* at 7. When added to the 2009 grow of 297.3 kilograms, Mr. French says that the total marijuana quantity is 610.8 kilograms and a base offense level is 26, not 30. *Id.*

## III.   DISCUSSION

### A.   The Applicable Standards

At a sentencing hearing, the Government bears the burden of establishing drug quantity by a preponderance of the evidence.[3]  *United States v. Doe*, 741 F.3d 217, 234 (1st Cir. 2013) ("[T]he sentencing court may continue to find facts based upon a preponderance of the evidence"); *United States v. Mills*, 710 F.3d 5, 15 (1st Cir. 2013) ("A sentencing court can make reasonable estimates of drug quantities, provided they are supported by a preponderance of the evidence") (citing *Bernier*, 660 F.3d at 545-46).  The Court "can consider all kinds of relevant information regardless of admissibility at trial (including hearsay that has never been tested by cross-examination), provided it has 'sufficient indicia of reliability to support its probable accuracy.'"  *Mills*, 710 F.3d at 15 (quoting U.S. SENTENCING GUIDELINES § 6A1.3(a) (U.S. SENTENCING COMM'N 2015)) (citing *United States v. Cintrón–Echautegui*, 604 F.3d 1, 6 (1st Cir. 2010); *United States v. Brewster*, 127 F.3d 22, 27–28 (1st Cir. 1997)).  In the absence of definitive proof, the First Circuit has written that a sentencing court must "err on the side of caution."  *United States v. Sklar*, 920 F.2d 107, 113 (1st Cir. 1990) (quoting *Walton*, 908 F.2d at 1301).

## B.    The Court's Analysis

### 1.    The Pro-Mix Methodology

The Court concludes that the Pro-Mix methodology for estimating the quantity of marijuana allows for a "'reasoned estimate[] based on historical data.'"  *Bernier*, 660 F.3d at 546 (alteration in original) (quoting *United States v. Platte*, 577 F.3d 387,

---

[3]      There is an exception for facts that either increase a maximum statutory penalty or require the imposition of a minimum statutory penalty.  *Doe*, 741 F.3d at 233 (citing *Alleyne v. United States*, 133 S. Ct. 2151, 2160 (2013); *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).  Here, the jury found those facts beyond a reasonable doubt.  *Jury Verdict Form* at 1-3.

392 (1st Cir. 2009)).  The Court is persuaded by the evidence that the French conspiracy used Pro-Mix to fertilize the marijuana plants and that the quantity of Pro-Mix directly correlates to the quantity of marijuana.

At trial, the Government introduced into evidence the records from Griffin Greenhouse Supplies that confirmed that Cold Stream Contracting, a business owned by Mr. French, had purchased 4,590 bags of Pro-Mix from March 24, 2006 through February 13, 2009.  *Gov't Ex.* 210 & 175(a).  The Government called as a trial witness Gerald Davis, an employee of Griffin Greenhouse who handled inside sales.  *Partial Tr. of Proceedings, Test. of: Gerald Davis* 4:21-22 (ECF No. 426).  Mr. Davis confirmed that when Griffin Greenhouse made sales of Pro-Mix to Cold Stream Contracting, he dealt with Rodney Russell, *id.* 11:20-12:15, and Mr. Davis identified Mr. Russell as the individual with whom he had dealt.  *Id.* 55:11-19.

In addition, the Government introduced evidence through two truck drivers, Linda Archer and Rick Kenney, who delivered significant shipments of Pro-Mix to Mr. French's warehouse at Township 31.  *See Partial Tr. of Proceedings, Test. of: Linda Archer* (ECF No. 417); *Partial Tr. of Proceedings, Test. of: Rick Kenney* (ECF No. 543).  This is the same warehouse where the French conspiracy housed the migrant laborers.  *French PSR* ¶ 19.

Winston McTague described how the conspirators used Pro-Mix to fertilize the marijuana plants, explaining that after they fashioned "egg-shaped wire cages, it was 3-by-5 or 6, and some weed barrier on the bottom up about a foot on the sides and half a [bale] of [Pro-mix] in it . . . ."  *Partial Tr. of Proceedings, Test. of: Winston*

*McTague* 11:16-18 (ECF No. 414) (*McTague Test.*).  Miguel Angel Roblero Velasquez, one of the migrant workers, testified that a tractor-trailer came to the warehouse and they unloaded bags of soil, which they took into the woods.  *Partial Tr. of Proceedings. Test. of: Miguel Angel Roblero Velasquez* 22:20-24:4 (ECF No. 370) (*Miguel Roblero Test.*).  Consistent with the testimony of Mr. McTague, Mr. Roblero testified that when they made nests or baskets, they put in a piece of cloth and threw soil into the baskets.  *Id.* 26:22-27:5.  Based on this and other trial testimony, the Court concludes that there was a direct relationship between the orders of Pro-Mix and the marijuana grow operation in this case.

### 2.    Specific Defense Objections to the Pro-Mix Method

#### a.    The "No Direct Correlation" Objection

The Court rejects Mr. French's argument that there is "no direct correlation between bags of Pro-Mix and plants cultivated and no witness has testified on this score."  *French Mem.* at 3.  To the contrary, the Court finds that the correlation was direct, clear, and amply supported by the evidence.

#### b.    The Other Uses Objection

The Court also rejects Mr. French's complaint that this correlation falsely assumes that "each and every bag of Pro-Mix ordered from Griffin Greenhouses must have been used to cultivate marijuana."  *Id.*  There is no evidence in this record that these enormous orders for Pro-Mix—4,590 bags in a four-year period—were used in any other legitimate business.

#### c.    The Red Patch Gang Objection

The Court is unmoved by Mr. Russell's contention that the bags of Pro-Mix purchased in 2007 were for associates of Winston McTague, known as the "Red Patch." *Russell PSR*, Obj. 16. This is a curious argument for Mr. Russell to make. During his trial testimony, he testified that he had never heard of Red Patch until after the September 2009 police raid. *Partial Tr. of Proceedings*, *Test. of: Rodney Russell* 17:1-12 (ECF No. 364). Mr. Russell's argument must be based on Mr. French's incredible testimony about the so-called Red Patch gang and about paying off the Red Patch gang in Pro-Mix; this is testimony that the jury rejected in arriving at its verdict and that the Court rejects in arriving at its sentencing. *Partial Tr. of Proceedings*, *Test. of: Malcolm French* 28:23-33:20 (ECF No. 362). The Court is utterly dubious about Mr. French's Red Patch testimony and does not credit it for purposes of Mr. Russell's sentencing argument.

### d.    The Green Bag Red Herring

The Court concludes that the Defendants' complaint about green bags is a red herring. The controversy comes from testimony of Mr. Roblero. *Miguel Roblero Test*. 22:20-24:14. Mr. Roblero testified that one day a tractor-trailer came to the warehouse and unloaded five or six pallets of soil. *Id*. 22:20-23:24. They then brought the bags of soil to the mountain. *Id*. 24:2-14.

The first problem is timing. Mr. Roblero testified that he came to Maine for two seasons. The second season was the season of the police raid, which occurred in September 2009. *Id*. 65:25-66:18. Mr. Roblero arrived in Maine the first time the year before, after the 2008 harvest, and was set to work cutting and cleaning

marijuana in the French warehouse. *Id.* 12:22-14:20. He cleaned marijuana for about four months. *Id.* 20:15-17; 22:17-19. After that, he recalled that a tractor-trailer arrived at the warehouse with what he called dirt or soil. *Id.* 22:20-24. It was then that they spray painted the bags. *Id.* 22:23-25. After they completed the spray painting, they took the bags to the woods. *Id.* 24:2-4. According to the PSR, Griffin Greenhouse filled two orders for Pro-Mix in March 2008, timing generally consistent with Mr. Roblero's testimony. *French PSR* ¶ 24. This means that the spray-painted bags were in the Maine woods from March 2008 until September 2009. The Defendants' argument assumes that the Defendants would not have trashed the green painted bags of Pro-Mix after they were empty and that the sprayed-on green paint would have survived eighteen months in the Maine woods, including a Maine winter.

Moreover, Mr. Roblero testified that when they spray painted the bags, they did not remove them from the pallets and just painted the four sides. *Id.* 23:25-24:1. The patchy paintjob makes it even more unsurprising that law enforcement did not come upon green bags of Pro-Mix during their raid in September 2009.

Finally, the absence of green paint on Pro-Mix bags is hardly evidence that the bags were not in fact purchased and delivered since the Griffin Greenhouse records confirm the dates and amounts of the sales.

### e. The 100 Gram Assumption and Hypothetical Plants

To translate the number of marijuana plants to a specific quantity of marijuana, the PO used a provision of the United States Sentencing Guidelines.

*French PSR* ¶ 28.  In the background commentary to United States Sentencing Guidelines § 2D1.1 states: "In the case of an offense involving marihuana plants, treat each plant, regardless of sex, as equivalent to 100 grams of marihuana.  *Provided*, however, that if the actual weight of the marihuana is greater, use the actual weight of the marihuana."  U.S. SENTENCING GUIDELINES § 2D1.1, notes to quantity table (E) (U.S. SENTENCING COMM'N 2015) (emphasis in original).

The Defendants concede that the 100 grams assumption may be used for the marijuana plants found in Township 37 in September 2009, but they object to using the 100 gram assumption for hypothetical plants, namely the number of plants the PO calculated by using the Pro-Mix methodology.  *French Mem.* at 5.  It is true that two circuits, the Sixth and the Second, concluded that the equivalency ratio may be applied only to "live" plants.  *Stevens*, 15 F.3d at 323; *Blume*, 967 F.2d at 49.  Since *Stevens* and *Blume*, however, "the majority of circuits which have addressed the point do not" restrict the drug equivalency guideline to live plants.  *United States v. Swanson*, 210 F.3d 788, 791-92 (7th Cir. 2000) (citing *United States v. Fitch*, 137 F.3d 277, 281-82 (5th Cir. 1998); *United States v. Layman*, 116 F.3d 105, 109 (4th Cir. 1997); *United States v. Shields*, 87 F.3d 1194, 1197 (11th Cir. 1996); *United States v. Silvers*, 84 F.3d 1317, 1325-27 (10th Cir. 1996); *United States v. Wilson*, 49 F.3d 406, 410 (8th Cir. 1995); *United States v. Wegner*, 46 F.3d 924, 927-28 (9th Cir. 1995)).

In any event, the Court does not view the live plant versus dead plant debate as relevant to the drug quantity issue before it.  The question these Circuit Courts addressed was whether the law and the guidelines require differential treatment of

live plants and dead plants, which in either form were physically available, in contrast to the calculations at issue here. *See, e.g., United States v. Swanson*, 210 F.3d 788, 792 ("[D]ead or alive, all 'plants' count"). The PO calculation in this case represents an attempt to assign a drug quantity to marijuana plants grown, harvested, and distributed by the Defendants before September 2009. So long as the sentencing court is persuaded that a defendant actually grew or distributed a marijuana plant in violation of federal criminal law, the language of Note E to § 2D1.1 offers a 100 gram equivalency to the unavailable plant. To rule otherwise would leave a sentencing court—absent other probative evidence of drug quantity such as financial records—to calculate a guideline range without taking into consideration a defendant's actual conduct for previously distributed marijuana.[4]

### 3. Calculation Using the Pro-Mix Methodology

The Court turns to the next issue: the accuracy of the PO calculation. The PO used the Pro-Mix method for all years except 2009, when the PO used the actual number of marijuana plants seized in that year. *French PSR* ¶¶ 27-28.

The Defendants object to the use of two different methods to arrive at drug quantity. *French's Second Suppl. Mem.* at 3-4. Their objection is rooted in math. They observe that the Pro-Mix methodology from 2006 through 2008 used a 1.5 bale per basket ratio and included all Griffin Greenhouse orders through March 27, 2008. *Id.* at 3. Noting that the PO eliminated only the 630 bags Cold Stream purchased on

---

[4]     The PSR points out that one of the primary investigators in this case testified that each plant was capable of producing one-half pound of marijuana or about 226 grams per plant. *French PSR* ¶ 27. Therefore, the 100 gram per plant equivalency appears to favor the Defendants.

February 13, 2009, the Defendants contend that the 630 bags alters the calculation for 2009 to .5 bags per basket. *Id.* They argue that the disparity between 2006-2008 and 2009 may be explained by the conspiracy's use of previously delivered Pro-Mix to fertilize the 2009 plants. *Id.* at 4. If so, the PO calculation would have double counted the Pro-Mix not used in 2008; for example, by calculating the number of marijuana plants for the year 2008 and by again calculating the actual number of marijuana plants in 2009.

One way to test this argument is to calculate total drug quantity by using the Pro-Mix methodology. The Court starts with the total number of Pro-Mix bales that Griffin Greenhouse sold to Cold Stream from 2006 through 2009: 4,590. *French PSR* ¶ 24. Applying the 1.5 bags per basket assumption to 4,590 to arrive at the total number of baskets, the result is 3,060 baskets: 4,590 x .6667 = 3,060. Applying the three plants per basket assumption, the result is a total of 9,180 plants: 3,060 x 3 = 9,180. Applying the 100 gram per plant equivalency from the guidelines, the total is 918,000 grams or 918 kilograms. This figure falls within base offense level 28. § 2D1.1(c)(6) ("At least 700 KG but less than 1,000 KG of Marihuana").

The Court views this means of calculation as a "reasoned estimate[] based on historical data." *Bernier*, 660 F.3d at 546 (quoting *Platte*, 577 F.3d at 392). The Court acknowledges that it seems odd to discard the actual number of marijuana plants discovered in September 2009 in favor of a calculation based on quantities of purchased fertilizer. But using a consistent methodology has the advantage of eliminating even the remote possibility of double counting.

It also has the advantage of "err[ing] on the side of caution." *Sklar*, 920 F.2d at 113 (quoting *Walton*, 908 F.2d at 1301).  These calculations favor the Defendants in a number of ways.  First, the Court used the 1.5 bales per basket figure rather than .5 bales per basket, either of which would be justified by the evidence.  Indeed, if the Court used the 630 bale figure as accurate for the 2,943 live marijuana plants seized in 2009, the result would have been about .5 bales per basket, which is consistent with Winston McTague's trial testimony. *McTague Test.* 11:14-19; 19:18-22.  The 1.5 bale figure substantially benefits the Defendants.  Second, the Court used the assumption that each nest contained only three marijuana plants, instead of relying on testimony that each nest produced between three and six plants.  Third, the use of actual Pro-Mix deliveries also eliminates Mr. French's concern about annual variability in the marijuana crop.  Finally, while the old figure of 1,086.3 kilograms sits at the bottom of base offense level 30 (1,000 KGs to 3,000), the new figure of 918 is at the top of base offense level 28 (700 to 1,000 KG).  This has the effect of broadening any margin of error in favor of the Defendants, including the Defendants' unsupported argument that some of the Pro-Mix was legitimately used and their equally unsupported argument that some of the Pro-Mix was used to fertilize unsuccessful plantings.

### 4.   Alternative Methodologies

The Court examined the alternative methodologies proposed by the Defendants and has concluded that none is as accurate as the one the Court has adopted.

### a.   Actual Marijuana and Actual Sales

Both Mr. French and Mr. Russell urge the Court to count only the marijuana seized in September 2009 and the marijuana that members of the conspiracy sold. *French Mem.* at 3; *Russell PSR*, Obj. 16.   But apart from an occasional sale of marijuana to Fai Littman, there is almost no evidence of actual sales of marijuana. To entirely eliminate the overwhelming weight of the Government's evidence that these Defendants were in fact involved in a prolific, multi-year marijuana growing conspiracy would be not only inaccurate but also grossly unfair to the Government.

### b.   The Nest Counting Method

Mr. French contends that the Court should rely on his nest counting as the most accurate way to determine drug quantity.   *French Second Suppl. Mem.* at 6-7. But this proposal assumes that the French conspiracy members never reused a marijuana nest from year to year, an assumption for which there is no evidence and that the Court is unwilling to make.

### c.   The Cleaned Pounds Method

Similarly, the Court does not accept Mr. French's proposal that the cash payments the migrant laborers sent to Mexico through MoneyGram should be used as a proxy for drug quantity. *French's Suppl. Mem.* at 3-4. As the Government points out, the proposal assumes that MoneyGram represents all the money the migrant laborers received from the conspiracy. *Gov't Second Suppl. Mem.* at 3-7. Whether Mr. Soto used more than one money transferring service; whether wire transfers were made through Western Union or another company as well; whether the migrant

laborers were charged for housing and food; whether the migrant laborers received and used some of the payments for their own living expenses; whether non-migrant workers, including Mr. Russell and Mr. MacPherson, processed marijuana; the length of time the migrant laborers processed the marijuana—all are among the questions left unanswered by this approach. The Court is not convinced that Mr. French's proposed methodology would result in an accurate number for drug quantity or at least a more accurate number than the Pro-Mix method. *Bernier*, 660 F.3d at 547 ("It is well settled that a sentencing court's selection from among plausible alternative scenarios or divergent inferences presented by the record cannot be clearly erroneous") (citing *Platte*, 577 F.3d at 393-94; *United States v. Ruiz*, 905 F.2d 499, 508 (1st Cir. 1990)).

### 5.    Drug Quantity and the Individual Defendants

In the context of a drug conspiracy, a sentencing court "must determine the specific quantity of drugs for which the defendant is personally responsible." *Bernier*, 660 F.3d at 547 (quoting *United States v. Rivera Calderón*, 578 F.3d 78, 100 (1st Cir. 2009)). The PO recommended that Malcolm French and Kendall Chase be held responsible for the entire drug quantity produced by the conspiracy from the beginning to the end. *French PSR* ¶ 26 ("With respect to drug quantity, the Probation Office takes the position that **French** is responsible for all of the marijuana grown by the conspiracy between 2006 and 2009"); *Chase PSR* ¶ 29 ("The Probation Office takes the position that **Kendall Chase** is responsible for the total drug quantity outlined above"). The PO recommended that Rodney Russell be held responsible for

the marijuana grown from 2007 through 2009. *Russell PSR* ¶ 28 ("Accordingly, the Probation Office believes that **Russell** is responsible for a total of <u>9,303 marijuana plants</u> (6,360 plants + 2,943 plants) between 2007 and 2009") (emphasis in original).

### a.   Malcolm French

Malcolm French has not claimed that the evidence fails to support his involvement from the beginning to the end of the conspiracy, and the Court accepts the PO recommendation as to the length of his involvement. The Court fixes Malcolm French's personal responsibility for the marijuana produced by the conspiracy at 918 kilograms for a base offense level of 28.

### b.   Kendall Chase

Regarding Kendall Chase, the PO made two points about the length of time Mr. Chase was involved in the conspiracy. First, the PO found that Mr. Chase had joined the conspiracy in 2005, and the PSR states that "there is evidence of continued involvement until approximately mid-2009." *Chase PSR* ¶ 29. The PO "recognize[d] that there is evidence that a dispute occurred between French and **Chase** in 2009, and due to that dispute, **Chase** stopped going to the marijuana grow by approximately mid-2009." *Id.* The PO writes, however, that "even if **he** did not actively care for the marijuana grow during the latter part of 2009, there is evidence of **Chase** being present when the marijuana was planted in the Spring of 2009, and for at least a brief period beyond." *Id.* Next, the PO notes:

> [S]ince the evidence suggests **Chase's** primary role was to provide expertise on growing/harvesting high-quality marijuana, and since **he** provided that knowledge to **his** co-conspirators for a period of several years, this office believes **he** is still responsible for the plants seized in

2009, under the provisions of relevant conduct, regardless of **his** activity level in the latter part of 2009.

*Id.*

In his memorandum, Mr. Chase argues that he "should not be held responsible for the entire drug amount." *Chase Mem.* at 10.  He poses the following analogy: "If a father teaches his son to hunt, and the son later engages in poaching, surely the father would not be held responsible for the poaching.  Similarly, if Mr. Chase assisted or taught others how to grow plants, he should not be held responsible for all future plants." *Id.*  The analogy is imperfect.  It assumes that Mr. Chase taught others how to do something legal, and they misused his teaching by doing something illegal.  Here, Mr. McTague described Mr. Chase (and a man named Mike Smith) as the "brains" behind the marijuana grow part of the operation. *McTague Test.* 16-23-17:4 ("Kendall and Mike both were the brains.  They were the ones that knew how to grow it and make it good").  Mr. Chase had previously been convicted of Unlawful Trafficking in Scheduled Drugs involving a marijuana grow operation in Washington County. *Chase PSR* ¶ 46.  According to Mr. Roblero, Mr. Chase was the one who tagged the marijuana plants when they were ready to harvest. *Miguel Roblero Test.* 31:12-32:5.

There is evidence that Mr. Chase had a falling out with Mr. French at some point in 2009.  Mr. Roblero testified that although Mr. Chase was around the marijuana grow site more in 2008, he (and his brother Kevin) were seldom around the operation in 2009. *Id.* 50:4-15.  But Mr. Roblero confirmed that when Mr. Chase

was around, he helped the migrant laborers plant the marijuana and put down poison. *Id.* 50:16-20.

As the Court views it, a defendant who sows the seeds is responsible for the harvest. Here, Mr. Chase helped plant the marijuana crop in the spring of 2009, and he therefore bears his share of responsibility for the ripe plants in the fall. Furthermore, there is no evidence that Mr. Chase ever formally withdrew from the French conspiracy. The standard for a formal withdrawal is "strict." *United States v. Ciresi*, 697 F.3d 19, 27 (1st Cir. 2012) (quoting *United States v. Juodakis*, 834 F.2d 1099, 1102 (1st Cir. 1987) (per curiam)). "Mere cessation of activity in furtherance of the conspiracy does not constitute withdrawal." *Juodakis*, 834 F.2d at 1102 (quoting *United States v. Dunn*, 758 F.2d 30, 37 (1st Cir. 1985)); *United States v. Mardian*, 178 546 F.2d 973, 978 (D.C. Cir. 1976)). To withdraw from a conspiracy, the law requires "either . . . a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." *Ciresi*, 697 F.3d at 27 (quoting *United States v. Piper*, 298 F.3d 47, 53 (1st Cir. 2002)).

The Court does not understand Mr. Chase's argument to be that he legally withdrew from the French conspiracy. If this argument is being made, the evidence is simply not there to support it. Nor is there any evidence that Mr. Chase voluntarily disclosed the offense under § 5K2.16 of the guidelines. U.S. SENTENCING GUIDELINES MANUAL § 5K2.16 (U.S. SENTENCING COMM'N 2015). The Court concludes that Mr. Chase is responsible for the marijuana that was found at the Township 37 grow site

in September 2009.  The Court fixes Kendall Chase's personal responsibility for the marijuana produced by the conspiracy at 918 kilograms for a base offense level of 28.

### c.   Rodney Russell

The PO concluded that Rodney Russell joined the conspiracy in late 2006 and that he eventually became a trusted associate, becoming involved with the marijuana grow on a daily basis and supervising the migrant laborers with Scott MacPherson. *Russell PSR* ¶ 10.  Accordingly, the PO did not hold Mr. Russell responsible for any marijuana before 2007.  *Id.* ¶ 26.

Using the Pro-Mix methodology as the exclusive means to determine drug quantity, the Court subtracts the March 24, 2006 delivery of 780 bags of Pro-Mix from the calculation, resulting in 3,810 bags of Pro-Mix: 4,590 − 780 = 3,810.  Using the 1.5 bags per nest figure, the result is 2,540 baskets: 3,810 x .6667 = 2,540.  Applying the three plants per nest figure, the result is 7,620 plants: 2,540 x 3 = 7,620. Multiplying the number of plants by 100 grams, the figure is 762,000 grams or 762 kilograms.  This places Mr. Russell in a base offense level of 28.  U.S. SENTENCING GUIDELINES § 2D1.1(c)(6) (U.S. SENTENCING COMM'N 2015) ("At least 700 KG but less than 1,000 KG of marijuana").

In Mr. Russell's August 6, 2015 sentencing memorandum, he adopted Mr. French's drug quantity arguments and incorporated by reference his Objection 16 to the PO's PSR.  *Russell Mem.* at 6.  The Court has addressed Mr. French's objections. The Court has also addressed the arguments in Mr. Russell's Objection 16 to the PSR: the Red Patch gang, and the description of the Pro-Mix bags as described by Mr.

Roblero as opposed to the Pro-Mix bags found by law enforcement in September 2009. Finally, it has rejected the defense request to use actual marijuana sales plus the number of plants in Township 37 as the exclusive means of calculating drug quantity.

The Court fixes Rodney Russell's personal responsibility for the marijuana produced by the conspiracy at 762 kilograms for a base offense level of 28.

## IV.   CONCLUSION

The Court SUSTAINS in part and DENIES in part the Defendants' objections to the Probation Office's recommended drug quantity calculation.  Bearing in mind the need to err on the side of caution, the Court concludes that the most accurate means to determine drug quantity is to consistently use the Pro-Mix methodology. This results, in the Court's view, in a conservative assessment of drug quantity by applying a series of assumptions most favorable to the Defendants.  The Court calculates each Defendant's drug quantity and resulting base offense level as follows:

(1) Malcolm French's personal responsibility for the marijuana produced by the conspiracy equals 918 kilograms for a base offense level of 28;

(2) Kendall Chase's personal responsibility for the marijuana produced by the conspiracy equals 918 kilograms for a base offense level of 28; and

(3) Rodney Russell's personal responsibility for the marijuana produced by the conspiracy equals 762 kilograms for a base offense level of 28.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 12th day of April, 2016