UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:12-cr-00160-JAW |
| | ) | |
| MALCOLM A. FRENCH, et al. | ) | |

**SENTENCING ORDER ON FIREARMS ENHANCMENT**

The Court declines to apply the two-level weapons enhancement under United States Sentencing Guideline § 2D1.1(b)(1) to co-conspirators in a marijuana operation because the evidence is too equivocal to find it is more likely than not that the Defendants actually knew, or that it was reasonably foreseeable, that a co-conspirator would possess a firearm in connection with the conspiracy.

## I.     BACKGROUND

### A.     Procedural History

On January 24, 2014, a federal jury found Malcolm French, Rodney Russell, and Kendall Chase guilty of several federal crimes involving a conspiracy to manufacture and a conspiracy to distribute marijuana. *Jury Verdict Form* (ECF No. 311); *Superseding Indictment* (ECF No. 187). The Probation Office (PO) prepared and revised Presentence Investigation Reports on each Defendant. *French PSR*; *Russell PSR*; *Chase PSR*. In making its sentencing guideline calculations, the PO included a two-level enhancement under United States Sentencing Guideline (USSG) § 2D1.1(b)(1) for possession of a dangerous weapon. *French PSR* ¶ 37, *Russell PSR* ¶

37, *Chase PSR* ¶ 37.  Each Defendant objected to the firearms enhancement.  *French PSR*, Obj. 2, *Russell PSR*, Obj. 18; *Chase PSR*, Obj. 6.

On June 2, 2015, the Government filed a sentencing memorandum addressing the firearms enhancement.  *Gov't Consolidated Mem. in Aid of Sentencing* (ECF No. 519) (*Gov't Mem.*).   On July 30, 2015, July 31, 2015, and August 6, 2015, the Defendants filed responsive memoranda.  *Def.'s Mem. in Aid of Sentencing* (ECF No. 550); *Def.'s Corrected Mem. in Aid of Sentencing* (ECF No. 553) (*Chase Mem.*); *Def. Malcolm French's Mem. in Aid of Sentencing* (ECF No. 551) (*French Mem.*); *Def. Rodney Russell's Sentencing Mem.* (ECF No. 562) (*Russell Mem.*).   On August 12, 2015, the Government filed a reply memorandum but did not address the firearms enhancement.  *Gov't Consolidated Reply Mem. in Aid of Sentencing* (ECF No. 571) (*Gov't Reply*).

On February 3, 2016, Malcolm French filed another sentencing memorandum that—among other things—addressed the firearms enhancement.   *Def. Malcolm French's Suppl. Sentencing Mem.* (ECF No. 608) (*French Suppl. Mem.*).  On February 5, 2016, the Government filed another sentencing memorandum also addressing the firearms enhancement.  *Gov't Mem. in Aid of Sentencing* (ECF No. 612) (*Gov't Suppl. Mem.*).  Finally, on March 18, 2016, Mr. French filed a second supplemental memorandum but mentions the firearm enhancement only in passing.  *Def. Malcolm French's Second Suppl. Sentencing Mem.* at 11 (ECF No. 635).

### B.     Brief Background

In 2009, a number of law enforcement agencies investigated an allegation that there was a substantial marijuana grow operation located in Township 37, Washington County, Maine on land owned by Haynes Timberland, Inc. (Haynes Timberland).[1]    Malcolm French, a Co-Defendant, was a co-owner of Haynes Timberland. *Partial Tr. of Proceedings*, *Test. of: Malcolm French* 106:12-22 (ECF No. 362) (*French Test.*).    Haynes Timberland owned approximately 22,000 acres in Township 37, *French PSR* ¶ 6, and Mr. French and his wife, Barbara, jointly owned another parcel of land in Township 31 also in Washington County, Maine, where a warehouse was located.  *Id.* ¶ 9; *see Final Order of Forfeiture* (ECF No. 621).  Mr. French referred to this warehouse as "Colson Field."  *French Test.* 43:16-44:3.

The investigation revealed that there were four major actors in the conspiracy, the three Defendants, and a man named Scott MacPherson, who tragically committed suicide in 2011.   *French PSR* ¶ 10.   Mr. French, who was a very successful businessman, was "in charge" and the overall leader of the marijuana conspiracy.  *Id.* Kendall Chase contributed to the conspiracy through his knowledge about how to manufacture and harvest high quality marijuana.  *Id.*  In late 2006, Rodney Russell joined the conspiracy and became involved in the marijuana grow on a daily basis. *Id.*  Mr. Russell and Mr. MacPherson monitored and supervised the migrant workforce.  *Id.*

---

[1]       In reciting this factual background, the Court relied on the Malcolm French, Rodney Russell, and Kendall Chase PSRs.  For purposes of this overview, the Court cites only the French PSR because the other PSRs substantially echo the contents of the French PSR.

Mr. French came up with the idea of hiring migrant laborers to work on the marijuana operation. *Id.* As opposed to local residents, Mr. French thought illegal workers posed less risk and would be cheaper because: (1) he could pay them less, (2) they would be less likely to steal the marijuana, (3) they would be reluctant to contact local law enforcement, and (4) they would be unable to geographically locate the grow in a large and unfamiliar tract of land. *Id.* In late 2007, Mr. French engaged Moises Soto, a United States citizen originally from Mexico fluent in English and Spanish, to recruit laborers for the marijuana grow operation. *Id.* ¶ 11. On September 21, 2009, law enforcement executed a search warrant at Township 37, and on September 22, 2009, they confirmed the existence of a marijuana grow operation on Haynes Timberland land. *Id.* ¶ 6.

## C.    Miguel Angel Roblero-Velasquez

The only witness who testified about the presence of a firearm in connection with the marijuana grow operation was a Mexican laborer named Miguel Angel Roblero Velasquez. The Court has focused on his testimony to determine whether the Government has sustained its burden of proof to demonstrate the applicability of the firearms enhancement.

Mr. Roblero testified at the jury trial on January 15-16, 2014. *Partial Tr. of Proceedings*, *Test. of: Miguel Angel Roblero Velasquez* (ECF No. 370) (*Roblero 1/15/14*); *Partial Tr. of Proceedings*, *Test. of: Miguel Angel Roblero Velasquez* (ECF No. 371) (*Roblero 1/16/14*). As of January 2014, Mr. Roblero was twenty-five years old and living with his fiancée and child in Harrisburg, Pennsylvania. *Roblero*

4

*1/15/14* 3:23-5:7; 24:15-25:4.   Brought up in Chiapas, Mexico, Mr. Roblero was twenty years old when he first came to the United States from Monterrey, Mexico. *Id.* 4:8-19; 5:23-6:1.   He paid $2,000 to a "coyote," a person who helps sneak immigrants across the United States-Mexico border. *Id.* 6:9-7:1. Mr. Roblero entered Texas and found his way to Florida. *Id.* 7:10-16. Mr. Roblero worked in Florida and in North Carolina. *Id.* 7:23-8:3. While working in North Carolina, Mr. Roblero met Abner Efran Perez Morales, who had grown up in the same area of Mexico as Mr. Roblero. *Id.* 8:11-21.   They both traveled back to Florida where they continued working. *Id.* 8:25-9:6. It was in Florida that Mr. Roblero learned about a job planting pine trees in Maine. *Id.* 9:7-12.

Both Mr. Roblero and Mr. Perez were interested in working in Maine, and two people transported them to Maine, dropping them off at a gas station. *Id.* 10:1-6. At the gas station, they were met by Mr. Soto. *Id.* 10:7-11. Mr. Soto informed them that they were there to plant and cut marijuana. *Id.* 10:19-23. Mr. Soto took Mr. Roblero and Mr. Perez to a warehouse; shown a photograph of Mr. French's warehouse in Township 31, Mr. Roblero identified it as the warehouse where the migrant laborers stayed and worked. *Id.* 11:3-19; 17:2-6.

Mr. Soto introduced Mr. Roblero and Mr. Perez to Scott, the man who lived at the warehouse. *Id.* 11:20-12:1. This was Scott McPherson. *French Test.* 43:12-44:3. Over time, Mr. Roblero met "Malcolm, Rod, Kevin, Kendall and Bobby."[2] *Roblero*

---

[2]      In its August 12, 2015 reply memorandum, the Government suggests that Mr. Roblero's reference to Kevin is to Kevin Chase, Kendall Chase's brother. *Gov't's Reply* at 4.  None of the Defendants contested this assertion, but it is not material to the issue before the Court.

*1/15/14* 12:7-9.  Mr. Roblero and Mr. Perez's initial dealings were mostly with Mr. MacPherson and Mr. Soto.  *Id.* 12:10-21.  They were instructed by Mr. MacPherson through Mr. Soto to cut and clean dried marijuana plants.  *Id.* 12:22-14:15.  They worked ten to twelve hours per day in the warehouse with one other migrant laborer named Fernando.  *Id.* 14:16-25.  "Rod," presumably Rodney Russell, helped them clean the marijuana plants.  *Id.* 15:1-4.  After the marijuana was cleaned, Mr. Russell and Mr. MacPherson placed the marijuana in Ziploc baggies, weighed the bags on a scale, and stored the bags in metal boxes in Mr. MacPherson's room.  *Id.* 15:5-16:15.

Mr. Roblero together with the other migrant workers received their food from Mr. MacPherson.  *Id.* 16:19-24.  They were not allowed outside the warehouse and slept inside the warehouse.  *Id.* 17:2-9.  Mr. MacPherson covered over the warehouse windows, and the workers were not able to look outside.  *Id.* 17:7-20.  Mr. Soto paid the workers a weekly cash salary of $380 to $400.  *Id.* 17:21-18:3.  Mr. MacPherson gave Mr. Soto the cash to pay the workers.  *Id.* 18:4-8.  When Mr. Roblero was working with Mr. MacPherson and Mr. Russell, Mr. French, Mr. Kevin Chase, Mr. Kendall Chase, and Mr. Berg would come by.  *Id.* 18:15-18.  At one point, Mr. French, Mr. MacPherson, and Mr. Russell showed the workers a process to handle the discarded parts of the marijuana plants.  *Id.* 18:25-20:14.  Mr. Roblero worked in the warehouse for four months.  *Id.* 20:15-17.  At the end of the time in the warehouse, Mr. Roblero recalled Mr. Kevin Chase driving a tractor-trailer to the warehouse loaded with white bags of dirt or soil.  *Id.* 22:20-23:10.  The workers spray-painted the bags green, and

6

Mr. MacPherson, Mr. French, Mr. Russell, Mr. Kevin Chase, and Mr. Kendall Chase took the bags into the woods. *Id.* 23:13-24:6.

Eventually, Mr. Roblero and the other migrant workers went to "the mountain" about forty minutes away from the warehouse. *Id.* 24:12-14; 26:9-13. Mr. French and Mr. MacPherson took the workers to the mountain by car. *Id.* 26:14-15. When they arrived, Mr. Roblero saw the soil packages that they had painted green. *Id.* 27:16-18. Mr. MacPherson taught Mr. Roblero, Mr. Perez, and Fernando how to make "nests" or "baskets" from wire, cloth, and the bagged soil. *Id.* 26:19-28:19. The migrant laborers were able to make fifty to sixty baskets per day. *Id.* 28:8-15. After they made the baskets, Mr. French and Mr. MacPherson took the laborers into the woods where the workers positioned the baskets, filled them with soil, and planted marijuana in them. *Id.* 28:24-29:10. The marijuana came from a greenhouse that Mr. MacPherson and Mr. Russell had built in the woods. *Id.* 29:11-20. While they were working in the woods, Mr. MacPherson provided camouflage clothing for the workers. *Id.* 30:3-13.

After the marijuana plants were planted in the nests, the workers tended them by cutting off the yellow leaves, watering them, and putting poison down to ward off pests. *Id.* 30:14-31:1. Mr. Russell and Mr. MacPherson showed the workers how to care for the marijuana plants. *Id.* 30:14-31:11. Mr. Chase put tags or stickers on the plants to indicate that they were ready to harvest. *Id.* 31:12-32:5. Mr. MacPherson and Mr. Russell would also label each plant with a plastic tag, stating the type of

marijuana in the basket. *Id.* 33:24-34:25. The laborers worked ten to twelve hour days. *Id.* 35:1-3.

Mr. Roblero described the area of the marijuana grow in Township 37. He said there were three houses in the marijuana grow area: one for eating and washing up, one for sleeping, and a third for Mr. Russell and Mr. MacPherson to sleep. *Id.* 35:4-10; 37:22-24. He said that he was present when they brought the third building to the marijuana grow site and that Mr. French pulled in the building with the help of Mr. MacPherson and Mr. Russell. *Id.* 36:7-18. There was also a small house where the marijuana was placed to dry; Mr. MacPherson and Mr. Russell put the marijuana in that house for drying. *Id.* 43:12-44:7.

After that first season, Mr. Roblero returned to Mexico along with Mr. Soto's brother-in-law. *Id.* 44:6-14. The next year, Mr. Roblero returned to the United States with Mr. Perez around April. *Id.* 44:22-45:4; 48:6-9. After an encounter with kidnappers in Texas from which Mr. Soto extracted them, Mr. Roblero and Mr. Perez returned to Maine with Mr. Soto to the same garage. *Id.* 45:25-48:11. He also returned to the mountain where the marijuana grow operation was located. *Id.* 48:12-13. The same Americans there the season before were present at the mountain. *Id.* 49:23-50:3. However, the Chase brothers, Kendall and Kevin, were seldom there, maybe once a week. *Id.* 50:4-6. Mr. Roblero understood that there had been a falling out among the Chase brothers and Mr. French. *Id.* 50:10-15.

In September, 2010, a plane flew over the grow site. *Id.* 65:25-66:2. Mr. French, Mr. MacPherson, and Mr. Russell were at the grow site that day. *Id.* 66:14-

8

18.  The migrant laborers met up with Mr. French, Mr. MacPherson, and Mr. Russell, and after the three Americans talked, the laborers went with Mr. MacPherson and Mr. Russell, while Mr. French went off somewhere else on foot.  *Id.* 66:23-67:13.  Mr. MacPherson, Mr. Russell, and the migrant workers spent the night in the woods.  *Id.* 67:18-23.  Later, the group went to the warehouse, where they were picked up by Mr. Berg; Mr. Berg along with Mr. MacPherson drove the migrant laborers for two hours to Mr. Berg's garage, where they stayed until later that day.  *Id.* 68:21-71:24.  Then Mr. Soto came and picked them up, and Mr. Roblero went to New York before ultimately ending up in Pennsylvania.  *Id.* 71:23-72:21.

The only trial testimony that Mr. MacPherson had a firearm is found in the following exchange:

> Q.  And did Scott ever wear a gun or a firearm when you were with him?
> A.  He always had a pistol sometimes on his - - at his waist.
> Q.  Did he ever threaten you in any way?
> A.  No, it was just - - he would get angry, and we'd get scared because we didn't know what he was saying.  He would get angry.  He would scare us because he'd get angry, and we didn't know what was going on.

*Roblero 1/16/14* 42:12-19.

### D.  Scott MacPherson and Firearms

In addition to Mr. Roblero's testimony, the Government introduced evidence that when law enforcement searched the Township 31 compound, including Mr. MacPherson's residence, they found two pistols in a safe inside Mr. MacPherson's living quarters.  *Gov't Mem.* at 7 (citing *Sentencing Ex. List* Ex. 1 (ECF No. 520) (*Sentencing*)).  In addition, they note that law enforcement found guns when they

9

executed the search warrant at the French residence. *Id.* (citing *Sentencing* Ex. 2). The Government introduced into evidence for sentencing purposes a photograph of the safe and the two pistols as well as a number of long rifles located at Mr. French's residence. *See Sentencing* Exs. 1-2. The Government also presented a deputy sheriff's report of Mr. MacPherson's suicide. *Id.* Ex. 3. On February 11, 2011, Mr. MacPherson's body was found in a pickup truck at the compound; there was a loaded .357 Taurus revolver between his legs and a bullet hole in his head. *Id.*

## II.    THE PARTIES' POSITIONS

### A.    The Government's Initial Memorandum

The Government says that "[t]o warrant the enhancement the presence of the weapon must have been known to, or reasonably foreseeable to, the defendant." *Gov't's Mem.* at 6 (quoting *United States v. Quinones-Medina*, 553 F.3d 19, 23 (1st Cir. 2009). According to the Government, it has "long been settled in this Circuit that 'firearms are common tools of the drug trade.'" *Id.* (quoting *United States v. Bianco*, 922 F.2d 910, 912 (1st Cir. 1991)). The Government notes that under First Circuit law, "absent evidence of exceptional circumstances, we think it fairly inferable that a codefendant's possession of a dangerous weapon is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances for a large amount of cash." *Id.* at 6-7 (quoting *Bianco*, 922 F.2d at 912). With this background, the Government argues that, taken together, the testimony of Mr. Roblero, the presence of the firearms in Mr. MacPherson's safe, and

10

the presence of firearms at the French residence sustain its burden under §
2D1.1(b)(1).  *Id.* at 7.

   **B.    The Chase Memorandum**

   In response, Mr. Chase points out that the standard for application of the two-
level enhancement is whether the gun possession was "reasonably foreseeable."
*Chase Mem.* at 10 (quoting *Bianco*, 922 F.2d at 912).  He notes that "[a]ccording to
the commentary, '[t]he adjustment should be applied if the weapon was present
unless it is clearly improbable that the weapon was connected with the offense.'" *Id.*
at 11 (quoting USSG § 2D1.1(b)(1) cmt. n.3).  The prosecution, Mr. Chase states,
"bears the initial burden of proving by a preponderance of the evidence that a weapon
was possessed in connection with a drug offense."  *Id.* (citing *United States v.
McDonald*, 121 F.3d 7, 10 (1st Cir. 1997)).  The burden shifts to the defendant "to
persuade the factfinder that the connection between the weapon and the crime is
clearly improbable."  *Id.* (quoting *McDonald*, 121 F.3d at 10).  Mr. Chase notes that
"[o]ne factor to be considered in determining the reasonable foreseeability of the
possession of a firearm is the size and quantities of the drugs involved."  *Id.* (citing
*McDonald*, 922 F.2d at 912).  Mr. Chase argues that "[b]ecause firearms are
considered 'common tools of the drug trade,' a co-defendant's possession of a
dangerous weapon 'is foreseeable to a defendant with reason to believe that their
collaborative criminal venture includes an exchange of controlled substances for a
large amount of cash.'"  *Id.* (quoting *Bianco*, 922 F.2d at 912).

11

Mr. Chase observes that there is no evidence to tie him personally or directly to the firearm. *Id.* In fact, none of the Defendants in this case was convicted of a firearm offense in connection with this case. *Id.* He points out that there is no evidence that any of the co-defendants fired or brandished a firearm in his presence or that he was actually aware of concealed or openly carried firearms. *Id.* Nor was Mr. Chase the owner of the land or the homes where the firearms were found or seen. *Id.* Citing a Seventh Circuit case, *United States v. Vold*, 66 F.3d 915, 921 (7th Cir. 1995), he says that the "mere risk involved in a drug manufacturing conspiracy does not establish the reasonable foreseeability of a concealed firearm absent other evidence." *Id.* At the same time, he concedes that given the amount of marijuana involved in the conspiracy, there is "little merit in arguing that the amount of marijuana grown in the present matter is negligible"; nevertheless, he argues that marijuana is different from the other drugs in Schedule I. *Id.*

## C.   The French Memorandum

Mr. French agrees that "law enforcement officers found two pistols at Scott M[a]cPherson's residence during the execution of a search warrant," but he notes that the weapons were found "in a <u>safe</u> inside the residence." *French Mem.* at 6 (emphasis in memorandum). He argues that there was:

> no evidence presented that any of the co-defendants were aware of these firearms ever being outside the safe at any time and it is just as likely that Scott M[a]cPherson left those two pistols in the safe during the entire time that he lived at the residence and during the entire time of his marijuana cultivation.

*Id.* Regarding the firearms in Mr. French's residence, he contends that there is no evidence of a connection between those firearms and the marijuana cultivation conspiracy. *Id.*

Mr. French points out that none of the factors often found in firearms enhancement cases is present here. *Id.* at 6-7. He did not tell a co-defendant to have a firearm. *Id.* (citing *United States v. Galvan*, 453 F.3d 738, 742 (6th Cir. 2006)). He was not involved in any drug transactions with firearms present in the past. *Id.* (citing *United States v. Ward*, 506 F.3d 468, 475 (6th Cir. 2007); *United States v. Clay*, 376 F.3d 1296, 1302-03 (11th Cir. 2004)). Mr. French says there is no "credible evidence" that he possessed firearms in connection with the offenses, that Scott MacPherson possessed a firearm in connection with the offenses, or that it was reasonably foreseeable to Mr. French that Mr. MacPherson would have two firearms locked away in a safe in his residence. *Id.* at 7.

### D.    The Russell Memorandum

Mr. Russell contends that evidence that Mr. MacPherson possessed a firearm is merely an "incidental association" and that there was "no evidence that a firearm was used during any part of the conspiracy." *Russell Mem.* at 3. He sees not a "scintilla of evidence actually associating defendant Russell with a firearm." *Id.* He notes that there is no evidence that a firearm was ever in his possession or in any place under his control or ownership. *Id.*

13

### E.    French Supplemental Memorandum

Citing United States Sentencing Commission statistics from 1997 to 2009, Mr. French argues that the percentage of weapon involvement in marijuana trafficking offenses—i.e., how often marijuana traffickers used weapons—was a mere 6.6% of the time. *French Suppl. Mem.* at 5 (citing *id.* Attach. 4 *Ex. Sentencing Tables*). He notes that the same statistics much more directly correlate drug offenses and weapons possession with drugs other than marijuana. *Id.* For example, when the drug is crack cocaine, the weapons enhancement is present in 30.7% of the cases. *Id.* Based on these statistics, he contends that a mere six percent chance does not meet the reasonable foreseeability standard. *Id.*

He then says that the "nature of the offense" does not establish foreseeability. *Id.* He points out that under the Government theory, he was growing marijuana on property "he owned, gated, and kept from the public." *Id.* "Deep in the heart of one of these properties he operated an undetectable marijuana grow." *Id.* at 5-6. He notes that there is no evidence that the marijuana grow was ever under any threat or that large amounts of cash were ever kept there. *Id.* at 6.

Mr. French disputes the evidence that Mr. MacPherson actually possessed a firearm. *Id.* Mr. French maintains that Mr. Roblero's first and only mention of Mr. MacPherson's gun possession came during cross-examination by defense counsel and was not revealed in any of the discovery. *Id.*

14

Finally, he asserts it would be "fundamentally unfair" to enhance Mr. French's sentence for a weapons enhancement, particularly since there is no evidence Mr. French was aware that Mr. MacPherson possessed a weapon. *Id.*

### F.   The Government's Supplemental Reply

The Government briefly urges the Court to reject Mr. French's argument based on national sentencing statistics and states that if a "lowly worker" was aware of Mr. MacPherson's firearms possession, Mr. French and the other Defendants must have known as well. *Gov't's Suppl. Mem.* at 2.

## III.   DISCUSSION

### A.   Legal Principles

#### 1.   Guideline Provisions

The dangerous weapons enhancement provision is found in USSG § 2D1.1(b)(1): "If a dangerous weapon (including a firearm) was possessed, increase by **2** levels." U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(b)(1) (U.S. SENTENCING COMM'N 2015). The Guideline Commentary explains that this enhancement "reflects the increased danger of violence when drug traffickers possess weapons." *Id.* cmt. n.11(A).[3] The Commentary states that the enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id.* It says, for example, that the enhancement would not be

---

[3]     Regarding the proper version of the Guidelines, the Court notes that the PO used the 2008 Guidelines for Mr. French and Mr. Russell, *French PSR* ¶ 33; *Russell PSR* ¶ 33, and the 2014 Guidelines for Mr. Chase. *Chase PSR* ¶ 34. The general rule is that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." U.S. SENTENCING GUIDELINES MANUAL § 1B1.11(a) (U.S. SENTENCING COMM'N 2015). Having concluded that any differences in Application Note 11(A) across the different versions of the Guidelines are immaterial, the Court refers to the 2015 Guidelines in this discussion.

applied "if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet." *Id.*

### 2.    Caselaw

#### a.    The Legal Standard and Burden of Proof

In a series of cases, the First Circuit described the circumstances in which the enhancement should and should not be applied, the legal standard for application of the enhancement, and an analytic method for resolving this issue.  Over the years, the First Circuit reiterated some basic principles about guns and drugs.  "To warrant the enhancement the presence of the weapon must have been known to, or reasonably foreseeable to, the defendant." *Quinones-Medina*, 553 F.3d at 23 (collecting cases). The sentencing enhancement "must be supported by a preponderance of the evidence." *United States v. Burgos-Figueroa*, 778 F.3d 319, 320 (1st Cir. 2015) (citing *McDonald*, 121 F.3d at 9).  Also, "[t]he facts undergirding an enhancement need not be established by direct evidence but, rather, may be inferred from circumstantial evidence." *Id.* (citing *United States v. Cruz*, 120 F.3d 1, 4 (1st Cir. 1997) (en banc)).

#### b.    The Analytic Approach

In *United States v. McDonald*, the First Circuit described the analytic approach to weapons enhancement issues.  The *McDonald* Court noted that the Sentencing Commission provided that "the adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *McDonald*, 121 F.3d at 9-10 (quoting USSG § 2D1.1(b)(1) cmt. n.3). The First Circuit has required that there be "a certain nexus between the weapon

16

and the offense" in order for the enhancement to lie. *Id.* at 10 (citing *United States v. Lagasse*, 87 F.3d 18, 22 (1st Cir. 1996)). However, "to establish the link the prosecution need only prove that the defendant possessed the weapon during the currency of the offense, not necessarily that he actually used it in perpetrating the crime or that he intended to do so." *Id.* (citing *Lagasse*, 87 F.3d 18 at 22). Furthermore, the First Circuit wrote that a defendant "need not have had the weapon on his person for the enhancement to apply; any possession—actual or constructive— can trigger the two-level increase." *Id.* (citation omitted). In sum, "when the weapon's location makes it readily available to protect either the participants themselves during the commission of the illegal activity or the drugs and cash involved in the drug business, there will be sufficient evidence to connect the weapons to the offense conduct." *Id.* (quoting *United States v. Corcimiglia*, 967 F.2d 724, 727 (1st Cir. 1992)). "Where . . . the government has shown that a firearm possessed by the defendant was present during the commission of the offense, the burden shifts to the defendant to persuade the factfinder that a connection between the weapon and the crime is clearly improbable." *Id.* (citing *United States v. Jackson*, 3 F.3d 506, 509 (1st Cir. 1993)). The First Circuit emphasized that the inference of "reasonable foreseeability" does not create an irrebuttable presumption because the sentencing court may refuse to find reasonable foreseeability "in light of special circumstances or contrary evidence presented by the defendant in rebuttal." *Bianco*, 922 F.2d at 912 (quoting *United States v. Aguilera-Zapata*, 901 F.2d 1209, 1216 (5th Cir. 1990)).

### c.    The Underlying Principles and Factors

In general, the First Circuit described firearms as "common tools of the drug trade." *Bianco*, 922 F.2d at 912 (citations omitted).  The First Circuit observed that the connection between a weapon and drugs "may be, among other things, the weapon's utility for protection of the drugs, the trafficking operation, or the proceeds of the operation." *Quinones-Medina*, 553 F.3d at 23 (citations omitted).  The First Circuit also noted that "one of the things that happens 'on the street' is the theft of drugs during the course of illicit trafficking.'" *Id.* at 24 (citations omitted).  Possession of a firearm is reasonably foreseeable where a "large amount of drugs" are involved. *Bianco*, 922 F.2d at 912 (quoting *United States v. Garcia*, 909 F.2d 1346, 1350 (9th Cir. 1990)).  Indeed, in *Bianco*, the First Circuit concluded that it was not error to infer that a co-defendant's firearm possession was reasonably foreseeable merely from the quantity of the marijuana involved in their substantive offenses of conviction.  *Id.* at 912.  Likewise, the Ninth Circuit in *Garcia* wrote that although "it does not appear from the record that Garcia had actual knowledge of Soto's possession of the gun," the facts that "the drug transaction involved approximately 17 kilograms of cocaine" and "the negotiations leading up to the sale lasted nearly one month" made it reasonably foreseeable to Garcia that Soto would possess a gun.  *Garcia*, 909 F.2d at 1350.

### d.    The Weapons Enhancement and Co-conspirators

In *Burgos-Figueroa*, the First Circuit addressed the circumstances under which the weapons enhancement may be imposed upon a co-conspirator who did not

possess the weapon.  778 F.3d at 321.  The First Circuit emphasized that for the weapons enhancement to apply, "a defendant need not be caught red-handed: the enhancement applies not only where a defendant himself possessed a firearm but also where it was reasonably foreseeable to the defendant that firearms would be possessed by others during the conspiracy." *Id.* (citations omitted).  The First Circuit discussed such factors as whether the co-conspirators regularly carried firearms to protect the drugs, whether the co-defendant was a drug point owner, whether the co-defendant was a leader of the conspiracy whose duties included the supervision of others, whether the co-defendant knew of the practices and any incidents involving gun use and could foresee their continuance, and how involved the co-defendant was in the drug operation.  *Id.*  The *Burgos-Figueroa* Court also noted that the drug quantity was a factor: "[w]hen large quantities of drugs are involved, firearms are common tools of the trade."  *Id.* (citing *Quinones-Medina*, 553 F.3d at 24; *Bianco*, 922 F.3d at 912).

### B.    The Law and the Arguments

#### 1.    A Failure to Charge

In response to Mr. Chase's observation that none of the Defendants was charged with a weapons possession offense, the Court turns to *Burgos-Figueroa*: the recent First Circuit decision, discussed above, addressing a defendant's argument that the district court's application of a weapons enhancement was undermined by the fact that other defendants in the conspiracy were charged in a weapons count but not the appellant.  778 F.3d at 322.  In *Burgos-Figueroa*, the First Circuit described

the defendant's argument as a "non-issue" and "beside the point." *Id.* The First Circuit explained that "[w]hat counts is that the court below supportably determined that the use of weapons during the conspiracy was reasonably foreseeable to the appellant." *Id.* (citations omitted). The same principle applies here. The Defendants can take nothing from the fact none was charged with a weapons offense separately or in connection with the conspiracy.

## 2.    Drug Quantity

Here, the PO recommended that Malcolm French and Kendall Chase be held accountable for 1,086.3 kilograms of marijuana and Rodney Russell for 930.3 kilograms of marijuana. *French PSR* ¶ 28; *Russell PSR* ¶ 28; *Chase PSR* ¶ 28. The 1,086.3 kilograms translates into 2,394.87 pounds of marijuana (2.20462 x 1,086.3 KGs = 2,394.87 lbs.). The 930.3 kilograms translates into 2,050.95 pounds (2.20462 x 930.3 = 2,050.95 lbs.). In addition, the PO also noted that law enforcement estimated that the resale value of the marijuana at Township 37 in September 2009 was between $3,000,000 and $4,000,000. *French PSR* ¶ 8; *Russell PSR* ¶ 8; *Chase PSR* ¶ 8. In *Bianco*, the First Circuit upheld the weapons enhancement where the defendant was involved in negotiating the purchase of one hundred pounds of marijuana for $80,000 and in discussions about even larger purchases. 922 F.2d at 913.

The Court accepts the First Circuit's guidance and treats the drug quantity on these facts, which under any calculation is enormous, as a factor that supports the weapons enhancement. The Court acknowledges the Defendants' argument that the

location of the marijuana grow, deep in the heart of Haynes Timberland's vast gated parcel of land among thousands of privately-held acreage, would have made it more difficult for an interloper to find the grow and steal the marijuana. However, the Defendants themselves presented evidence through the testimony of Francis Janusz that the land in Township 37 was more porous and accessible than their current argument allows. *See Partial Tr. of Proceedings*, *Test. of: Francis Janusz* (ECF No. 480) (discussing his activities as a bear hunting guide in Township 37). In addition, the Government presented the testimony of Jared Flewelling that there were rumors about the presence of marijuana in Mr. French's LaGrange parcel and that Mr. Flewelling—acting on those rumors—traversed numerous lots, went past gates, and located marijuana in a trash can in an attic in Mr. French's barn. *See Partial Tr. of Proceedings*, *Test. of: Jared Flewelling* (ECF No. 416). Finally, Winston McTague testified that he was able to locate the Township 37 marijuana grow by following a ProMix trailer from Newport, Maine, walking past the south gate, and coming upon the grow. *See Partial Tr. of Proceedings*, *Test. of: Winston F. McTague, Jr.* 27:4-29:1 (ECF No. 414).

The first point is that the presence of a large marijuana grow is never a secret for long. The second, as the First Circuit implied, is that a large marijuana grow consisting of millions of dollars of value is vulnerable to theft, and because the crop is illegal, if armed robbers come intent upon taking it, the growers cannot call the police. Conspirators often make a show of weapons to telegraph the risk to would-be thieves and, once armed, the risk of violence is exponential. The Court weighs the

21

value of the marijuana crop at Township 37 and the presence of a marijuana processing facility in Township 31 as factors in favor of the imposition of the weapons enhancement.

### 3.    Statistical Argument

The Court is nonplussed about Mr. French's statistical sentencing argument. *French Suppl. Mem.* at 5.  The argument appears to be based on the faulty premise that because the weapons enhancement is applied less frequently nationally in marijuana cases, as opposed to cases involving other drugs, it should not be applied by this Court in Mr. French's case.  The Court remains unclear why Mr. French believes that national statistics say something about whether the Government has met its burden of proof in his case.  Mr. French cites no authority for his contention that in place of evidence in this sentencing about whether the weapons enhancement applies to him, the Court should take into account national statistics about how often other courts in other cases on other facts apply the weapons enhancement to other defendants.

The First Circuit has made it clear that the sentencing court's judgment on the applicability of the weapons enhancement must be based on the evidence, direct or circumstantial, that is before the Court. *Burgos-Figueroa*, 778 F.3d at 320.  It is true that "[e]videntiary requirements at the sentencing stage are significantly less rigorous than they are at trial." *United States v. Hinckley*, 803 F.3d 85, 92 (1st Cir. 2015).   Under the Guidelines, the sentencing court "may consider relevant information without regard to its admissibility under the rules of evidence applicable

22

at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."   U.S. SENTENCING GUIDELINES MANUAL § 6A1.3(a) (U.S. SENTENCING COMM'N 2015); *see also United States v. Luciano*, 414 F.3d 174, 180 (1st Cir. 2005) (quoting USSG § 6A1.3(a)).   The Court readily concludes that statistics from the Sentencing Commission have sufficient indicia of reliability under this rubric, but the Court is unable to conclude that they are relevant to the application of the weapons enhancement in this case.

### C.    Scott MacPherson and the Firearms

The Court's approach to the enhancement begins with Mr. MacPherson and whether, if he were still alive and if he had been convicted of participating in this conspiracy, the weapons enhancement would apply to him based on the evidence before the Court.   The Court concludes that it would have applied the enhancement to Mr. MacPherson.

First, the Court had an opportunity to hear Mr. Roblero's testimony and found him to be an extremely credible witness.

Second, Mr. Roblero's testimony about Mr. MacPherson and a firearm is consistent with his prior statements.   In his supplemental memorandum, Mr. French claims: "Nowhere in any of the discovery was there even a mention that Scott MacPherson ever carried or displayed a weapon.   The existence of a weapon was asserted for the first time during cross-examination of Miguel Roblero by a defense

counsel." *French Suppl. Mem.* at 6.  This assertion is wrong.[4]  It is true that Mr.

Roblero did not mention that Mr. MacPherson possessed a gun during his September

6, 2012 interview with Special Agent Castellanos and Investigator Jonathan

Richards.   *French Mem.* Attach 1 *Continuation Report 2012-09-19 (9/6/2012*

*Interview*).   But two days later on September 8, 2012, Agents Castellanos and

Richards traveled with Mr. Roblero to Washington County, where Mr. Roblero

identified the buildings where he and other migrant laborers worked.  *Id.* Attach. 2

*Report of Investigation 09-19-12 (9/8/2012 Interview).*  The Report states:

> ROBLERO explained that Scott (identified as Scott MACPHERSON)
> lived in the house next to the garage while they were kept locked inside
> the garage.  ROBLERO stated he and PEREZ were not allowed to leave
> the garage and MACPHERSON also covered the windows so that
> ROBLERO and PEREZ would not peek outside.   Additionally,
> ROBLERO pointed out that about a month after trimming marijuana
> inside the garage, MACPHERSON was observed by ROBLERO wearing
> a handgun on his waist.  SOTO had previously mentioned to ROBLERO
> and PER[E]Z that MACPHERSON possessed a high powered rifle and
> that they should not worry as MACPHERSON only had it for protection.

*Id.* at 3.  Also, when Miguel Roblero was called to testify before the grand jury on

September 12, 2012, Mr. Roblero testified:

> Q.   What would Scott do to you?
> A.   The first month, the second month -- the first month he treated
>      us well.  The second month he showed up one day with a pistol on
>      his hip.  So he told us we were undocumented and began to say --
>      insult us.
> Q.   Did he ever do that in front of any of the other Americans?
> A.   No.

*Id.* 45:2-9 *Test. of Miguel A. Roblero Velasquez (Roblero Grand Jury Test.).*

---

[4]    Mr. French's inaccurate assertion is surprising because he submitted the prior witness
statements as attachments to his July 30, 2015 memorandum.  *See French Mem.* Attach. 2 *Report of
Investigation 09-19-12* at 3 (referencing Mr. MacPherson keeping a weapon).

Mr. Roblero's testimony about Mr. MacPherson's gun possession is tragically consistent with the way Mr. MacPherson died and the loaded Taurus pistol found between his legs by deputy sheriff. It is also consistent with the discovery of two pistols located in his safe at his residence at the compound.

The Court views Mr. MacPherson's possession of a pistol as having two likely purposes. The first is the obvious need to protect an extremely valuable illegal crop from robbers. The second is a show of force against the migrant laborers. Mr. MacPherson kept the migrant laborers virtually captive in the warehouse. At the grand jury, Mr. Roblero testified that he had been told he was going to Maine to plant pine trees and work with blueberries. *Roblero Grand Jury Test.* 40:10-14. In his original interview of September 6, 2012, Mr. Roblero told law enforcement about the conditions under which the migrant laborers were held. *9/6/2012 Interview* at 2-3. He described living with Mr. Perez in the top floor of the warehouse, working twelve hour days, seven days per week, trimming marijuana, being restricted as to the length of his telephone calls to his mother in Mexico, and having food brought to them by Mr. Soto. *Id.* He told the investigators that the migrant laborers continued to work for Mr. MacPherson and the others because they had no place to go and they felt "kidnapped." *Id.* at 3. On September 8, 2012, Mr. Roblero told law enforcement that he and Mr. Perez were locked inside the warehouse, that they were not allowed to leave the garage, and that Mr. MacPherson had covered the garage windows so that they could not look outside. *9/8/2012 Interview* at 3. Mr. MacPherson "was always there watching us, supervising." *Roblero Grand Jury Test.* 24:25. Mr. Perez

said that Mr. Soto explained that the migrant workers were not allowed to leave the warehouse because Mr. French did not want law enforcement to encounter them since the police would find it suspicious that migrant workers would be in an area without work at that time of year. *French Mem.* Attach. 9 *Report of Investigation 10/10/2012* at 3.

Based on all the evidence, the Court concludes that it is more likely than not that Mr. MacPherson possessed a firearm at the marijuana grow and manufacture sites in connection with the French marijuana conspiracy and that, if Mr. McPherson were alive today and had he been charged and convicted of participating in the French marijuana conspiracy, the weapons enhancement would apply to him pursuant to USSG § 2D1.1(b)(1). *See United States v. Cruz-Rodriguez*, 541 F.3d 19, 33 (1st Cir. 2008) (affirming the application of § 2D1.1(b)(1) where "[a]t trial, a cooperating witness testified that while Cruz was a drug point owner he possessed an automatic firearm and carried it with him while at the housing project").

### D.   Actual Possession by Defendants

There is limited evidence that any of the Defendants in this case actually possessed a firearm.[5]  The Government produced a photograph of guns when they executed the search warrant at the French residence. *Sentencing* Ex. 2.  At trial, Agent Richards testified that on September 24, 2009, he executed a search warrant

---

[5]      The French PSR mentions an incident involving a man named Derek King and Malcolm French on Mothers' Day weekend in 2007, where Mr. King alleged that he wandered onto Mr. French's land and encountered Mr. French, who became visibly upset and angry. *French PSR* ¶ 16. Mr. King claimed he saw a pistol on Mr. French's lap. *Id.* The Government has represented that it does not intend to press Mr. King's encounter in support of the weapons enhancement.

at Mr. French's residence in Enfield, Maine. *Partial Tr. of Proceedings, Test. of: Jonathan Richards* 30:20-25; 49:25-50:5 (ECF No. 428). He testified that he found a "fairly old" marijuana plant drying on a blanket in a small cubbyhole in an attic area off the master bedroom and some "marijuana residue" in two vacuum heat sealers. *Id.* 50:16-23. He also found a "gallon-size Ziploc bag" in a chest freezer in the basement of the French residence that contained marijuana buds. *Id.* 55:10-15.

Based on this evidence, the Court does not find that Mr. French possessed the firearms located in his Enfield residence in connection with the marijuana conspiracy. Government's Sentencing Exhibit Two depicts what appears to be a walk-in gun closet with over twenty-five hunting rifles leaning against the wall and one, perhaps two, pistols on a counter. *Sentencing* Ex. 2. The Court could find no evidence as to whether these rifles and pistols were loaded. The French residence was in Enfield, Maine; as the crow flies, approximately seventy miles west of the Township 37 marijuana grow. *Partial Tr. of Proceedings, Test. of: Rodney Russell* 25:5-11 (ECF No. 364); *Order Denying Def. French's Third Mot. for New Trial; Def. Chase's Am. Mot. for New Trial; and Def. Russell's Mot. for New Trial* at 3 n.3 (ECF No. 598). There was evidence of an old marijuana grow at Mr. French's hunting camp in LaGrange, Maine. *See Partial Tr. of Proceedings, Test. of: Steve Benson* 7:24-8:6; 9:14-10:2 (ECF No. 419). But there was no evidence of a marijuana grow at Mr. French's Enfield residence.

The Sentencing Guidelines provide the following commentary concerning the weapons enhancement:

> The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet.

U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(b)(1) cmt. n.11(A) (U.S. SENTENCING COMM'N 2015). Applying this guidance, the Court finds that the firearms located in the gun closet at Mr. French's Enfield residence were not possessed in connection with the marijuana conspiracy. In arriving at this conclusion, the Court relied on the following factors: (1) with the exception of one or two pistols, the firearms at the Enfield residence were hunting rifles; (2) the pistol or pistols do not appear to be the type of small, inexpensive, readily concealable pistols favored in the drug trafficking world; (3) the LaGrange marijuana grow was located a significant distance from the Enfield residence; (4) the Township 37 marijuana grow was located about seventy miles by straight line from the Enfield residence; and (5) the single drying marijuana plant, marijuana residue, and Ziploc bag of marijuana buds in the freezer that law enforcement found in the Enfield residence are generally consistent with personal use and do not pose the issues that the weapons enhancement is intended to punish. The Court views the evidence of the firearms at the Enfield residence as generally consistent with the exception discussed in Commentary 11(A) and declines to apply the two-level enhancement on the basis of the firearms discovered during the search of Mr. French's Enfield residence.

### E.    Scott MacPherson's Weapons Possession and the Other Defendants

The Court turns to the last question: whether the enhancement should be applied where although the defendant did not actually possess a firearm in connection with the drug offense, "it was reasonably foreseeable to the defendant that firearms would be possessed by others during the conspiracy." *Burgos-Figueroa*, 778 F.3d at 321 (citations omitted).  Here, there is substantial evidence that Mr. French, Mr. Russell, and Mr. Chase were present both at the Township 31 warehouse and at the Township 37 marijuana grow.   The question narrows to how often Mr. MacPherson toted a gun.  If Mr. MacPherson usually carried a visible gun, it is logical to conclude that frequent visitors to the warehouse and the grow site, such as the Defendants, would have been actually aware of Mr. MacPherson's gun possession and should be held responsible for the weapons enhancement.   By contrast, if Mr. MacPherson was rarely armed, it is difficult to infer that Defendants would have knowledge of his firearms possession.

Here, evidence of the frequency of Mr. MacPherson's gun possession comes solely from Mr. Roblero.  As noted earlier, Mr. Roblero made three statements concerning Mr. MacPherson's possession of a firearm.  At trial, he testified:

> Q.    And did Scott ever wear a gun or a firearm when you were with him?
> A.    He always had a pistol sometimes on his - - at his waist.
> Q.    Did he ever threaten you in any way?
> A.    No, it was just - - he would get angry, and we'd get scared because we didn't know what he was saying.  He would get angry.  He would scare us because he'd get angry, and we didn't know what was going on.

*Roblero 1/16/14* 42:12-19.  From this snippet of testimony, the Court could infer that because Mr. MacPherson "always" had a pistol and "sometimes" wore the pistol in his waistband, the Defendants would have had to know that he possessed a firearm.

Mr. Roblero made two prior statements to law enforcement referencing the firearm.  During his September 8, 2009 interview, Mr. Roblero said that he observed "MACPHERSON . . . wearing a handgun on his waist." *9/8/2012 Interview* at 3.  The statement does not mention frequency.  However, during that same interview, Mr. Roblero said that Mr. Soto told him and Mr. Perez that "MACPHERSON possessed a high powered rifle and that they should not worry as MACPHERSON only had it for protection." *Id.*  The Court is unclear about these references.  The fact that Mr. Soto mentioned Mr. MacPherson's gun possession to the migrant workers suggests that Mr. MacPherson's possession was not a singular event.  But Mr. Soto referred to a high-powered rifle, and there is no evidence that Mr. MacPherson possessed such a firearm.

Finally, when Mr. Roblero testified before the grand jury on September 12, 2012, he stated:

> Q.   What would Scott do to you?
> A.   The first month, the second month -- the first month he treated us well.  The second month he showed up one day with a pistol on his hip.  So he told us we were undocumented and began to say -- insult us.
> Q.   Did he ever do that in front of any of the other Americans?
> A.   No.

*Roblero Grand Jury Test.* 45:2-9.  This testimony indicates that Mr. MacPherson actually possessed a pistol on only one day.  It could be that Mr. Roblero was saying

that Mr. MacPherson had been unarmed until "one day" when he arrived with a pistol and that he wore the pistol thereafter. But the statement is at the very least equivocal, and it could mean exactly what it says—namely, that Mr. MacPherson wore a pistol only "one day." Further, although his reference to Mr. MacPherson not doing "that" in front of the other Americans may mean his wearing the pistol, it also may mean insulting the migrant laborers.

Given the equivocal nature of the evidence about the frequency with which Mr. MacPherson possessed a firearm, the Court concludes the evidence is insufficient to find that the Defendants had actual knowledge of Mr. MacPherson's firearms possession. The Court suspects that the Defendants did actually know, given their intimate involvement with the marijuana conspiracy and their regular visits to the warehouse and the grow, but suspicions do not meet the legal requirements of proof by a preponderance.

The last question is whether even if the Defendants did not actually know that Mr. MacPherson possessed a firearm in connection with the marijuana conspiracy, the Court should impose the weapons enhancement based on a finding that it was nevertheless "reasonably foreseeable to the defendant that firearms would be possessed by others during the conspiracy." *Burgos-Figueroa*, 778 F.3d at 321 (citations omitted). In *Burgos-Figueroa*, for example, the First Circuit upheld a weapons enhancement where firefights had erupted when the defendant's organization waged war with rival gangs. *Id.* Similarly, in *United States v. Vazquez-Rivera*, 470 F.3d 443 (1st Cir. 2006), the First Circuit affirmed the weapons

31

enhancement where there was evidence that the defendant was a manager of a drug point and that he was likely aware or could have foreseen that his subordinates were carrying guns.  *Id.* at 447.  Here, even though the Defendants in this case might well have known or surmised that Mr. MacPherson possessed a firearm in connection with the conspiracy, the evidence is insufficient to carry the Government's burden of proving that the enhancement should apply by a preponderance of the evidence standard.

## IV.   CONCLUSION

The Court declines to apply the two-level dangerous weapons enhancement to the Defendants under United States Sentencing Guideline § 2D1.1(b)(1).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 13th day of April, 2016