UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:12-cr-00160-JAW |
| | ) | |
| MALCOLM A. FRENCH, et al. | ) | |

**SENTENCING ORDER IMPOSING OBSTRUCTION OF JUSTICE
ENHANCEMENTS**

Opposing the recommended obstruction of justice enhancement, Malcolm

French seeks to admit the results of a polygraph examination that concluded he told

the truth when he testified at his trial.  The Court rejects his request because the

polygraph test would be more trouble than it is worth and because, having presided

over the trial in this case, the Court has a firm conviction that both he and his co-

defendant, Rodney Russell, willfully lied when they denied committing the crimes of

which they were found guilty and willfully lied when they testified in contradiction

of material testimony from other witnesses that the Court has concluded was true.

At sentencing, the Court will apply the two-level obstruction of justice enhancement

under United States Sentencing Guideline § 3C1.1 for Mr. French and Mr. Russell.

I.      **BACKGROUND**

A.      **Procedural History**

On January 24, 2014, a federal jury found Malcolm French, Rodney Russell,

and Kendall Chase guilty of several federal crimes involving a conspiracy to

manufacture and a conspiracy to distribute marijuana.  *Jury Verdict Form* (ECF No.

311) (*Jury Verdict*); *Superseding Indictment* (ECF No. 187).  The Probation Office (PO) prepared and revised a Presentence Investigation Report (PSR) on each Defendant.  *French PSR*; *Russell PSR*; *Chase PSR*.  In making its sentencing guideline calculations, the PO recommended an obstruction of justice enhancement for Mr. French and Mr. Russell, *French PSR* ¶¶ 31, 32, 41, *Russell PSR* ¶¶ 31, 32, 41, but not for Mr. Chase.  Mr. French and Mr. Russell objected to imposition of the enhancement.  *French PSR*, Obj. 3; *Russell PSR*, Obj. 17.

On June 2, 2015, the Government filed a sentencing memorandum addressing the obstruction of justice enhancement.  *Gov't's Consolidated Mem. in Aid of Sentencing* at 7-12 (ECF No. 519) (*Gov't's Mem.*).  On July 30, 2015 and August 6, 2015, Mr. French and Mr. Russell filed responsive memoranda.  *Def. Malcolm French's Mem. in Aid of Sentencing* at 7-9 (ECF No. 551) (*French Mem.*); *Def. Rodney Russell's Sentencing Mem.* at 1-3 (ECF No. 562) (*Russell Mem.*).  On August 12, 2015, the Government filed a reply memorandum but did not address the obstruction of justice argument.  *Gov't's Consolidated Reply Mem. in Aid of Sentencing* (ECF No. 571).

On February 3, 2016, Malcolm French filed another sentencing memorandum that challenged the obstruction of justice enhancement in part on the basis of the results of a polygraph examination.  *Def. Malcolm French's Suppl. Sentencing Mem.* at 7-12 (ECF No. 608) (*French Suppl. Mem.*).  On February 5, 2016, the Government filed another sentencing memorandum addressing the obstruction of justice

enhancement. *Gov't Mem. in Aid of Sentencing* at 2-3 (ECF No. 612) (*Gov't Suppl. Mem.*).

On February 8, 2016, Mr. French filed another sentencing memorandum, urging the Court to admit for sentencing purposes the results of his polygraph examination conducted by Mark Teceno on January 14, 2016, *Def. Malcolm French's Mem. of Support Admission of Polygraph Test Results for Sentencing Purposes* (ECF No. 614) (*French Polygraph Mem.*), and on February 9, 2016, he filed a series of attachments. *Order* (ECF No. 615) (*Order*); *id.* Attach. 1 *Decl. of Polygraph Expert Dr. David C. Raskin* (*Raskin Decl.*); *id.* Attach. 2 *Decl. of Mark Teceno* (*Teceno Decl.*). On March 9, 2016, the Government filed another sentencing memorandum that addressed the issue of the polygraph examination. *Gov't Mem. in Aid of Sentencing* (ECF No. 631) (*Gov't's Second Suppl. Mem.*). Finally, on March 18, 2016, Mr. French filed a second supplementary memorandum addressing drug quantity. *Def. Malcolm French's Second Suppl. Sentencing Mem.* at 7-11 (ECF No. 635) (*French's Second Suppl. Mem.*).[1]

## B. Brief Background

In 2009, a number of law enforcement agencies investigated allegations that there were marijuana grow operations located in Township 37, Washington County, Maine on land owned by Haynes Timberland, Inc. (Haynes Timberland) and in the town of LaGrange, Maine on land owned by Malcolm French. Malcolm French, a Co-Defendant, was a co-owner of Haynes Timberland. *Partial Tr. of Proceedings*, *Test.*

---

[1]   The parties filed other sentencing memoranda that did not address the obstruction of justice enhancement.

of: *Malcolm French* 106:12-22 (ECF No. 362) (*French Test. 1/21/14*); Haynes Timberland owned approximately 22,000 acres in Township 37. *French PSR* ¶ 6.[2] Mr. French and his wife, Barbara, jointly owned another parcel of land in Township 31, also in Washington County, Maine, where a warehouse was located. *Id.* ¶ 9; *see Final Order of Forfeiture* (ECF No. 621) (*Final Forfeiture*). Finally, Mr. French owned a hunting camp in LaGrange, Maine where a marijuana grow site had been located. *French PSR* ¶ 2; *Final Forfeiture* at 2.

### C.    The Jury Verdicts

On January 24, 2014, the jury found Mr. French and Mr. Russell guilty of count one: engaging in a conspiracy to manufacture 1,000 or more marijuana plants. *Jury Verdict* at 1-2. It found that the conduct of Mr. French and Mr. Russell in count one involved 1,000 or more marijuana plants. *Id.* at 2. The jury found Mr. French and Mr. Russell guilty of count two: manufacturing 1,000 or more marijuana plants and for each of them, his conduct involved 1,000 or more marijuana plants. *Id.* at 3. It found that Mr. French and his corporation, Haynes Timberland, were guilty of count three: managing or controlling a drug involved premises. *Id.* at 4. It found Mr. French guilty of count four: managing or controlling a drug involved premises. *Id.* at 4-5. It found Mr. Russell guilty of counts five and six: using or controlling a drug involved premises. *Id.* at 5. The jury found Mr. French and Mr. Russell guilty of counts seven, eight, and nine: harboring illegal aliens Martin Roblero, Miguel Angel

---

[2]       In reciting this factual background, the Court relied on the Malcolm French and Rodney Russell PSRs. For purposes of this overview, the Court cites only the French PSR because the Russell PSR substantially echoes the contents of the French PSR.

Roblero Velasquez, and Abner Perez Morales, respectively. *Id.* at 5-6. It found Mr. French and Mr. Russell guilty of count eleven: engaging in a conspiracy to distribute and possess with the intent to distribute marijuana. *Id.* at 6. After the verdicts on the criminal counts, the jury returned a forfeiture verdict against Mr. French's ownership interest in Haynes Timberland and his interests in the lots in Township 31, LaGrange, and Township 37. *Jury Forfeiture Verdict Form* at 1-5 (ECF No. 312).

### D.   The Probation Office Recommendation

#### 1.   Malcolm French

The Probation Office (PO) noted that Mr. French testified at trial and denied that he was guilty of the crimes with which he had been charged and later convicted. *French PSR* ¶ 31. The PO concluded that some of his testimony was false: (1) the Red Patch motorcycle gang explanation for the 2005 marijuana grow in LaGrange, including the visit by Mike Smith and Mr. French's reparations to the Red Patch in the form of Pro-Mix; (2) his hiring of migrant laborers for legitimate forestry work; (3) his denial of any knowledge that marijuana was being processed at the warehouse in Township 31; (4) his denial of sales to Fai Littman; (5) his denial of participating in the unloading of Pro-Mix; and (6) his denial of knowledge that Mr. Russell was ordering growing supplies through Griffin Greenhouse. *Id.*

#### 2.   Rodney Russell

The PO noted that Mr. Russell testified at trial and denied that he was guilty of the crimes with which he had been charged and later convicted. *Russell PSR* ¶ 31. The PO concluded that some of his testimony was false: (1) that he thought the Pro-

Mix ordered in 2007 was going to be resold; (2) that he did not know Miguel Roblero; (3) that he knew nothing about migrant workers living in the Township 31 warehouse; (4) that Mr. French had hired migrant workers in 2008 to help with firewood; (5) that he had not been physically present at the Township 37 marijuana grow in 2008 and only went there after the police raid in 2009; (6) that he did not sell marijuana to Mr. Littman; and (7) that he did not know about where the cash came from to purchase supplies from Griffin Greenhouse.  *Id.*

## II.   THE PARTIES' POSITIONS

### A.   The Government's Memorandum

In the its June 2, 2015 memorandum, the Government set forth seventeen specific instances in the trial testimony of Malcolm French where it contends Mr. French attempted to obstruct justice and twelve instances in the trial testimony of Rodney Russell where it contends Mr. Russell attempted to obstruct justice.  *Gov't's Mem.* at 8-10.  After setting forth the applicable law, the Government argues that because Mr. French and Mr. Russell "flatly denied having any involvement in or knowledge of the Township 37 marijuana grow," their testimony is not only "contradicted by the verdict" but is also "demonstrably false."  *Id.* at 12 (citation omitted).

### B.   Malcolm French's Response

In his response, Mr. French concedes that his testimony was clear: "he had no involvement whatsoever in any of the cultivation of marijuana and the only role he had with the cultivation was his purchase of Pro-Mix and other items to pay off a debt

to the true marijuana cultivators here—a gang with which Winston McTague was affiliated—and nothing more." *French Mem.* at 7. Mr. French disagrees that the jury verdicts compel the conclusion that he was lying because in his view the jury did not have to choose "one version of what happened as opposed to another." *Id.* at 7-8. He suggests that the jury could have found him guilty as an accomplice because he purchased items that were used in the cultivation of marijuana. *Id.* at 8. He argues that none of his statements was "untruthful on their face." *Id.* Simply because Mr. French contradicted some of the Government's witnesses does not mean, in his view, that he obstructed justice, particularly since the Government has a high burden to prove obstruction. *Id.* at 8-9 (citations omitted).

### C.    Rodney Russell's Response

Rodney Russell echoes Mr. French's arguments. *Russell Mem.* at 1-3. In particular, Mr. Russell disagrees with the Government's assertion that he contradicted his own testimony by stating both that he did not recall saying anything about following Scott MacPherson's orders and that if Mr. MacPherson asked him to write a check, he wrote a check. *Id.* Mr. Russell contends that these two statements are not necessarily contradictory, and in any event, they do not concern, in his view, a material fact. *Id.* at 2-3.

### D.    Malcolm French's Supplemental Memorandum

In his February 3, 2016 supplementary memorandum, Mr. French introduced a new subject: he says he took and passed a polygraph examination by Mark Teceno, a polygraph examiner, which confirmed that it is "very highly likely" that he was

telling the truth both during that test and at trial. *French Suppl. Mem.* at 1. Mr. French offers the results of the polygraph to "corroborate defendant's trial testimony for sentencing purposes." *Id.* (footnote omitted). Mr. French says that Mr. Teceno "asked three versions of the same fundamental question which is essence was: 'did Mr. French perjure himself, or intentionally lie, at his trial?' The answer was no, he did not." *Id.* at 7.

Contrary to the Government's contentions, Mr. French insists that his testimony about the Red Patch gang was "demonstrably true." *Id.* He maintains that his testimony was corroborated by the grand jury testimony of Warden Bruce Loring. *Id.* According to Mr. French, Warden Loring testified that in January 2007, Mr. French told him that he had incurred debts to a group including Mike Smith when one of Mr. French's workers destroyed marijuana valued at $35,000 belonging to the gang. *Id.* Mr. French says that Warden Loring told the grand jury that Mr. French was afraid of Mr. Smith and his group and at one point appeared "on the verge of tears." *Id.* Mr. French points out that his conversation with Warden Loring took place thirty months before the raid and seven years before the trial. *Id.* at 7-8. Mr. French then attacks the testimony of Moises Soto, Mr. Littman, Miguel Roblero, and Mr. McTague as incredible. *Id.* at 8-12. He argues that the Court should not accept the testimony of these "unreliable government witnesses" to sustain its burden of proof for the obstruction of justice enhancement. *Id.* at 8.

### E.   The Government's Supplemental Response

In its supplemental response, the Government says that "[p]olygraph test[s] are generally viewed as unreliable for Court purposes." *Gov't's Suppl. Mem.* at 2. The Government argues that "[f]our Government polygraphers have conducted quality control reviews of Mr. Teceno's work and found flaws in how it was conducted." *Id.* at 3. Moreover, the Government maintains that Mr. French "already underwent a lie detector test—his jury trial—and the results of that test prove beyond all reasonable doubt that he failed the test." *Id.* It says that the "jury could not have conceivably accepted his testimony and returned verdicts of guilty on every count." *Id.*

**F.    The Government's Second Supplemental Sentencing Memorandum**

In its second supplemental memorandum, the Government notes that it submitted two reports concerning quality control reviews of Mr. Teceno's work conducted by four Government polygraphers and that these Government witnesses "identified several problems with the work of Mr. Teceno and expressed the unanimous view that in light of those problems they would not support a 'no deception indicated' decision." *Gov't's Second Suppl. Mem.* at 9. The Government also reviewed caselaw concerning the admissibility of the results of polygraph testing at sentencing hearings. *Id.* at 10-14 (collecting cases). Even if the Court could accept the results of a polygraph examination for sentencing purposes, the Government urges the Court not to do so in this case because the testing of Mr. French was unreliable and the results would contradict the jury's verdict. *Id.* at 14-18.

**G.    Malcolm French's Second Supplemental Sentencing Memorandum**

Responding to the Court's inquiry, Mr. French provided caselaw in which courts have admitted polygraph evidence at sentencing proceedings. *French Second Suppl. Mem.* at 7-8 (collecting cases). Mr. French also defends Mr. Teceno's test results by including the opinion of Dr. Charles Honts, a polygraph expert, that "none of the statements made by Mr. Teceno or Mr. French impact the validity or reliability of the test in any fashion." *Id.* at 9. He also says that the issue of the "'friendly polygraph examiner' has been scientifically studied and the literature does not support such a theory and generally contradicts it." *Id.* (citing *Raskin Decl.* at 25). Again contrary to the Government's position, Mr. French argues that his trial testimony is not inconsistent with the verdict and his denial of involvement was consistent with his subjective belief. *Id.* at 9-11.

## III.   DISCUSSION: THE POLYGRAPH ISSUE

### A.   The Law

The most recent First Circuit discussion of the admissibility of polygraph evidence is found in *United States v. Castro-Caicedo*, 775 F.3d 93 (1st Cir. 2014). In *Castro-Caicedo*, the First Circuit reiterated its longstanding skepticism about polygraph test results. *Id.* at 102. It quoted from an earlier First Circuit case relied upon by the Defendant in the case before it:

> This is the latest in a growing line of cases that ought to suggest, if not a per se rule, then at least a code of best practice for the virtuous prosecutor: polygraph evidence, even that dealing with matters other than the actual results of an examination, is usually more trouble than it is worth.

*Castro-Caicedo*, 775 F.3d at 102 (quoting *United States v. Mare*, 668 F.3d 35, 42 (1st Cir. 2012)).  The *Castro-Caicedo* Court's distrust of polygraph results is consistent with earlier First Circuit caselaw.  In 2009, the First Circuit wrote that "[p]olygraph results are rarely admissible at trial."  *United States v. Rodriguez-Berríos*, 573 F.3d 55, 73 (1st Cir. 2009).  Indeed, in *Rodriguez-Berríos*, the First Circuit found it "troubling that a polygraph test was mentioned in the presence of the jury."  *Id.*  The *Rodriquez-Berríos* Court quoted a 1983 First Circuit opinion, *deVries v. St. Paul Fire and Marine Insurance Co.*, 716 F.2d 939 (1st Cir. 1983), which reserved the question of "whether a *per se* prohibition against the use of lie detector tests is appropriate" but noted that "polygraph evidence has long been considered of dubious scientific value and hence has been deemed irrelevant by the federal courts."  *Rodriguez-Berríos*, 716 F.2d at 73 (quoting *deVries*, 716 F.2d at 944-45).  Consistent with the First Circuit's view, in *United States v. Godin*, 563 F. Supp. 2d 299 (D. Me. 2008), the district court in Maine rejected a request for funds to hire a polygraph examiner for sentencing purposes, expressing concerns about "the reliability of polygraph examinations."  *Godin* 563 F. Supp. 2d at 299-300 (citing *United States v. Scheffer*, 523 U.S. 303, 309 (1998); *United States v. York*, 357 F.3d 14, 23 (1st Cir. 2004)).

The First Circuit's wariness contrasts with some circuits that have been friendlier toward admissibility.  In the Eleventh Circuit, for example, polygraph evidence may be admitted in two contexts: (1) when the parties stipulate in advance to the test's circumstances and scope of its admissibility, and (2) to impeach or corroborate the testimony of a witness at trial.  *United States v. Henderson*, 409 F.3d

1293, 1301-02 (11th Cir. 2005) (citing *United States v. Piccinonna*, 885 F.2d 1529, 1535 (11th Cir. 1989) (en banc); *United States v. Gilliard*, 133 F.3d 809, 811-12 (11th Cir. 1998)); *see also* MARK S. BRODIN, JOSEPH M. MCLAUGHLIN, JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FED. EVIDENCE, § 702.06[1][b] (2d ed. 2015) (discussing circuit positions).  Even so, the Eleventh Circuit has affirmed a refusal to admit polygraph test results at trial.  *Henderson*, 409 F.3d at 1301-02 (affirming trial court decision not to admit polygraph evidence under Rule of Evidence 702).

On February 9, 2016, Mr. French filed with  the Court an opinion from the Middle District of Florida in *United States v. Angulo-Mosquera*, No. 8:14-cr-379-T-36TGW, (M.D. Fla. Apr. 9, 2015), in which the trial judge permitted polygraph evidence to be admitted at trial.  *Order*.  The case is noteworthy in part because the district judge was presented with the testimony of Dr. David C. Raskin, one of Mr. French's experts, and she granted the Defendant's motion to determine the admissibility of polygraph evidence through expert testimony under Federal Rule of Evidence 702.  *Id.* at 9.

Although of interest, there are significant differences between Mr. Angulo-Mosquera's trial and Mr. French's sentencing hearing.  First, the district judge in Florida applied binding precedent from the Eleventh Circuit, not the First Circuit, and she found that the defense had met the preconditions for admissibility in the Eleventh Circuit.  *Id.* at 5.  Second, although Dr. Raskin testified in favor of the scientific reliability of polygraph testing, the Government did not present any

evidence or testimony at the *Daubert*[3] hearing in *Angulo-Mosquera* to contradict his testimony.  *Id.* at 7-8.  Here, the Government presented reports from government polygraph experts, criticizing Mr. Teceno's compliance with accepted testing protocol and disagreeing with his conclusion that Mr. French's test results justified a no deception indicated opinion.  *Gov't's Second Am. Sentencing* Attach. 4 *Jan. 29, 2016 Internal Revenue Service Review of Psychophysiological Detection of Deception (PDD/Polygraph) Examination Administered on Jan. 14, 2016* (ECF No. 632); *Gov't's Second Am. Sentencing* Attach. 5 *Feb. 3, 2016 Dep't of Defense Psychophysiological Detection of Deception (PDD/Polygraph) Exam. Administered on Jan. 14, 2016* (ECF No. 632).  The Court reviewed the other authority presented by the parties and views the authority from other circuits to be informative but not determinative.  *See Gov't's Second Suppl. Mem.* at 10-16; *French's Second Suppl. Mem.* at 7-9.

## B.    Polygraph Results and Sentencing

The Court will not consider Mr. Teceno's polygraph test results at the sentencing hearing for Malcolm French.  It declines to do so because first, as the Court has observed, the First Circuit has expressed its unease with the validity of polygraph test results.

Next, the Court is aware that "[e]videntiary requirements at the sentencing stage are significantly less rigorous than they are at trial."  *United States v. Hinckley*, 803 F.3d 85, 92 (1st Cir. 2015).  The First Circuit has written that the "only evidentiary requirement at sentencing is that the sentence be based on information

---

[3]    *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993).

which has 'sufficient indicia of reliability to support its probable accuracy,'" *United States v. Figaro*, 935 F.2d 4, 8 (1st Cir. 1991) (quoting U.S. SENTENCING GUIDELINES MANUAL, § 6A1.3), and the sentencing court retains discretion to determine "both the relevance and reliability of the sentencing information." *United States v. Luciano*, 414 F.3d 174, 180 (1st Cir. 2005) (quoting *United States v. Iquaran-Palmar*, 926 F.2d 7, 10 (1st Cir. 1991)).

Here, the Court is concerned that arguments about the validity of polygraph examinations in general and Mr. Teceno's polygraph examination of Mr. French in particular will be "more trouble than it is worth." *Castro-Caicedo*, 775 F.3d at 102. The Court will not put polygraph testing on trial. The sentencing hearing to determine appropriate punishment should not devolve into a *Daubert* hearing to determine the scientific validity of a post-verdict polygraph examination.

Even if it has the inherent authority to schedule a *Daubert* hearing to test Mr. French's polygraph experts against the Government's polygraph experts and to rule on the validity of polygraph testing in this context, this is not the right case to do so. The jury verdict in this case was issued on January 24, 2014. *Jury Verdict*. The delay in sentencing has been caused mostly by the numerous post-verdict and sentencing motions filed by the Defendants. For example, on December 1, 2015, the Court set February 10, 2016 as the date for the sentencing hearing. *Notice of Hr'g* (ECF No. 600). Mr. French did not raise the polygraph issue until February 3, 2016, *French Suppl. Mem.*, only a week before the scheduled sentencing hearing, which forced the Court to continue the February 3, 2016 hearing. On February 23, 2016, the Court

14

scheduled the sentencing hearing for April 21, 2016, more than two years after the verdict. *Notice of Hr'g* (ECF No. 626). To hold a *Daubert* hearing—and none has been requested—would only further delay Mr. French's sentencing. Mr. French presented evidence from Mr. Teceno, Dr. Raskins, and Dr. Honts, supporting the polygraph results; the Government presented countervailing evidence from Lisa Holtz and Timothy Shanahan, special agents and polygraph examiners with the Internal Revenue Service, and from Billy Davenport and Darren Mott with the Defense Intelligence Agency. The Court is unable to arrive at reasoned judgment about who among these experts is correct without holding a full-scale *Daubert* hearing and delaying sentencing.

Apart from the question of scientific validity, the Court would be compelled to address the extent to which the results of the polygraph contradict the jury verdict. Mr. French took the stand, testified in his own defense, denied committing the crimes charged, and the jury found him guilty of each indicted offense. Attempting to slice between the preclusive effect of the jury verdicts and the proffered polygraph evidence would be extraordinarily difficult, and the Court suspects that there would be little, if anything, left after considering the impact of the verdicts.

Finally, as the Court will discuss further, the Court is not a stranger to this case. It presided over this complex and hard-fought trial, and it has issued detailed rulings on countless post-verdict motions. The Court maintains a firm conviction, based on all the evidence, that Mr. French and Mr. Russell lied under oath when they testified at trial. No polygraph examiner will convince the Court to the contrary. *See*

15

*United States v. Duverge Perez*, 295 F.3d 249, 254 (2d Cir. 2002) ("Considering the record of the proceeding as a whole, the limited probative value of the polygraph evidence and, as the judge stated, 'the time it will take to put it in,' we hold that the district court did not abuse its discretion in refusing to hear this testimony").

## IV.   DISCUSSION: OBSTRUCTION OF JUSTICE

### A.   The Law

Section 3C1.1 of the guidelines provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction, and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.

U.S. SENTENCING GUIDELINES MANUAL, § 3C1.1 (U.S. SENTENCING COMM'N 2015) [hereinafter U.S.S.G. § 3C1.1].  In Application Note 4, the Guidelines Manual gives examples of covered conduct, including "committing, suborning, or attempting to suborn perjury . . . if such perjury pertains to conduct that forms the basis of the offense of conviction" and "providing materially false information to a judge or magistrate judge."  U.S.S.G. § 3C1.1 cmt. n.4, (B), (F).  At the same time, the Manual cautions:

> In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

*Id.* § 3C1.1, cmt. n.2.

16

"Material and deliberately false testimony at trial is a standard basis for the [obstruction of justice] enhancement, so long as the district court finds the specific elements of perjury." *United States v. Campusano*, 556 F.3d 36, 40-41 (1st Cir. 2009) (citations omitted).  "Perjury consists of false testimony under oath concerning a matter material to the proceeding, as long as the testimony is given 'with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Shinderman*, 515 F.3d 5, 19 (1st Cir. 2008) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

The Court has previously observed that the facts in this case, a case that took thirteen days to try to completion, are extremely dense.  *Order Denying Def. French's Third Mot. for New Trial; Def. Chase's Am. Mot. for New Trial; and Def. Russell's Mot. for New Trial* at 2 (ECF No. 598) ("The facts underlying Mr. French's motion for new trial are dense . . ."); *see also Order Denying Defs.' Suppl. Mots. for New Trial* at 1-69 (ECF No. 500) (delving into facts).  Before undertaking the necessary analysis, the Court observes that in its strong view, Mr. French and Mr. Russell lied under oath on all matters material to the charges for which they were convicted and fully merit the obstruction of justice enhancement under U.S.S.G. § 3C1.1.

### B.    The Crimes: Malcolm French and Rodney Russell

The deep background for this criminal case harkens back to a fifth-grade basketball game when Mr. French, Mr. Russell, and Robert Berg met one another. *See French Suppl. Mem.* Attach. 8 *Tr. of Proceedings, Sentencing of Robert Berg* 37:4-7 (ECF No. 608) (*Berg Sentencing Tr.*).  The three became schoolboy friends, and the

friendship lasted into adulthood.  *Id.* 37:8-9.  In 2007, Mr. Russell began working for Mr. French.  *Partial Tr. of Proceedings*, *Test. of: Rodney Russell* 8:4-7 (ECF No. 364) (*Russell Test.*).

Over the years, Mr. French came to know a man named Scott MacPherson, and by 2007, Mr. MacPherson ended up doing some work for Mr. French in exchange for a place to live—namely, a warehouse Mr. French owned in Township 31.  *French Test. 1/21/14* 41:2-44:3.  Mr. French also came to know Kendall Chase, a co-defendant in this case.  *Id.* 82:18-23.  Mr. Chase owned a sawmill, and he obtained logs from Mr. French in exchange for providing Mr. French with sawing services.  *Id.* 83:3-8.  Mr. French met a man named Moises Soto, also a co-defendant in this case, around 2004. *Id.* 49:18-20.

Starting from comparatively modest beginnings, Malcolm French became an extremely successful businessman through hard work and intellect.  *Id.* 3:19-12:14. By 2000, Mr. French owned about 25,000 acres of land, *id.* 10:4-6, and by 2009 about 80,000 acres.  *Id.* 60:18-22.  Among his properties, Mr. French owned a lot in LaGrange, where he built a camp in 2005.  *Id.* 18:5-18.  In 2004, Haynes Timberland, Inc., Mr. French's corporation, bought approximately 38,000 acres for $4,100,000 in Township 37.[4]  *Id.* 44:9-18; *Partial Tr. of Proceedings*, *Test. of: Malcolm French*, 24:1-4 (ECF No. 363) (*French Test. 1/22/14*).  In 2007, Mr. French purchased property in

---

[4]      The French Presentence Report recites the figure 22,000 acres in Township 37.  *French PSR* ¶ 6.  The Court is not certain about the exact acreage, but it does not matter; the point is that the marijuana grow was found in the middle of thousands of acres owned by Mr. French's company.

Township 31, which included a warehouse and which he referred to as "Colson Field." *French Test. 1/21/14* 38:23-25. This is where Mr. MacPherson lived. *Id.* 43:16-44:3.

In 2005, Mr. French hired Steve Benson to clear some of his land in LaGrange, where Mr. French was building a camp. *Id.* 18:5-24. While dumping some loads of debris, Mr. Benson stumbled upon and substantially destroyed a marijuana patch located on Mr. French's land. *Partial Tr. of Proceedings, Test. of: Steve Benson* 7:8-20, 9:14-24 (ECF No. 419). Mr. Benson informed Mr. French of this incident. *Id.* 9:25-10:2.

In the fall of 2008, a man named Winston McTague emailed tips to law enforcement about the marijuana grows in this case. *Gov't Ex.* 147-49. In the early morning hours of September 22, 2009, the Maine Warden Service and Customs and Border Protection flew an airplane and later a helicopter over Mr. French's land in Township 37. *French PSR* ¶ 6. Law enforcement performed a search of the marijuana grow in Township 37. *Id.* ¶ 8. They also searched Mr. French's home in Enfield, Maine, his camp in LaGrange, and the warehouse at Colson Field. *Id.* ¶ 9. They discovered evidence of a substantial marijuana operation in Township 37, including 2,943 live marijuana plants and six abandoned grow sites. *Id.* ¶¶ 8-9.

The evidence linking Mr. French and Mr. Russell to the marijuana operation was simply overwhelming. For example, the Government introduced evidence that from March 2006 through February 2009, Cold Stream Contracting, one of Mr. French's businesses, purchased 4,590 bags of Pro-Mix, a fertilizer used in the marijuana grow, and in 2007, it purchased 3,000 pounds of rabbit guard fencing, used

to ward off animals from the plants. *Id.* ¶¶ 13, 24-25. Mr. Russell was the person who ordered these large quantities of Pro-Mix from Griffin Greenhouse. *Partial Tr. of Proceedings, Test. of: Gerald Davis* 11:20-24 (ECF No. 426). When Linda Archer, a truck driver, dropped off three large loads of Pro-Mix at the Colson Field warehouse in 2007, she negotiated the price with Mr. Russell, *Partial Tr. of Proceedings, Test. of: Linda Archer* 7:8-18 (ECF No. 417), and described Mr. Russell as "my go-to guy." *Id.* 13:7-9, 16:21-23. Ms. Archer recalled that Mr. French, Mr. Russell, and Mr. Chase unloaded the pallets of Pro-Mix. *Id.* 12:5-9. She also remembered that Mr. French brought her the check for payment. *Id.* 13:10-13.

Mr. French came up with the idea of hiring migrant laborers to work on the marijuana operation. *French PSR* ¶ 10. As opposed to local residents, Mr. French thought illegal workers posed less risk and would be cheaper because: (1) he could pay them less, (2) they would be less likely to steal the marijuana, (3) they would be reluctant to contact local law enforcement, and (4) they would be unable to geographically locate the grow in a large and unfamiliar tract of land. *Id.*

The Government introduced the testimony of Mr. Soto, a dual United States-Mexico citizen, whom Mr. French recruited into the conspiracy in late 2007 and who was fluent in both Spanish and English. *Id.* ¶ 11. At Mr. French's request, Mr. Soto recruited migrant laborers to work in the marijuana business, initially cleaning marijuana. *Partial Tr. of Proceedings, Test. of: Moises Soto* 10:3-12 (ECF No. 369) (*Soto Test.*). Within a couple of weeks, Mr. Soto was able to procure two migrant laborers, Miguel Roblero and Mr. Perez, to work in the marijuana operation. *Id.*

13:13-18. The migrant laborers cleaned marijuana in Mr. French's warehouse at Colson Field under the supervision mostly of Mr. MacPherson, but Mr. French and Mr. Russell would also stop by. *Id.* 16:2-18. In the spring of 2008, the migrant workers began working in the marijuana grow, planting the marijuana crop. *Id.* 20:9-19. After returning to Mexico and coming back to work for the marijuana conspiracy, the migrant laborers continued working there until September 2009, when the police flew over the operation in an airplane and helicopter. *Id.* 27:11-28:5; *Partial Tr. of Proceedings, Test. of: Miguel Roblero* 65:1-66:8 (ECF No. 370) (*Roblero Test.*). When Mr. Soto went to the marijuana grow to check on the workers, he would see Mr. French, Mr. Russell, and Mr. MacPherson there. *Soto Test.* 30:13-17.

The Government was able to track down some of the migrant laborers and call them to testify at trial. Miguel Angel Roblero Velasquez, Mr. Perez, and Martin Roblero—the cousin of both Miguel Roblero and Mr. Perez—identified Mr. French, Mr. Russell, Mr. Chase, Mr. Soto, and Mr. MacPherson as the Americans involved in the marijuana grow conspiracy. *French PSR* ¶¶ 19-21. All three migrant laborers testified that when the airplane flew over the marijuana grow, they were ordered to run into the woods and did so with Mr. MacPherson and Mr. Russell. *Id.* At that point, there were seven or eight migrant laborers, and they were picked up in the woods in a van driven by Mr. Berg and taken to Mr. Berg's barn in Corinna where they spent the night. *Berg Sentencing Tr.* 10:12-21. The next day, Mr. Soto arrived and spirited the workers away from Maine. *Id.* 10:18-21.

21

Mr. Berg explained his involvement by noting that Mr. French was not merely an old friend, but a trusted advisor, who had been instrumental in Mr. Berg's ability to continue his father's business when his father died unexpectedly. *Id.* 37:12-21. Mr. Berg said that Mr. French approached him on numerous occasions beginning in 2007 and urged him to become involved in the marijuana grow operation, but that Mr. Berg had refused. *Id.* 38:1-8. Instead, Mr. Berg told Mr. French that it was too risky and that he should stop. *Id.* 38:8-10. But when law enforcement swooped over the Township 37 grow and the migrant laborers ran through the woods with Mr. Russell and Mr. MacPherson, Mr. French—desperate to find a place to put them for the night—called Mr. Berg repeatedly and asked to use his barn as a hideaway. *Id.* 40:14-25. Mr. Berg made the mistake of consenting. *Id.* 41:1-11.

In addition to this evidence, the Government called Jared Flewelling as a witness. *French PSR* ¶ 17. Mr. Flewelling testified that in 2007, he heard rumors at a party about a large amount of marijuana being stored at one of the camps in LaGrange.[5] *Partial Tr. of Proceedings, Test. of: Jared Flewelling* 4:10-15 (ECF No. 416). After a while, he set about looking for the marijuana. *Id.* 4:13-23. He finally found the marijuana inside a trash can in the attic of the barn in what turned out to be Mr. French's LaGrange camp. *Id.* 6:1-23. The marijuana was in a large trash bag,

---

[5]       The French PSR states that "in the winter of 2007, [Mr. Flewelling] learned there was a large amount of marijuana at **French's** family camp in LaGrange, Maine." *French PSR* ¶ 17. This statement is technically true but may be confusing. Mr. Flewelling testified that he had heard there was marijuana in one of the camps in LaGrange but had "no clue" where the camp was, *Flewelling Test.* 5:2-4, that he "kept going down side roads, kept taking different dirt roads and looking for camps," *id.* 5:5-7, and that he had "heard there was a gate on the road, so [he] went to roads with gates and then walked down multiple roads and finally found a camp." *Id.* 14:2-6. He confirmed that he did not know who owned the camp. *Id.* 14:14-15. Thus, Mr. Flewelling's testimony makes clear that he did not know it was Mr. French's camp until after he had taken the marijuana.

and the trash bag was at least half-full with plastic Ziploc bags of marijuana. *Id.* 7:6-13, 8:10-14. Mr. Flewelling stole the marijuana. *Id.* 8:2-7. He identified a photograph of Mr. French's LaGrange barn as the place where he found and stole the marijuana. *Id.* 9:11-10:13. Mr. Flewelling said that his stepfather, an ex-police officer, discovered the marijuana, that Mr. Flewelling was ultimately questioned by the police, and that he told the police where he had gotten the marijuana. *Id.* 8:18-9:8.

The Government presented the testimony of Mr. Littman, who at one time was Mr. Russell's son's college roommate. *French PSR* ¶ 18. Mr. Littman was a marijuana user and dealer. *Partial Tr. of Proceedings, Test. of: Fai Littman* 8:12-9:2 (ECF No. 411). To start getting marijuana from Mr. Russell, Mr. Littman testified that he contacted him and set up a meeting. *Id.* 13:14-14:8. He bought and paid for a half-pound of marijuana directly from Mr. Russell. *Id.* 15:6-9. The next time, Mr. Russell fronted him a half-pound of marijuana. *Id.* 16:9-25. The agreed-upon prices were $1,250 for a half-pound or $2,500 for a pound. *Id.* 17:1-7. Mr. Littman said that he gradually moved up from one-half pound to five pounds and that he got marijuana from Mr. Russell every seven to ten days from the second half of 2008 through the fall of 2009. *Id.* 17:21-19:1. Mr. Littman testified that on six occasions, two people—other than Mr. Russell—delivered marijuana to him; those two people were Malcolm French and his son, Thomas French. *Id.* 19:18-20:3. Mr. Littman stated that four times, he ordered marijuana from Mr. Russell and Malcolm French delivered it. *Id.* 26:22-24.

The Government called Amanda Gorrell as a witness. *French PSR* ¶ 15. Ms. Gorrell was Thomas French's girlfriend from 2007 to October 2008. *Id.* After testifying that Thomas French bought and delivered to his father's home some unusual purchases, namely between twelve and fifteen plastic trash cans and a large amount of chicken wire, Ms. Gorrell testified that Thomas French told her that he was assisting Malcolm French with the manufacture and sale of marijuana. *Id.*

Having heard this evidence and more, the jury convicted Mr. French and Mr. Russell of conspiracy to manufacture 1,000 or more marijuana plants, manufacturing 1,000 or more marijuana plants, maintaining a drug-involved place or aiding and abetting, harboring illegal aliens or aiding and abetting, and conspiracy to distribute and possess with the intent to distribute marijuana. *Jury Verdict.*

## C.    Perjury: Malcolm French

In sum, the marijuana grow operation was Malcolm French's conspiracy. The marijuana was grown on his land; supplies were purchased through his company; he personally unloaded some of the supplies; he personally sold some of the marijuana; marijuana was cleaned in his warehouse; marijuana was stored in his barn; hiring migrant laborers was his idea; the laborers were hired through his contact; all the important co-conspirators were his long-term friends and associates; and when law enforcement ultimately appeared, the migrant laborers fled and hid overnight in his old friend's barn at his request. Despite the massive amount of evidence of his guilt, Mr. French took the stand and denied that he committed any crime:

> Q.    Lastly, Malcolm, you heard the government's case over the last couple of weeks alleging that you were engaged in a conspiracy to

24

> possess, manufacture marijuana, conceal and harbor illegal
> aliens as part of that.  Would you tell the jury whether you were
> engaged in any conspiracy to possess or manufacture marijuana?
>
> A.   I was not.
>
> Q.   Were you part of some effort to conceal or harbor and shield illegal
> aliens as part of this marijuana conspiracy?
>
> A.   No.

*French Test. 1/21/14* 79:22-80:3.  The Court concludes that whenever his testimony

touched on the marijuana grow operation that is at the heart of this case, Mr. French

lied.

### 1.   Malcolm French's Life Story

Mr. French told the truth about his admirable life story, growing up in

LaGrange, Maine, attending the University of Maine, beginning with a skidder and

creating by dint of drive and intellect a significant timberland business.  *Id.* 3:19-13-

18.

### 2.   An Incident in Otis

Mr. French testified about an incident involving property he owned in Otis,

Maine in 1999.  *Id.* 13:14-17:3.  Mr. French explained that he had received permission

from state authorities to clear-cut a 200-acre parcel, much of which abutted the lots

of 135 camp owners.  *Id.* 14:12-15:2.  During the Fourth of July weekend in 1999,

after he had moved in a feller buncher, a grapple skidder, and delimber to begin the

work, he received a phone call saying that his equipment had been damaged by fire.

*Id.* 15:3-12.  Mr. French ended up owing the bank $77,000 for the equipment and not

having the equipment itself to pay for the loan.  *Id.* 15:23-16:6.  He suspected that the

camp owners, who had opposed the clear-cut, were responsible for burning his

equipment.  *Id.* 16:7-14.  Mr. French thought about offering a $10,000 reward, but the fire marshal told him not to do so because it would just add to his workload and no good would come of it.  *Id.* 16:14-18.

### 3.    Marijuana in LaGrange: 2003

In 2003, Mr. French said he happened upon a marijuana grow on his property in LaGrange, Maine about a half-mile away from where he later built his hunting camp.  *Id.* 17:8-20, 18:5-12.  Mr. French discussed his discovery with Ron Dunham, the local game warden, and Warden Dunham came to LaGrange.  *Id.* 17:11-22. Having heard nothing further, Mr. French called Warden Dunham, who told him that he had contacted the Drug Enforcement Agency, but they had said they were too busy so they were "just going to let it go."  *Id.* 17:23-18:4.

### 4.    Marijuana in LaGrange: 2005

Mr. French said that he was building his hunting camp in LaGrange in 2005, when he hired Mr. Benson to clear some of the land.  *Id.* 18:13-24.  He told Mr. Benson that he could dump the stumps and other debris in a big hole in the LaGrange lot. *Id.* 19:3-18.  Later that afternoon, Mr. Benson came to him and told him about stumbling onto a marijuana grow.  *Id.* 19:19-22.  Mr. French said that he was very surprised and concerned.  *Id.* 19:23-20:1.  But he decided not to contact the authorities because they had not been interested before.  *Id.* 20:8-13.

About four or five days later, Mr. French said he got a visit from a man named Mike Smith.  *Id.* 20:14-22.  According to Mr. French, Mr. Smith told him that he was there as his friend and that the marijuana belonged to a motorcycle group under the

26

name of the Red Patch. *Id.* 28:23-29:3. Mr. Smith said that the Red Patch had also grown the marijuana Mr. French found in 2003 and that they were aware that he had gone to the game warden. *Id.* 29:3-5. Mr. Smith told Mr. French that the Red Patch was concerned that he was going to go to the police and was angry that their marijuana had been stolen by, the Red Patch thought, Mr. French's crew. *Id.* 29:6-10. Mr. Smith said that he did not want to see Mr. French get hurt as he had been in Otis. *Id.* 29:9-10. Mr. French testified that Mr. Smith offered him a way out, which included promising not to go to the law and making "reparations." *Id.* 30:19-31:6. Mr. French said he agreed to both. *Id.*

In three or four days, Mr. Smith returned and told Mr. French that the Red Patch was demanding $35,000 in reparations, which Mr. French agreed to pay. *Id.* 31:9-23. When Mr. French said that he did not have the cash to make such a payment, Mr. Smith responded that he could pay in materials—specifically, a load of Pro-Mix. *Id.* 31:24-32:12. Mr. French said that he had his secretary set up an account but that he did not order the Pro-Mix. *Id.* 32:16-18. In fact, he testified that he did not know who ordered it, but he paid for it. *Id.* 32:19-20. Ultimately, he paid for four loads of Pro-Mix: one in 2006, then three more loads in March 2007. *Id.* 33:14-20. He did not make any payments of Pro-Mix after 2007. *Id.* 33:21-23.

### 5. Marijuana in LaGrange in 2007

Mr. French turned to the marijuana that Mr. Flewelling found in the attic of his camp barn in 2007. *Id.* 34:9-11. He recalled that Game Warden Bruce Loring stopped by his house and told him that marijuana had been found in his camp. *Id.*

34:12-24.  Mr. French went right over to the camp with Warden Loring.  *Id.* 35:8-16.
After Warden Loring found some marijuana in a paper bag or grocery bag in the attic
of the garage, he removed it from the premises.  *Id.* 35:24-36:13.

Then early in 2007, Mr. Smith paid Mr. French another visit.  *Id.* 36:14-21.
Mr. French said that the marijuana that had been taken from his attic also belonged
to the Red Patch motorcycle gang and that they expected him to pay them $16,000
for it.  *Id.* 36:22-37:3.  Mr. French said that he told Warden Loring "the whole story"
about the $35,000 that the Red Patch had extorted from him, but not about the 2007
threat because it had not yet been made.  *Id.* 37:7-11.  The Red Patch expanded upon
their request in 2007, asking for additional Pro-Mix, tarps, and orders from Northern
Tool or Northern Hydraulics.  *Id.* 38:10-16.  The first load of Pro-Mix had been
delivered to Mr. Berg's business, but the Red Patch did not like that spot because of
its visibility, so Mr. French said he agreed to unload the later orders of Pro-Mix at his
warehouse in Colson Field.  *Id.* 38:17-25.  After the Pro-Mix was unloaded, Mr. French
returned to find it was gone.  *Id.* 39:4-6.  He also bought rabbit fencing and tarps for
the Red Patch.  *Id.* 39:7-14.  This was the last demand that Mike Smith made; Mr.
French bought no more products for the Red Patch after the end of 2007.  *Id.* 39:15-
40:6.  After reporting this matter to Warden Loring, Mr. French said he did not make
any further reports because law enforcement had done nothing in 2003 or in 2005
and he was "scared to death."  *Id.* 40:20-23.

### 6.    Scott MacPherson

Regarding Mr. MacPherson, Mr. French testified that he had known Mr. MacPherson ever since Mr. MacPherson was a student at the University of Maine. *Id.* 41:2-16.  After graduating from Maine, Mr. MacPherson did some forestry work for Mr. French. *Id.* 41:17-19.  Mr. MacPherson left the state of Maine for a while and returned in 2006.[6] *Id.* 42:23-43:7.  When he returned, Mr. MacPherson came to Mr. French hoping to work for him, but Mr. French had nothing available at the time. *Id.* 43:5-11.  However, Mr. French let Mr. MacPherson stay at his camp in LaGrange, and in 2007, he moved to Colson Field. *Id.* 43:8-44:7.  Mr. French testified that he came up with an idea to employ Mr. MacPherson, working for Old Stream Conservation, a corporation Mr. French established to deal with camp owners on Mr. French's property and later to enter into annual conservation leases. *Id.* 44:4-48:5.

### 7.   Moises Soto

Regarding Mr. Soto, Mr. French acknowledged that he knew Mr. Soto from the time they first met in 2004. *Id.* 49:18-20.  At that time, Mr. French said that he hired Mr. Soto to saw and split firewood. *Id.* 50:3-11.  Then in 2005, Mr. French hired Mr. Soto and his "guys" to tip Christmas trees for wreaths. *Id.* 51:18-52:11.  Mr. French said that he did not hear from Mr. Soto in 2006 but that in 2007, Mr. MacPherson reported to Mr. French that Mr. Soto was looking for work "for these guys". *Id.* 52:17-54:2.  Mr. French assumed they were legal laborers because they had worked for Merrill Blueberries. *Id.* 54:4-7.  He allowed them to stay at the Colson Field

---

[6]    Mr. French initially testified that Mr. MacPherson returned in 1996 and began working at Colson Field in 1997, but he later corrected himself and placed the date in 2007. *French Test. 1/21/14* 42:23-44:3.

warehouse, and thought he "might have some firewood to do up there." *Id.* 54:20-55:5. He testified that he never saw anything that looked like a marijuana operation in Colson Field. *Id.* 55:7-16. This is despite the fact he "got down there once per week." *Id.* 55:20.

### 8.   September 22, 2009

Mr. French acknowledged that he was present in Township 37 on September 22, 2009, the date of the execution of the search warrant. *Id.* 69:23-25. He said that he was told by someone at the Washington County Sheriff's Office that there was a fire on his property. *Id.* 70:17-21. He said he "first heard about the marijuana from Agent Rolfe." *Id.* 72:19-23.

### 9.   Use of Marijuana

Reminded about the marijuana that law enforcement found in his home, Mr. French admitted that he smoked marijuana. *Id.* 75:9-17. Although he did not have a medical marijuana card, he said that he used marijuana to alleviate some physical problems. *Id.* 75:18-76:25. He testified that he got the marijuana from "[o]ff some of my land" but did not know "whose it was." *Id.* 77:4-12. He also testified that he got marijuana from a man named "Fernald" from Lincoln who had passed away. *Id.* 96:8-13.

### 10.   Fai Littman

Mr. French testified that he knew Fai Littman, but he denied ever selling marijuana to him or bringing him marijuana. *Id.* 77:18-78:14.

### 11.   Amanda Gorrell

Mr. French agreed with Amanda Gorrell's testimony that he had purchased some trash cans "to clean out down in Colson Field." *Id.* 78:25-79:8. He acknowledged that he had paid for them and asked his son, Thomas, to pick them up. *Id.* 79:9-12.

### D.   Discussion: Malcolm French and Obstruction of Justice

The Court is unable reconcile Mr. French's testimony and the jury verdict in this case. Nor can the Court reconcile Mr. French's testimony and the evidence that the Court has concluded is true.

First, Mr. French expressly denied committing the crimes alleged by the Government and of which the jury found him guilty. *Compare id.* 79:22-80:6 (denying involvement in the conspiracy), *with Jury Verdict* (finding him guilty of involvement in the conspiracy). The Court is utterly skeptical of Mr. French's explanation for his testimony in which he denied engaging in the conspiracy to manufacture and possess marijuana and to conceal and harbor illegal aliens as part of that conspiracy:

> Neither of those questions and answers invalidate Mr. French's polygraph. It was Mr. French's contention that he was not part of any conspiracy with Rodney Russell or Kendall Chase. He was admittedly involved with Mike Smith and Red Patch. The first question was with respect to the former. The second question was whether he was harboring illegal aliens *as part of the* Russell/Chase conspiracy. Mr. French answered he was not. He may have harbored illegal aliens, but not as part of the Russell/Chase conspiracy and the jury could have made that determination given the state of the evidence. This is not parsing words too finely. Mr. French is fighting to preserve what little may remain after serving at least a minimum mandatory sentence. The questions call for legal conclusions. Mr. French believed he was not part of the conspiracy referenced in the questions. Mr. French's subjective beliefs cannot be deemed untrue just because he was convicted.

*French Second Suppl. Mem.* at 10-11 (emphasis in original).

31

This argument is somewhat unclear, but to the extent Mr. French is arguing that the jury could have found him guilty of participating in the Red Patch motorcycle gang's marijuana conspiracy, instead of the Russell/Chase conspiracy, he is incorrect. The Government charged Mr. French with conspiring with Rodney Russell and Kendall Chase, not with Mike Smith and the Red Patch. *Superseding Indictment* (ECF No. 187). Furthermore, the Government never argued to the jury that if they did not find Mr. French guilty of a marijuana conspiracy with Mr. Russell and Mr. Chase, they should find him guilty of conspiring with Mr. Smith and the Red Patch. Finally, the Court instructed the jury that to convict Mr. French, it had to find that the agreement specified in the indictment—and not some other agreement or agreements—existed between at least two people to intentionally manufacture marijuana for both conspiracy counts.

Instead, it seems beyond argument that Mr. French denied that he conspired with Mr. Russell and Mr. Chase to manufacture and possess marijuana and to harbor illegal aliens as part of that conspiracy. The jury refused to accept his denials and convicted him of those crimes. His straightforward denials are flatly contrary to the verdicts. Nor can Mr. French's own subjective belief in his innocence carry the day in light of the verdicts that found him guilty beyond a reasonable doubt of willfully joining in a conspiracy to violate the law. It is true, as the guidelines suggest, that some defendants provide inaccurate testimony from confusion, mistake, or faulty memory, but having had the opportunity to see Mr. French testify and evaluate his credibility, the Court finds that Mr. French's testimony about his lack of involvement

with the marijuana grow in Township 37 was not the product of confusion or mistake. To the contrary, the Court finds that it was a deliberate and conscious attempt to mislead the jury about the true nature of his involvement.

A few examples of false testimony should suffice.  Mr. French explained his purchases of Pro-Mix in 2006 and 2007 as responses to Mr. Smith and the Red Patch's extortion.  But the dates do not add up.  Mr. French said that he made no payments of Pro-Mix to the Red Patch after 2007 and yet his business Cold Stream Contracting purchased 1,950 bags of Pro-Mix from Griffin Greenhouse in 2008 and 2009.  *French PSR* ¶ 24.  These purchases continued despite the fact that Mr. French admitted he did not use a lot of Pro-Mix in his businesses.  *French Test. 1/21/14* 125:12-14.  In fact, Mr. French insisted that he did not know anything about the Pro-Mix purchases ordered by Mr. Russell and delivered in Township 31 at Colson Field in 2008 and 2009.  *Id.* 140:15-25.  The Court does not believe that Mr. French, who was a successful and detail-oriented businessman, would not know that Mr. Russell had ordered and paid for tens of thousands of dollars of Pro-Mix in 2008 and 2009.  Nor, based on the Court's assessment of the relationship between Mr. French and Mr. Russell, does the Court believe that Mr. Russell would have ordered tens of thousands of dollars of Pro-Mix, and had Mr. French pay for it, without Mr. French's knowledge and approval.

The other area of obvious lies is the hiring of the migrant laborers, the work they did at Mr. French's warehouse and on his land in Township 37, and their flight to Mr. Berg's barn and then out of state from there.  Mr. French denied knowing that

there was any marijuana being processed at his warehouse at Colson Field by migrant laborers, asserted that he thought the workers were all legal, testified that they were working in the firewood business, and denied knowing about their flight from Township 37, their hiding in Mr. Berg's barn and their quick departure from Maine. The Court finds Mr. French's testimony about the migrant laborers incredible. The testimonies of Mr. Soto, Miguel Roblero, Martin Roblero, and Mr. Perez all contradict Mr. French, whose testimony was also contradicted by information Mr. Berg confirmed to be true at his sentencing. Having had the opportunity to evaluate each of these witnesses at trial and to assess Mr. Berg's honesty at his sentencing hearing, the Court accepts the witnesses' testimonies and Mr. Berg's representations over the testimony of Mr. French.

The Court makes a similar finding concerning Mr. Littman and Ms. Gorrell. The Court believes Mr. Littman's testimony concerning purchasing marijuana from Mr. French; it rejects Mr. French's denial of any such interaction. Further, the Court believes Ms. Gorrell's testimony concerning the true reason—i.e., the marijuana operation—that Mr. French purchased the trash cans and chicken wire; it rejects Mr. French's assertion that these items were unrelated to the marijuana operation.

In short, the Court concludes (1) that Mr. French willfully obstructed or impeded or attempted to obstruct or impede the administration of justice with respect to the prosecution of this case and that his obstructive conduct related to his offenses of conviction and (2) that Mr. French knowingly gave false testimony under oath, testimony that constitutes perjury, and that his false testimony was not the result of

confusion, mistake, or faulty memory. The Court will apply the two-level enhancement under U.S.S.G. § 3C1.1 to Malcolm French.

### E.   The Crimes: Rodney Russell

The Court has described Mr. Russell's role in the French conspiracy. The Court adds information about Mr. Russell's testimony and fleshes out the Court's conclusion that he committed perjury. In the fall of 2006, about the same time he lost his job at The Brown Company, he reconnected with his childhood friend, Malcolm French. *Russell Test.* 9:15-20. Mr. Russell began socializing with Mr. French and Mr. Berg, another childhood acquaintance. *Id.* 9:21-10:15. By late 2006, Mr. Russell had begun working in the French marijuana conspiracy. *Russell PSR* ¶ 10.

Mr. Russell played many roles in the French marijuana conspiracy; essentially, he was Mr. French's right-hand man. Mr. Russell monitored and supervised the migrant laborers, *id.* at 10; instructed the migrants workers how to perform their tasks, including planting and caring for the marijuana plants, *id.* at 11; transported them to and from the work site, *id.* at 21; ordered them about, *id.* at 19; tended the marijuana plants himself, *id.* at 22; placed orders for, paid for, and unloaded the Pro-Mix, *id.* at 23; led the migrants workers through the woods in September 2009 and delivered them to Mr. Berg, *id.* at 19; and sold marijuana to Mr. Littman. *Id.* at 18.

### F.   The Perjury: Rodney Russell

Rodney Russell testified on his own behalf on January 22, 2014. *Russell Test.*

#### 1.   Rodney Russell's Life Story

The Court accepts Mr. Russell's testimony about his life story.  *Id.* 3:18-5:3, 6:23-8:7.  As with Mr. French, the Court perceives Mr. Russell to be an intelligent person.  He is well educated, as he holds both a bachelor's degree and a master's degree in business administration with a specialty in finance from the University of Maine.  *Id.* 6:23-7:7.  He worked as a stockbroker at Paine Webber and at The Brown Company.  *Id.* 7:8-12.  For whatever reason, these jobs did not last; Mr. Russell was laid off from The Brown Company in September 2006.  *Id.* 7:18-20.  Mr. Russell turned for work to his "very good friend," Mr. French, whom he had known since first grade.  *Id.* 8:4-9:8.  Around this time, Mr. Russell was going through a divorce, having separated from his wife in October 2006 and finalized the divorce in January 2007.  *Id.* 4:20-25.

### 2.     Rodney Russell and the Co-Conspirators

The Court also generally accepts Mr. Russell's testimony about his relationships with the co-conspirators in this case.  He testified about his friendship with Mr. French going back to the first grade, carrying through their school days together, then the two reconnecting socially in the fall of 2006.  *Id.* at 8:22-10:16.

Mr. Russell also knew Mr. Chase.  *Id.* 10:17-18.  Although there was a family connection, Mr. Russell did not meet Mr. Chase until around 2007 when they met at Mr. French's camp.  *Id.* 10:19-24.  Mr. Russell described Mr. Chase as a friend.  *Id.* 11:2.  He explained that Mr. Chase owned a portable band sawmill and described his own family history of operating a cedar fence mill.  *Id.* 11:3-18.

Mr. Russell met Mr. Berg in the fourth or fifth grade. *Id.* 11:24-12:2. Mr. Russell had known Mr. Berg for about forty years and socialized with him. *Id.* 12:2-8.

Mr. Russell met Mr. MacPherson at Mr. French's house in the winter of 2006-2007, when Mr. MacPherson was staying at Mr. French's camp. *Id.* 12:15-13:7. He thought Mr. MacPherson moved the Colson Field in 2007. *Id.* 24:1-13.

Mr. Russell did not know Mr. McTague. *Id.* 13:14-22.

Mr. Russell came to know Mr. Soto in 2007 through Mr. French. *Id.* 13:23-14:6. He said that Mr. Soto would come and cut firewood. *Id.* 14:2-4.

### 3. Work for Malcolm French: 2007—2009

Mr. Russell testified that he began working for Malcolm French in 2007 and his work involved firewood. *Id.* 8:4-16. He said that either Mr. French or Mr. MacPherson would bring down a big trailer-load of firewood to the warehouse, and they used the firewood to heat the warehouse. *Id.* He also said that Malcolm allowed him to sell the firewood for himself. *Id.* 8:14-16. In addition, Mr. Russell testified that Mr. French had a project, called Old Stream Conservation, they "tried to get off the ground." *Id.* 18:6-11.

### 4. Pro-Mix, Rabbit Fencing and Old Stream

Mr. Russell confirmed that in March 2007, he helped unload three loads of Pro-Mix at Colson Field. *Id.* 18:24-19:8. Mr. Russell testified that he had "no idea" what the Pro-Mix was going to be used for. *Id.* 19:9-24. In 2007, he recalled traveling to Massachusetts in Mr. MacPherson's truck to pick up some rabbit fencing, which he

signed for.  *Id.* 21:8-18.  He testified that he thought the fencing was being used for Old Stream Conversation, of which he was the treasurer.  *Id.* 21:23-24, 22:4-5.  Mr. Russell said that at Mr. MacPherson's request, he would run errands for him, including picking up supplies at Griffin Greenhouse.  *Id.* 29:9-21.

On March 2, 2009 and again in April 2009, Mr. Russell injured and reinjured his elbow, which restricted his ability to do physical work.  *Id.* 30:13-31:15.  On March 3, 2009, the day after the accident, he traveled with Mr. MacPherson to Griffin Greenhouse to pick up some material that he had ordered at Mr. MacPherson's directive.  *Id.* 31:20-32:10.  Mr. Russell said that Mr. MacPherson gave him cash to make the purchases.  *Id.* 32:11-33:6.  Mr. Russell said he had "[n]o idea" where the cash came from.  *Id.* 33:7-8.

Mr. Russell further testified that in 2008, when he purchased Pro-Mix from Griffin Greenhouse, he thought that the Pro-Mix was possibly going to be used for salmon conservation work or to be resold.  *Id.* 55:1-12.  Mr. Russell testified that after the Pro-Mix was delivered at Colson Field in March 2007, he did not know what happened to it.  *Id.* 62:3-5.

### 5.   Colson Field and Migrant Laborers

Mr. Russell confirmed that in 2007, he frequented the warehouse at Colson Field.  *Id.* 20:13-14.  Mr. Russell testified that he saw some migrant laborers around Colson Field in 2008.  *Id.* 20:25-21:7.  Mr. Russell said that he was not aware of any migrant laborers living in the warehouse at Colson Field in 2007.  *Id.* 24:23-25.  He said that he did not know that the migrant laborers were living at the warehouse in

38

2008 and that Moises Soto would bring them to help with the firewood.  *Id.* 25:1-4.
Mr. Russell described some physical problems he encountered in 2008 and he said
that he continued to work at the warehouse in 2008, doing what he could to help with
the firewood.  *Id.* 26:20-28:24.

### 6.     The Township 37 Marijuana Grow

Mr. Russell denied ever going to the marijuana grow area until "long after the
raid."  *Id.* 28:11-16.  Mr. Russell specifically denied having any involvement with Mr.
MacPherson or anybody else in Township 37 during 2009.  *Id.* 34:13-15.  Mr. Russell
said that he had no involvement with the marijuana grow in Township 37 "wittingly,"
but he added that he "may have in retrospect."  *Id.* 44:1-3.  He again denied knowing
that there was a marijuana grow operation in Township 37 in 2008 or 2009.  *Id.* 44:4-
6 ("Absolutely not").  He also denied any involvement with other grows in previous
years.  *Id.* 44:7-10.

### 7.     Fai Littman

Mr. Russell admitted knowing Mr. Littman, but he denied selling marijuana
to him or to anyone else.  *Id.* 29:22-30:12 ("Absolutely not"; "Never to anyone, ever").

### 8.     The September 2009 Raid

Mr. Russell testified that on September 22, 2009, he was in Bangor, Maine
with his wife.  *Id.* 34:20-35:1.  He denied being out in the field with Miguel Roblero
on September 23, 2009.  *Id.* 37:17-19.

### G.     Rodney Russell and Obstruction of Justice[7]

---

[7]     In his August 6, 2015 sentencing memorandum, Mr. Russell's sole objection to the obstruction
of justice enhancement is to the PSR's statement that Mr. Russell testified that he was following orders

The Court is unable to reconcile Mr. Russell's testimony and the jury verdicts in this case. Nor can the Court reconcile Mr. Russell's testimony and the evidence that the Court has concluded is true. Like Mr. French, Mr. Russell expressly denied committing the crimes that the Government alleged, and the jury found him guilty of all of those crimes. *Compare id.* 44:4-6 (answering "[a]bsolutely not" to the question of whether he knew of a marijuana operation in 2008-2009); *with Jury Verdict* (finding him guilty of involvement in the conspiracy).

Specifically, Mr. Russell's denial of even knowing about the Township 37 marijuana grow is contradicted by the testimony of Mr. Soto, who testified that Mr. Russell was present at the warehouse when the migrant laborers were cleaning marijuana, *Soto Test.* 16:11-18; that Mr. Russell was present at the marijuana grows, *id.* 22:9-15, 30:13-17; and that Mr. Russell helped build the marijuana nests. *Id.* 22:18-25. It is also contradicted by the testimony of Miguel Roblero, who testified that Mr. Russell helped the migrant laborers clean the marijuana and that Mr. Russell and Mr. MacPherson put the processed marijuana into Ziploc bags, *Roblero Test.* 15:1-8; that Mr. Russell along with other Americans came up with a process to address the left-over marijuana stems, *id.* 18:19-19:6; that Mr. Russell and Mr.

---

from Mr. MacPherson. *Russell Mem.* at 2-3. Mr. Russell testified extensively on the fact that he did what Mr. MacPherson told him to do in terms of placing orders for and paying for such material as Pro-Mix. *Russell Test.* 29:2-21, 31:16-33:8. Mr. Russell testified that he would run errands for Mr. MacPherson and did "anything he asked me to do." *Id.* 29:9-13. He also testified that he ordered fertilizer and "some other stuff" in March 2009 from Griffin Greenhouse. *Id.* 30:20-32:1. He said he ordered this material because "Scott told me to order it" and that he agreed that he placed the order "at his direction." *Id.* 32:7-10. Doing something at someone else's direction seems synonymous with following someone else's orders. But the Court's obstruction of justice conclusion does not depend on this distinction. The Court's conclusion is based on its finding that virtually none of Mr. Russell's sworn testimony about the French marijuana conspiracy and his role in it is true.

MacPherson made greenhouses for the marijuana, *id.* 29:8-18; that Mr. Russell and Mr. MacPherson showed the migrant laborers how to fertilize and trim the marijuana plants, *id.* 31:2-11; and that Mr. Russell slept in one of the houses at the grow site in Township 37. *Id.* 35:7-10. Having had an opportunity to see and evaluate the credibility of Mr. Russell and the credibility of Mr. Soto and Miguel Roblero, the Court accepts the testimony of Mr. Soto and Miguel Roblero over the testimony of Mr. Russell. The Court concludes that Mr. Russell was lying when he testified that he knew nothing about the Township 37 marijuana grow.

In addition, Mr. Russell denied that he knew what happened to the Pro-Mix after it was off-loaded at the warehouse. Miguel Roblero testified that Mr. Russell, along with the other Americans, took the Pro-Mix pallets into the woods. *Id.* 24:2-6. The Court accepts the testimony of Miguel Roblero over the testimony of Mr. Russell on this issue and finds that Mr. Russell was lying when he claimed he did not know what became of the Pro-Mix after it was unloaded. Similarly, the Court finds that Mr. Russell was lying when he testified that he thought the Pro-Mix had been bought for resale or, possibly, salmon conservation work.

Mr. Russell denied ever selling any marijuana to Mr. Littman. Mr. Littman testified that Mr. Russell repeatedly sold him marijuana from the second half of 2008 through the fall of 2009.[8] *Partial Tr. of Proceedings, Test of: Fai Littman* 13:14-19:1 (ECF No. 411) (*Littman Test.*). Having had the opportunity to see both Mr. Russell

---

[8]      The Court does not accept Mr. Littman's testimony that Mr. Russell sold him marijuana through the fall of 2009, but does accept his testimony that Mr. Russell sold him marijuana from the second half of 2008 to the fall of 2009.

and Mr. Littman testify, the Court accepts the testimony of Mr. Littman over the testimony of Mr. Russell and finds that Mr. Russell lied when he denied that he had sold marijuana to Mr. Littman.

Mr. Russell testified that he was not in Township 37 the day of the raid. Miguel Roblero testified that Mr. Russell, along with Mr. French and Mr. MacPherson, ran into the woods with the migrant laborers and that Mr. Russell and Mr. MacPherson took the migrant laborers and split off from Mr. French. *Roblero Test.* 66:14-67:1. Miguel Roblero testified that Mr. Russell spent the night in the woods with them. *Id.* 67:18-21. Having had the opportunity to see Mr. Russell and Miguel Roblero testify, the Court accepts the testimony of Miguel Roblero over the testimony of Mr. Russell and finds that Mr. Russell lied when he testified that he was in Bangor, not Township 37, at the time of the police raid.

In short, the Court concludes (1) that Mr. Russell willfully obstructed or impeded or attempted to obstruct or impede the administration of justice with respect to the prosecution of this case and that his obstructive conduct related to his offenses of conviction and (2) that Mr. Russell knowingly gave false testimony under oath, testimony that constitutes perjury, and that his false testimony was not the result of confusion, mistake, or faulty memory. The Court will apply the two-level enhancement under U.S.S.G. § 3C1.1 to Rodney Russell.

## V.   CONCLUSION

The Court REJECTS Malcolm French's request that it admit the results of his polygraph examination at his sentencing hearing, and the Court IMPOSES the two-

level obstruction of justice enhancement against both Malcolm French and Rodney Russell under United States Sentencing Guideline § 3C1.1.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 20th day of April, 2016