UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:12-cr-00160-JAW |
| | ) | |
| MALCOLM A. FRENCH, et al. | ) | |

**ORDER DENYING MOTION FOR NEW TRIAL**

On January 24, 2014, at the end of a three-week trial, a jury convicted three individual defendants and one corporate defendant of a series of federal crimes generally related to their participation in a conspiracy to manufacture marijuana. Over two years later on April 28, 2016, they returned to Court to request a new trial, claiming that during jury voir dire on January 8, 2014, a juror failed to respond truthfully to her juror questionnaire and to a material voir dire question. The Defendants assert that had the juror responded truthfully during voir dire, it would have provided a valid basis for a challenge for cause, and they request that the Court hold an evidentiary hearing to question the juror. Having reviewed the questionnaire and the voir dire transcripts, and having considered the risks from questioning the juror, the Court rejects the request for an evidentiary hearing to question the juror. The Court denies the Defendants' motion for new trial.

**I.     BACKGROUND**

**A.     Procedural History**

**1.     Indictment, Trial, and Verdict**

On September 14, 2012, a federal grand jury indicted Malcolm French, Rodney Russell, Kendall Chase, and Haynes Timberland, Inc., for a number of federal crimes relating in general to their alleged involvement with a marijuana growing operation in Maine.[1]  *Indictment* (ECF No. 2).  On November 13, 2013, a grand jury issued a superseding indictment.  *Superseding Indictment* (ECF No. 187).  On January 8, 2014, United States Magistrate Judge Margaret J. Kravchuk presided over jury selection, and a jury trial began immediately after selection.  *Minute Entry* (ECF No. 281).  The trial took place from January 8, 2014, through January 24, 2014.  *Minute Entry* (ECF No. 308).

On January 24, 2014, the jury returned verdicts finding Malcolm French, Rodney Russell, and Kendall Chase guilty of engaging in a conspiracy to manufacture marijuana; finding Malcolm French and Rodney Russell guilty of manufacturing marijuana; finding Malcolm French, Rodney Russell, and Haynes Timberland, Inc., guilty of managing or controlling a drug-involved premises; finding Malcolm French and Rodney Russell guilty of harboring illegal aliens; and finding Malcolm French, Rodney Russell, and Kendall Chase guilty of engaging in a conspiracy to distribute marijuana.  *Jury Verdict Form* (ECF No. 311).

## 2.    Motion for New Trial

On April 28, 2016, Malcolm French filed a motion for a new trial.  *Def. Malcolm French's Mot. for New Trial Pursuant to F.R. Crim. P. 33* (ECF No. 674).  Mr. French also filed a motion for enlargement of time, requesting an additional twenty-one days

---

[1]    Other Defendants were also indicted but are not relevant to the pending motion.

to file supporting memoranda and documentation in support of his motion for a new trial. *Def.'s Mot. for Enlargement of Time to File Supp. Mem. and Documentation* (ECF No. 675). Kendall Chase joined Mr. French's motions on May 2, 2016. *Def. Kendall Chase's Mot. to Join Def. Malcolm French's Mot. for New Trial and Mot. to Extend Time to File Supp. Mem.* (ECF No. 678). Rodney Russell and Haynes Timberland, Inc., joined the motions shortly thereafter on May 8 and May 16, respectively. *Def. Rodney Russell's Mot. to Join Def. Malcom French's Mot. for New Trial and Mot. to Extend Time to File Supp. Mem.* (ECF No. 682); *Def. Haynes Timberland, Inc.'s Joinder in Def. Malcolm French's Mot. for New Trial and Mot. to Extend Time to File Supp. Mem.* (ECF No. 683).

On May 19, 2016, Mr. French filed a supplemental memorandum in support of his motion for a new trial. *Sealed Suppl. Mem. in Supp. of Def. Malcolm French's Mot. for New Trial Pursuant to F.R. Crim. P. 33* (ECF No. 685) (*French Mem.*). Mr. Chase, Mr. Russell, and Haynes Timberland, Inc., all subsequently joined Mr. French's supplemental memorandum. *Def. Kendall Chase's Mot. to Join Def. Malcolm French's Suppl. Mem. in Supp. of Mot. for New Trial Pursuant to F.R. Crim. P. 33* (ECF No. 686); *Def. Rodney Russell's Mot. to Join Def. Malcolm French's Suppl. Mem. in Supp. of Mot. for New Trial Pursuant to F.R. Crim. P. 33* (ECF No. 690); *Def. Haynes Timberland, Inc.'s Joinder in Def. Malcolm French's Sealed Suppl. Mem. in Supp. of Mot. for New Trial Pursuant to Fed. R. Crim. P. 33* (ECF No. 694).

The Government filed an objection to the Defendants' motion for a new trial on May 27, 2016. *Gov't Sealed Obj. to Defs.' Mot. for New Trial* (ECF No. 695) (*Gov't's*

3

*Obj.*).  On June 14, 2016, Mr. French filed a reply to the Government's objection.  *Def. Malcolm French's Resp. to Gov't's Sealed Obj. to Def.'s Mot. for New Trial Pursuant to F.R. Crim. P. 33* (ECF No. 702) (*French Reply*).  Within the following week, Mr. Chase, Haynes Timberland, Inc., and Mr. Russell joined Mr. French's reply.  *Def. Kendall Chase's Mot. to Join Def. Malcolm French's Resp. to Gov't's Mot. for New Trial Pursuant to F.R. Crim. P. 33* (ECF No. 703);  *Def. Haynes Timberland, Inc.'s Joinder in Def. Malcolm French's Reply to Gov't's Obj. to Motion for New Trial Pursuant to F.R. Crim. P. 33* (ECF No. 704);  *Def. Rodney Russell's Joinder in Def. Malcolm French's Reply to Gov't's Obj. to Mot. for New Trial Pursuant to F.R. Crim. P. 33* (ECF No. 706).

## B.    The Factual Backdrop

Before voir dire in the Defendants' case, the Court provided the potential jurors, including Juror 86, with a two-page juror questionnaire.  *French Mem.* Attach 2, *Juror Questionnaire* (ECF No. 685) (*Juror Questionnaire*).  Question 3 appeared on the first page of the questionnaire.  *Id.* at 1.  It requested information regarding court matters that involved the juror or the juror's close family:

> 3.    a) Please describe briefly any court matter in which you or a close family member were involved as a plaintiff, defendant, witness, complaining witness or a victim.
> b) Was the outcome satisfactory to you?
> c) If no, please explain.

*Id.*  In the space provided for Question 3(a), Juror 86 wrote "n/a."  *Id.*  She left the spaces next to (b) and (c) blank and completed the remainder of the questions on the first page.  *Id.*

4

The second page of the questionnaire contained six additional questions and a signature block. *Id.* at 2. Over the signature block, the following language appeared:

> I declare under penalty of perjury that I have answered all the foregoing questions truthfully and completely.

*Id.* However, Juror 86 failed to complete any portion of the second page, leaving blank the entire page, including the signature line. *Id.* At no point during jury selection did any of the attorneys raise any issues about Juror 86's responses to the questions on the first page, her failure to respond to any questions on the second page, or her failure to sign the form. Specifically, none of the attorneys asked the Court to bring Juror 86's omission to her attention, to clarify the responses she made, to ask for answers to the questions she had omitted, or to make certain that the Juror understood that her answers were being given under the penalty of perjury.

Jury selection began on January 8, 2014. *Minute Entry* (ECF No. 281). At the start of the selection process, the members of the jury pool swore an oath to answer truthfully all questions regarding their ability to serve on the jury. *Tr. of Proceedings* at 7:18–23 (ECF No. 399) (*Voir Dire Tr.*). The Clerk of Court randomly selected several jurors, including Juror 86, to come forward to begin the voir dire process. *Id.* at 16. During voir dire, the Magistrate Judge posed the following question to the venire:

> Now, as you've heard for a couple hours now this morning, this is a case about marijuana, which is a controlled substance under federal law. Is there anyone on the jury panel who themselves personally or a close family member has had any experiences involving controlled substances, illegal drugs, specifically marijuana, that would affect your ability to be impartial?

5

And by any experiences, I'm talking about whether you or a close family member have been involved in a situation involving substance abuse or involving treatment that—maybe professionally treating that condition, or being the victim of a crime involving those substances, or being the perpetrator of a crime where someone alleged those substances were involved. Any involve—view or experiences regarding illegal drugs, and specifically marijuana, but any illegal drug, controlled substance under federal law, is there anyone who's had that sort of experience?

*Id.* at 115:23–16:14. Juror 86 did not respond to the question. *Id.* at 116:14–17:5.

Later in voir dire, Magistrate Judge Kravchuk asked:

Is there anyone here who knows of any other reason, some question I haven't asked or something that's been sitting there troubling you, why hasn't she asked me about this, those attorneys, those people should know about this fact and it might interfere with me being a fair and impartial juror or it might appear that it would interfere, is there any other fact that you feel would affect in any way your ability to be a fair and impartial juror?

*Id.* at 143:11–20. Again, Juror 86 did not respond to the question. *Id.* 143:21–22.

Following voir dire, Magistrate Judge Kravchuk empaneled the jury, including Juror 86. *Id.* at 155:17–18.

On January 24, 2014, following a three-week trial, the jury found Malcolm French, Rodney Russell, Kendall Chase, and Haynes Timberland, Inc., guilty of various charges relating to the cultivation, processing, and distribution of marijuana. *Jury Verdict Form* (ECF No. 311). Following their conviction, the Defendants were housed at the Piscataquis County Jail until June 19, 2015, when they were transferred to the Somerset County Jail to await sentencing. *French Mem.* at 1; *French Mem.* Attach 1, *Aff. of Counsel under Seal* ¶ 4 (ECF No. 685) (*Hallett Aff.*).

In March 2016, while at the Somerset County Jail, Mr. Chase met a fellow prisoner who claimed to know Juror 86. *French Mem.* at 1. The prisoner informed

Mr. Chase that Juror 86 had a son who grew marijuana and was caught at an immigration roadblock with ten pounds of marijuana in 2010.  *Id.*  Mr. Chase relayed the information to Mr. French.  *Id.* at 1–2.  After a review of the trial documents in his possession, Mr. French determined that Juror 86 did not notify the Court of her son's drug convictions, either on her juror questionnaire or in response to the Magistrate Judge's voir dire questioning.  *Id.* at 2.

Mr. French asserts that a further investigation into Juror 86's son, "M.J.," revealed that he had been "involved in the criminal justice system" as follows:

1)  On December 12, 2002, M.J. was charged with unlawfully furnishing marijuana but pleaded guilty to the lesser charge of possession of marijuana.  He received a 180-day jail sentence, all suspended, and one year of probation.

2)  In May 2003, M.J. violated his probation by testing positive for marijuana and possessing marijuana.  In October 2003, he again violated probation by testing positive for cocaine.  The Court partially revoked M.J.'s probation and sentenced him to twenty-one days in jail.  Juror 86 visited M.J. during his stay in jail.

3)  In October 2014, M.J. was indicted for unlawful trafficking in cocaine.  He pleaded guilty to the lesser charge of possession and was sentenced to seven days in jail.

4)  On October 28, immigration officials stopped M.J. at a roadblock in Old Town, Maine.  They discovered two pounds of freshly cut

marijuana in the car. M.J. was charged with unlawfully

trafficking in marijuana. M.J. again pleaded guilty to the lesser

charge of possession.

*Id.* at 3–4.

## II.   THE PARTIES' POSITIONS

### A.   The Defendants' Motion

The Defendants' motion for a new trial[2] is based on allegations of juror misconduct leading up to and during voir dire. *French Mem.* at 1–10. The Defendants ask for an evidentiary hearing to determine whether the verdicts should be vacated. *French Mem.* at 10.

Citing the vital importance of an impartial jury, the Defendants say that the First Circuit has set forth a two-part test for determining whether a party should be granted a new trial based on juror dishonesty. *Id.* at 6–7 (citing *Sampson v. United States*, 724 F.3d 150, 164–65 (1st Cir. 2013)). First, the moving party must establish that "the juror failed to answer honestly a material [voir dire] question." *Id.* at 6 (citing *Sampson*, 724 F.3d at 164) (alteration added).[3] A voir dire question is "material" if a response to it "has a natural tendency to influence, or is capable of influencing, the judge's impartiality determination." *Id.* (quoting *Sampson*, 724 F.3d

---

[2]   The Defendants filed their motion for a new trial by May 3, 2016, in order to stay a 14-day appeals period. FED. R. APP. P. 4(b)(1)(i). However, the Defendants were unable to complete their investigation into the potential juror misconduct by the May 3 deadline. The Defendants filed a placeholder motion containing the available facts before the deadline and, with leave of Court, subsequently filed a supplemental memorandum with a more complete set of facts and legal arguments. For consistency, the Court refers to the Defendants' supplemental motion as the "motion for a new trial."

[3]   The text of *Sampson* includes the words "voir dire." *Sampson*, 724 F.3d at 164.

at 165) (internal quotation marks omitted).  Second, the moving party must establish that "a truthful response to the *voir-dire* question would have provided a valid basis for a challenge for cause."  *Id.* at 7 (citing *Sampson*, 724 F.3d at 165).  Jurors are subject to excusal for cause if they are biased.  *Id.*

### 1.    Failure to Answer Honestly a Material Voir Dire Question

The Defendants maintain that they have met the *Sampson* binary test and that the Court should order an evidentiary hearing to "determine whether to vacate his sentence and order a new trial based on newly discovered evidence of juror dishonesty."  *Id.* at 7–10.  First, they argue that Juror 86 failed to answer honestly a material question.  They highlight that Juror 86 responded "n/a" to Question 3 on the juror questionnaire when she should have identified at least three criminal proceedings involving her son.  *Id.* at 7.  Moreover, they point out that Magistrate Judge Kravchuk's voir dire question "laid out the factors which would impact a juror's impartiality" and specifically mentioned marijuana; however, Juror 86 "failed to disclose numerous illegal substance charges, convictions and imprisonment of her son primarily for growing and selling marijuana."  *Id.* at 9.  They assert that the questions were material because of the similarity between her son's offenses and the subject matter of their trial.  *Id.* at 8.  That is, "[t]rue answers would have gone to the very heart of the case against [the Defendants], and bring directly into issue a mother's ability to be impartial[.]"  *Id.*

### 2.    Valid Basis for a Challenge for Cause

Second, the Defendants argue that a truthful response to the voir dire question would have revealed Juror 86's bias and provided a valid basis for a challenge for cause. *Id.* at 9. The Defendants apply a compendium of factors set forth in *Sampson* to support a finding of Juror 86's bias, including (1) the ability to separate her emotions from her duty; (2) the similarity between the juror's experience and the important facts presented at trial; (3) the scope and severity of the juror's dishonesty; and (4) the juror's motivation for lying. They assert that Juror 86 was not able to separate her emotions from her duty as a juror because "[i]t is inconceivable that a mother that sees her son struggling with criminal convictions and an obvious illegal substance abuse issue could remain emotionally detached[.]" *Id.* Next, they maintain that there is a strong similarity between Juror's 86 son's experience and the Defendants' case. *Id.* Additionally, they contend that the scope of Juror 86's dishonesty belies her bias because she gave untruthful answers on the jury questionnaire and twice during voir dire. *Id.* Finally, they speculate that Juror 86 was motivated to lie either because she was embarrassed or because she wanted to sit on the jury. *Id.* at 10. According to the Defendants, these factors support their contention that Juror 86 was biased, and that if she had answered the material questions truthfully, she would be subject to challenge for cause. *Id.*

### 3. Request for Evidentiary Hearing

The Defendants assert that when a party files a non-frivolous motion alleging juror misconduct, the judge must complete a "painstaking" investigation into the claim. *Id.* (citing *United States v. Lara-Ramirez*, 519 F.3d 76, 86 (1st Cir. 2008);

*Wilgren v. F/V Sirius, Inc.*, 665 F. Supp. 2d. 23 (D. Me. 2009)).   As such, the Defendants ask for an evidentiary hearing on the matter.  *Id.*

### B.   The Government's Opposition

The Government disagrees.  *Gov't Obj.* at 1–12.  As a preliminary matter, the Government makes clear that Juror 86 did not complete or sign her questionnaire, and thus her answers to the questionnaire were unsworn.  *Id.* at 2.  The Government points out that "[w]ell in advance of jury selection, juror questionnaires were made available to all the parties for their review" but that none of the attorneys informed the Court that Juror 86 "had failed to complete and sign her questionnaire."  *Id.*  Nor did defense counsel request that Juror 86 be brought up to sidebar for further inquiry.  *Id.*  Moreover, at the end of voir dire, Magistrate Judge Kravchuk called counsel to side bar and asked whether they were satisfied with voir dire.  *Id.* at 3.  No counsel requested further questioning.  *Id.*

### 1.   Juror 86 Did Not Fail to Answer Honestly

The Government also argues that Juror 86's answer to Question 3 does not compel the conclusion that Juror 86 provided false information.  *Id.* at 4–5.  Question 3 inquired into court matters involving the jurors or "a close family member."  *Id.* at 4.  The Government highlights that the Defendants do not provide any evidence that Juror 86 and M.J. are actually related, much less that their relationship was "close" at the time Juror 86 submitted her questionnaire.  *Id.* at 5.  Moreover, the Government suggests that the term "court matter" could have been ambiguous to

11

Juror 86 "if she was related to the marijuana offender but did not know whether or not he went to court." *Id.*

In addition, the Government notes that the Defendants have not offered any evidence that Juror 86 failed to provide a truthful response to Magistrate Judge Kravchuk's voir dire questioning. *Id.* at 5–6. According to the Government, the question at issue inquired whether any of the jurors or a close family member "has had ***any experiences*** involving controlled substances, illegal drugs, specifically marijuana, ***that would affect your ability to be impartial***[.]" *Id.* at 6 (emphasis in original). Again, the Government suggests that Juror 86 may not have viewed her relationship with M.J. as close. *Id.* Alternatively, she may have honestly believed that M.J.'s experiences with marijuana would not affect her ability to be impartial. *Id.* The Government argues that the Defendants present no evidence to the contrary, and that Juror 86's lack of response indicating that she could be impartial is presumed to be truthful. *Id.* (citing *United States v. Rosario*, 111 F.3d 293, 300 (2nd Cir. 1997); *Smith v. Phillips*, 455 U.S. 209 (1982)).

### 2.    No Basis for a Challenge for Cause

The Government then attacks the Defendants' position that Juror 86 was biased and that a truthful response during voir dire would have raised a valid basis for a challenge for cause. To begin, the Government questions the Defendants' conclusion that Juror 86 was biased. *Id.* at 7–8. The Government largely agrees with the Defendants' list of applicable factors for determining bias but argues that the factors militate against a finding of juror bias in this case. *Id.* First, the Government

12

argues that there is no evidence that Juror 86 struggled to separate her emotions from her duty as a juror. *Id.* Second, the Government contends that M.J.'s alleged criminal conduct is not comparable to the facts of the present case. *Id.* M.J.'s offenses involved only a few instances of a small amount of marijuana, whereas the Defendants engaged in a multi-million dollar marijuana operation over several years. *Id.*

Third, the Government asserts that the scope and severity of Juror 86's misconduct is unclear, especially because it is uncertain whether Juror 86 was aware of all of M.J.'s criminal conduct. *Id.* Fourth, the Government points out that the Defendants offer no evidence of Juror 86's motive. *Id.*

Finally, the Government raises another potential factor for determining bias— the juror's interpersonal relationships—but concludes that this factor is inapplicable here because there is no suggestion that the juror had a relationship with the prosecution team that she failed to disclose. *Id.* Thus, according to the Government, these factors undermine the conclusion that Juror 86 "harbored any actual bias against the defendants." *Id.* at 8.

Next, the Government maintains that even if Juror 86 provided false information, it is not clear that a truthful answer would have prompted the Defendants to challenge Juror 86 for cause. *Id.* at 10. Under the Government's reading of caselaw, the Defendants must demonstrate that if Juror 86 provided truthful information, then the Defendants *themselves* would have challenged the juror for cause. *Id.* (citing *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S.

548, 556 (1984)).  The Government argues that it is unlikely that the Defendants would have raised a for-cause challenge if Juror 86 notified the Court of her son's prior drug-related convictions.  *Id.* at 11.  To prove its point, the Government cites the example of Juror 10.  *Id.* at 8–11.  On her questionnaire and during voir dire, Juror 10 informed the Court that her son had been prosecuted for possession of marijuana.  *Id.* at 8–9.  She intimated that she had strong views in favor of marijuana legalization and that her views and her son's conviction would make it difficult for her to be impartial in the Defendant's case.  *Id.* at 9–10.  The Defendants' counsel urged the Magistrate Judge to retain the juror, stating, "I move that we try this case in front of that juror only."  *Id.* at 10.  According to the Government, the Defendants willingness to keep Juror 10 despite her child's drug offenses indicates that the Defendants would also move to keep Juror 86 if she notified the Court about her son's drug convictions.  *Id.* at 11.

### 3.   Opposition to Evidentiary Hearing

Finally, the Government urges the Court to deny the Defendants' request for an evidentiary hearing.  *Id.* at 11–12.  The Government insists that "[w]here a defendant's proof of misconduct embodies 'evidence so sparse, a pyramiding of inferences so fragile, a thesis so speculative, as to envelop the bias/misconduct charge in a miasma of doubt" the need for post-verdict inquiry is lacking.  *Id.* at 11 (citing *Neron v. Tierney*, 841 F.2d 1197, 1203 (1st Cir. 1988)).  Here, because the Defendants did not provide any documentation to support their allegations, and because the Defendants' allegations against Juror 86 implicate her Fifth Amendment right

14

against self-incrimination, the Government argues that the Court should deny the request for an evidentiary hearing. *Id.* at 12.

### C.     The Defendants' Reply

#### 1.     Failure to Answer Honestly a Material Voir Dire Question

In their reply, the Defendants state that Juror 86's failure to complete the juror questionnaire "has no impact with respect to the false answer that was provided." *French Reply* at 4. The Defendants point out that although she never signed the questionnaire, the preliminary paragraph of the form read "[y]our answers are given under the penalty of perjury." *Id.* Moreover, "[h]ad [Juror 86] been truthful in her answer, much more attention would have been paid to her questionnaire." *Id.* In effect, her dishonesty "lulled the parties into complacency." *Id.* This complacency extended to voir dire because her false answer provided no notice that further inquiry was necessary. *Id.* at 5. Finally, the Defendants reject the Government's contention that Question 3 was somehow ambiguous. *Id.*

The Defendants also provide additional documentation to support their claim that Juror 86 is the mother of M.J. *Id.* at 5. Notably, the Defendants attach a copy of the Kennebec County visitation log, which shows that Juror 86 visited M.J. and identified herself as his mother. *French Reply* Attach 2, *Kennebec Cty. Record of Visits* at 2 (ECF No. 702) (*Visitation Log*). Additionally, the Defendants attach an affidavit from M.J.'s attorney, Lenny Sharon, in which Mr. Sharon swears that Juror 86 paid M.J.'s legal fees on August 31, 2010, and September 9, 2010. *French Reply* Attach 3, *Aff. of Counsel under Seal* ¶ 4 (ECF No. 702) (*Sharon Aff.*). These

15

documents, the Defendants attest, raise a colorable claim that Juror 86 is M.J.'s mother and that she knew about his convictions at the time of jury selection. *Id.* at 5–6. Moreover, the documents lend weight to the assertion that Juror 86 and M.J. were "close." *Id.* at 6.

Next, the Defendants argue that the Magistrate Judge's voir dire questioning did require an affirmative response from Juror 86. *Id.* at 6–7. Although the first portion of the question regarding illegal drugs inquired whether a close family member's connection with drugs would affect the jurors' ability to be impartial, the second part of the question specifically asked whether any jurors had close family members who were "involved in…a crime where someone alleged [illegal drugs] were involved." *Id.* Because Juror 86's son was convicted of multiple drug offenses, the Defendants claim that she was required to identify herself during the voir dire questioning. *Id.* at 7.

## 2.   Valid Basis for a Challenge for Cause

The Defendants disagree with the Government's interpretation of the second prong of the binary test in *Sampson*. *Id.* at 3. According to the Defendants' reading of caselaw, the second prong is satisfied as long as a truthful answer would have permitted either party—the Defendant or the Government—to assert a valid challenge for cause. *Id.* That is, even if Juror 86 lied to benefit the Defendants, the Defendants themselves could seek a new trial for juror dishonesty under the *Sampson* test. *Id.*

16

The Defendants acknowledge that the Court cannot know Juror 86's actual motive until she testifies at an evidentiary hearing. *Id.* Nevertheless, they speculate that any bias would actually flow in favor of the Government because Juror 86 would likely blame marijuana manufacturers for her son's consistent drug problems. *Id.* at 8. In any event, they state that "[i]t is not unreasonable to assume…given her failure to provide truthful answers, that the issues in this case struck an emotional chord[,]" *id.* at 3, and that the resulting bias is sufficient to preclude Juror 86 from sitting as a juror. *Id.* at 8.

The Defendants argue that whether they would have challenged Juror 10 is irrelevant. *Id.* at 8. They assert that in the case of Juror 10, a valid basis for a challenge for cause existed, and the Government properly sought the challenge. *Id.*

### 3.   Request for Evidentiary Hearing

Finally, although they acknowledge that Juror 86's failure to truthfully respond to voir dire could "trigger criminal liability," the Defendants downplay the Government's Fifth Amendment concerns, remarking that "[t]hose issues arise frequently and are handled by the court system with obvious success." *Id.* at 8–9. They note that the juror "may not have a problem answering questions, or may seek counsel with an attorney." *Id.* at 8. The Defendants propose that Juror 86 be provided immunity and write that "either the government can seek immunity for the witness, or the court *sua sponte* can grant such immunity" to Juror 86. *Id.* They end by stating that the fact a juror "providing false information may suffer discomfort is

not a valid reason to deny a request for a hearing in a very troublesome situation of constitutional proportion such as the one at hand." *Id.* at 8–9.

## III.   LEGAL STANDARD

### A.   The Constitutional Right to an Impartial Jury

The Sixth Amendment of the United States Constitution guarantees defendants in a federal criminal trial the right to an "impartial jury." U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."). "An impartial jury is one 'capable and willing to decide the case solely on the evidence before it.'" *Sampson*, 724 F.3d at 163 (quoting *McDonough*, 464 U.S. at 554). "Voir dire is a singularly important means of safeguarding the right to an impartial jury." *Id.* "A probing voir dire examination is '[t]he best way to ensure that jurors do not harbor biases for or against the parties.'" *Id.* at 163–64 (quoting *Correia v. Fitzgerald*, 354 F.3d 47, 52 (1st Cir. 2003)). Furthermore, "[t]he party seeking to upset the jury's verdict has the burden of showing the requisite level of bias by a preponderance of the evidence." *Id.* at 166.

### B.   The *Sampson* Binary Test

#### 1.   Failure to Answer Honestly a Material Voir Dire Question

In *Sampson*, the First Circuit established two requirements for when dishonest answers at jury empanelment may justify setting aside a verdict: (1) "that the juror failed to answer honestly a material voir dire question," and (2) that an honest answer "would have provided a valid basis for a challenge for cause." *Id.* at 164–65 (internal

18

citations and quotation marks omitted).  Regarding the first requirement, the Supreme Court in *McDonough* emphasized that the party moving for a new trial must demonstrate "that a juror failed to answer honestly a material question on *voir dire*." 464 U.S. at 556.  "[A] voir dire question is material if a response to it 'has a natural tendency to influence, or is capable of influencing,' the judge's impartiality determination." *Sampson*, 724 F.3d at 165 (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)).

Both the *McDonough* and *Sampson* Court also discussed the difference between a dishonest answer and an honest but mistaken response. *McDonough*, 464 U.S. at 555–56; *Sampson*, 724 F.3d at 164 n.8.  A defendant may still be entitled to a new trial if a juror makes an honest but mistaken response but only if the defendant has made "a more flagrant showing of juror bias."  *Sampson*, 724 F.3d at 164 n.8; *United States v. Fuentes*, No. 2:12-cr-50-DBH, 2013 U.S. Dist. LEXIS 115459, at *18–19 (D. Me. Aug. 15, 2013).

### 2.   Valid Basis for a Challenge for Cause

"The second part of the binary test requires a finding that a truthful response to the voir dire question 'would have provided a valid basis for a challenge for cause.'" *Sampson*, 724 F.3d at 165 (quoting *McDonough*, 464 U.S. at 556).  A valid basis for a challenge for cause normally exists if the jurors "are biased or if they fail to satisfy statutory qualifications." *Id.*  Here, as in *Sampson*, "only bias is relevant." *Id.*  In making a bias determination, the First Circuit resisted the temptation to create categories of bias. *Id.*  Instead, it directed the trial courts to ask whether the juror

was "'capable and willing to decide the case solely on the evidence.'" *Id.* (quoting *McDonough*, 464 U.S. at 554). It observed that the Supreme Court warned that "'hints of bias [are] not sufficient'" and only "'[d]emonstrated bias in the responses to questions on *voir dire* may result in a juror's being excused for cause.'" *Id.* (quoting *McDonough*, 464 U.S. at 554). The First Circuit also noted that "bias is not a pedagogical conception but rather a state of mind" and "[a]ny inquiry into potential bias in the event of juror dishonesty must be both context specific and fact specific." *Id.*

With these principles in mind, the *Sampson* Court set down the applicable test to determine whether a juror's bias could provide a valid basis for a challenge for cause:

> [W]hether a reasonable judge, armed with the information that the dishonest juror failed to disclose and the reason behind the juror's dishonesty, would conclude under the totality of the circumstances that the juror lacked the capacity and the will to decide the case based on the evidence (and that, therefore, a valid basis for excusal for cause existed).

*Id.* at 165–66. To this end, the First Circuit listed some of the factors that the trial court might consider to determine bias: (1) "the juror's interpersonal relationships"; (2) "the juror's ability to separate her emotions from her duties"; (3) "the similarity between the juror's experiences and important facts presented at trial"; (4) "the scope and severity of the juror's dishonesty"; and (5) "the juror's motive for lying." *Id.* at 166. The First Circuit further explained that while "any one of these factors, taken in isolation, may be insufficient to ground a finding of a valid basis for a challenge for cause, their cumulative effect must nonetheless be considered." *Id.*

## IV.    DISCUSSION

### A.    Juror 86 and the Juror Questionnaire

#### 1.    N/A and the Honest Answer Requirement

The Court first takes up Juror 86's incomplete and arguably inaccurate response to Question 3 of her juror questionnaire. Again, Question 3(a) was:

> Please describe briefly any court matter in which you or a close family member were involved as a plaintiff, defendant, witness, complaining witness or a victim.

Juror 86's handwritten response was "n/a." The question is whether the Defendants have demonstrated that Juror 86 failed to answer Question 3(a) honestly.

As a preliminary matter, the initials "n/a" are inherently ambiguous. The most common meaning is "not applicable," but they also can mean "not available" or "no answer." *See* https://en.wiktionary.org/wiki/n/a; http://acronyms.thefreedictionary.com/N%2FA. The Court does not know how Juror 86 used "n/a" in the context of this jury questionnaire. It well may be, as Defendants contend, that she was saying that neither she nor any members of her family had been involved in a court matter, or it may be that she was saying that she did not have enough information about her son's involvement with the criminal justice system to adequately answer the question.

The Court turns to the other information in the record to determine whether it supplies an answer to what Juror 86 intended. First, based on the substantial evidence that Attorney Hallett amassed, the Court accepts the Defendants' contention that M.J. is likely Juror 86's son. In Attorney Hallett's affidavit, he lists

21

a number of instances in which M.J. was involved with the criminal justice system, beginning in 2002, when M.J. was twenty years old, and ending in 2011, when he was twenty-eight. *Hallett Aff.* at 3–4. A review of the submitted documents confirms Attorney Hallett's summary of M.J.'s involvement with the criminal justice system: M.J. spent seven days in jail in December 2002, twenty-one days in jail in November 2003, and seven days in jail in December 2005; he paid a fine in 2011. *Hallett Aff.* ¶¶ 8–10. In addition, the Defendants attach to their reply a document entitled "Kennebec County Jail Record of Visits" from October 2003, which appears to confirm that Juror 86 visited her son while he was in jail on October 24, 2003, when he was twenty-one years old. *Visitation Log* at 2. Finally, the Defendants also demonstrate through an affidavit from Attorney Leonard Sharon that he represented Juror 86's son in 2010–2011 when the son was charged and convicted of Unlawful Possession of a Schedule Drug, Class E, and fined $750. *Hallett Aff.* ¶ 10; *Sharon Aff.* ¶ 3 (ECF No. 702). It is also true that a woman with the same name as Juror 86, likely M.J.'s mother, paid some or all of Attorney Sharon's legal fees. *Sharon Aff.* ¶ 4.

Even assuming that Juror 86 was generally aware her son had been in and out of some kind of legal trouble and that she had sent some money to his attorney in 2010, this does not necessarily mean that she "failed to answer honestly a material question on *voir dire*." *McDonough*, 464 U.S. at 556. Juror 86 may have concluded that she could not accurately describe his involvement in these "court matters," and it was proper to indicate that she did not have enough information to answer the question.

Alternatively, Juror 86's information about her son's legal troubles may have been non-specific.  At the time of jury selection on January 8, 2014, according to her questionnaire, Juror 86 was about sixty years old, *Juror Questionnaire* at 1, and according to the Defendants' information, her son was thirty-one.  *French Reply* Attach. 14, *Call for Serv.* at 2 (ECF No. 702).  A sixty-year-old mother of a thirty-one-year-old son might or might not be sufficiently aware of the details of his scrapes with the law that occurred in his twenties to describe them accurately in a jury questionnaire.

Secondly, the questionnaire does not define "court matter."  As lawyers and judges, this phrase would likely be interpreted to mean a civil or criminal case filed in court, whether or not the case went to trial.  However, given the fact that the jury questionnaire was being asked in the lead-up to jury selection for a trial, a lay person might have interpreted "court matter" to mean a trial, and there is no evidence that Juror 86's son went to trial on any of his charges.

The Court does not know what exactly Juror 86 was thinking when she wrote "n/a" because defense counsel did not seek to question her during voir dire.  With these ambiguities, the Court concludes that the Defendants have not demonstrated that Juror 86 "failed to answer honestly a material voir dire question" by responding "n/a" to Question 3(a).  *Sampson*, 724 F.3d at 164–65.

## 2.    An Honest, but Mistaken Response

At the same time, based on the record evidence, the Court also concludes that Juror 86's response to Question 3(a) was likely mistaken.  Her son had been involved

in court matters, some involved illegal drugs, and the most recent one involved marijuana, the same controlled substance the Defendants were charged with conspiring to manufacture. Even if the Defendants have not demonstrated that Juror 86 knew enough about her son's legal issues for the Court to conclude she was actively lying about his involvement, the Defendants have produced evidence, including her visit to her son while he was in jail and her payments to his defense lawyer to establish that her "n/a" response was at least mistaken. In other words, the question as to whether any close family member—her son obviously qualifies—was involved in any court matter should have elicited a response from Juror 86 that alerted the Magistrate Judge and the attorneys for both the Government and for the Defendants about her son's involvement with court matters.

This conclusion, however, does not necessarily require a new trial. In *Sampson*, the First Circuit left open the question of whether an honest but mistaken response—without more—would be sufficient to entitle a defendant to a new trial. 724 F.3d at 164 n.8 ("[I]t suffices to say that in the absence of dishonesty, post-trial relief, *if available at all*, will require a more flagrant showing of juror bias") (emphasis added). The First Circuit has not had the opportunity to further explain this cryptic "if available at all" comment. It may be, therefore, that Defendants' requested relief is unavailable. However, this Court concludes that because the Defendants have not demonstrated that Juror 86's responses were dishonest, this is not a case where post-trial relief would be appropriate, and assuming it is possible that an honest but

24

mistaken juror response could justify a new trial, the Court concludes that the Defendants have failed to make "a more flagrant showing of juror bias." *Id.*

### 3. The Role of Counsel During Voir Dire

The Court has already described the vital role voir dire plays in securing "the accused…the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. Indeed, Federal Rule of Criminal Procedure 24 expressly provides that if, as here, the judge questions the potential jurors, it "must permit the attorneys for the parties to…submit further questions that the court may ask if it considers them proper." FED. R. CRIM. P. 24(a)(2)(B). The Court has adopted procedures designed to provide counsel with sufficient information to submit such questions for consideration to the presiding judge. In this case, in accordance with the District's Jury Selection Plan, the Clerk's Office made the responses to the jury questionnaires available before empanelment to all counsel or persons employed by or working for the attorneys. *U.S. Dist. Ct., Dist. of Me., Plan for the Random Selection of Grand and Petit Jurors for Serv. in the Dist. of Me. as Am. Dec. 19, 2012* XV(2). More specifically, on December 3, 2013, when the case was set for trial, the Clerk's Office issued a notice stating:

> Jury questionnaires will be available for inspection in the Clerk's Office three days prior to jury empanelment and should be reviewed since the questions asked in them will not be re-asked during voir dire.

*Criminal Cases Scheduled for Trial Commencing Before Hon. John A. Woodcock, Jr. on Jan. 8, 2014* at 1 (ECF No. 207) (*Scheduling Notice*).[4] As a matter of practice, the

---

[4]   In this Scheduling Notice, the Court permitted all parties to submit proposed questions in advance of voir dire. *Scheduling Notice* at 1 ("Any requested voir dire interrogatories…shall be filed

Clerk's Office makes the jury questionnaires available to counsel as the completed questionnaires come in, typically substantially in advance of the three-day period in the trial notice.   Thus, all counsel had access to Juror 86's questionnaire before the jury empanelment on January 8, 2014.   Indeed, on January 7, 2014, counsel for Haynes Timberland filed a motion regarding access to juror information that was premised on his prior access to the jury information in the Clerk's Office.   *Def. Haynes Timberland, Inc.'s Mot. for Access to Juror Information* (ECF No. 275).[5]   If counsel had any issues with Juror 86's completion of her jury questionnaire, they were free, as counsel for Haynes Timberland did, to bring those issues to the Magistrate Judge's attention by pretrial motion or at voir dire.   They did not.

Moreover, Juror 86's answer "n/a" to Question 3(a), her failure to answer any questions at all on the second page of the jury questionnaire, and her failure even to sign the questionnaire were all immediately obvious.   The jury questionnaire consisted of two full pages with twelve questions, some with subparts.   *Jury Questionnaire* at 1–2.   Juror 86 answered only the questions on the first page, namely six questions, and she left the entire second page blank.   *Id.*   From her answers, the

---

by December 31, 2013"). On December 31, 2013, Defendant Haynes Timberland, Inc., filed proposed questions, but these questions concerned issues relating to illegal immigration. *Def. Haynes Timberland, Inc.'s Request for Voir Dire* (ECF No. 257). The Government submitted a question relating to immigration, as well as a question concerning marijuana legalization and the use of medical marijuana. *Gov't's Proposed Voir Dire* (ECF No. 247). No party proposed questions that sought information about drug convictions involving the jurors' families. Nor did the parties request that the Magistrate Judge clarify her questions regarding the venire's impartiality and prior experiences with illegal drugs. This failure to ask the right questions would seem to preclude a finding of juror misconduct, much less "a more flagrant showing of juror bias" for honest but mistaken responses, regardless of whether Juror 86 fully completed her questionnaire.

[5]     The Magistrate Judge held a hearing on the motion the morning of jury selection and it was quickly resolved. *Tr. of Proceedings*, *Mot. Hr'g* (ECF No. 464).

lawyers only knew the juror's name, age, place of birth, length of residency in Maine, marital status, number of children, prior occupation before retirement, and current occupation. *Id.* at 1. She wrote "n/a" to questions about prior service on a grand jury and on a jury. *Id.* She wrote "n/a" to the question about her or a close family member's involvement with any court matter and to whether either she or an immediate family member had been employed in law enforcement. *Id.*

Because she left the second page blank, at the time of voir dire, the lawyers did not know (1) if Juror 86 was married, her spouse's occupation,[6] (2) her level of education, (3) whether she had any charges currently pending against her for any state or federal crimes, (4) whether she had ever been convicted of a state or federal crime, (5) whether she read, spoke, and understood English, and (6) whether she had any physical or mental conditions which would require accommodations to assist her in her jury service. *Jury Questionnaire* at 2.

Even more significantly, the bottom of page two contains the following statement:

> I declare under penalty of perjury that I have answered all the foregoing questions truthfully and completely.

*Jury Questionnaire* at 2. Beneath this declaration is a place for the prospective juror to place her signature. All of the second page, including the signature block affirming the truthfulness of the information, is blank on Juror 86's questionnaire. *Id.*

---

[6]    Based on the obituary that defense counsel supplied, *French Reply* Attach. 5, *Obituary*, Juror 86's husband may have passed away in 2004. However, the answer to Question 7, like all the questions on the second page, is blank.

Accordingly, Juror 86 never affirmatively represented that the answers she completed were true and complete as required by the form.[7]

Even though all the lawyers, including defense counsel, were or should have been well aware that Juror 86 had failed to complete the jury questionnaire, had left half of the questions blank, had inserted some answers that were ambiguous, and had failed to sign the form, affirming the truth of her responses, they failed to bring any of these issues to the attention of the presiding judge and failed to request that she question Juror 86.  In *McDonough*, the Supreme Court was careful to point out that "it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination."  464 U.S. at 555.

Here, because the lawyers remained silent, the Court does not know what would have happened if they had brought Juror 86's form to the Magistrate Judge's attention.  However, during voir dire, the Magistrate Judge not only repeatedly brought numerous prospective jurors to sidebar to discuss specific issues, but she freely allowed counsel to approach sidebar to discuss issues the lawyers raised.  *Voir Dire Tr.* 12:12–14, 13:24–14:15, 22:2–155:3.  Based on the Magistrate Judge's conduct of the voir dire, the Court concludes that if any of the lawyers had brought Juror 86's

---

[7]     There is a lead-in paragraph in the jury questionnaire that reads in part: "Your answers are given under penalty of perjury; you must give true and complete answers to all questions."  *Jury Questionnaire* at 1.  The Court could assume that Juror 86 read and understood the perjury warning, but the form also instructed Juror 86 that her answers had to be not only true but complete, and she did not complete the form.

incomplete questionnaire to the Magistrate Judge's attention, the Magistrate Judge would have asked Juror 86 to come to sidebar, would have discussed with her the contents of the form, would have asked her to review her answers and the blanks, would have asked her to answer the unanswered questions and to review the ones she answered, would have told her that she was providing the answers under penalty of perjury, and would have asked her whether her completed answers were true. Moreover, if counsel had any concerns about her "n/a" responses, the Magistrate Judge herself would have either questioned Juror 86 or allowed them to do so at sidebar.

The Defendants explain, however, that they could not have obtained the information about Juror 86's experiences with marijuana, nor even asked the right questions of the juror during voir dire, because Juror 86 incorrectly wrote "n/a" next to Question 3, which asked about prior court matters involving the jurors or their close family. In fact, the Defendants make the unusual claim that Juror 86's answer to Question 3(a) "lulled the parties into complacency." *French Reply* at 4. Here, by "parties," the Defendants really mean the lawyers. The law does not expect criminal defense lawyers to be so easily tranquilized and certainly does not expect them to be complacent in protecting their clients' Sixth Amendment rights to an impartial jury. Obvious omissions and ambiguities in the juror questionnaires constitutes "information which objectively [counsel] should have obtained from a juror on *voir dire* examination." *McDonough*, 464 U.S. at 555. In fact, the *Sampson* binary test implicitly requires defendants to have asked the presiding judge to pose the right

29

questions of the venire during voir dire.  *See Sampson*, 724 F.3d at 164–65 (an honest

answer "would have provided a valid basis for a challenge for cause").

Given the facts in this case, the Court concludes that the Defendants may not

rely on an incomplete, unsworn, and ambiguous questionnaire to support their theory

of jury misconduct when it was the Defendants' own responsibility to recognize the

problem and address the issue when voir dire commenced well over two years ago.

## B.   Juror 86 Did Not Fail to Answer Honestly a Material Voir Dire Question

The Court turns to the Defendants' second contention: that Juror 86 failed to

honestly answer one of the Magistrate Judge's questions during jury voir dire.  Part

one of *Sampson*'s binary test requires the Court to determine whether "the juror

failed to answer honestly a material voir dire question."  *Sampson*, 724 F.3d at 164.

To set the stage, the Magistrate Judge began the jury selection process by

explaining the procedure.  She first told the venire that they were required to answer

all questions truthfully:  "Now, in a moment, [the Clerk] is going to administer to you

your oath.  That's your jurors' oath to answer truthfully to all of the questions that

are put to you." *Voir Dire Tr.* 2:24–3:1.  Subsequently, the Clerk administered the

following oath:

> Do each of you solemnly swear that you will truly answer all questions
> put to you by the court regarding your ability to serve on the jury to be
> drawn today, so help you God?

*Id.* 7:19–22.  The transcript indicates that all potential jurors responded, "Yes."  *Id.*

7:23.  The Magistrate Judge also informed the venire about the protocol to be followed

if one of the potential jurors had an affirmative response to one of the questions.  *Id.*

3:8–14. She told them that she would often ask them to come to sidebar to discuss the matter privately. *Id.* 3:10–14. The Magistrate Judge informed the venire that "[t]his morning's exercise is our attempt to obtain [a] fair and impartial jury" and she again reminded them that "it's so imperative that you answer truthfully and honestly…all these questions." *Id.* 4:6–9.

Before the Magistrate Judge came to the disputed question in this case, she followed the procedure she had outlined: asking a general question to all the potential jurors and, if there was a positive response, she asked the responding juror to come to sidebar. *See id.* 21:18–22:3. Thus, before the Magistrate Judge asked the question, Juror 86 had taken an oath to tell the truth in response to any questions, had been reminded of the vital importance of answering the questions truthfully, and was aware that if she answered a question affirmatively, her privacy would be protected by a sidebar conference.

Toward the end of the voir dire, the Magistrate Judge put the following question to the potential jurors:

> Now, as you've heard for a couple hours now this morning, this is a case about marijuana, which is a controlled substance under federal law. Is there anyone on the jury panel who themselves personally or a close family member has had any experiences involving controlled substances, illegal drugs, specifically marijuana, that would affect your ability to be impartial?
>
> And by any experiences, I'm talking about whether you or a close family member have been involved in a situation involving substance abuse or involving treatment that—maybe professionally treating that condition, or being the victim of a crime involving those substances, or being the perpetrator of a crime where someone alleged those substances were involved. Any involve—view or experiences regarding illegal drugs, and

> specifically marijuana, but any illegal drug, controlled substance under
> federal law, is there anyone who's had that sort of experience?[8]

*Voir Dire Tr.*, at 115:23–116:14. As an initial matter, the question was clearly
material. By its terms, the question sought to identify jurors who believed that their
prior experiences with illegal drugs might affect their ability to be impartial.
"Questions that go to the heart of juror impartiality are unarguably material to the
voir dire process." *Sampson*, 724 F.3d at 167.

Given the results of the Defendants' post-trial investigation of Juror 86 and
her son, the Defendants strenuously contend that Juror 86 should have responded
affirmatively to the Magistrate Judge's question. The Court disagrees. As every trial
lawyer knows, the answer depends upon the question asked. Here, it is essential to
parse the question to see whether, given what is known about Juror 86's son, she
should have responded affirmatively. The precise question was:

> Is there anyone on the jury panel who themselves personally or a close
> family member has had any experiences involving controlled
> substances, illegal drugs, specifically marijuana, *that would affect your
> ability to be impartial*?

---

[8]     The Court acknowledges that conducting jury voir dire is a difficult art; nevertheless, the
question here was unusually long and convoluted with subordinate clauses and stops and starts. The
issue before this Court would have been clearer if the Magistrate Judge had asked a more generalized
and direct question—for example, have you or a close family member had any experiences with drugs
that would make it difficult for you to be a fair and impartial juror? At sidebar, the Magistrate Judge
could have followed up with specific questions about the nature of the experience. Although the Court
is always concerned about requiring people to acknowledge publicly that they or a close family member
has had a problem with drugs, this Court's experience has been that the people in the venire are willing
to raise their hands and come to sidebar to explain their experiences, including as in this case,
revealing that a son or daughter has had trouble with the law due to illegal drug use. Again, the Court
emphasizes the role of counsel. Even though the practice in this District is for the judge to perform
jury voir dire, this does not absolve counsel from the duty to bring a convoluted question—such as the
one in this case—to the attention of the judge and ask for a more direct question.

*Id.* 115:25–116:4 (emphasis added).  For good reason, the Magistrate Judge did not ask the venire whether any of them or a close family member had "had any experiences involving controlled substances, illegal drugs, specifically marijuana." A question phrased this way would have run the risk of forcing a potential juror to confess to a crime in front of a federal prosecutor.  The way the Magistrate Judge phrased the question allowed the potential jurors to decide for themselves whether their or their families' experiences with drugs would have affected their ability to be impartial.  In fact, the phrasing presumes that some jurors or their close family members might have had experiences with drugs that would not render them unable to be impartial.

The Defendants correctly point out that the second portion of the Magistrate Judge's question expressly mentions "a close family member . . . being the perpetrator of a crime where someone alleged those substances were involved." *Id.* 116:6–11.  The Defendants contend that this question required Juror 86 to "come clean with respect to involvement of any kind of illegal substances" and that her failure to answer honestly satisfies the first prong of the *Sampson* test.  *French Reply* at 7.  The Court disagrees.  In her long description, the Magistrate Judge was giving examples of experiences that could lead a juror to conclude that she could not be impartial.  The Magistrate Judge never said nor implied that if a close family member had been accused of committing such a crime, the juror must respond affirmatively so that the Court and the attorneys could make their own evaluation of the juror's ability to be impartial.  In other words, the Magistrate Judge asked the potential jurors to

consider certain types of experiences that could affect a juror's fairness, and then asked them whether they believed their life experiences would affect their ability to remain impartial.  It is entirely reasonable to conclude that, upon hearing these examples, Juror 86 maintained her belief that she could decide the facts of the case based solely on the evidence despite her son's previous involvement with marijuana.

Thus, the Defendants' argument rests on the faulty premise that because Juror 86's son was previously convicted of a drug offense, she must have lied when she resolved that she could be an impartial juror.  One does not necessarily flow from the other.  It may well be that Juror 86 believed that, despite her son's troubles with the law, she would still be able to impartially judge the facts of the case based solely on the evidence presented at trial, and therefore an affirmative response was not necessary.  The Defendants offer no proof to the contrary.

Moreover, Juror 86 swore an oath at the beginning of the voir dire process, and the Defendants' assumption runs headlong into the presumption that potential jurors tell the truth on voir dire.[9]  *See United States v. Huguenin*, 950 F.2d 23, 30 (1st Cir. 1991) (endorsing the view that "courts ordinarily presume veniremen to tell the truth

---

[9]      This presumption makes eminently good sense in the context of jury selection.  Having been screened by security, having entered an impressive federal courtroom, having been sworn to tell the truth in a court of law, having been presented with instructions about the imperative to tell the truth so that the parties receive a fair and impartial trial, in the presence of a federal judge, two federal prosecutors, and in this case, five defense lawyers, the potential jurors, including Juror Number 86, must have known that this was very serious business.  Moreover, knowingly lying during voir dire subjects jurors to possible criminal contempt pursuant to 18 U.S.C. § 401, as well as to possible substantial restitution claims by the government.  *United States v. Colombo*, 869 F.2d 146, 151 (2nd Cir. 1989).  This does not mean that potential jurors will never willfully lie or make honest mistakes in responding to voir dire inquiries.  But the incentive for potential jurors to be scrupulously honest is apparent.

on voir dire") (citing *United States v. Masat*, 896 F.2d 88, 95 (5th Cir. 1990)); *see also United States v. Gometz*, 879 F.2d 256, 261 n.3 (7th Cir. 1989) (concluding that where no member of the jury expressed prejudicial sentiments during voir dire regarding the defendant's decision to invoke the Fifth Amendment, "the law is entitled to presume that these individuals responded to questions honestly"); *United States v. Rosario*, 111 F.3d 293, 300 (2nd Cir. 1997) ("[A]bsent evidence to the contrary, we presume that jurors remain true to their oath"). Based on an analysis of the precise question, the Court concludes that the Defendants have not overcome this presumption. Without more, the Court does not conclude that Juror 86 failed to answer honestly the Magistrate Judge's question.

Finally, at the end of the entire session, the Magistrate Judge inquired:

> Is there anyone here who knows of any other reason, some question I haven't asked or something that's been sitting there troubling you, why hasn't she asked me about this, those attorneys, those people should know about this fact and it might interfere with me being a fair and impartial juror or it might appear that it would interfere, *is there any other fact that you feel would affect in any way your ability to be a fair and impartial juror?*

*Voir Dire Tr.*, at 143:14–21 (emphasis added). No jurors responded affirmatively. *Id.* at 143:22–23. Once again, it may be that Juror 86 believed that her son's prior drug convictions would not impact her ability to be a fair and impartial juror. Juror 86 swore an oath before voir dire, and this Court will presume that Juror 86 answered the Magistrate Judge's questions in accordance with that oath.

In sum, the Court does not find that the facts in this case establish that Juror 86 "failed to answer honestly a material voir dire question." *Sampson*, 724 F.3d at 164–65.

## C.   Valid Basis for a Challenge for Cause

Assuming arguendo that the Magistrate Judge's questioning required Juror 86 to disclose her son's convictions, and that Juror 86 failed to answer honestly by remaining silent, it is still not clear that the Defendants have satisfied the second prong of *Sampson*'s binary test, namely, that a truthful response to the question would have provided a valid basis for cause. *See Sampson*, 724 F.3d at 165. In *Sampson*, the First Circuit discussed the standard by which a trial court should evaluate a challenge for cause:

> [W]hether a reasonable judge, armed with the information that the dishonest juror failed to disclose and the reason behind the juror's dishonesty, would conclude under the totality of the circumstances that the juror lacked the capacity and the will to decide the case based on the evidence (and that, therefore, a valid basis for excusal for cause existed).

724 F.3d at 165–66.

In *Sampson*, the First Circuit listed a number of factors that may be relevant in determining whether a juror "has both the capacity and the will to decide the case solely on the evidence." 724 F.3d at 166. Those factors include (1) "the juror's interpersonal relationships"; (2) "the juror's ability to separate her emotions from her duties"; (3) "the similarity between the juror's experiences and important facts presented at trial"; (4) "the scope and severity of the juror's dishonesty"; and (5) "the juror's motive for lying." *Id.* at 166.

36

The *Sampson* decision cited cases containing examples of each factor.  For "the juror's interpersonal relationships," the *Sampson* Court cited *United States v. Colombo*, 869 F.2d, 146, 151–52 (2nd Cir. 1989), and *United States v. Scott*, 854 F.2d 697, 698–700 (5th Cir. 1988).  In *Colombo*, a potential juror deliberately refused to reveal that her brother-in-law was a government lawyer and admitted to a fellow juror that she had done so in order to be seated on a jury involving those who allegedly plotted their crimes at a business near her residence.  869 F.2d at 151–52.  In *Scott*, a potential juror failed to disclose that his brother was a deputy sheriff in the office that performed some of the investigation of the case being tried.  854 F.2d at 698. Here, in the circumstances of this case, Juror 86's failure to reveal that her son was convicted of previous drug offenses does not approach the facts in *Colombo* or *Scott*.

The second and third factors are closely related.  The second factor is when a juror finds it difficult to separate emotions from a duty to be objective.  The third factor is the similarity between the juror's experiences and important facts presented at trial.  With respect to the second factor, the First Circuit cited two cases.  *See Dennis v. Mitchell*, 354 F.3d 511, 518–19 (6th Cir. 2003); *Burton v. Johnson*, 948 F.2d 1150, 1158–59 (10th Cir. 1991).  In *Dennis*, a death penalty case for murder occurring during a robbery, the Sixth Circuit affirmed the denial of a petition for writ of habeas corpus even though a female juror failed to disclose that contemporaneous with jury selection, she was soon to sign a criminal complaint as the victim in a case involving gross sexual imposition.  354 F.3d at 518–19.  Upon questioning, the juror informed the trial court that she was confident in her ability to separate her emotions from her

juror duty in part because she did not view the defendant's crime as similar to her experience. *Id.* at 518. The Sixth Circuit upheld the trial court's determination that the juror could satisfactorily separate her emotions the case. *Id.* at 519–521. In *Burton*, by contrast, the Tenth Circuit affirmed the granting of a new trial where the defendant had been charged with shooting and killing her husband and the defense was the "battered woman's syndrome." 948 F.2d at 1151. The juror failed to reveal that she and her children had been and at the time of the trial were still victims of abuse. *Id.* at 1154.

With respect to the third factor, the First Circuit cited *Burton*, as well as *United States v. Torres*, 128 F.3d 38 (2nd Cir. 1997). In the latter case, the defendants were on trial for money laundering and structuring deposits to avoid the $10,000 reporting requirements, and the potential juror admitted that she had similarly engaged in structuring deposits to avoid the $10,000 reporting requirement. *Id.* at 41–42. The Second Circuit upheld the trial court's decision to excuse the juror for cause because the activities were "closely akin" and "too closely resembled" one another. *Id.* at 41, 48.

In this case, the Defendants' case and Juror 86's son's experiences both relate to marijuana, and it appears that they all grew marijuana in a bog, *French Mem.* at 3; *French Reply* Attach 7, *Aff. in Supp. of Probable Cause* at 1 (ECF No. 702), but the similarities end there. In *Torres* and *Burton*, the jurors' experiences aligned closely with the circumstances surrounding the defendants' trials. *See also Sampson*, 724

F.3d at 168 (finding bias where the overlap between a juror's experience and the defendants' conduct was "striking").

Here, by contrast, the Government charged the Defendants with operating a multi-million dollar marijuana production and distribution conspiracy. Juror 86's son's illegal activity was of a different order of magnitude. He was convicted three times of low-level drug possession offenses for which he actually served only seven days in jail. *French Mem.* at 3–4. Like many drug defendants, he had some difficulty staying clean, and when he was in his early twenties, he ended up violating his probation conditions and spending twenty-one days in jail. *Id.*

Because of the differences between Juror 86's experiences and the circumstances surrounding the Defendants' trial, it is reasonable to conclude that Juror 86 was able to separate her emotions from her duty to be objective. In this way, Juror 86's case is more akin to *Dennis* than *Burton*. The Defendants have failed to produce any convincing evidence to the contrary. Indeed, Juror 86's lack of response to the Magistrate Judge's questions regarding impartiality provides some evidence that she actually believed herself able to separate her emotions from her duty. Thus, the Court determines that neither the second nor third *Sampson* factor is indicative of bias in this case.

The fourth factor is the scope and severity of the juror's dishonesty. Again, the First Circuit cited two cases. In the first, *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998), a death penalty case involving hostage-taking and murder, a juror denied that any of her relatives or close friends had ever been the victim of any crime, and denied

that any of her relatives or close friends had ever been accused of crimes other than traffic offenses. *Id.* at 972. In fact, her brother had been pistol-whipped and shot in the back of the head, and it turned out that the juror and her siblings had been kidnapped by her father when she was a child, that she had been attacked at knifepoint by her cousin, that she was the victim of countless burglaries, that her husband had been arrested on rape charges just a month before trial, and that numerous other members of her family had been in serious trouble with the law. *Id.* at 975, 979–81 (describing her first denial as "just the tip of Pinocchio's nose"). The second case, *Scott*, is the case where the potential juror failed to reveal his brother's employment with a law enforcement agency investigating the case. 854 F.2d at 697–98.

The facts of the present case differ substantially from either *Dyer* or *Scott*. In *Dyer*, the defendant flatly lied to a direct question, and the lie masked the fact that a number of her past experiences closely resembled the circumstances of the case. In this case, Juror 86 failed to respond to a rather convoluted voir dire question that, in the Court's view, related to the ability of the jurors to be impartial. Unlike *Scott*, where the juror's brother was a member of the agency investigating the case, there is no indication that Juror 86's son was in any way related to the Defendants' drug activities.

The final factor is the juror's motivation for lying. The First Circuit cited *McDonough*, as well as *Skaggs v. Otis Elevator Co.*, 164 F.3d 511 (10th Cir. 1998). In *McDonough*, the Supreme Court addressed a "mistaken, though honest response to a

question." 464 U.S. at 555.  In *Skaggs*, a civil action, a voir dire question should have elicited the potential juror's history of lawsuits, but the juror failed to mention them. 164 F.3d at 514.  The Tenth Circuit observed that the evidence failed to establish that the juror's non-disclosure was motivated by a desire to obtain a seat on the jury and that he may have been motivated by embarrassment about his personal financial difficulties and subsequent litigation.  *Id.* at 518.

Here, the Defendants speculate about why Juror 86 might have failed to admit her son's criminal conduct.  *French Mem.* at 10.  They claim that "this juror was either too embarrassed to provide the information needed, or wanted to sit on the jury."  *Id.* The Court views these arguments skeptically.   First, the Defendants provide no evidence at all that Juror 86 wanted to sit on the jury, other than to say "it could easily be that [Juror 86] did want to be seated[.]"  *French Reply* at 8.  Second, *Skaggs* itself makes clear that Juror 86's embarrassment alone would not provide a valid basis for a challenge for cause.  164 F.3d at 514.  Again, the Tenth Circuit ruled that the evidence in that case did not demonstrate juror bias because an "equally plausible explanation" for the juror's silence may have been embarrassment.  164 F.3d at 518; *see also McDonough*, 464 U.S. 548, 556 ("The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial").

Based on the First Circuit's teaching in *Sampson*, the Court concludes that a reasonable judge, upon learning of the prior drug convictions of Juror 86's son and in the face of Juror 86's representation that she could be fair and impartial, would not

have sustained a challenge for cause because there would have been no valid basis to "conclude under the totality of the circumstances that the juror lacked the capacity and the will to decide the case based on the evidence (and that, therefore, a valid basis for excusal for cause existed)." *Sampson*, 724 F.3d at 165–66.[10]

### D.     The Right to a Hearing

#### 1.       General Legal Principles

In their motion, the Defendants maintain that they have presented a "non-frivolous" claim justifying a full investigation, including a hearing in which the Court questions Juror 86. *French Mem.* at 10; *French Reply* at 8–9. They recognize that Juror 86 "may suffer discomfort" in such a hearing but contend that the Court's duty to ensure that the Defendants received a fair trial outweighs such considerations. *Id.* The Government responds that the Defendants have not offered any evidence that Juror 86 was biased and thus a hearing is unwarranted. *Gov't's Obj.* at 12.

The First Circuit has instructed that if a "nonfrivolous suggestion is made that a jury may be biased or tainted by some incident, the district court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial." *United States v. Ramirez-Rivera*, 800 F.3d 1, 40–41 (1st Cir. 2015) (quoting *United States v. Ortiz-Arrigoitia,* 996 F.2d 436, 442 (1st Cir.1993)).  The First Circuit has emphasized, however, that the trial court "is vested

---

[10]       The Government contends that the Defendants' desire to retain Juror 10 provides further proof that the Defendants would not have asserted a challenge for cause if Juror 86 provided a truthful answer.  *Gov't's Obj.* at 8–11.  The analogy to Juror 10 is unpersuasive.  Juror 10's views toward marijuana clearly favored the Defendants.  In fact, Defense counsel quipped that, "I move that we try this case in front of that juror only."  By contrast, accepting her silence as an affirmation of her belief that she could be impartial, there is no other evidence that Juror 86's feelings toward marijuana would have favored either the Defendants or the Government.

with the discretion to fashion an appropriate and responsible procedure to determine whether misconduct actually occurred and whether it was prejudicial." *Id.* at 41 (quoting *Ortiz-Arrigoitia*, 996 F.2d at 443). "Substantial deference is due the trial court's exercise of its discretion[.]" *Id.* (quoting *United States v. Angiulo,* 897 F.2d 1169, 1185 (1st Cir.1990)).

The First Circuit also teaches that when a defendant's assertions embody "evidence so sparse, a pyramiding of inferences so fragile, a thesis so speculative, as to envelop the bias/misconduct charge in a miasma of doubt," then an evidentiary hearing with the juror is not constitutionally required. *Neron*, 841 F.2d at 1203 (1st Cir. 1988). In *Neron*, the defendant claimed that his "son had dated a woman who later became a juror." *Id.* The First Circuit found that "[t]he mere fact that [the defendant's] son dated a woman who later became a juror was not 'so inherently prejudicial that [the defendant] was thereby denied his constitutional right to a fair trial. *Id.* The First Circuit went to on say that the defendant "was obliged to make a more cogent showing before it became constitutionally imperative to recall the juror." *Id.*

The same is true in this case. The criminal activities of Juror 86's son differ in significant ways from the Defendants' conduct in this case. The fact that Juror 86's son committed minor drug offenses—relative to the Defendants—was not "so inherently prejudicial that [the Defendants were] thereby denied [their] constitutional right to a fair trial." *See id.* at 1203. As explained above, the Defendants have not produced convincing evidence either that Juror 86 failed to

answer honestly a material question or that she was biased.  In accordance with *Neron*, this Court concludes that the Defendants are "obliged to make a more cogent showing" before the Court will recall the juror for an evidentiary hearing.  *See id.*

### 2.    Propriety of Questioning Juror 86

This is the second time the Defendants in this case have attacked the verdict by attacking the jurors.  In resolving the prior motion against the Defendants, this Court expressed its concerns regarding the fairness of hauling a juror into court and demanding that the juror testify to what he was thinking during voir dire one year earlier.  *See United States v. French*, No. 1:12-cr-00160-JAW, 2015 U.S. Dist. LEXIS 59133, at *72 (D. Me. Apr. 27, 2015).  These considerations are especially applicable in this case, where the Defendants filed their motion more than two years after the challenged voir dire.[11]

First, although the parties have been intensely involved in the circumstances surrounding the January 8, 2014 voir dire, there is no indication that Juror 86 has given jury selection a moment's thought since then.  The Court is deeply concerned

---

[11]        The Court is aware that Judge Hornby of this District ordered a new trial when it came to light after a guilty verdict that one of the jurors had made ethnic slurs during the trial against the Defendants.  *United States v. Fuentes*, No. 2:12-cr-50-DBH, 2013 U.S. Dist. LEXIS 115459 (D. Me. Aug. 15, 2013).  There are, however, several distinctions between *Fuentes* and this case.  First, timing. The *Fuentes* jury returned a guilty verdict on March 18, 2013, and the juror misconduct issue came to the attention of the Judge on April 16, 2013, less than one month after the verdict.  *Id.* at *2.  Second, ethnic slurs.  In *United States v. Villar*, 586 F.3d 76 (1st Cir. 2009), the First Circuit ruled that a district judge has the discretion to hold an inquiry into possible bias in jury deliberations where the claimed bias involved racial or ethnic prejudice.  *Id.* at 87–88.  The First Circuit has not formally extended *Villar* into other types of potential misconduct.  *But see United States v. Jones*, 674 F.3d 88 (1st Cir. 2012).  Third, narrowness of the factual issue.  In *Fuentes*, the Judge was confronted with a very narrow factual issue—either the juror made an ethnic slur during his service on a jury or he did not.  *Fuentes*, 2013 U.S. Dist. LEXIS 115459, at *20–21.  Fourth, jury empanelment. In *Fuentes*, the Judge concluded that despite the juror's ethnic slur, the Judge concluded that the defendants had not proven that the juror was dishonest during voir dire.  *Id.* at *17–19.

about the fairness of bringing Juror 86 into court, presenting her with her incomplete jury questionnaire, confronting her with the Magistrate Judge's list of questions, pointing out her son's prior convictions, and demanding that she explain why she did not inform the Court and the parties of her son's experiences.

Second, many individuals would find the contemplated hearing nerve-racking in the extreme.  Having sat on a three-week trial, having acted as a member of the jury, having deliberated with other jurors, and having issued a verdict finding the Defendants guilty of numerous serious federal crimes, Juror 86 would find herself back in the same court over two years later, presided over by the same judge, looking at the same federal prosecutors, many of the same five defense lawyers, including as an addition, Attorney Leonard Sharon, her son's former defense counsel, and the same Defendants.  There is no telling how Juror 86 would respond to the prospect of such an inquisition, but many people would find the experience intimidating and confusing.

Beyond fairness concerns, the Supreme Court has identified a number of policy considerations that caution against direct contact with jurors after a verdict.  In *Tanner v. United States*, 483 U.S. 107 (1987), the Court refused to admit a juror's testimony that other jurors used drugs and consumed alcohol during the trial.  *Id.* at 108.  The Court recognized that a number of public interests weighed against hauling a juror before the Court following a verdict to testify about the jurors' deliberations. *Id.* at 120–124.  These interests include preventing harassment of former jurors by losing parties as well as the possible exploitation of disgruntled or otherwise badly-

motivated ex-jurors, *id.* at 124, preserving the community's trust in a system that relies on the decisions of laypeople, *id.* at 121, and ensuring finality. *Id.* at 120.

Although the *Tanner* Court identified these policy concerns in the context of protecting jury deliberations, these same factors weigh against this Court's post-verdict contact with Juror 86. Opening the door to post-verdict contact with jurors would incentivize defeated parties or others upset with the verdict to harass jurors in an attempt to secure some evidence of "misconduct sufficient to set aside the verdict." *Id.* at 120 (quoting *McDonald v. Pless*, 238 U.S. 264, 268).

Moreover, the jury system is founded upon community trust. Citizens trust their peers to decide cases fairly and accurately based on the evidence and the law. However, disappointment in a jury verdict does not warrant criticism of the jurors who issued it. To insist on reexamining a verdict by retroactively questioning the qualifications and truthfulness of a juror erodes the foundations of public trust upon which the jury system relies. Although "[t]here is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior[,] [i]t is not at all clear…that the jury system could survive such efforts to perfect it." *Id.* at 120.

Perhaps most importantly, permitting post-verdict contact with jurors disrupts the finality of the verdict. *Id.* Finality concerns are particularly apparent where, as here, the "[p]assage of time [and] erosion of memory" threaten the accuracy of a juror's testimony. *See e.g. Engle v. Isaac* 456 U.S. 107, 127–128; *see also Tanner*, 483 U.S. at 120 ("Allegations of juror misconduct…raised for the first time days, weeks, or

months after the verdict, seriously disrupt the finality of the process"). The Supreme Court recently discussed finality concerns in *Dietz v. Bouldin*, 136 S. Ct. 1885 (2016). In *Dietz*, the Court cautioned district courts against invoking their inherent power to recall a discharged jury. *Id.* at 1895. In part, the Court reasoned that a long delay between discharge and recall might lead jurors to forget key facts, and various external influences might taint the juror in the intervening period. *Id.* at 1893–94.

The same considerations caution against recalling Juror 86 here. It is very difficult more than two years after the fact to recreate what happened at voir dire. At the very least, it would be important for Juror 86 to know exactly what the Magistrate Judge told the jury venire in an effort to refresh her memory. Even if the Court read the Magistrate Judge's questions verbatim to Juror 86, numerous other considerations may make it difficult for Juror 86 to recreate her exact thinking. For example, her relationship with her son or her views toward marijuana may have changed in the intervening period, raising the possibility that she may now have different feelings about the Defendants' conduct than she did at trial.[12] Furthermore, unlike her state of knowledge at voir dire, Juror 86 sat through a three-week trial with countless witnesses and exhibits, including the testimony of two of the Defendants in which they denied committing the charged offenses. The evidence revealed a large-scale marijuana operation complete with illegal workers, who were

---

[12]    To this point, just this November, (although perhaps subject to a recount), the voters of the state of Maine narrowly approved a referendum question, legalizing marijuana. The Maine vote was echoed in California, Massachusetts, and Nevada. These votes bring to twenty-eight the number of states plus the District of Colombia that have legalized marijuana. How these national and state developments since 2014 might affect Juror 86 is speculative.

spirited away from the grow site.  Any new feelings about the case may color her ability to recreate her mental state at the time of voir dire.

Finally, deliberately lying during voir dire is a crime.  *Colombo*, 869 F.2d at 151 ("Knowingly lying during the *voir dire*…subjected the juror to possible criminal contempt pursuant to 18 U.S.C. § 401").  Juror 86 would have the right to remain silent and the right to counsel.  Even if she did not request counsel, the Court would likely act sua sponte and appoint counsel to represent her.

In bringing Juror 86 back, there are three broad possibilities: she confirms the Defendants' suspicions, she does not, or she expresses confusion and uncertainty about the entire matter.  If, as Defendants propose, Juror 86 admitted that she deliberately lied about her son's criminal involvement and consciously remained silent to the Magistrate Judge's question when she knew she should not have done so, her newly-appointed lawyer would no doubt advise her to take the Fifth Amendment given her criminal exposure.  If she satisfactorily explained her questionnaire responses and her silence during voir dire, the result would be the same as the Court is ordering today.  If she looked bewildered, expressed embarrassment, and equivocated, the Court and the parties would be no better off, except the Defendants would not have sustained their *Sampson* burden.

Anticipating the Court's concern about Juror 86's potential criminal exposure if she did what the Defendants claim she did, the Defendants assert in their reply that the Court or the Government could simply grant Juror 86 immunity.  *French Reply* at 8.  The Defendants cite no authority for the proposition that the Court—as

48

opposed to the Government—could grant immunity sua sponte in this case, and the Court is extremely doubtful of its authority to do so. *See* 18 U.S.C. § 6003; *Dirosa v. United States*, No. 2:11-CR-00193-GZS, 2015 WL 9596017, at *5 (D. Me. Dec. 3, 2015), *report and recommendation adopted*, No. 2:11-CR-00193-GZS, 2016 WL 50420 (D. Me. Jan. 4, 2016) ("[T]he power to grant immunity is vested in the prosecutor. The government has broad discretion in its grants of immunity. It is the [prerogative] of the Attorney General and his designees to determine whether a grant of immunity is "in the public interest[.]"") (internal quotation marks omitted); *United States v. Davis*, 623 F.2d 188, 193 (1st Cir. 1980) (the district court has no general power to grant immunity for a witness unless the defendant would be denied due process); *In re Daley*, 549 F.2d 469, 479 (7th Cir. 1997) ("Courts have clearly stated that the power to apply for immunity pursuant to 18 U.S.C. §§ 6002-03 rests solely with the Government, being confined to the United States Attorney and his superior officers").

Given all these concerns, it is unsurprising that the First Circuit strongly disfavors post-verdict contact with jurors. *See United States v. Meader*, 118 F.3d 876, 878 (describing "First Circuit authority strongly disfavoring direct contact with jurors"); *Bouret-Echevarria v. Caribbean Aviation Maint. Corp.*, 784 F.3d 37, 48 n.8 (1st Cir. 2015) (quoting *United States v. Kepreos*, 759 F.2d 961, 967 (1st Cir. 1985)) (noting that post-verdict contact with jurors is prohibited in the First Circuit generally). The First Circuit has limited such post-trial juror contacts to "'extraordinary situations.'" *Dall v. Coffin*, 970 F.2d 964, 972 (1st Cir. 1992) (quoting *Kepreos*, 759 F.2d at 967); *see also United States v. Swan*, No. 1:12-cr-00027-JAW-02,

49

2016 WL 4039393, 2013 U.S. Dist. LEXIS 110915 (D. Me. Aug. 7, 2013) (declining co-defendant's request to interview jurors who participated in trial resulting in guilty verdict of co-defendant). For the reasons listed above, the Court does not believe that this is one such "extraordinary situation," and thus the Court will not schedule an evidentiary hearing at which Juror 86 is called to testify.

### E.   Prejudice

Finally, in *Wilder v. United States*, 806 F.3d 653 (1st Cir. 2015), a case that involved a defendant's Fifth Amendment right to be present at voir dire, the First Circuit observed that the Defendant did not meet his burden to show actual prejudice as he had not demonstrated that "the outcome would have been different." *Id.* at 659. Here, the Defendants similarly fail to meet their burden to show any actual prejudice. The Court previously reviewed the strength of the Government's case against each of the Defendants. *Order Den. Defs.' Suppl. Mots. for New Trial* at 55–69 (ECF No. 500). Given the strength of the Government's case here, "it requires too much speculation to say that the outcome would have been different." *Wilder*, 806 F.3d at 659.

### F.   Summary

The Court ends by reiterating what it concluded in the Defendants' earlier motion that attacked another juror. In *McDonough*, then Justice Rehnquist wrote:

> To invalidate the result of a 3-week trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give. A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination.

464 U.S. at 555.  To invalidate the result of the Defendants' nearly three-week trial where they have failed to demonstrate that Juror Number 86 dishonestly answered any of the questions, both in the jury questionnaire and during voir dire, is "to insist on something closer to perfection than our judicial system can be expected to give." *Id.*

## V.  CONCLUSION

The Court DENIES Defendant's Motion for New Trial Pursuant to F.R. Crim. P. 33 (ECF No. 674), including Defendants' request for an evidentiary hearing.[13],[14] The Court also DENIES Defendant Kendall Chase's Motion to Join Defendant Malcolm French's Motion for New Trial (ECF No. 678), Defendant Rodney Russell's

---

[13]    The Defendants filed their motion and reply under seal and the Government followed suit. The Court has substantial qualms about whether this order as drafted should be sealed.  *See United States v. Kravetz*, 706 F.3d 47 (1st Cir. 2013).  Similarly, the parties' filings are subject to a presumption of disclosure since they are "relevant to the determination of the litigants' substantive rights" under *Kravetz*.  *Id.* at 58.  Yet, the parties have filed documents that reveal the name of the juror and her son's name.  Consistent with *Kepreos*, 759 F.2d 961, the names of jurors should be protected from public disclosure.  Accordingly, the Court orders counsel within seven days of the date of this order to notify the Court whether they object to the unsealing of this Order, and if so, the basis for their objection.  Further, the Court orders counsel to file redacted copies of all pleadings and documents associated with this motion protecting the name of the juror and her son, but releasing the rest of the documents in accordance with *Kravetz*.  The Court orders that the parties file such redacted documents within two weeks of the date of this order or such further time as may be necessary upon motion of the parties.

[14]    In addition to requesting a hearing in their motion for new trial, on November 4, 2016, the Defendants moved a second time for a hearing and asked that it be scheduled "within the next month." *Mot. for Hr'g on Def.'s Pending Mot. for New Trial Pursuant to F.R. Crim. P. 33* (ECF No. 712).  On November 7, 2016, the Government objected.  *Gov't's Resp. to Def. French's Mot. for a Hr'g on his Pending Mot. for New Trial* (ECF No. 713).  As Mr. French had clearly requested a hearing in his original motion for new trial, the Court views the latest motion as evidence of Mr. French's frustration with the Court's delay in issuing an opinion or acting on the motion for hearing.  The Court regrets the time it has taken to fully consider and rule on the motion for new trial.  In its defense, the Court has been anxious to fully consider Defendants' detailed motion, to thoroughly address the issues the Defendants have raised, and to adequately explain the reason for its rejection of the motion.  To hold a hearing would in the Court's opinion only cause further delay in the resolution of this case at the trial and appellate levels.  The Court DENIES Defendant French's Motion for Hearing on Defendant's Pending Motion for New Trial Pursuant to F.R. Crim. P. 33 (ECF No. 712).

Motion to Join Defendant Malcolm French's Motion for New Trial (ECF No. 682), and Defendant Haynes Timberland, Inc.'s Joinder in Defendant Malcom French's Motion for New Trial (ECF No. 683).

      SO ORDERED.

                            /s/ John A. Woodcock, Jr.
                            JOHN A. WOODCOCK, JR.
                            UNITED STATES DISTRICT JUDGE

Dated this 16th day of November, 2016