UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:12-cr-00160-JAW |
| | ) | |
| MALCOLM A. FRENCH, et al. | ) | |

**ORDER DENYING MOTION TO RECUSE**

Following the Court of Appeals for the First Circuit's September 17, 2018 decision vacating my order denying a motion for new trial and remanding the case to me for further proceedings, the Defendants moved for me to recuse myself from this case. I deny the motion for recusal because I do not find that my impartiality may be reasonably questioned.

**I. BACKGROUND**

On September 14, 2012, in a multi-count indictment, a federal grand jury charged Malcolm French and Rodney Russell with several violations of federal drug laws involving marijuana and with harboring illegal aliens. *Indictment* (ECF No. 2). After a multi-week trial, on January 24, 2014, a federal jury convicted Malcolm French, Rodney Russell, and Kendall Chase of a number of offenses involving the manufacture and distribution of marijuana and of several offenses involving the harboring of illegal aliens. *Jury Verdict Form* (ECF No. 311); *J.* (ECF No. 659); *J.* (ECF No. 661).

On April 28, 2016, Malcolm French filed a motion for a new trial. *Def. Malcolm French's Mot. for New Trial Pursuant to F.R. Crim. P. 33* (ECF No. 674). On May 8,

2016, Rodney Russell joined the motion. *Def. Rodney Russell's Mot. to Join Def. Malcom French's Mot. for New Trial and Mot. to Extend Time to File Supp. Mem.* (ECF No. 682). The basis of this motion for new trial was that Juror 86 had engaged in misconduct by failing to honestly respond to a material voir dire question, namely Question 3 of the jury questionnaire, and that a truthful answer would have provided a valid basis for a challenge for cause. *Sealed Suppl. Mem. in Supp. of Def. Malcolm French's Mot. for New Trial Pursuant to F.R. Crim. P. 33* at 6-7 (ECF No. 685). On November 16, 2016, I denied the motion for new trial. *Order Denying Mot. for New Trial* (ECF No. 734).

Mr. French and Mr. Russell appealed the jury verdict and sentencings to the Court of Appeals for the First Circuit. *Notice of Appeal* (ECF No. 708); *Notice of Appeal* (ECF No. 738); *Notice of Appeal* (ECF No. 739). On September 17, 2018, the Court of Appeals for the First Circuit vacated my order for a new trial based on the response of Juror 86 to question 3 on the jury questionnaire and remanded for further proceedings on that motion. *United States v. French*, Nos. 16-2386, 16-2392, 2018 WL 4403950, 2018 U.S. App. LEXIS 26268, at *33-34 (Sept. 17, 2018) (*French*). The First Circuit rejected the Defendants' remaining challenges to their convictions and sentences. *Id.*

## II.    THE MOTION TO RECUSE

On October 4, 2018, Malcolm French moved for me to recuse myself from the case. *Def. Malcolm French's Mot. to Recuse Judge Woodcock* (ECF No. 787) (*French Mot.*). On October 8, 2018, Mr. Russell joined in Mr. French's motion "for the same

reasons and on the same grounds as set forth in Defendant French's motion" but did not separately brief his position. *Def. Rodney Russell's Joinder in Def. Malcolm French's Mot. to Recuse Judge Woodcock* (ECF No. 789). On October 15, 2018, the Government responded, opposing the motion. *Gov't's Objection to Mot. to Recuse* (ECF No. 792) (*Gov't's Opp'n*). On October 18, 2018, Mr. French filed a reply, which Mr. Russell joined. *Def.'s Reply to the Gov't's Objection to Def.'s Mot. to Recuse Judge Woodcock* (ECF No. 793) (*French Reply*); *Def. Rodney Russell's Joinder in Def. Malcolm French's Reply Entitled "Def.'s Reply to Gov't's Objection to Def.'s Mot. to Recuse Judge Woodcock"* (ECF No. 794).

## III. THE POSITIONS OF THE PARTIES

### A. Malcolm French's Motion

Mr. French "requests that Judge Woodcock recuse himself from acting further in this matter and specifically from conducting a hearing on the bias or misconduct of Juror 86." *French Mot.* at 1. Mr. French explains:

> As grounds, Mr. French states that Judge Woodcock's impartiality might reasonably be questioned as a result of Judge Woodcock's past refusal to follow the law in questioning the jurors concerning allegations of bias and misconduct, and in particular Judge Woodcock's repeated refusal to do so in the instant case, as well as Judge Woodcock's decision to put the interests of a juror ahead of Mr. French's constitutional rights to a fair and impartial jury when faced with the prospect of questioning a juror in the exact type of evidentiary hearing that the First Circuit Court of Appeals suggested should have taken place.

*Id.* (quoting *French*, 2018 U.S. App. LEXIS 26268, at *13 ("The only way to tell if the passage of time would have erased Juror 86's memory of events would be to ask her to recall these events, something the district court declined to do")).

Mr. French recites three instances in which he claims I exhibited bias and a refusal to follow First Circuit precedent regarding challenges to specific jurors: (1) Juror 79; (2) Juror 114; and (3) Juror 86. *Id.* at 2-4. As Mr. French describes it, when defense counsel questioned whether Juror 79 knew one of the witnesses but failed to disclose it during voir dire, even though his motion for new trial alleged that Juror 79's response was intentional, I conducted only "partial hearing on the motion, taking testimony from the witness in the trial, Steve Koenig, who confirmed that he 'knew' the juror in question, and spoke to Juror 79 during a 5-10 minute telephone call in 2013." *Id.* at 2. Furthermore, according to Mr. French, I declined defense counsel's request that I question Juror 79 because I was concerned about Juror 79's potential criminal exposure and his Fifth Amendment rights. *Id.* at 2-3. Similarly, Mr. French accuses me of exhibiting bias in my handling of defense counsel complaints about Juror 114. *Id.* at 3. Finally, Mr. French interprets the First Circuit decision as confirming that I improperly favored the juror over his own constitutional right to a fair and impartial jury. *Id.* at 3-4.

Taken together, Mr. French claims that "the comments and opinions surrounding the Court's three rulings on juror misconduct investigations create an objective risk of bias, or whether this Court's impartiality might reasonably be questioned." *Id.* at 6. Mr. French concedes that "[t]rial rulings on their own can almost never form the basis for a bias or partiality motion." *Id.* Nevertheless, he notes that "where a trial ruling is based upon extrajudicial knowledge and motive, that extrajudicial knowledge and motive *can* form the basis of a bias or partiality

motion," *id.*, and he contends that "a factual basis derived from 'surrounding comments or accompanying opinions' to the trial ruling, may be the basis for a bias or partiality motion." *Id.* (quoting *Liteky v. United States*, 510 U.S. 540, 545, 555 (1966)). Mr. French argues that my "comments and opinions" surrounding my three rulings regarding juror misconduct investigations "create an objective risk of bias" or suggest that my "impartiality might reasonably have been questioned." *Id.*

Mr. French maintains that "[t]he common thread of the Court's comments and opinions surrounding the three Court Orders previously questioned, is the appearance of an extrajudicial bias of the Court in favor of the rights of a juror when weighed against the constitutional requirement of a fair and impartial jury under the Sixth Amendment." *Id.* Mr. French goes further and claims that my "comments and opinions" surrounding my rulings "derive from extrajudicial facts and opinions formulated by the Court as to the sanctity of the individual juror, and the jury system" and are "not formulated from the facts or events set forth in *United States v. French*, but are based on facts and opinions held by the Court outside the confines of the *French* proceedings, and are therefore extrajudicial." *Id.* Quoting one of my comments concerning Juror 79, Mr. French asserts that it is my view the "juror must be protected, at Mr. French's expense." *Id.* at 7. Mr. French charges that "we have a judge who is perhaps uniquely concerned about protecting jurors during investigations for possible wrong-doing," which he acknowledges is "[i]n and of itself . . . not objectionable and perhaps admirable." *Id.* But he says that in doing so, I have

"created a situation where the Court's impartiality 'might reasonably be questioned.'" *Id.*

Mr. French next raises the possibility that I will be unable to apply the directive of the First Circuit on remand in this case. *Id.* at 7-8. He worries that I have developed a "strongly held belief" and I should not "question a potentially mendacious juror" and this creates, in his view, "an *appearance* that the Court *might* be partial to a juror's interests during a continuing investigation of the juror's alleged wrongdoing as required by the First Circuit." *Id.* at 7-8 (emphasis in original). He claims that the Court's refusal to question a juror in the other two instances, "where it should have, creates a situation where the Court's impartiality might reasonably be questioned." *Id.* at 8. He concludes that "[a]ny appearance of partiality is unacceptable." *Id.*

## B.    The Government's Response

On October 15, 2018, the Government filed its opposition to the motion to recuse. *Gov't's Opp'n* at 1-7. The Government says that "[n]otwithstanding the defendants' argument, there is no basis to conclude that the Court's impartiality might reasonably be questioned or that recusal is in order." *Id.* at 1-2.

The Government reviews the legal standards under which a motion to recuse should be evaluated. *Id.* at 2-3. The Government questions whether the motion recuse is timely, noting that my ruling on Juror 79 was in April 2015 and my trial rulings on the other jurors were in January 2014 and any alleged bias would have been evident then. *Id.* at 4-5. The Government discounts Mr. French's charge that

by considering a juror's Fifth Amendment rights, I exhibited bias against Mr. French. *Id.* at 6. The Government also observes that Mr. French failed to mention that the First Circuit upheld my ruling on Juror 79. *Id.* The Government finds Mr. French's contention regarding Juror 114 to be "confounding" because I granted the defense motion to remove Juror 114, a decision the Government characterizes as "reasonable and judicious." *Id.* at 7. The Government concludes that Mr. French failed to meet the legal standards for recusal. *Id.*

## C.  Malcolm French's Reply

After reciting additional caselaw on recusal issues, Mr. French says that the Government's opposition "completely misses the mark." *French's Reply* at 2. Mr. French repeats his concern that I demonstrated the appearance of bias when I expressed concern that "a potentially mendacious juror" should be protected "from the fallout from that conduct over the rights of the defendant to a fair and impartial trial." *Id.* He contends that this "cannot be disputed." *Id.* Mr. French observes that the resolution of the issue on remand "is in large part dependent on the Juror's credibility" and he believes that "[b]ias in favor of jurors is going to impact the decision, or at least have that appearance." *Id.*

Mr. French says that the "challenge for this Court is to view recusal through an objective rather than subjective lens." *Id.* at 3. He quotes the United States Supreme Court in writing that "actual bias is difficult to discern." *Id.* (quoting *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (quoting *In re Murchinson*, 349 U.S. 133, 136 (1955)).

Mr. French writes that the Government is "only partially correct" when it assumes that it is my "past refusal to comply with known law" that is evidence of my bias. *Id.* He stresses that he "*primarily contends* that the Court's extrajudicially formulated opinions of the sanctity of the juror as contained in the Court's own statements" that "firmly establish that the Court's 'impartiality might reasonably be questioned.'" *Id.* (emphasis in original). Mr. French criticizes me for worrying about the juror's assertion of her Fifth Amendment right to remain silent and argues that "[i]t is exactly this thought process that gives rise to the appearance of bias, conscious or unconscious." *Id.* at 4. Mr. French returns to my comments about Juror 79 and not allowing him to "walk into a snare." *Id.* Mr. French concludes that the "investigation could easily be conducted by another federal judge, without any appearance of partiality, conscious or unconscious," and in his view, "[t]he system would be well served." *Id.* at 5.

## IV.    LEGAL STANDARDS

### A.    Statutory Provisions

There are two statutory provisions addressing recusal:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

28 U.S.C. § 144. Subsection (a) of § 455 of title 28 provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in

which his impartiality might reasonably be questioned."[1]  Mr. French has not filed

an affidavit under § 144 and he has argued that I must recuse because my

"impartiality might reasonably be questioned."  Accordingly, although he does not

specify the recusal statute under which he is proceeding, I assume it is § 455(a).

### B.     Caselaw on Recusal

The First Circuit observed that the "reach of the subsection is broad.  It forbids

partiality whether grounded in an 'interest or relationship' or a 'bias or prejudice';

and it forbids not only the reality of partiality but its objective appearance as well."

*United States v. Snyder*, 235 F.3d 42, 45 (1st Cir. 2000) (citing *Liteky v. United States*,

510 U.S. 540, 548 (1994)).  At the same time, the First Circuit has noted that "judges

are not to recuse themselves lightly under § 455(a)."  *Id.* (citation omitted).  The First

Circuit wrote that "under § 455(a) a judge has a duty to recuse himself if his

impartiality can reasonably be questioned; but otherwise, he has a duty to sit."  *Id.*

(footnote omitted).

## V.     DISCUSSION

### A.     The Allegations of Bias

In his motion, Mr. French rests his demand for recusal on three matters

involving jurors that took place during his January 2014 trial: (1) Juror 79; (2) Juror

114; and (3) Juror 86.

#### 1.     Juror 79

---

[1]     Section 455 also contains a subsection (b), which lists specific instances where a judge should disqualify himself from a proceeding, such as where the judge knows he is likely to be a material witness in the proceeding.  *See* 28 U.S.C. § 455(b)(1)-(5)(iv). Mr. French has not claimed that any of these specific provisions applies to his case.

There are a couple of unusual aspects to Mr. French's claim about Juror 79. First, according to the First Circuit, Mr. French did not appeal my handling of the issue surrounding Juror 79. *French*, 2018 U.S. LEXIS 26268, at *20-21 ("Defendants also filed a separate motion for a new trial based on the voir dire responses of another juror, Juror 79. <u>Only Russell, and not French, appeals the denial of this motion</u>") (emphasis supplied). If my response to the Juror 79 issue displayed, as Mr. French now claims, judicial conduct meriting recusal, Mr. French did not deem my handling of the issue worthy of appeal.

Moreover, the First Circuit rejected Mr. Russell's appellate challenge to my response to the issue surrounding Juror 79. The issue involved whether Juror 79 gave a dishonest answer to a question from the Magistrate Judge during voir dire about whether he knew Steve Koenig, one of the trial witnesses. *Id.* at 21-22. Instead of questioning Juror 79, I elected to bring in Mr. Koenig and ask him whether he knew Juror 79. *Id.* at *22. Mr. Koenig responded that he had spoken to Juror 79 on the phone for five to ten minutes sometime during the year before trial but that the two had never met before trial. *Id.* There was no probative evidence of any other direct contact between the two. *Id.* Based on this evidence, I concluded no further investigation was warranted. *Id.*

In the words of the *French* Court, "the district court brought in Koenig for questioning, but saw no reason to go further and bring in Juror 79 after hearing Koenig's testimony." *Id.* 2018 U.S. App. LEXIS 26268, at *23-24. The First Circuit wrote that "[o]n such a record, having heard testimony from Koenig, the district court

did not abuse its discretion in deciding to deny the motion without additional investigation." *Id.* at *25. As the First Circuit affirmed my decision not to bring in Juror 79 for questioning and instead to allow the questioning of another witness, it is difficult to understand how my handling of the controversy surrounding Juror 79 could be evidence of bias or prejudice against Mr. French.

### 2. Juror 114

#### a. A Ruling Favorable to the Defense

With Juror 114, I granted defense counsel's motion to excuse Juror 114, switching her from being a member of the jury to being an alternate. *Tr. of Proceedings* 2344:25-2345:3 (ECF No. 725) ("I'm going to grant the motion. I will place her as Alternate 1 and slip Alternate No. 1, who is Juror No. 120, in seat 8 as a member of the jury"). I excused Juror 114 as a juror just before jury deliberations and she did not participate in the jury deliberations in this case. *Id. at* 2406:13-17 ("I will tell you now who the three alternates are. The three alternates are Juror No. 114 . . . The three of you are each alternates, and you are now free to leave the courtroom with the court's thanks"). Again, it is difficult to understand how ruling in favor of the Defendants can be construed as exhibiting bias or prejudice against them.

#### b. A Prior Objection

Mr. French highlights my comments about my "misgivings" and about my sense that counsel had me "over a barrel" before I granted the motion. *French Mot.*

at 4 (quoting *Tr.* 2344:15-2345:3).  But Mr. French fails to mention the significant context underlying the issue with Juror 114.

The background began the eighth day of trial.  *Tr. of Proceedings* 1501:16-1506:22 (ECF No. 722).  Juror 114 was a female with an expressive face, and she began visibly reacting to the cross-examination by one of the defense lawyers, Jeffrey Silverstein, who represented Kendall Chase.  Mr. Silverstein brought her facial responses to my attention:

> Judge, it's come to my attention that . . . the juror seated in the third seat from the right . . . has engaged in behavior, which has been communicative, involving an apparent dislike, disgust, impatience, or what have you with me.
> I have not seen it because I have been focused on the work that I've been doing, but it's been brought to my attention, now for two days running, by others in the courtroom that she has engaged in such conduct as rolling her eyes, as mouthing the words, oh, my God, this very morning when I cross-examined Mr. Dickey.
>
> And my concern is, Judge, that any personal opinion she has developed about the manner in which I've been conducting myself in this trial may cause prejudice to my client, and given the fact that she's engaged in outward displays that have been noticed by others of intemperance and impatience on her part, that it may have been picked up by other jurors, and there is the potential for possible communications by her to other jurors regarding her opinions.
>
> So for those reasons, Judge, I ask that the court make inquiry of her with an eye towards her being removed or replaced from the jury if she's no longer neutral and impartial.  The case has not been completed -- the government's case.  We certainly haven't started any defense case.  But by all appearances, she has some very firm opinions, and I have some concerns that her opinions regarding me, whatever they may be, may be to my client's prejudice.

*Id.* 1501:16-1502:14.

I indicated that I had not noticed her facial expressions, but I expressed my view that by the eighth day of trial, many jurors had begun to form impressions and that some were better than others at hiding them. *Id.* I did not think that I should remove her as a juror or separate her out and interview her. *Id.* I was worried that if I brought to her attention that Attorney Silverstein was concerned that she did not like him yet kept her on the jury, it could be trouble for him. *Id.* 1503:2-19. Furthermore, I could not see how judicial intervention at that point in trial could be accomplished without investigating the jurors' mental impressions because I thought "the cure is worse than any problem that may exist." *Id.* 1504:13-1505:22.

In response to Mr. Silverstein's objection, however, I took the following actions: First, I asked Mr. Silverstein to present me with any caselaw on the issue, which I promised to review "assiduously" and that if it suggested that I should do what he was suggesting, I told him that I would do it. *Id.* 1505:3-17.

Second, I asked other counsel what they had witnessed. *Id.* 1587:18:1595:8. One lawyer said that he had noticed that she had "nodded off quite a bit . . . but that wasn't the nature of my complaint." *Id.* 1588:1-5. He focused on her "rolling her eyes when Mr. Silverstein was doing a lengthy examination," that "early on, she was nodding off," and then "at one point, she mouthed something, and I couldn't see what it was, but it sounded like "Oh, my God," or words to that effect." *Id.* 1588:6-11. Another lawyer said that he saw "pretty much the same thing," but he had noticed "a difference when it was Mr. Silverstein up there . . . [and] she started making these exaggerated kind of gestures." *Id.* 1588:16-24. A third lawyer said that he "thought

she was sleeping." *Id.* 1589:12-18. He thought that when Mr. Silverstein was doing the questioning, the juror was "just shutting down." *Id.* 1589:19-25.

I added that during Mr. Silverstein's examination, I observed her take both hands and hold them on either side of her face "as if she was trying to hold her head up." *Id.* 1590:2-5. I indicated that I was more concerned with her "nodding off." *Id.* 1590:9-14. I did not think that rolling the eyes and mouthing "Oh my God" amounted to juror misconduct. *Id.* 1590:15-22.

Third, in light of the lawyers' concerns, however, I said that I was going to "continue to monitor her and see whether or not she is nodding off." *Id.* 1591:20-21. I indicated that if it was significant, I would consider making her an alternate and moving one of the alternates into her spot as a regular member of the jury. *Id.* 1591:20-24. But I expressly reserved judgment. *Id.* 1591:24.

Fourth, I stated that I would reemphasize to the jury that they were obligated not to prejudge the case. *Id.* 1591:25-1592:9.

Fifth, in addition to personally monitoring the juror, I also asked counsel "to monitor her, as well, as well as other members of the jury." *Id.* 1594:1-4.

Finally, I ruled, however, that her conduct at that point did not justify her removal. *Id.*

### c. The Conference of Counsel Before the Closing Arguments

During the rest of the trial, I kept my eye on Juror 114 because I wanted to ascertain whether she was in fact making faces at Attorney Silverstein or anyone else

and whether she was nodding off. I did not notice any improper conduct on her part, and I placed this on the record just before the closing arguments:

> The one remaining motion is the motion to excuse the juror. It was the issue raised by Mr. Silverstein on behalf of Mr. Chase. I have been watching the juror, and I have seen no evidence of any untoward conduct. She's paying attention; she's alert. And I didn't see anything ever since the issue was raised.

*Id.* 2227:25-2228:6. I asked each lawyer whether he had noticed anything improper with Juror 114 and each indicated that he had not. *Id.* 2228:10-19. I therefore denied the motion to excuse Juror 114. *Id.* 2228:20-13.

### d. The Closing Arguments and the Court's Ruling Making Juror 114 an Alternate

The closing arguments took place on January 23, 2014. *Tr. of Proceedings* (ECF No. 725). After an extended set of jury instructions, the lawyers each gave closing arguments. *Id.* 2258:19-2387:1. The transcripts do not establish the length of time of the closing arguments, but it had been a long trial and the closing arguments were not short.

At the request of counsel, I allowed a bathroom break in the middle of the closing arguments after one lawyer had finished and another was about to begin. *Id.* 2340:15-2341:10. At the beginning of the break, counsel again referred to Juror 114:

> Mr. McKee: Your Honor, I wanted to indicate to the court before you stepped off the bench that I've been very closely monitoring the juror, and I have a very different view of how things have played out and I watched the juror at issue here third from the right. I mean, very asleep. I know the court was looking in that direction, probably saw the same thing I did. I believe my co-counsel - - codefendants' counsel share that view. She was just sound asleep, and it was - - it was kind of distracting. I actually tried to move around a little bit to try to - - you know, I know these

15

things aren't the most exciting things on earth, but then again, it was very striking. I'm sure the court made observations of it, but my codefendants' counsel do, as well.

But I guess I would now ask - - I certainly join in the original motion of Mr. Silverstein. I would - - I would ask that the motion - - I would - -

The Court: You may be seated. Apparently this is going to take a little while.

Mr. McKee: I didn't want to leave that, Your Honor.

The Court: I - - I watched her. I didn't think she was asleep. I thought she was just closing her eyes.

Mr. McKee: I - -

The Court: But do other people think she was asleep?

Mr. Peterson: Your Honor, I - - I was pretty close to her, and that - - that was my impression, I have to say, as well, and I did, even before this came up, mention it to Jeff that I had seen that. I - - I didn't - - I thought she was nodding in and out.

The Court: You can't see her.

Mr. Silverstein: I can't see anything from here.

Mr. Marjerison: I did observe that she was closing her eyes for extended periods of time. Whether she was actually fully asleep, I don't know, but she looked sleepy.

The Court: What's the government's position?

Mr. Casey: Your Honor, when - - when I was doing my closing argument, I was fairly close to her, and she would close her eyes and then open them, but, you know, these are - - are long chats that we have with jurors, and I'm sure Mr. Lowell was even closing his eyes a couple of times when some of us were talking. It doesn't mean that she was falling asleep.

I never saw any suggestion that she had completely zoned out and zonked out and was sleeping. She'd close her eyes and then she'd open them.

Mr. McKee: I just have a very distinct, different impression, and I looked at everybody else and nobody was even close to that. So it really stood out. So I offer only my observations and - - and leave it to you.

The Court: Right. Look, I'll think about it. We got a little time. I'll think about it. It seems to me - - I'm very, very worried, I'm worried about manipulating the jury here. I mean, what's gone - - what's gone on - - what I've heard is that Mr. Silverstein's concerned that this juror doesn't like him, and I very concerned about opening a door where because a - - one juror reacts apparently poorly to one lawyer's cross-examination during the course of a two-week trial, that that juror is going to be evicted because it seems to me, as I said earlier, we do not want to get involved in playing musical chairs with the jury.

The - - both parties to this case, not simply the defendants, but also the government, have a right to a fair and impartial jury, and if I get involved in evicting a juror because that juror reacted poorly to one lawyer's cross-examination, or because the juror closes her eyes during the course of a closing argument, sometimes people think better and hear better and concentrate better when their eyes are closed.

I'm very, very worried about, as I've indicated, manipulating the jury. I'll take it under advisement and tell you what I think, but, again, that's my serious concern.

Mr. McKee: Understood.

(Court recessed from 1:39 p.m. to 2:01 p.m.)

The Court: All right. On the request to excuse the juror . . . I have mis - - I have really strong misgivings about it, but I think that basically defense counsel has me over a barrel based on First Circuit precedent, and that First Circuit precedent says that when an issue like this comes up, I have to do an investigation, and I'm not going to do an investigation. This is in the middle of closing arguments. It'd be vastly inappropriate to start calling jurors in, interviewing them, finding out whether or not she

actually fell asleep or didn't fall asleep, or whether she was concentrating. I think defense counsel, as I said, has me over a barrel, and I'm going to grant the motion. I will place her as Alternate No. 1 and slip Alternate No. 1, who is Juror 120, in seat 8 as a member of the jury.

*Id.* 2341:12-2345:3.

### e. Discussion

Mr. French badly misconstrues my final colloquy with counsel, leading to my granting the defense motion to excuse Juror 114. As the First Circuit wrote in *French*, once a claim of juror misconduct has been made, a district judge has a duty to investigate the claim and to determine whether it was prejudicial. *French*, 2018 U.S. App. LEXIS 26268, at *10. Here, I did not perform an investigation because I assumed that what defense counsel said about Juror 114 was true, and I gave the Defendants the relief they requested, moving Juror 114 into an alternate position so that she did not participate in any jury deliberations. Again, it is difficult to understand how accepting the representations of a defense lawyer instead of performing an investigation and then granting them the relief the lawyers requested can possibly be construed as exhibiting a bias against the Defendants.

Properly understood, the comment about "over a barrel" is also not evidence of bias against the Defendants. I thought that the defense lawyers were making a strategic motion to eliminate a juror they viewed as potentially troublesome to their cases. Despite my request, the Defendants had not produced any caselaw that supported their view that I should remove a juror who seemed to be frustrated with a particular lawyer.

In fact, although not always true, Attorney Silverstein's examinations of some of the witnesses were much longer than the cross-examinations of other defense counsel.[2]  The point is not to criticize Attorney Silverstein, who is an exceptionally fine defense lawyer, but to note that if a lawyer spends much more time examining witnesses than other lawyers, the attorney runs the risk of irritating some jurors, who are performing a public duty away from their homes and jobs and are always conscious of time.  Although even if I assume that there may be a situation where a specific juror's response to the tactics of one lawyer could justify excusing the juror, the defense lawyers did not provide any authority to that effect, despite my request for caselaw in support of that position.

---

[2]    *See Tr. of Proceedings, Test. of Richard Rolfe* 280-301 (ECF No. 716) (*AUSA Casey Direct Exam.*: 280:9-290:14 (10 pages); *Att'y McKee*: no questions (0); *Att'y Maddox*: 290:23-292:19 (2 pages); *Att'y Silverstein*: 292:24-300:23 (8 pages); *Att'y Marjerison*: no questions (0); *AUSA Casey*: no redirect (0)); *Id., Test. of Jonathan Richards, Id. Tr. of Proceedings, Test. of Jonathan Richards* 426-665 (ECF Nos. 717-18) (*AUSA Casey Direct Exam.*: (*AUSA Casey Direct Exam.*: 426:15-525:24 (99 pages); *Att'y McKee*: 526:3-545:2 (19 pages); *Att'y Peterson*: 545:6-556:18 (11 pages); *Att'y Silverstein*: 575:13-632:17 (57 pages); *Att'y Marjerison*: 632:22-633:16 (1 page); *AUSA Casey Redirect Exam.*: 633:21-643:18 (10 pages); *Att'y McKee Cross Exam.*: 652:6-654:22 (2 pages); *Att'y Peterson Cross-Exam.*: 654:1-658:19 (4 pages); *Att'y Silverstein Cross-Exam.*: 658:23-657:17 (8 pages); *Att'y Marjerison Cross-Exam.*: 665:22-667:5 (2 pages); *AUSA Casey Redirect Exam.*: 667:9-670:9 (3 pages); *Att'y Peterson Re-Cross-Exam.*: 670:16-672:3 (2 pages); *Att'y Silverstein Cross-Exam.*: no questions (0); *Att'y Marjerison Cross-Exam.*: no question (0); *Tr. of Proceedings, Test. of Shawn Gillen*, 697-708 (ECF No. 718) (*AUSA Lowell Direct Exam.*: 697:16-704:4 (7 pages); *Att'y McKee Cross-Exam.*: no questions (0); *Att'y Maddox Cross-Exam.*: no questions (0); *Att'y Silverstein Cross-Exam.*: 704:10-707:11 (3 pages); *Att'y Marjerison Cross-Exam.*: no questions (0); *AUSA Lowell Redirect Exam.*: 707:18-08:11 (1 page); *Att'y McKee Re-cross-Exam.*: no questions (0); *Att'y Peterson Re-cross Exam.*: no questions (0); *Att'y Silverstein Re-cross-exam.*: 676:20-712:23 (36 pages); *Att'y Marjerison Re-cross Exam.*: no questions (0 pages); *Tr. of Proceedings, Test. of Winston McTeague, Tr. of Proceedings, Cont. Test. of Winston McTeague* 714-857 (ECF No. 719) (*AUSA Casey's Direct Exam.*: 714:6-744:23 (30 pages); *Att'y McKee Cross-Exam.* 745:1-765:11 (20 pages); *Att'y Peterson Cross-Exam.*: 765:16 -767:14 (2 pages); *Att'y Silverstein Cross-Exam.* 767:19-793:4; 799:19-832:23 (59 pages); *Att'y Marjerison Cross-Exam.*: 834:7-845:10 (11 pages); *AUSA Casey Redirect Exam.*: 845:18-848:8 (3 pages); *Att'y McKee Re-cross Exam.*: 848:14-857:9 (9 pages); *Att'y Peterson Re-cross Exam.*: no questions (0); *Att'y Silverstein Re-cross-Exam.*: 857:17-860:8 (2 pages); *Att'y Marjerison Re-cross-Exam.*: no questions (0).  For these witnesses, Attorney Silverstein's questioning was much more than twice the amount of questioning of all other defense counsel combined and roughly equal to the questions on direct examination by the prosecution.

Nor are jurors required as a matter of law to sit like statues, expressionless, humorless, and non-reactive during a trial. A trial remains a human event and the jurors are expected to have human reactions to the proceedings, including to the lawyers. If a juror reacts visibly to something lawyers have done or said, either positively or negatively, lawyers generally take the responses as a signal to alter or maintain their trial presentation, not an invitation to exclude the juror. In short, I did not think that the juror's responses to Attorney Silverstein's lengthy cross-examination justified her removal. Yet the defense lawyers had it in their minds that this particular juror had shown her hand and was not favorable to the defense. Thus, when the lawyers asked me to exclude the juror because she was allegedly sleeping, I thought (and continue to believe) that the request was mostly a strategic maneuver to manipulate the jury in their favor.

If I thought the juror had in fact been, as Attorney McKee claimed, "very asleep" or "sound asleep," I would have taken some action. Although not common, it is not unheard of that a juror will actually fall asleep during a trial. The typical response of the trial judge is to take a break, allow the jury to stretch and reinvigorate, and proceed with the trial. Sometimes, it is merely to allow the jury to stand, stretch, and reengage briefly while in the courtroom; other times, the judge declares a full break and sends the jury back to the jury room to refresh itself. In my experience, lawyers generally view a juror sleeping as a mark against their own performance, since most lawyers assume some basic responsibility for not putting the jurors to sleep. In fact, this was the first and only time I have been presented with a

motion to excuse a juror who had nodded off.  In my view, excusing a juror for momentarily nodding off would apply an ultimate sanction for a minor issue, typically cured in the ordinary course.

More to the point, as I promised, I had been keeping a careful eye on Juror 114 in light of the earlier sidebar conference about her nodding off.  I observed Juror 114 close her eyes during the closing arguments as some people do when they are concentrating.  But I did not observe her falling asleep, except for one occasion, when she had what the medical profession refers to as a microsleep, a fleeting, unintended episode of sleep.  I observed Juror 114 lose consciousness for a fraction of a second, to snap herself awake, and to resume listening, more flinch than sleep.  I simply did not see Juror 114 fall fast asleep as alleged by defense counsel.

Defense counsel's on-the-record assertion that Juror 114 had fallen "very sleep" or "fast asleep" placed me in an awkward position because I could not become a witness and Attorney McKee placed on the record something I did not believe was justified, based on what I had observed.  Of course, Attorney McKee may have seen something I did not, but again, as promised, I was keeping an alert eye on Juror 114 during the closing arguments.  Other counsel, including the prosecutor, did not confirm Attorney McKee's assertion of "sound sleep."  *Transcript of Proceedings* 2341:12-2345:3 (Attorney Peterson – "nodding in and out"); (Attorney Silverstein — "I can't see anything from here"); (Attorney Marjerison — "I did observe that she was closing her eyes for extended periods of time.  Whether she was actually fully asleep, I don't know, but she looked sleepy"); (AUSA Casey — "when I was doing my closing

argument, I was fairly close to her, and she would close her eyes and then open them . . . I never saw any suggestion that she had completely zoned out and zonked out and was sleeping.  She'd close her eyes and then she'd open them").  Attorney McKee acknowledged that he had "a very distinct, different impression."  *Id.*  In other words, the record was equivocal at best as to whether Juror 114 had in fact fallen into a sound sleep, but one highly respected defense lawyer was representing to me that she had.

The timing of the issue was extremely awkward.  All the evidence had been presented, I had given the final substantive jury instructions (except for brief instructions about jury deliberations), the prosecutor had completed his closing argument, Mr. French's attorney had completed his closing argument, Mr. Chase's attorney had completed his closing argument, and all that was left was the closing arguments of Mr. Russell's and Haynes Timberland's attorneys, any rebuttal by the prosecutor, and final jury instructions about jury deliberations.  *See Tr. of Proceedings* 2258-2407.  To stop the trial and open an investigation at this critical time would have been problematic.  The impact of the earlier closing arguments would have faded, the impact of the closing arguments given after completion of the investigation would have been emphasized, and there was no telling how long the investigation would take.

The nature of the requested investigation was unclear.  I would have had to recess the trial, discuss with the attorneys what should be done, potentially bring the juror into chambers, question her about whether she in fact had fallen asleep, find

out whether she thought she had missed any of the closing arguments, address whether defense counsel wished to pursue their earlier objection to her alleged bias against Attorney Silverstein, and rule on whatever relief should be granted. Meanwhile, the other jurors would have been waiting in the jury room during a critical point in the trial. I was also worried about the impact on the juror herself, if not excused, she might surmise who was questioning her and resent it.

I was also worried about the impact on the other jurors. It was unclear whether the defense lawyers were asking that I interview other jurors about whether they observed Juror 114 falling asleep, but this was a possibility. This is what I was referring to when I said that "[i]t'd be vastly inappropriate to start calling jurors in, interviewing them, finding out whether or not she did fall asleep or didn't fall asleep, or whether she was concentrating." *Id.* 23420-24. Also, if I called Juror 114 into chambers or into the courtroom for questioning, the other jurors would have wondered what was happening. With all of these confounding problems, I decided to cut the Gordian knot, take what Attorney McKee had represented as true, grant the relief the defense lawyers were seeking, and move Juror 114 into a position of alternate. *Id.* 2344:24-2345:3. No one objected to my decision to do so. *Id.* 2345:1-4.

If the sleeping complaint about this juror had not been preceded by a challenge to her potential bias, it would have only been a sleeping juror issue. But I thought that the defense lawyers had managed to oust a member of the jury they thought was favoring the prosecution and disfavoring the defense. I did not approve of their successful manipulation of the jury, but I did not feel that the circumstances of the

objection gave me any choice but to move her into an alternate position.  This is why I expressed "misgivings" and said that the defense lawyers had me "over a barrel."

In sum, I reject Mr. French's argument that I displayed any bias against him or Mr. Russell in crediting defense counsel's assertions and in acceding to Mr. French's request to replace Juror 114 with another juror for purposes of jury deliberations.

### 3.    Juror 86

Mr. French correctly points out that the First Circuit criticized my handling of whether Juror 86 provided truthful responses to the written jury questionnaire and remanded the case for further proceedings, concluding that I should have questioned or allowed the questioning of Juror 86.  But Mr. French provided no authority for the proposition that if an appellate court does not affirm all of a trial judge's rulings, the trial judge should be recused on remand.[3]  After all, trial judges recognize that appellate court routinely review trial court rulings, that it is the duty of an appellate court to correct trial court error, and that it is the corresponding duty of the trial judge to apply the teachings of the appellate court on remand.  Here, the First Circuit did not elect, as they could have done, to remand this case to another trial judge,

---

[3]     During this multi-week trial, I issued countless rulings on matters great and small.  On appeal, in addition to my handling of the issues surrounding Juror 86, Mr. French and Mr. Russell challenged my handling of Juror 79 and my drug quantity calculations at the sentencing hearing.  *French*, 2018 U.S. App. LEXIS 26268 at *20-33.

Mr. Russell challenged three additional issues on appeal.  *Id.* at *29.  One involved jury selection over which I did not preside.  *Id.* at *29-30.  Another involved an allegation of prosecutorial misconduct that he did not raise at trial.  *Id.* at *31-33.  The third involved my ruling on the admissibility of Mr. Russell's prior convictions.  *Id.* at *30-31.

Except for the issue concerning Juror 86, the First Circuit affirmed all of the rulings that Mr. French and Mr. Russell challenged on appeal.  *Id.* at *33-34 ("We otherwise reject all of defendants' challenges to their convictions and sentences").

which is an indication that it did not view my rulings as requiring recusal. *French*;
*Liteky v. United States*, 510 U.S. 540, 551 (1994) ("It has long been regarded as normal
and proper for a judge to sit in the same case upon its remand, and to sit in successive
trial, involving the same defendant").

## B.    The Rights of the Defendant and the Jury

I disagree to some extent with one of the premises of Mr. French's motion:

> The common thread of the Court's comments and opinions surrounding
> the three Court Orders previously questioned, is the appearance of an
> extrajudicial bias of the Court in favor of the rights of a juror when
> weighed against the constitutional requirement of a fair and impartial
> jury under the Sixth Amendment.

*French Mot.* at 6.  Mr. French goes on to say that "any inconvenience that Juror 86
might suffer pales in comparison to defendant's felony convictions and lengthy prison
sentence." *Id.* at 8.  Mr. French accuses me of exhibiting a "demonstrated history of
trying to protect jurors and shield them from examination under oath, and because
that is precisely what must happen next in this case, Mr. French respectfully requests
that Judge Woodcock recuse himself." *Id.*

I accept of course that it is "constitutional bedrock that '[i]n all criminal
prosecutions, the accused shall enjoy the right to a speedy and public trial, by an
impartial jury.'" *Sampson v. United States*, 724 F.3d 150, 163 (1st Cir. 2013) (quoting
U.S. Const. amend. VI).  The United States Supreme Court has written that "[v]oir
dire is a singularly important means of safeguarding the right to an impartial jury",
*id.*, and that the "voir dire process, which is fluid rather than mechanical, is
frustrated when a prospective juror is dishonest." *Id.* at 164.  Moreover, under First

Circuit authority, once a defendant demonstrates that "a juror failed to answer a material question on <u>voir dire</u>" and shows that "a correct response would have provided a valid basis for a challenge for cause," a defendant is entitled to a new trial. *French*, 2018 U.S. App. 26268, at *9 (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984)). In *French*, the First Circuit emphasized that once a defendant comes forward with a "colorable or plausible" claim of juror misconduct, the trial court should "investigate the claim," leaving the nature of the investigation to the discretion of the trial judge. *Id.* at 10-11.

In my view, Mr. French's argument that whenever a defendant makes a claim against a juror, a defendant's rights always trump concerns about the impact on the juror, and the trial judge is required to bring the juror to court and subject the juror to questioning, overstates the tension between a defendant's right to a fair and impartial jury and judicial concerns about finality and juror harassment. The balance is more nuanced than Mr. French's argument allows.

Here, the jury issued its verdict on January 24, 2014, and Mr. French's allegations against Juror 86 were first made over two years later on April 28, 2016. *See Order Denying Mot. for New Trial* at 1 (ECF No. 734). As the First Circuit itself wrote, when a defendant raises misconduct questions about a juror after a verdict has been issued, the courts must consider "the important interest in the finality of trial." *French*, 2018 U.S. App. LEXIS 26268, at *10. The First Circuit went on to write:

> [T]rial courts should not accommodate fishing expeditions after a verdict has been rendered, especially years after the fact, conducted in the hope of establishing a toehold for a misconduct claim.

*Id.* The *French* Court quoted *Neron v. Tierney*, 841 F.2d 1197, 1205 (1st Cir. 1988):

> [C]ourts generally should be hesitant to haul jurors in after they have reached a verdict to probe for potential instances of bias, misconduct, or extraneous influence.

*Id.*

If Mr. French's general proposition were true—that a defendant's right to a fair trial invariably trump judicial concerns about discharged jurors—a defendant would have the right to contact jurors after a verdict to determine whether post-verdict juror interviews revealed a basis for attacking the verdict. But in the First Circuit, such post-verdict contact by attorneys and their clients has long been strictly prohibited without court supervision. *United States v. Kepreos*, 759 F.2d 961, 967 (1st Cir. 1985). The *Kepreos* Court explained:

> We start with the proposition that henceforth this Circuit prohibits the post-verdict interview of jurors by counsel, litigants or their agents except under the supervision of the district court, and then only in such extraordinary situations as are deemed appropriate. Permitting the unbridled interviewing of jurors could easily lead to their harassment, to the exploitation of their thought processes, and to diminished confidence in jury verdicts, as well as to unbalanced trial results depending unduly on the relative resources of the parties.

*Id.*

In balancing Mr. French's undoubtedly important rights against significant policy considerations against bringing a discharged juror back to court, the First Circuit struck a different balance than the one I did, and the First Circuit concluded that I should have then and should now undertake an investigation. *Id.* at *9-20. But the fact that I struck the balance differently than the First Circuit does not mean that no balance was (or is) required.

In any event, here, the First Circuit has directed me to undertake an investigation into Juror 86's responses, and I have no compunctions about following the directive of the First Circuit. I have questions about the type of investigation that is warranted at this point and how to go about it, and I will consult with counsel to get their advice as to how to proceed. But if the results of the investigation require it, I will have no problem ordering a new trial for Mr. French and Mr. Russell, since the First Circuit has said that "[t]he presence of a juror whose revealed biases would require striking the juror for cause in a criminal case is structural error that, if preserved, requires vacatur." *French*, 2018 U.S. App. LEXIS 26268, at *18.

## C.    Extrajudicial Bias

Finally, in his motion, Mr. French contended that I was influenced by an extrajudicial source when ruling on Juror 86. *French Mot.* at 6, n.1. The Government did not address this contention, and in his reply, Mr. French noted that "[t]he extrajudicial nature of the statements and opinions of the Court is not addressed in the Government's Objection." *French Reply* at 3, n.1.

I do not consider Mr. French's extrajudicial bias argument for recusal to apply to my involvement in this case. The seminal case on extrajudicial bias is *Liteky*. As the Supreme Court explained, the traditional definition of extrajudicial source was "a source outside the judicial proceedings at hand." 510 U.S. at 545. Mr. French makes no suggestion that I have been influenced by any sources outside these judicial proceedings and he has identified none. In fact, no outside source has influenced anything I have done in either Mr. French's or Mr. Russell's cases.

Mr. French contends that my rulings evidenced an "extrajudicial bias of the Court in favor of the rights of a juror when weighed against the constitutional requirement of a fair and impartial jury under the Sixth Amendment." *French Mot.* at 6. Mr. French quotes *Liteky* as stating that "[a] favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render a fair judgment." *Id.* (quoting *Liteky*, 510 U.S. at 551). As the Supreme Court explained, some courts refer to this branch of the bias analysis as "pervasive bias." *Id.*

Indeed, the First Circuit adopted the view that, even if a judge's alleged bias comes from events at trial, "judicially acquired information can form the basis of a judge's disqualification." *United States v. Chantal*, 902 F.2d 1018, 1022 (1st Cir. 1990) (quoting *Panzardi-Alvarez v. United States*, 879 F.2d 975, 983-84 (1st Cir. 1989)). In the First Circuit, the standard for recusal is "whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt, not in the mind of the judge himself or even necessary in the mind of the litigant filing the motion under 28 U.S.C. § 455, but rather in the mind of the reasonable [person]." *Id.* at 1022 (quoting *Panzardi-Alvarez*, 879 F.2d at 983-84).

At the same time, I do not read the First Circuit standard as contradicting the Supreme Court's statement in *Liteky* that "judicial rulings alone almost never constitute valid basis for a bias or impartiality motion," a proposition Mr. French

himself acknowledges is true. *French Mot.* at 6; *Likety*, 510 U.S. at 553 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)).

Nor do "some opinions acquired outside the context of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading)" establish extrajudicial bias. *Liteky*, 510 U.S. at 553 (citing *Grinnell*, 384 U.S. at 583). Here, contrary to Mr. French's argument, my view of the need to balance Mr. French's rights against caselaw that cautions against bringing discharged jurors back to court did not come from my judicial instincts to favor jurors over defendants, an accusation I firmly reject. Instead, it came from my understanding of First Circuit caselaw that expressly warned trial judges against "haul[ing] jurors in after they have reached a verdict to probe for potential instances of bias, misconduct, or extraneous influence." *French*, 2018 U.S. App. LEXIS 26268, at *10 (quoting *Neron*, 841 F.2d at 1205). Thus, as Mr. French's basis for moving for my recusal is bottomed on my view of the law, not as he has claimed, some kind of instinctive pro-juror bias, his claim of extrajudicial bias must fail because the source of my supposed extrajudicial bias, as he sees it, is the First Circuit itself.

Similarly, the First Circuit observed that "the defendant's claim and its implications cannot themselves alone suffice to require the judge's recusal, lest the law confer a veto power on the assignment of his trial judge to any heckling defendant who merely levels a charge that implicates a judge's defensive or vicariously defensive reaction." *In re Bulger*, 710 F.3d 42, 46-47 (1st Cir. 2013) (Souter, J.). Justice Souter went on to write for the First Circuit that "[t]he recusal standard must be more

demanding because 'the disqualification decision must reflect *not only* the need to secure public confidence through proceedings that appear impartial, *but also* the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." *Id.* at 47 (quoting *In re Allied-Signal, Inc.*, 891 F.2d 967, 970 (1st Cir. 1989) (emphasis in original)).

Again, I do not conclude that my prior rulings regarding Juror 86 meet the standards for recusal. The fact the First Circuit concluded that I erred in rejecting Mr. French's demand to further investigate Juror 86's responses does not mean that I am biased against either him or Mr. Russell or that I am unable to follow the investigation that the First Circuit ordered to wherever it leads.

## VI. CONCLUSION

I DENY Defendant Malcolm French's Motion to Recuse Judge Woodcock (ECF No. 787) and Defendant Rodney Russell's Joinder in Defendant Malcolm French's Motion to Recuse Judge Woodcock (ECF No. 789).

The Court ORDERS the Clerk's Office to schedule a conference of counsel to discuss the next steps in the case consistent with the Court of Appeals for the First Circuit's remand order for further proceedings on the Defendants' motion for new trial.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 5th day of November, 2018