UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:12-cr-00160-JAW |
| | ) | |
| MALCOLM A. FRENCH, et al. | ) | |

**ORDER ON MOTION FOR NEW TRIAL ON REMAND**

Concluding that a juror knowingly gave an inaccurate answer to a juror questionnaire, the First Circuit vacated this Court's denial of the defendants' motion for a new trial and remanded the motion to this Court for an evidentiary hearing. After conducting an evidentiary hearing at which the juror and others testified, the Court affirms that the juror's responses to the jury questionnaire in the fall of 2013 were inaccurate and finds that the juror was not honest in her responses. The Court also concludes that some, but not all, of the requested information about the juror's family's experiences with "court matters" in the jury questionnaire would have been material to the jury selection process. At the same time, the Court finds that the juror was credible when she testified that she could be and was fair and impartial as a juror in the defendants' case. Absent any evidence of the juror's motivation underlying her dishonesty, the Court concludes that the defendants failed to sustain their burden of proof to demonstrate they are entitled to a new trial.

## I. BACKGROUND

### A. Remand

On October 10, 2018, the Court of Appeals for the First Circuit issued its mandate, remanding the Malcolm French and Rodney Russell cases to this Court "for further proceedings" on the Defendants' motion for new trial. *United States v. French*, 904 F.3d 111, 125 (1st Cir. 2018); *Mandate as to Malcolm French* (ECF No. 790); *Mandate as to Rodney Russell* (ECF No. 791).

**B.    Recusal**

On October 4, 2018 and October 8, 2018, immediately after the issuance of the First Circuit opinion and before the receipt of the mandate on October 10, 2018, the Defendants moved to recuse this Judge. *Def. Malcolm French's Mot. to Recuse Judge Woodcock* (ECF No. 787); *Def. Rodney Russell's Joinder in Def. Malcolm French's Mot. to Recuse Judge Woodcock* (ECF No. 789). After briefing, on November 5, 2018, the Court denied the motions to recuse. *Order Denying Mot. to Recuse* (ECF No. 796).

**C.    The November 20, 2018 Conference of Counsel**

After the November 5, 2018 recusal order, on November 7, 2018, the Court scheduled a conference of counsel for November 20, 2018. *Notice of Hr'g* (ECF No. 797). In anticipation of the conference of counsel, the Government wrote the Court on November 16, 2018. *Letter from AUSAs Joel B. Casey and F. Todd Lowell to Hon. John A. Woodcock, Jr.* (Nov. 16, 2018) (ECF No. 843). The Government suggested that the Court engage in a "staged process" whereby the Court contacts Juror 86, arranges for counsel to represent her, and brings her to court for further questioning:

> Step 1 – the Clerk of Court corresponds with Juror 86 to serve her a summons and to notify her that the Court would appoint counsel to represent her;
>
> Step 2 – the Court would appoint experienced CJA counsel to represent Juror 86;
>
> Step 3 – Counsel for the Government and the Defendants could provide written questions for the Court to ask Juror 86;
>
> Step 4 – the Court would call Juror 86 to court for an on the record discussion, which counsel for the Government and the Defendants could observe via video-teleconference. The Court would consult with counsel about any additional questions;
>
> Step 5 – the Court Reporter would prepare a transcript of the proceedings and the parties would file memoranda.

*Id.* at 2.

Several issues arose at the conference of counsel. The Court first discussed with counsel what kind of investigation the Court should undertake and whether an evidentiary hearing was necessary. The Defendants took the position that an evidentiary hearing was necessary and that the Court should hold a hearing at which Juror 86 was called to testify. The Government contended that, although an evidentiary hearing was required, the First Circuit had not directed the Court to hold a particular type of evidentiary hearing and that something less than having Juror 86 testify in open court might satisfy the First Circuit directive. The Court agreed

with the Defendants, citing the First Circuit opinion that the Court read as requiring an evidentiary hearing. *See French*, 904 F.3d at 122 ("Because we are vacating and remanding <u>for an evidentiary hearing</u>. . ..") (emphasis supplied). The Court stated that front and center in the evidentiary hearing would be the question of Juror 86's motivation and, assuming her answer was inaccurate, her motivation would go to whether the inaccurate answer would have provided the basis for a challenge for cause.

The Court and counsel discussed several practical questions: (1) how to approach Juror 86; (2) whether it was likely that Juror 86 would invoke her Fifth Amendment rights; and (3) whether the Court should appoint counsel to represent Juror 86. In addition, the Court asked counsel about the procedure to be used at the evidentiary hearing: (1) whether the Court or counsel should do the questioning; (2) whether the Court should hold the evidentiary hearing in open court or in chambers; (3) whether—if counsel were appointed to represent Juror 86—her court-appointed attorney or other counsel should perform direct examination; (4) whether the Rules of Evidence would apply; and (5) whether the parties anticipated calling any witnesses other than Juror 86. The Court indicated, and counsel agreed, that any questions about actual jury deliberations and her impressions of the evidence during trial and jury deliberations were not proper subjects of the anticipated hearing.

At the conference, the Court stated to counsel that it was inclined to appoint experienced defense counsel to represent Juror 86 for purposes of the anticipated hearing. The Defendants objected. The Court ordered counsel to file their positions.

They did so. *Letter from Att'ys Thomas F. Hallett and Jamesa J. Drake to Hon. John A. Woodcock, Jr.* (Nov. 23, 2018) (ECF No. 805); *Letter from Att'y William S. Maddox to Hon. John A. [W]oodcock, Jr.* (Nov. 23, 2018) (ECF No. 806); *Letter from AUSAs Joel B. Casey and F. Todd Lowell to Hon. John A. Woodcock, Jr.* (Nov. 16, 2018) (ECF No. 807).

On November 23, 2018, the Court issued an order resolving several issues. *Order on Juror Right to Counsel* (ECF No. 808). The Court reiterated its view that the First Circuit remanded this matter to the district court to hold an evidentiary hearing, that it would likely require the testimony of Juror 86, that over the Defendants' objection, it would appoint counsel to represent Juror 86, and that after counsel had been appointed to represent Juror 86 and the Court had received notice that the matter was ready to proceed, the Court would convene another conference of counsel. *Id.* at 1-14. On the same day, November 23, 2018, the Court appointed the Federal Defender (FD) for the District of Maine, David Beneman, to represent Juror 86. *Order Appointing Counsel* (ECF No. 809).

### D.     The January 14, 2019 Conference of Counsel

After FD Beneman notified the Clerk's Office that he was prepared to proceed, on January 3, 2019, the Court scheduled a conference of counsel for January 14, 2019. At the conference, FD Beneman stated that his client, Juror 86, did not take a position on an evidentiary hearing. The Court urged counsel to stipulate to such facts as whether Juror 86 is the mother of a person convicted of various offenses and the exact

nature of the son's criminal record. The Court suggested that at the evidentiary hearing, Juror 86 be referred to as Juror 86 and not her actual name.

FD Beneman suggested that the Court consider something less than a full public hearing, similar to what happens during voir dire, and that the Court seal the hearing from the public. After some discussion, the Court stated that it was not inclined to seal the hearing because this hearing was presumptively public under *United States v. Kravetz*, 706 F.3d 47 (1st Cir. 2013).

The Court concluded that it was not going to ask Juror 86 questions from the bench. The Court stated that it was inclined to allow FD Beneman to perform a direct examination of Juror 86 and then allow counsel for the Defendants and the Government to perform a cross-examination. FD Beneman agreed to perform a direct examination if asked to do so by the Court. Although the Government preferred that the Court ask questions, it agreed that, absent questions from the bench, a direct examination by FD Beneman would be appropriate. The Defendants objected, saying that since they had the burden of proof, they should be allowed to question Juror 86 first.

The Court also addressed whether the Rules of Evidence would apply to the evidentiary hearing and, after some discussion, the parties agreed that they would not. Instead, the Court stated that it would evaluate objections based on more general standards of relevance, materiality, and prejudice. At the conference, the Court scheduled the evidentiary hearing for February 1, 2019. *Notice of Hr'g* (ECF No. 816).

### E. The January 22, 2019 Order

On January 22, 2019, the Court issued an order, clarifying the issues being presented at the February 1, 2019 evidentiary hearing, the burden of proof, confidentiality issues, stipulations, Juror 86's son's criminal record, jury deliberations, and the sequencing of questioning.

#### 1. Issues to be Resolved

On the issues to be resolved at the hearing, the Court wrote that there were two main issues: "(1) did Juror 86 fail to honestly answer a material question; and (2) would a correct response have provided a basis for a challenge for cause." *Order in Anticipation of Evid. Hr'g* (ECF No. 820). Regarding the second issue, the Court quoted the First Circuit as stating that "[t]he outcome of this inquiry depends on whether a reasonable judge, armed with the information that the dishonest juror failed to disclose <u>and the reason behind the juror's dishonesty</u>, would [have struck the juror for cause]." *Id.* at 2 (quoting *French*, 904 F.3d at 116 (quoting *Sampson v. United States*, 724 F.3d 150, 165-66 (1st Cir. 2013)) (emphasis in *French*). The Court listed the factors the First Circuit enumerated in *French*. *Id.* at 2-3 (quoting *French*, 904 F.3d at 116 (quoting *Sampson*, 724 F.3d at 166)). If the Court found that Juror 86 did not lie, but was honestly mistaken, the Court noted that the First Circuit requires a "more flagrant showing of juror bias." *Id.* at 3 (quoting *Sampson*, 724 F.3d at 164 n.3).

#### 2. Burden of Proof

The Court concluded that the burden of proof rested on Defendants Malcolm French and Rodney Russell. *Id.* (quoting *French*, 904 F.3d at 117).

### 3. Confidentiality Issues

Regarding confidentiality, the Court rejected the Government's position that the evidentiary hearing should be sealed. *Id.* at 3-4 (citing *United States v. Kravetz*, 706 F.3d 47 (1st Cir. 2013)). The Court ruled, however, that neither Juror 86's name nor the name of her son would be publicly available, but that the parties should file a stipulation under seal that confirmed the person appearing before the Court on February 1, 2019 was in fact Juror 86. *Id.* at 4.

### 4. Stipulations

The Court urged counsel to enter into as many stipulations as possible to limit the presentation of evidence. *Id.*

### 5. Son's Criminal Record

Assuming counsel might wish to have the son's actual criminal record available for examination, the Court urged counsel to prepare an appropriately redacted document. *Id.*

### 6. Jury Deliberation Process

Referring to Federal Rule of Evidence 606(b) as a guide, the Court ruled that the juror must not be asked about jury deliberations, juror votes, or the juror mental processes concerning the verdict. *Id.* at 5.

### 7. Sequence of Questioning

The Court concluded that, although permissible, it would not conduct the initial examination of the juror. *Id.* The Court further ruled that, although permissible, it would not prohibit counsel from the defense and prosecution from asking questions. *Id.* When the Court suggested that it would ask FD Beneman to perform a direct examination of Juror 86, Malcolm French objected, and the Court allowed him to present any authority for his contention that the Defendants had a right to cross-examine Juror 86 without any direct examination. Following the January 14, 2019 conference of counsel, Defendant French wrote the Court to confirm that he could locate no such authority. *Letter from Att'y Thomas Hallett and Att'y Jamesa J. Drake to Hon. John A. Woodcock, Jr.* (Jan. 20, 2019) (ECF No. 817). The Court ruled that the sequence of questioning would be: (1) FD Beneman on direct examination; (2) cross-examination by defense counsel for Malcolm French; (3) cross-examination by defense counsel for Rodney Russell; (4) cross-examination by the federal prosecutor; and (5) redirect examination and re-cross-examination in the same order. *Id.* at 6-8.

**F.    The January 28, 2019 Order**

On Monday, January 28, 2019, in anticipation of the Friday, February 1, 2019 evidentiary hearing, Rodney Russell moved the Court to have the audio recording of the jury voir dire of January 8, 2014 available for use during the evidentiary hearing. *Def. Rodney Russell's Mot. to Have the Audio for the Voir Dire to be Available at Hr'g on Feb. 1, 2019 Consistent with Court Order dated Mar. 18, 2015 at Doc # 490* (ECF No. 824). On January 29, 2019, the Court dismissed without prejudice Mr. Russell's

motion. *Order on Def. Rodney Russell's Mot. to Have the Audio for the Voir Dire to be Available at Hr'g on Feb. 1, 2019 Consistent with Court Order dated Mar. 18, 2015 at Doc # 490* (ECF No. 827). The Court ruled that by statute, 28 U.S.C. § 753, and under the Guide to Judiciary Policy, the certified transcript of the jury voir is the official record, that the backup recording is the court reporter's personal property, and that Mr. Russell proffered no justification for his request. *Id.* at 1-4.

### G. The January 31, 2019 Order

On January 30, 2019, Malcolm French moved the Court to order that Juror 86's original questionnaire be made available in the courtroom during the February 1, 2019 evidentiary hearing and to inform the parties when the Court received her written questionnaire. *Mot.* (ECF No. 828). On January 31, 2019, the Court granted in part and dismissed in part the Defendant's motion. *Order* (ECF No. 830). With some conditions about the handling of the original document, the Court granted the motion to make the original questionnaire available. *Id.* at 1. The Court dismissed the Defendant's request for a specific date that the Court received the written questionnaire, but it confirmed that the Clerk's Office received it sometime between October 18 and October 31, 2013. *Id.* At the February 1, 2019 evidentiary hearing, the parties stipulated that the Clerk's Office received the questionnaire from Juror 86 between October 18 and October 31, 2013 and that it was a one-page form. *Tr. of Proceedings, Evidentiary Hr'g* 4:17-5:15 (ECF No. 835) (*Tr.*).

## II. THE FEBRUARY 1, 2019 EVIDENTIARY HEARING

### A. Stipulations

10

Consistent with the Court's January 22, 2019 order, the parties entered into several stipulations concerning the criminal record of Juror 86's older son at the time Juror 86 completed the jury questionnaire and at the time of jury selection:

1. A conviction in state court in Kennebec County, Maine for Operating After Suspension (29-A M.R.S. § 2412-A), a Class E misdemeanor and a conviction for Unlawful Possession of Scheduled Drugs, namely marijuana (17-A M.R.S. § 1107), a Class E misdemeanor. Both of these crimes were charged in one complaint and alleged a date of offense of December 13, 2002. The defendant pleaded guilty to these offenses on December 16, 2002, and was sentenced on the same day to 7 days in jail and a $500 fine on the Operating After Suspension change and 180 days, all suspended, with one year or probation on the Unlawful Possession of Scheduled Drugs charge. The defendant was originally charged with a third count for Unlawful Furnishing of Scheduled Drugs, namely marijuana (17-A M.R.S. § 1106), a Class D misdemeanor. That charge alleged the same date of offense as the other two charges and was dismissed on December 16, 2002. The docket record shows that the defendant was pro se.

   A. On May 21, 2003, the court partially revoked the defendant's probation. The court imposed a sentence of 21 days.

   B. On October 21, 2003, a probation officer filed a Motion for Probation Revocation. The defendant was incarcerated for a period of time. The probation officer withdrew the Motion for Probation Revocation.

2. A conviction in state court in Kennebec County, Maine for Unlawful Possession of Scheduled Drugs, namely cocaine (17-A M.R.S. § 1107-A(1)(C)), a Class D misdemeanor. The defendant was originally charged with Unlawful Furnishing of Scheduled Drugs, namely cocaine (17-A M.R.S. § 1106), a Class C felony. The Class C charge was amended to the Class D misdemeanor offense on December 27, 2005, and the defendant pleaded guilty to the misdemeanor offense and was sentenced on the

misdemeanor charge on that date. The court sentenced the defendant to 7 days in jail and a $2,000 fine. The docket record shows that the defendant was represented by Leonard Sharon.

3. A conviction in state court in Penobscot County, Maine for Unlawful Possession of Scheduled Drugs, namely marijuana (17-A M.R.S. § 1107-A(F)(1)), a Class E misdemeanor. The defendant pleaded guilty to the charge on February 2, 2011, and was sentenced on the same day to a $750 fine. The docket record shows that the defendant was represented by Leonard Sharon.

*Stip. Number One* (ECF No. 829). The parties filed a second stipulation under seal confirming Juror 86's name as well as her older son's name. The parties stipulated that her older son's year of birth was 1982. *Stip. Number Two* (ECF No. 834) (under seal).

**B.    Exhibits**

During the evidentiary hearing, the Court admitted the following exhibits:

(1) Juror 86 Exhibit 1, Jury Information Form;

(2) Juror 86 Exhibit 2, Juror Questionnaire;

(3) French Exhibit 1, Kennebec County Jail Record of Visits;

(4) French Exhibit 2, Criminal Summons;

(5) French Exhibit 7, Conditions of Probation;

(6) French Exhibit 13, Copies of checks; and

(7) French Exhibit 18, Petition request.

Several exhibits were admitted and sealed, but redacted versions of the exhibits were admitted on the public record. *See Court Ex. List* (ECF No. 832).

The Juror 86 exhibits were copies of the questionnaires Juror 86 completed in the fall of 2013 that generated the need for the evidentiary hearing. French Exhibit One reflects that on October 22, 2003, Juror 86 visited her older son at the Kennebec County Jail. French Exhibit Two is a uniform summons and complaint for Juror 86's son for the charge of Unlawful Trafficking in Scheduled Drugs on August 28, 2010 with an appearance date of October 6, 2010. French Exhibit Three is a motion for probation revocation dated October 17, 2003 for failure to refrain from the use of drugs, cocaine, and failure to report as directed in August and September 2003. French Exhibit Seven is a list of conditions of probation for Juror 86's son following his 2002 convictions for operating after suspension and unlawful possession. French Exhibit Thirteen consists of three personal checks Juror 86 made out to Leonard Sharon, Esq. on August 31, 2010, September 10, 2010 and September 16, 2010; two in the amount of $1,000 and one in the amount of $2,000. Finally, French Exhibit Eighteen is a petition request authorization in a juvenile matter for theft and forgery dated January 23, 2001, referring the matter to a juvenile caseworker.

### C.    February 1, 2019 Stipulation

At the outset of the evidentiary hearing, counsel stipulated that when jurors are contacted by the Clerk's Office and complete the questionnaires, they do not know whether the case is going to be a civil or criminal matter. *Tr.* 6:17-7:15.

### D.    Juror 86's Testimony

#### 1.    Direct Examination:  Federal Defender Beneman

On direct examination by FD Beneman, Juror 86 confirmed her name and that she is the mother of the person listed in Stipulation Two. *Tr.* 12:8-11. She testified that she graduated from high school, reads and writes English, and worked in an office environment. *Id.* 12:15-20. She said she is used to reading state government forms and papers. *Id.* 12:21-23.

Shown Exhibits One and Two, Juror 86 acknowledged that the handwriting on both forms is hers. *Id.* 12:24-13:17. She said she had no recollection of having seen these forms. *Id.* 13:24-14:1. Juror 86 Exhibit One is a juror information form, containing such information as the juror's address, marital status, age, employment, spouse's employment, whether there are any pending criminal charges against the juror, and whether the juror had been previously convicted of a felony. *Juror 86* Ex. 1. Juror 86 confirmed that all the information on Juror 86 Exhibit One was correct as of the fall of 2013. *Tr.* 14:15-22.

Juror Exhibit Two is the questionnaire that was the focus of the First Circuit opinion and is the focus of the remand. Looking at Juror Exhibit Two, Juror 86 said she could not recall whether it came with Juror Exhibit One or separately. *Id.* 14:23-15:1. Asked about the other information on Juror Exhibit Two, Juror 86 testified that it was all correct. *Id.* 15:2-22. Juror 86 agreed that she had answered question 3(a) of the questionnaire, "N/A," and that in her mind, "N/A" means not applicable. *Id.* 15:10-17.

FD Beneman referred Juror 86 to Question Three, Part A:

> Please describe briefly any court matter in which you or a close family member were involved as a plaintiff, defendant, witness, complaining witness or a victim.

*Juror 86* Ex. 2 at 1. Juror 86 described her understanding of the terms, plaintiff, defendant, witness, complaining witness, and victim. *Id.* 15:23-16:22. Juror 86 said that she had gone to court on two occasions, once as a witness in a matter involving her sister's neglectful raising of her daughter and again when she was divorced. *Id.* 16:23-17:18. She was married to her current husband in 2013 and she was aware that he had gone to court for his divorce and for an operating under the influence charge. *Id.* 17:25-18:9. She stated she was satisfied with the outcomes of both her and her husband's involvement with the court system. *Id.* 17:12-18; 18:7-9.

Juror 86 confirmed she has two sons. *Id.* 18:10-11. The son whose criminal record was stipulated is the older son. *Id.* 18:23-24. Regarding her younger son, she was aware, as of the fall of 2013, that he had been to court on a speeding charge, for possession of tobacco by a minor, and for possession of a "small amount of pot." *Id.* 18:25-19:5. He had gone to court for these matters on separate occasions. *Id.* 19:6-8. In fact, she thought she had gone to court with him on some, perhaps all the charges. *Id.* 19:9-19. She testified that she was satisfied with the outcome of her younger son's court cases. *Id.* 19:20-22.

She was asked about her older son. *Id.* 19:23-24. She testified that she was aware that he had gone to court, but she stated she did not know why he had done so. *Id.* 19:25-20:6. She admitted that she had visited her older son at the Kennebec County Jail, but she said that she did not know why he was in jail. *Id.* 20:7-16. In

fact, she testified that she did not know why he was in jail until December 2018 when she met with FD Beneman. *Id.* 20:17-18.

Juror 86 stated that she did not recall taking checks on several occasions to the office of Leonard Sharon on her older son's behalf. *Id.* 20:21-23. But she recalled writing checks to Mr. Sharon for his assistance to her son in some kind of a legal matter. *Id.* 20:24-21:5. She said she did not know the specifics of why her son had hired Mr. Sharon, and even as of her February 1, 2019 testimony, she did not know the specifics. *Id.* 21:6-10. Although she knew that her son hired Mr. Sharon, she explained that her son did not have a checking account and that she would write checks for him. *Id.* 21:11-15. She said that she did not pay Mr. Sharon out of her own funds, instead her son deposited money in her account, and she wrote the checks based on his deposits to pay Mr. Sharon. *Id.* 21:11-21. Juror 86 confirmed that the remaining answers on page one of Juror 86 Exhibit Two were accurate. *Id.* 21:22-22:19.

Turning to the second page of Juror 86 Exhibit Two, Juror 86 confirmed that she did not date the form, sign the form, or complete any of the information on the second page. *Id.* 22:20-23:7. She testified that even reviewing the juror questionnaire did not assist her ability to remember how she had answered Juror 86 Exhibit Two when she filled it out. *Id.* 23:8-24. Juror 86 did not recall filling out Juror 86 Exhibits One or Two and looking at the forms did not refresh her recollection. *Id.* 23:25-24:10.

Juror 86 recalled coming to the federal courthouse in December 2013 for a jury selection, but she was not selected in December. *Id.* 24:16-22. She stated that no one asked her any questions about Juror 86 Exhibits One and Two. *Id.* 24:23-25:5.

On January 8, 2014, Juror 86 returned to federal court for jury selection and she did not recall anyone showing her Juror 86 Exhibits One or Two or pointing out that Juror 86 Exhibit Two had not been completed. *Id.* 25:6-16. Asked whether she recalled the magistrate judge asking the jurors whether there was anyone on the panel who themselves personally or a close family member has had any experiences involving controlled substances, illegal drugs, specifically marijuana, that would affect their ability to be impartial, she did not recall answering the question, but she said she thought it "did not pertain to me." *Id.* 26:9-20. She explained: "Because I stay neutral; I don't form judgments prior to knowing the full story." *Id.* 26:21-23. She testified that the fact her sons had resolved past matters that involved marijuana would not have affected her impartiality. *Id.* 27:7-10 ("No, not at all").

FD Beneman quoted another question from the magistrate judge: "Is there anyone on the jury panel who has strong beliefs about the legalization or continued illegality of marijuana, either way, that would affect your ability to be fair and impartial in rendering a verdict in this case." *Id.* 27:15-18. Juror 86 did not recall responding to that question, but she said that she would not have responded because she "did not have an opinion either way." *Id.* 27:15-22. Juror 86 said she did not have opinions about marijuana in 2013 that would have affected her ability to be fair and impartial. *Id.* 27:23-28:1. When posed the final, overall question from the magistrate

judge — whether there was anything that would have interfered with her ability to be a fair and impartial juror — Juror 86 reiterated that she felt she could be fair and impartial and, looking back on the answers she gave, she still believed as of February 1, 2019 that there was nothing that made it difficult for her to be a fair and impartial juror. *Id.* 28:5-29:13.

### 2. Cross-examination: Thomas Hallett

Attorney Thomas Hallett cross-examined Juror 86 on behalf of Malcolm French. *Id.* 29:19-20. Mr. Hallett directly questioned Juror 86 as to whether she had a problem with her memory, which she denied. *Id.* 30:16:17. Mr. Hallett pointed out the number of occasions where Juror 86 had contact with the court system—her second son going to court for marijuana, her divorce, gaining custody of her sister's daughter, her son being in jail in 2003, her paying Attorney Sharon in 2010—and he asked whether she recalled thinking of any of these contacts when she responded to Question 3(a). *Id.* 30:1-20. She responded that she did not recall thinking of these matters because "I did not think it was relevant." *Id.* 31:22-23. When pressed, she clarified that she did not think of these instances when completing the forms. *Id.* 32:1-10. In fact, she agreed that she had "no recollection" about completing the forms. *Id.* 32:11-21.

Juror 86 also agreed that an honest answer to Question 3(a) would have included every time she had gone to court. *Id.* 32:25-33:3. Mr. Hallett asked:

> Q. Now, Mr. Beneman asked you a question if you had recalled, when answering the voir dire questions, that both of your sons had gone to court for marijuana, right? Do you remember the question?

A. Yes.

Q. And you answered that that didn't impact your partiality.

A. Correct.

Q. So at the time you answered that question, you knew that both of your sons had gone to court for marijuana, right?

A. Yes.

*Id.* 33:14-24. Juror 86 could not recall when she learned that her sons had gone to court for marijuana, but she acknowledged that she knew they had done so when she completed the jury questionnaire. *Id.* 33:25-34:14. She denied, however, knowing what her older son's exact charges had been. *Id.* 34:15-18. She testified that she "remember he was pulled over, and he never talked to me about it." *Id.* 34:19-23. He told her that he had to go to the hospital that day and this scared her. *Id.* 35:1-16. She confirmed that her older son has had a health issue but denied that his smoking marijuana concerned her. *Id.* 35:18-23. She denied knowing how much marijuana either of her sons smoked. *Id.*

She was asked about her 2003 visit to her older son at the Kennebec County Jail. *Id.* 36:8-10. Although she did not know why he was in jail, she knew it was not for murder but could not recall if it was for theft. *Id.* 36:11-17. She reiterated that she did not know why he was in jail. *Id.* 36:18-20. She had never before been to jail and found it scary. *Id.* 36:23-37:1. She said she was nervous, but she was not worried about her son's physical safety or his health. *Id.* 37:11-18. She spent only "a few minutes" with her son and spoke to him "a little." *Id.* 37:22-25. Although she did not find the situation heartbreaking, she agreed that she was sad and upset but denied

she was angry.  *Id.* 38:5-16.  She reiterated that she never asked him why he was there and first learned why from Mr. Beneman.  *Id.* 38:17-24.

Mr. Hallett asked Juror 86 a series of questions about a juvenile proceeding involving her older son that took place in 2001.  *Id.* 42:14-45:18; *see French* Ex. 18.  Juror 86 recalled she reported her son to the police after he forged one of her checks and stole from her.  *Id.* 42:25-43:3.  However, she maintained that she did not recall what happened after that.  *Id.* 42:23-24.  Although the paperwork indicates she was present at a juvenile proceeding, she testified that she did not remember whether she was there and did not recall the incident until her February 1, 2019 testimony.  *Id.* 45:9-20.

Mr. Hallett asked Juror 86 about her recollections of the voir dire on January 8, 2014.  *Id.* 46:21-51:1.  Juror 86 confirmed that she had very little memory of what had occurred during jury voir dire, whether she had thought about her sons' marijuana smoking and charges during the voir dire, whether she had thought about her son being in jail.  *Id.*  Juror 86 could not walk through her thought processes that day, because she could not remember.  *Id.*

Mr. Hallett asked Juror 86 about her being contacted by FD Beneman and she agreed that she was shocked and very upset.  *Id.* 52:20-24.  She denied, however, that Attorney Beneman had told her that she could be in trouble.  *Id.* 53:2-4.  Knowing that she had answered the jury questionnaire under oath, she realized that if she recalled giving an inaccurate answer, she could get in trouble.  *Id.* 53:18-54:14.

**3.    Cross-examination: William Maddox**

Upon questioning by Attorney Maddox, Juror 86 testified that she recalled being in the same courtroom, but it was during the jury trial. *Id.* 54:24-55:4. She did not recall whether jury selection was conducted in the same courtroom. *Id.* 55:5-7. She had some memory of being in the courtroom during voir dire, but her memory was not precise. *Id.* 55:8-25. She was not sure whether when she participated in jury selection in December 2013, she was in the same courtroom. *Id.* 56:1-5. She had no specific recollection of jury selection in December 2013 and whether the same judge presided at both the December 2013 and January 2014 jury selections. *Id.* 56:6-12.

Turning to Juror 86 exhibit one, the juror information form, she reiterated that she did not recall completing that form. *Id.* 57:9-11. She said that if she completed the same form today, she would probably be able to answer all the questions right away without searching for information. *Id.* 57:9-16. She had retired from state employment on January 1, 2012. *Id.* 57:19-25. She had always worked for the Department of Health and Human Services and she worked there for thirty-six years and some months. *Id.* 58:8-18.

Juror 86 recalled that during jury voir dire, there were questions about marijuana. *Id.* 58:19-59:3. She said she paid attention to the judge's questions during voir dire and recalled that some jurors were excused for cause.[1] *Id.* 59:7-14. She denied that she was affected by the fact that some jurors had been excused. *Id.* 59:15-16.

---

[1] Although Juror 86 said she knew some potential jurors were excused for cause, the Court is not at all clear how she would have known why jurors were excused, but the Court accepts Juror 86's statement that she was aware that the magistrate judge excused some jurors.

She confirmed that both her sons had smoked marijuana. *Id.* 59:17-19. She did not know whether they or anyone else had smoked marijuana in her home. *Id.* 59:20-24. She smoked marijuana in her home years and years ago for a short time. *Id.* 59:25-60:3.

She was asked about a Maine marijuana referendum and said that she does not have an opinion one way or the other as to whether marijuana should be legalized. *Id.* 60:9-15. She explained that whether marijuana was legalized would not matter to her. *Id.* 60:9-16.

She denied that anyone had ever questioned how good her memory is. *Id.* 60:17-22.

### 4. Cross-examination: Todd Lowell

Assistant United States Attorney Todd Lowell questioned Juror 86. Juror 86 denied that when she responded to Question 3 on the jury questionnaire, she was trying to hide anything. *Id.* 61:13-18. She denied that she deliberately gave false information on the questionnaire. *Id.* 61:19-62:20. She said she did not have a burning desire to be on the jury or to avoid jury service. *Id.* She recognized that she had a civic duty with respect to jury service and she was willing to fulfill that duty if called. *Id.* 62:25:63:3.

Regarding jury selection in January 2014, although she did not recall of the details of jury selection, Juror 86 denied that she had provided any deliberately false information in response to the judge's questions. *Id.* 63:4-10. She denied that she failed to answer a question thinking that it would make her more or less likely to be

on the jury.  *Id.* 63:11-14.  She listened carefully to the judge's questions, took them seriously, and answered or responded to them accurately.  *Id.* 63:15-25.

Juror 86 agreed that she had only limited experience with the court system and very limited information about her sons' experiences with the criminal justice system.  *Id.* 64:1-5; 65:1-9.  She testified that this limited information did not affect her ability to be fair and impartial.  *Id.* 64:6-8.  She confirmed that she did not know either Malcolm French or Rodney Russell before the trial, that she has no bias against people accused of crimes, that she had no bias against people accused of drug crimes, that she does not feel any animosity against people accused of growing marijuana, and that she does not feel any animosity against people accused of criminal offenses. *Id.* 66:21-67:11.

### 5.    Re-cross-examination: Thomas Hallett

Turning again to the January 8, 2014 jury selection, Juror 86 confirmed that although she did not fully recall the magistrate judge's questions, she recalled the oath but not the specific questions.  *Id.* 67:22-68:6.  She also acknowledged that she did not know what was going on in her mind on January 8, 2014.  *Id.* 68:10-16.  She admitted that she does not remember thinking at the time of jury selection about her younger son smoking marijuana or being charged with it.  *Id.* 68:17-23.  Nor does she remember thinking about her older son being charged with marijuana possession or the juvenile incident.  *Id.* 68:24-69:6.  She does not recall thinking about any of the court incidents.  *Id.* 69:7-9.  Although she had testified at the February 1, 2019 hearing to what she would have done on January 8, 2014, she did not recall what was

going through her mind in 2013 or 2014. *Id.* 69:22-25. She agreed that she had not

included any of this information in response to Question 3 and had not been brought

to sidebar during the jury selection process and questioned by the judge. *Id.* 70:14-

23.

Attorney Hallett asked:

Q. For purposes of the record here, if - - at the time you were doing the voir dire, right - -

A. Right.

Q. - - that you were here, your younger son had been charged with marijuana possession, or something having to do with marijuana, right?

A. Yes.

Q. And your older son had also been charged with something to do with marijuana, right?

A. Yes.

Q. And you did not - - and you knew that at the time.

A. Yes.

Q. But you did not respond to the marijuana question - -

A. No.

Q. - - or you don't remember; fair to say?

A. Yes.

Q. Okay. Do you know if the marijuana charge you knew about your older son was the one where he was hospitalized or not?

A. I'm not sure.

Q. It could have been another one?

A. It could have been.

Q. Okay.

A. I don't remember.

*Id.* 71:1-25.

### 6. Re-cross-examination: William Maddox

In re-cross-examination, Attorney Maddox asked about whether Juror 86 had been asked individualized questions in December 2013 and she replied that she did not remember but did not believe so. *Id.* 72:7-10. She did not recall what the December 2013 case was about. *Id.* 72:11-12. She did not know whether the judge had excluded her or whether she was just not picked. *Id.* 72:13-15.

### 7. Re-cross-examination: Todd Lowell

In re-cross-examination, Juror 86 agreed that she took jury service seriously, including the obligation to be truthful during the jury selection process. *Id.* 72:23-74:4. She testified that if she believed she could not be fair and impartial when responding to the magistrate judge's questions, she would have responded affirmatively when asked. *Id.* 73:5-10.

### E. Edward's Testimony

Attorney Hallett called Edward, Juror 86's husband, to testify. *Id.* 74:8. Attorney Hallett asked Edward about whether he was aware that his wife's older son had been arrested for marijuana. *Id.* 75:16-76:1. Edward could not recall when the arrest took place, but he thought it might have been around the time of Edward's father's death. *Id.* 76:2-6. He was later informed, however, that Edward's father was

still alive when Juror 86's older son was arrested. *Id.* 76:7-8. Edward noted that the older son's father had died in 2007. *Id.* 76:10-12. Edward stated that he was aware of the 2002-03 marijuana charge. *Id.* 76:10-15. Edward said that he found out about the marijuana charge later and he supposed that other family members knew about it. *Id.* 76:22-25. He confirmed that Juror 86 knew about it. *Id.* 77:1-2.

F.     **Dr. Charles Robinson's Testimony**

1.     **Direct Examination: Thomas Hallett**

Dr. Charles Robinson is a forensic psychologist who has testified as an expert in a dozen states around the country. *Id.* 79:18-80:8. He has been qualified as an expert in memory. *Id.* 80:9-20. Dr. Robinson explained the Four R's for creating memory: Reception (or encoding), Retention, Retrieval, and Report. *Id.* 81:24-82:3.

Dr. Robinson testified that people tend to remember events when the occurrence is emotionally colored. *Id.* 83:8-84:13. Dr. Robinson testified that the episode in which Juror 86's son was involved in the juvenile proceeding would, in his view, have been coded into Juror 86's emotional memory because of the parental bond. *Id.* 84:16-85:20. Attorney Hallett asked about the marijuana charges against both sons, Juror 86's going to court to get custody of her sister's daughter, Juror 86's divorce, and her husband's operating under the influence charge, and Dr. Robinson opined that these events would have elicited an emotional response, such as sadness, anger and guilt. *Id.* 85:21-87:5.

Dr. Robinson reviewed Juror 86 Exhibit 2, the juror questionnaire, and testified that the questionnaire, if read and understood by a normal person, would

have evoked schema, events associated "through proximity, fear arousal, and things like that." *Id.* 87:6-88:3. He opined that it was "highly probable" that Question 3 would have triggered memories of the earlier described court events. *Id.* 88:17-21.

### 2.     Further Examination:  William Maddox

Dr. Robinson testified about the difference between short-term and long-term memory. *Id.* He said there is no set time when short-term memory transitions into long-term memory because it depended upon the conditions of emotional arousal; the higher the arousal, the more rapid the consolidation. *Id.* 89:4-19. Long-term memory, however, is more accurate than short-term memory. *Id.* 89:20-22. He said that females have superior episodic memory over males. *Id.* 90:2-5. He did not know whether when a parent and child experience the same event outside the norm, the parent or the child would have a more accurate memory. *Id.* 90:6-10.

### 3.     Cross-Examination: Todd Lowell

Dr. Robinson agreed that a person would not be able to perform the four memory formation functions if she did not read the question or if she did not read it carefully. *Id.* 92:15-23. He acknowledged that he has not assessed Juror 86 and the only time he had heard her speak was during her testimony in the courtroom. *Id.* 93:23-94:7. He had not conducted any tests or examinations on her and therefore, in his words, his opinions were a "generic analysis of the facts in the case as they relate to social cognition." *Id.* 94:8-12.

### 4.     Cross-examination: David Beneman

Mr. Beneman questioned Dr. Robinson about the fact that Juror 86 failed to complete the form, answered no questions on the back page, and failed to sign it. *Id.* 98:21-22. Dr. Robinson agreed that Juror 86's failure to complete the back page of the questionnaire suggested a lack of awareness on her part. *Id.* 98:23-25. In fact, if Juror 86 folded the questionnaire to place it in the mail, the fact there was a second side would have been apparent to her unless she was not paying attention. *Id.* 99:1-17.

### 5. Redirect Examination: Thomas Hallett

On redirect, Dr. Robinson testified that based on her answers to the questions on the first page of the questionnaire, it seemed to him that she was paying attention. *Id.* 99:23-100:16.

### 6. Further Examination: William Maddox

Attorney Maddox asked Dr. Robinson about the significance, if any, of the sons' criminal records, and Dr. Robinson replied that he thought the sons' criminal records were "not only significant, but consequential." *Id.* 101:3-11. He stated that "[u]nless this form was essentially randomly filled out, a person would have all the cues necessary to provide the information that's called for, particularly in Question 3." *Id.* 101:12-16.

### 7. Re-cross-examination: Todd Lowell

AUSA Lowell asked Dr. Robinson about the fact that Juror 86 had answered "N/A" to two of the questions. *Id.* 102:2-103:19. Dr. Robinson thought that the questionnaires' "cues were just too rich" for her, if she read the questionnaire, not to

have remembered "those things that are targeted by these questions." *Id.* 102:19-103:9.

AUSA Lowell pointed out to Dr. Robinson that Juror 86 answered Question Six inaccurately as well, because it asked her "duties at your present place of employment" and she wrote "Human Resource/Payroll," when she had retired and had no "present place of employment." *Id.* 103:20-105:1.

### 8. Re-cross Examination: David Beneman

FD Beneman pointed out that if Juror 86 had read Question 3 with an "are" and not a "were," her answer would have been accurate. *Id.* 105:8-21.

### 9. Re-re-direct Examination: Thomas Hallett

Mr. Hallett pointed out that Question 3(a)—"Was the outcome satisfactory to you"—is in the past tense and suggested that there had been an outcome. *Id.* 106:2-13. Also, Mr. Hallett noted that she accurately responded to Question 5 by saying that she had retired and that she may have interpreted Question 6 as asking about her prior occupation. *Id.* 106:14-22.

## III. THE POSITIONS OF THE PARTIES

### A. Malcolm French's Position

### 1. Whether Juror 86's Answer to Question 3 was Honest

On February 21, 2019, Malcolm French filed a post-hearing memorandum. *Second Supp. Mem. in Support of Def. French's Mot. for New Trial* (ECF No. 836) (*French Mem.*). After recounting some of the history of the case and the evidence presented at the February 1, 2019 hearing, Mr. French turned to "the first part of

*McDonough*'s[2] binary test," which focuses on "whether Juror 86 failed to answer honestly one of more material voir dire questions." *Id.* at 14. Reviewing Juror 86's February 1, 2019 testimony, Mr. French concluded that Juror 86's response of "N/A" to Question 3 "was not honest." *Id.* at 14-15.

### 2. Whether a Correct Answer Would Have Provided a Valid Basis for a For Cause Challenge

Mr. French turned to the second *McDonough* prong: whether "a correct response would have provided a valid basis for cause." *Id.* At this stage, Mr. French states that "we look at more than simply what a correct answer would have been and probe deeper to consider the reasons why a correct answer was not disclosed originally." *Id.* at 16 (citing *French*, 904 F.3d at 116 (quoting *Sampson v. United States*, 724 F.3d 150, 165-66 (1st Cir. 2013)) ("The outcome of this inquiry depends on whether a reasonable judge, armed with the information that the dishonest juror failed to disclose and the reason behind the juror's dishonesty, would have struck the juror for cause"). Mr. French likened this case to *Sampson*, where "Juror C gave false answers not only during voir dire but also during the post-hearing itself." *Id.* at 16 (quoting *Sampson*, 724 F.3d at 161). Mr. French rejected as "pure speculation" the Government's assertion that Juror 86 was not paying close attention when she completed the form. *Id.* at 16. Mr. French pointed out that Juror 86 "never testified that she was distracted when filling out the form;" instead, she testified "time and again that she had no recollection what she was thinking at the time." *Id.* at 16.

### 3. Juror 86's Motive

[2]    *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984).

Noting that the First Circuit in this and other cases has instructed the trial court to evaluate "the reason behind the juror's dishonesty," Mr. French wrote that the Court "cannot do that" because "Juror 86's memory has faded." *Id.* at 16-17. Mr. French again observed that "Juror 86 could not tell this Court why she failed to answer the questionnaire accurately and honestly or why she failed to respond to anything during voir dire." *Id.* at 17. In Mr. French's view, this "cuts against the government and requires a new trial." *Id.* He quoted the *French* opinion: "To the extent that memories have faded in the two years between the defendants' filing of their motion for a new trial and this decision, we place the responsibility for that possible loss of evidence at the feet of the government, not the defendants." *Id.* (quoting *French*, 904 F.3d at 120). Mr. French argued that even though the defendants have the burden of establishing bias, the burden "is lifted" when the "inability to establish such bias is caused by loss of memory." *Id.*

### 4. The Scope and Severity of the Juror's Dishonesty

Mr. French contended that "Juror 86 did not simply forget to mention one or two court matters involving close family members. She failed to disclose *eleven* such proceedings—at least four of which involved controlled substances." *Id.* (emphasis in original). Mr. French noted that Juror 86 did not leave the answer to Question 3(a) blank; she "purposefully wrote 'n/a,' which the First Circuit acknowledged would stymie follow-up questions by counsel." *Id.* In Mr. French's view, "Juror 86 failed to testify accurately at the post-trial hearing":

> Juror 86 implausibly testified that she had no idea why her son was
> incarcerated, only to later admit that she knew it was for marijuana-

related charges. Juror 86 also implausibly testified that she had no recollection of juvenile court proceedings, only to later offer that she called the police because her son wrote a bad check in her name, and met with police at her place of business.

*Id.* at 17-18.

### 5. Juror's Interpersonal Relationships and Similarity of Juror's Experiences and Important Facts at Trial

Mr. French contended that courts typically recognize that family member involvement with controlled substances might impact a juror's impartiality. *Id.* at 18. Here, Mr. French pointed out, both of Juror 86's sons were involved in marijuana-related criminal activity. *Id.* Mr. French asserted that her older son's criminal record "strongly suggests" that the older son "was not a casual marijuana user; rather, he was a known drug user among the criminal set." *Id.*

Mr. French argued that the Court should reject "Juror 86's self-professed neutrality about marijuana usage and legalization." *Id.* at 19. He cites caselaw that stands for the proposition that bias is often elusive, and a juror's own protestations of impartiality cannot suffice. *Id.* at 19.

### 6. The Juror's Ability to Separate her Emotions from her Duties

Mr. French wrote that "[i]nterestingly, in our case, Juror 86's apparent lack of emotion is the concerning part." *Id.* Mr. French was deeply skeptical that a mother would not know or remember that her sons had faced criminal charges, and in his view, this demonstrates that "Juror 86 continues to deceive." *Id.*

### 7. Malcolm French's Conclusion

Mr. French reminded the Court that the First Circuit deemed jury bias to be a "structural error—that is, per se prejudicial and not susceptible to a harmlessness analysis." *Id.* at 20 (quoting *French*, 904 F.3d at 119). Mr. French contended that he is entitled to a new trial because Juror 86 "never should have served on French's jury" and "even should this Court fail to make a finding of bias, a new trial is nevertheless required because of Juror 86's loss of memory." *Id.*

## B. Rodney Russell's Position

On February 22, 2019, Rodney Russell filed a post-hearing memorandum. *Def. Rodney Russell's Mem. Following Remand of Denial of Mot. for New Trial* (ECF No. 837) (*Russell Mem.*). Mr. Russell wrote that "the evidence adduced at [the February 1, 2019] hearing reveals that Juror 86's memory concerning her participation as a juror in this case manifests a problem which has not been solved on remand, and which leaves the state of the record in a posture which cuts against the government." *Id.*

In his memorandum, Mr. Russell reiterated the First Circuit's language in the *French* case and reviewed the evidence presented at the February 1, 2019 evidentiary hearing. *Id.* at 1-8. He noted that during the jury voir dire on January 8, 2014, the magistrate judge mentioned marijuana at least fourteen times, including the fact that the charge involved a conspiracy to possess and distribute marijuana. *Id.* at 8.

Mr. Russell turned to the relevance of another juror excused for cause by the magistrate judge: Juror 10. *Id.* at 10. Mr. Russell argued that the experience of another juror, Juror 10, who was excused for cause, supports "an inference that Juror

86 would have been struck for cause." *Id.* Mr. Russell pointed out that Juror 10's son had been prosecuted for possession of marijuana and he contended that the magistrate judge would have done the same with Juror 86. *Id.*

Mr. Russell argued that the First Circuit had concluded that Juror 86 was "most likely deceitful, whether knowingly or unknowingly." *Id.* at 11. Mr. Russell also pressed the point that the First Circuit "has held that the delay in the parties['] ability to develop new findings and facts inures to the detriment of the government." *Id.* In Mr. Russell's view, "the hearing revealed that the passage of time may not have affected her memory, yet, if it did, (which would run counter to the analysis of Dr. Robinson), the result should be vacatur." *Id.* Mr. Russell concluded that the "staleness of Juror 86's memory has become a problem on remand, a fact which cuts against the government." *Id.*

### C. The Government's Opposition

#### 1. A Lack of Close Attention

On March 8, 2019, the Government responded. *Gov't's Post-Hr'g Br. and Obj. to Mot. for New Trial* (ECF No. 838) (*Gov't's Opp'n*). The Government reviewed the factual and legal backdrop of the Defendants' motion for new trial. *Id.* 1-9. Next, the Government argued that Juror 86 did not intentionally provide dishonest information on the juror questionnaire or during voir dire. *Id.* at 9-16. The Government conceded that Juror 86's testimony "supports the conclusion that she did not give close attention to the form and her inattention was not selective." *Id.* at 9.

#### 2. Material Questions of Impartiality

The Government argued that the "material questions at issue during *voir dire* asked whether Juror 86 or a close family member had any experiences with controlled substances that 'would affect your ability to be impartial' or whether she knew of 'any other reason' that might interfere or appear to interfere with the ability to be 'a fair and impartial juror.'" *Id.* The Government pointed out that the First Circuit already has ruled that Juror 86's answers to these questions were not "cause for finding juror misconduct." *Id.* (*French*, 904 F.3d at 119).

### 3. Juror 86's "Apparent Dishonesty"

The Government disputed the defense view that the First Circuit has already found Juror 86 was dishonest. *Id.* at 10. It characterized the First Circuit's language in which it discussed Juror 86's "apparent dishonesty" not as fact-finding but "as part of the appellate court's explanation for remanding the case for an evidentiary hearing." *Id.*

### 4. For Cause Striking

The Government contended that the Defendants "failed to establish that Juror 86 inherently lacked the capacity and will to decide the case solely on the evidence and thus should have been struck for cause." *Id.* Under *Sampson*, the Government said that the Court should assess "the juror's interpersonal relationships," "the juror's ability to separate her emotions from her duties," "similarity between the juror's experiences and important facts presented at trial," the "scope and severity of the juror's dishonesty," and the "juror's motive for lying." *Id.* at 10 (quoting *Sampson*, 724 F.3d at 166). Acknowledging that Mr. French addressed some of these issues in

his memorandum, the Government maintained that "none of his arguments muster the support of evidence to demonstrate actual bias." *Id.* at 11. The Government argued that Mr. French "abandons the requirements of the second part of the Sampson binary test altogether, in favor of shifting the burden to the Government to prove that Juror 86 was 'unbiased.'" *Id.* The Government contended that Mr. French's "only support for this extraordinary shift is language from the First Circuit's opinion in French regarding the effect of faded memories." *Id.* Alternatively, the Government argued, Mr. French is contending that "Juror 86 really does remember the jury questionnaire and the jury selection process and is perpetuating her lies by falsely testifying before this Court." *Id.* To the contrary, in the Government's view, "[n]othing about Juror 86's interpersonal relationships suggests bias." *Id.* The Government observed that "neither French nor Russell make any effort to explain why Juror 86 would have lied on the questionnaire, during jury selection, or in the February 1 hearing." *Id.* at 10-11.

The Government pointed out that Juror 86's "knowledge of the experiences her sons had with controlled substances was and is extremely limited." *Id.* at 12. Nor, in the Government's view, were her sons' dealings with the court like the "multi-million-dollar marijuana-grow operation" and the "alien-harboring" charge that Mr. French and Mr. Russell faced. *Id.*

The Government concluded that a "reasonable judge, having learned of the 'court matters' of which Juror 86 was aware, and having observed her representations

that she could be fair and impartial, would not likely have sustained a challenge for cause." *Id.* (citing *McDonough*, 464 U.S. at 554).

### 5. Cut Against the Government

The Government responded to the Defendants' contention that if Juror 86 demonstrated a failed memory due to the lapse of time, the juror's memory problems should "cut against the government." *Id.*; *French*, 904 F.3d at 120. The Government pointed out that the First Circuit was discussing the two-year interval from March 2016 to its remand order of September 2018, not from the fall of 2013 when Juror 86 completed the questionnaire or January 8, 2014 when the jury was selected to September 2018. *Id.* at 13. The Government then argued that the Court should not hold Juror 86's lack of recollection against it for purposes of the motion for new trial. *Id.* at 14. Rather, the Government contended, Juror 86's lack of memory does not pose "an insoluble problem." *Id.* Finally, the Government urged the Court to resolve credibility issues in favor of Juror 86 and deny the motion for new trial. *Id.* at 14-15.

### D. Malcolm French's Reply

#### 1. Lack of Memory and New Trial

On March 15, 2019, Malcolm French filed a reply. *Def.'s Reply in Support of his Second Supp. Mem. for a New Trial* (ECF No. 839) (*French Reply*). Mr. French stated that "[o]n remand, this Court was charged with finding out why Juror 86 answered Question 3(a) of the Juror Questionnaire the way she did." *Id.* at 1. Mr. French said that "[b]oth the District Court and the First Circuit Court of Appeals framed that issue as critical and were aware of the difficulty inherent in that task

because of the need to recreate Juror 86's thinking at the time." *Id.* Mr. French wrote that at the hearing it turned out to be "an impossible task" and reiterated the First Circuit's statement that "we think it only fair for that to cut against the government." *Id.* (quoting *French*, 904 F.3d at 120). In Mr. French's view, Juror 86's "lack of memory, combined with her mendacity during jury selection and her continued mendacity at the February 1, 2019 evidentiary hearing respectfully also leaves this Court with no other option but to grant a new trial." *Id.*

### 2. Juror 86's Dishonesty

Regarding Juror 86's credibility, Mr. French made four points. First, he said that Juror 86 herself admitted that an honest answer to Question 3 would have included "*eleven* court matters." *Id.* at 2 (emphasis in original). Mr. French rejected the Government's contention that Juror 86 did not give close attention to the questionnaire, arguing that the Government is merely speculating. *Id.* Second, Mr. French urged the Court to find that Juror 86 continued to lie during the February 1, 2019 evidentiary hearing, especially because her testimony about her lack of memory concerning the prior convictions involved her own sons. *Id.* at 3-4. Third, Mr. French expressed skepticism about the Government's contention that Juror 86 took her obligations as a juror seriously. *Id.* at 4. Mr. French maintained that the Government is reading too much into the statement in *McDonald* that a court should not invalidate a trial because of a juror's "mistaken, though honest, response to a question." *Id.* (quoting *McDonald*, 455 U.S. at 555). Mr. French's view is that there

is no evidence to suggest that Juror 86 was inattentive or mistaken and that "no new light has been shed on this matter since the appellate decision." *Id.* at 4.

### 3.      Challenge for Cause

Mr. French again attacked the Court's decision to provide Juror 86 with counsel, complaining that "both the court and the parties were deprived of the opportunity to witness Juror 86's unfiltered emotions." *Id.* at 5. He discounted Juror 86's ability to aver "without emotion—that she is neutral and unbiased." *Id.* He soundly rejected the Government's contention that Juror 86's actual knowledge of her sons' involvement with controlled substances was and is extremely limited. *Id.* Mr. French noted that the Government could have asked Juror 86 — "*When did you forget what you were thinking about when you completed the questionnaire?—*but wisely chose not to." *Id.* at 6.

Mr. French argued:

> The important point is that this Court is unable to determine what Juror 86 was thinking at the time she completed the questionnaire because she has no recollection of that. This cuts against the government because it chose to oppose an evidentiary hearing that could have been conducted at a time when the event in question had more recently occurred. Plainly this is what the First Circuit intended.

*Id.* Mr. French urged the Court to order a new trial. *Id.* at 7.

### E.      Rodney Russell's Reply

Mr. Russell focused on the Government's failure to respond to his arguments about Juror 10, where the Magistrate Judge excused the juror because of her son's marijuana use and because it was hard to track the point of Juror 10's other responses. *Id.* at 3-5. He reiterated his view that the "commonalities between Juror

10 and Juror 86 are important to note" and that it "seems unlikely, therefore, that the court would excuse Juror 10 for cause, and not have done so given the nature of Juror 86's involvement with her sons and their involvement with marijuana." *Id.* 4. He joined Mr. French's call for the Court to vacate the verdict and order a new trial. *Id.* at 6.

## IV.    DISCUSSION

### A.    Did Juror 86 Fail to Answer a Material Question on Voir Dire?

In *French*, the First Circuit observed that "to obtain a new trial based on a juror's failure to respond accurately to questions asked of prospective jurors prior to their selection to sit as jurors, 'a party must first demonstrate that a juror failed to answer honestly a material question on <u>voir dire</u>.'"   904 F.3d at 116 (quoting *McDonough*, 464 U.S. at 556).  Again, Question 3(a) asked:

> Please describe briefly any court matter in which you or a close family member were involved as a plaintiff, defendant, witness, complaining witness or a victim.

*Def.'s Ex.* 2.

### 1.    Juror 86's Inaccurate Response

Embedded in the First Circuit remand was its determination that Juror 86's "N/A" response to Question 3 was likely inaccurate.  *Id.* at 117 ("Here, the defendants came forward with factual information fairly establishing that Juror 86 likely gave an inaccurate answer to question 3 on the written questionnaire").  On remand, the Defendants were able to further develop Juror 86's and her family's background and

in his memorandum, Mr. French posited eleven incidents, any one of which in his view, should have, in his view, elicited a positive response to question 3:

1) Her older son's juvenile theft and forgery proceeding;
2) Her older son's 2002 marijuana-related conviction;
3) Her older son's 2003 probation revocations — plural;
4) Her older son's cocaine-related conviction;
5) Her older son's marijuana-related conviction;
6) Her younger son's court matter involving speeding;
7) Her younger son's court matter involving possession of tobacco by a minor;
8) Her younger son's court matter involving marijuana possession;
9) Her husband's divorce from a prior spouse and his court matters involving drunk driving;
10) Her own divorce; and
11) Custody proceedings involving her niece.

*French Mem.* at 15.

Based on the evidence, the Court expressly finds that Juror 86's answer to Question 3 was not accurate.[3] Question 3 is broadly written and encompasses "any court matter" in which she or a close family member, certainly including her husband and her sons, was involved in virtually any capacity. Further, the Court acknowledges that accurate answers assist the Court and counsel to select jurors who are unbiased and fair-minded so that the defendant may receive a fair and impartial verdict. *Sampson*, 724 F.3d at 163 ("Voir dire is a singularly important means of safeguarding the right to an impartial jury").

---

[3] In its original order, noting that the letters "N/A" are "inherently ambiguous" and could mean both "not applicable" and "not available," the Court observed that it did not know how Juror 86 used "N/A" in the context of the jury questionnaire. *Order Denying Mot. for New Trial* at 21 (ECF No. 734). Commenting that although such a hypothesis was plausible, the First Circuit concluded the ambiguity was "insufficiently likely so as to warrant rejecting without investigation the claim of juror misconduct as improbable." *French*, 904 F.3d at 118. During her testimony, Juror 86 confirmed the First Circuit's view and clarified that by writing "N/A," she meant "not applicable." *Tr.* 15:10-17.

The fact that Juror 86 gave an inaccurate answer to Question 3, however, does not end the analysis. If inaccuracy alone merited a new trial, the First Circuit would have ordered one. Instead, the *French* Court remanded this case to this Court for "further proceedings," 904 F.3d at 125, and to make findings as to whether "a juror failed to answer honestly a material question on <u>voir dire</u>" and to determine whether "a correct response would have provided a valid basis for a challenge for cause." *Id.* at 116. The Court turns to those issues.

### 2. Failure to Honestly Answer a Material Question

Based on the evidence at the February 1, 2019 hearing, the Court concludes that Juror 86 failed to honestly answer a material question on voir dire. In the Court's view, this finding is virtually compelled by the evidence. During direct examination, Juror 86 testified that her second son had gone to court on three charges, including "possession of a small amount of pot." *Tr.* 19:3-5. She testified that she had gone with him on some and perhaps all his cases. *Id.* 19:9-19. The following dialogue appears during Attorney Hallett's cross-examination:

> Q. And an honest answer to Question No. 3 on that questionnaire would have included every time you went to court.
>
> A. Correct.
>
> Q. Including the time your son went to court for marijuana. How old was he when that happened?
>
> A. I don't remember.
>
> Q. This is your second son, right?
>
> A. I don't remember.

> Q. Or your first son. Which one?
>
> A. I don't remember.
>
> Q. You don't remember the time that either of your sons went to court for marijuana?
>
> A. No.

*Id.* 32:25-33:13. Immediately thereafter, however, Juror 86 admitted that she knew her sons were involved in marijuana and had gone to court before she completed the juror questionnaire:

> Q, Now, Mr. Beneman asked you a question if you had recalled, when answering the voir dire questions, that both of your sons had gone to court for marijuana, right? Do you remember that question?
>
> A. Yes.
>
> Q. And you answered that that didn't impact your partiality.
>
> A. Correct.
>
> Q. So at the time you answered that question, you knew that both of your sons had gone to court for marijuana, right?
>
> A. Yes.

*Id.* 33:14:24.

The Court finds it difficult to reconcile different parts of Juror 86's February 1, 2019 testimony. At one point, she testified she did not remember the time either of her sons had gone to court for marijuana and in the next breath, she testified she knew, when she answered the juror voir dire questions that both her sons had gone to court for marijuana. The Court discounts her responses to some extent because of

a certain lack of clarity in the questions.[4]  Nevertheless, assessing all the evidence,[5] the Court finds that it is more likely than not that at the time she answered the juror questionnaire, she knew that one or both of her sons had gone to court to face marijuana charges, that an honest answer to Question 3 would have been "yes," and that Question 3 would have elicited an explanation of the circumstances of the marijuana charges.

This finding is sufficient to respond to the First Circuit's remand. Nevertheless, Defendants French and Russell raised more general accusations against Juror 86's honesty by listing the eleven court matters Juror 86 had experienced before responding to Question 3 and before the juror voir dire.  For completeness, the Court addresses each of those allegations.  Even after the evidentiary hearing, the Court finds it difficult to assess whether Juror 86 was dishonest in failing to reveal each of these eleven matters.  Preliminarily, the Court is not convinced that jurors in general or Juror 86 in particular would think that the federal court was interested in whether a juror had been divorced, whether her husband had been divorced, whether her husband had been charged with operating under the influence, whether her son had been stopped and fined for speeding, or

---

[4]     For example, Attorney Hallett's question was: "Q. So at the time you answered <u>that question</u>, you knew that both of your sons had gone to court for marijuana, right?" (emphasis supplied).  But, his predicate question referred both to Attorney Beneman's preceding question and to questions during jury voir dire.  The Court is not entirely clear whether Juror 86 was answering that she knew her sons had gone to court for marijuana when answering Attorney Beneman's question earlier in her February 1, 2019 testimony or whether she was saying that she knew her sons had gone to court for marijuana when she responded to the jury voir dire on January 8, 2014.  It is also unclear whether the reference to juror voir dire questions is to the juror questionnaire of October 2013, the jury voir dire of January 8, 2014, or both.

[5]     This evidence includes the testimony of Juror 86's husband Edward that his wife knew about her older son's marijuana charge.  *Tr.* 77:1-2.

whether her son, when a minor, had been caught with a cigarette.[6]  Although the Court agrees that the better practice for all jurors, including Juror 86, would have been to have been fully complete and detailed, the Court is not convinced that in failing to disclose these relatively commonplace and benign interactions with the law, Juror 86 was actively dishonest.

The First Circuit recognized that not all juror failures to accurately answer questions are material.  *Sampson*, 724 F.3d at 165.  In *Sampson*, the First Circuit wrote that "[f]or this purpose, a voir dire question is material if a response to it 'has a natural tendency to influence, or is capable of influencing,' the judge's impartiality determination."  *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)).  To assess whether Juror 86 exhibited bias, absent some other evidence about these incidents-- and the parties have produced none-- the Court does not view these prior interactions with the law to be material within the First Circuit definition.  In other words, the Court does not conclude it would have mattered to the Magistrate Judge in this case or a judge in another that a prospective juror in a marijuana conspiracy and harboring illegal alien case had been divorced, that she was married to a man who himself had been divorced, that her husband had been found guilty of operating under the influence, that one of her sons had been caught with tobacco while he was a minor, and that one of her sons had been caught and fined for speeding.

---

[6]      There is no evidence that either divorce was contested or controversial.  If Juror 86 and her current husband went to court and a judge merely placed a stamp of approval on an uncontested divorce, it is more understandable that she did not think that the question called for disclosure.  If the divorces involved bitter, contested custody and/or property issues, and were protracted, her failure to disclose the divorces would be less understandable.  As there is no evidence on this issue, the Court will not assume that Juror 86's divorce and her current husband's divorce were contested.

The Court turns instead to the record of court interactions that more logically would have triggered Juror 86's memory and required a response.

1) The custody proceeding

There is very little information in this record about the custody proceeding involving Juror 86's niece. During her testimony, she confirmed that the first time she had gone to court was when her "sister was not doing well in raising her daughter and there was neglect." *Tr.* 17:2-5. Juror 86 reported the problem to the Department of Health and Human Services, there was a hearing, her niece came to live with her, and she was satisfied with the outcome. *Id.* 17:5-13.

Other than establishing that it was Juror 86's first encounter with the courts, the record does not reveal when this took place. Juror 86 was about fifty-seven years old in 2013, so it is possible, even likely, that the incident took place decades ago. The record does not reveal how old her niece was at the time of the proceeding, whether the proceeding was contested by her sister or guardian ad litem, whether her niece remained with Juror 86 or returned to her sister, or any other information about the proceeding. Furthermore, Maine law makes such proceedings strictly confidential. 22 M.R.S. § 4008. In light of the lack of information about this proceeding and its confidential nature, the Court is not convinced that Juror 86 was dishonest in failing to disclose her niece's custody proceeding on the questionnaire, nor is the Court convinced that her niece's custody proceeding would have been material to the Magistrate Judge's impartiality determination.

2) The juvenile proceeding

In October 2000, her older son just a few days shy of eighteen, Juror 86 complained to the authorities that he had stolen a check from her and forged her name on it. *Def. French Ex.* 18. The court documentation reflects that the state of Maine initiated a juvenile petition in January 2001 and that in March 2001, the juvenile court held a session where a parent (presumably Juror 86 because the father is listed as unknown) was present. *Id.* Her older son received a suspended fine, fifteen hours of community service, and was adjudicated as having committed a juvenile offense, Class E, theft. *Id.* During her testimony, Juror 86 recalled reporting the matter to the police, but she said she did not remember "[w]hat happened after that." *Tr.* 45:14. She said that she did not remember what happened "until today." *Tr.* 45:15-18.

The Court agrees with Dr. Robinson that it would seem likely that a parent would recall being present in a juvenile proceeding brought about by her own complaint to the police where a judge addressed her child about stealing from her. There is no explanation as to why Juror 86 did not recall this encounter with the juvenile court system because she was not asked. Counsel pointed out to her the fact of the juvenile adjudication, confirmed with her the documentation that suggested she likely was present, and elicited her response that she did not recall the encounter until the day of the hearing.

But counsel never asked Juror 86 why she would not remember such a singular event. Did she repress memories of it because it was so unpleasant? Was her memory somehow overshadowed by subsequent events in her life? Did the incident, though

initially memorable, fade from her memory because mother and son decided to move on with their lives and not deal with the fact he had stolen from her? The incident and the juvenile court appearance took place about thirteen years before she completed the questionnaire and participated in jury selection. Did the passage of time affect her ability to recall the incident? Was Juror 86's memory of the incident affected by the confidential nature of juvenile proceedings so that the question did not trigger her memory? Was there something about her relationship both then and now with her older son that prevented her from recalling the incident? If asked, Juror 86 may have had some or no explanation about why she did not remember such an event, but the Court does not know, because she was never asked.

Moreover, Juror 86's failure to disclose this juvenile case involving her older son would have to be material to warrant the granting of a new trial. The Court does not conclude that the Magistrate Judge or another judge would have viewed this incident as material to determine whether Juror 86 should have been excused for cause. If there had been evidence in this record that Juror 86's older son had stolen money from her to buy marijuana, it would be a different matter, and it is true that by failing to reveal the juvenile adjudication, Juror 86 prevented the Defendants from inquiring during voir dire. But defense counsel was not prevented from inquiring on February 1, 2019, and the record is silent.

3) The 2005 Cocaine Conviction

By stipulation, the parties agreed that on December 27, 2005, Juror 86's older son pleaded guilty to and was convicted of Class D, Unlawful Possession of Scheduled

Drugs, namely cocaine. *Stip. Number One* at 1. Her older son was sentenced to seven days in jail and was fined $2,000. *Id.* The original charge had been a Class C felony but was reduced to a Class D misdemeanor. *Id.* Attorney Leonard Sharon represented Juror 86's older son.

Unlike the marijuana charges, Juror 86 emphatically denied knowing about the cocaine charge. *Tr.* 38:23-39:4. Having had the opportunity to assess Juror 86's credibility in the courtroom, the Court is convinced that Juror 86 was telling the truth about her lack of knowledge of the cocaine charge against her older son. In 2005, Juror 86's older son would have been about twenty-three years old and there is no corroborating evidence that Juror 86 was aware of this specific charge against him. The Court accepts her testimony that her older son never told her about the cocaine charge and conviction and the Court concludes that she could not have revealed what she did not know.

4) <u>The Marijuana Charges</u>

The heart of the issue with Juror 86's completion of the jury questionnaire is the multiple marijuana charges against her sons in state court. As of the fall of 2013 and January 2014, their experience may be detailed as follows:

a) On December 13, 2002, Juror 86's older son was charged in state court with operating after suspension and unlawful possession of scheduled drugs, namely marijuana. On December 16, 2002, he pleaded guilty to these charges and was sentenced the same day to seven days in jail and a $500 fine on the operating after suspension

49

conviction and 180 days, all suspended, with one year of probation on the marijuana possession charge. Her older son was pro se; he was about twenty years old at the time. *Stip. Number One* at 1.

b) On May 21, 2003, state court partially revoked her older son's probation and sentenced him to twenty-one days in jail. *Id.* The older son would still have been twenty years old.

c) On October 21, 2003, a state probation officer filed a motion for probation revocation. *Id.*; *Def. French Ex.* 3. The bases of the motion were that her older son has tested positive for cocaine and failed to report as directed. *French Ex.* 3. On October 24, 2003, Juror 86 visited her older son in Kennebec County Jail. *French Ex.* 1. The probation officer subsequently withdrew the motion. The older son would have been twenty-two years old.

d) On August 12, 2010, her older son was stopped by an MDEA agent on I-95 in Old Town, Maine and summoned for unlawful trafficking in scheduled drugs. *Def. French Ex.* 2. On February 2, 2011, her older son pleaded guilty to unlawful possession of scheduled drugs, namely marijuana and was fined $750.00. Attorney Leonard Sharon represented him. From August 31, 2010 through September 16, 2010, Juror 86 issued three checks on her personal checking account to Mr. Sharon, totaling $4,000. *Def. French Ex.* 13; *Tr.* 20:21-21:2. She explained that her older son did not have a checking account and

when he wanted to write a check, he would deposit money in her checking account and she would write the checks. *Tr.* 20:11-21. At the time of his arrest and the check-writing, the older son would have been twenty-eight years old and at the time of his guilty plea, twenty-nine.

e) At some point, it is not clear when, but before 2013-2014, Juror 86's younger son was charged with "possession of a small amount of pot." *Tr.* 19:3-5; 71:1-7 ("marijuana possession, or something to do with marijuana"). Her younger son had been charged on separate occasions with speeding and with possession of tobacco by a minor, and Juror 86 went with him to court on some or maybe all of these occasions. *Id.* 19:3-8. Juror 86 may have gone to court with her younger son for the marijuana charge, but she was not certain. *Id.* 19:9-19. Because the year of her younger son's charge is not a matter of record, the Court does not know how old he was at the time. *Id.* 33:4-13 ("Q. Including the time your son went to court for marijuana. How old was he when that happened? A. I don't remember. Q. This is your second son, right? A. Yes. Q. Or your first son. Which one? A. I don't remember. Q. You don't remember the time that either of your sons went to court for marijuana? A. No").

As just noted, Juror 86 acknowledged that her younger son had gone to court for possession of marijuana and, in fact, she may have accompanied him. However,

when asked about her older son's dealings with court, she initially said that she did not know why he had gone to court, why he was in jail when she visited him, and why Attorney Sharon (to whom she had issued checks) had represented her older son. Later, she acknowledged that during voir dire, she knew her younger son had been charged with marijuana or something to do with marijuana and that her older son had also been charged with something to do with marijuana, but she admitted she had not responded to the marijuana question or she does not recall.

The Court agrees that this testimony is at best confusing and at worst disturbing. Considering the younger son, the Court concludes that at the time of her completion of the jury questionnaire and jury selection, Juror 86 knew that her son was involved in the criminal justice system over marijuana possession and that she should have disclosed this involvement in response to Question 3.

The older son is more complicated. All the drug charges occurred when her older son was no longer a teenager and all, but one, when he was an adult: the earliest charge being when he was twenty; the latest twenty-eight or twenty-nine. For most families, it would be inconceivable that a mother would not know about a criminal charge against her son. But most is not all. There is no evidence in this record about the relationship between Juror 86 and her older son. It is possible that Juror 86 knew of all these matters all along and is lying about her knowledge. It is also possible that she and her son had arrived at a "don't ask; don't tell" understanding: once he was old enough to be his own man, his mother did not want to know about his scrapes

with the law.[7]  Nevertheless, based on her own testimony, the Court finds that Juror 86 knew enough about at least one of the marijuana charges against her older son to require an affirmative response to Question 3.

Unlike the speeding charge, their divorces, and similar incidents, the Court finds that a reasonable juror would have disclosed her sons' troubles with the law over marijuana in response to Question 3.  The Court further finds that a judge would find this information about her sons' prior contact involving marijuana with the criminal justice system material within the First Circuit definition.  The federal case involved a charge that the Defendants were involved in marijuana production.  As the First Circuit pointed out, it might have been, given her sons' experiences, that Juror 86 was biased against the prosecution for bringing charges involving marijuana, that she was biased against the Defendants for producing marijuana, the same drug that got her sons into legal trouble, or that, despite her sons' experience, she was impartial.  Applying the *Sampson* standard, if Juror 86 had answered Question 3 accurately about her son's marijuana conviction or her sons' marijuana convictions, this information would have had "a natural tendency to influence" or would have been "capable of influencing," the judge's impartiality determination. *Sampson*, 724 F.3d at 165.  In short, the Court finds that Juror 86 failed to honestly answer a material question on voir dire.

### B.   Would a Correct Response Have Provided a Valid Basis for a Challenge for Cause?

---

[7]   Mr. French is incredulous that a mother could visit a son in jail and not ask about the alleged crime.  But the Court is less clear that a mother visiting a child in jail would necessarily ask him about the crime for fear that their conversation might be recorded and used against him.  The Court acknowledges this point is speculative.

Having concluded that Juror 86 failed to honestly answer a material question on voir dire, the Court turns to the second inquiry: whether a correct response would have provided a valid basis for a challenge for cause. A second, interrelated inquiry, as the First Circuit explained, is Juror 86's motivation in failing to accurately answer Question 3.

### 1.    The Law on For Cause Challenges

There are two sources of law concerning a juror's qualification for service on a federal jury. The first is statutory. Under 18 U.S.C. § 1865(b), the statute sets out certain basic requirements for jury service, such as being a citizen of the United States. There is no claim that Juror 86 failed to meet these fundamental qualifications.

The Sixth Amendment is the second source of law for a "for cause" challenge against a prospective juror and it stems from the constitutional guarantee of "the right to a speedy and public trial, by an impartial jury." U.S. CONST., am. VI. In 1936, the United States Supreme Court wrote:

> All persons otherwise qualified for jury service are subject to examination as to actual bias. All the resources of appropriate judicial inquiry remain available in this instance as in others to ascertain whether a prospective juror, although not exempted from service, has any bias in fact which would prevent his serving as an impartial juror.

*United States v. Wood*, 299 U.S. 123, 133-34 (1939). In *Sampson*, the First Circuit rejected a trial court's distinctions among different types of bias, actual, implied and inferable, and reiterated the general requirement that a juror be "capable and willing

to decide the case solely on the evidence." 724 F.3d at 165 (quoting *McDonough*, 464 U.S. at 554 (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).

In *French*, the First Circuit quoted the *Sampson* test: "whether a reasonable judge, armed with the information that the dishonest juror failed to disclose <u>and the reason behind the juror's dishonesty</u>, would conclude based on the totality of the circumstances that the juror lacked the capacity and the will to decide the case based on the evidence (and that, therefore, a valid basis for excusal for cause existed)." *French*, 904 F.3d at 116 (quoting *Sampson*, 724 F.3d at 165-66) (emphasis in *French*). Again quoting *Sampson*, the *French* Court listed factors that a court may consider when evaluating whether a juror will decide the case solely on the evidence, including "the juror's interpersonal relationships; the juror's ability to separate her emotions from her duties; the similarity between the juror's experiences and important facts presented at trial; the scope and severity of the juror's dishonesty; and the juror's motive for lying." *Id.* at 116-17 (quoting *Sampson*, 724 F.3d at 166). But of these potential factors, the *French* Court emphasized that the "ultimate inquiry under *Sampson* requires that the court consider "the reason behind the juror's dishonesty." *Id.* at 118 (quoting *Sampson*, 724 F.3d at 165-66). Thus, although Juror 86's motivation is, under *French*, a preeminent consideration, the Court is also cognizant of *Sampson* and its statement that "[a]lthough any one of these factors, taken in isolation, may be insufficient to ground a finding of a valid basis for a challenge for cause, their cumulative effect must nonetheless be considered." *Sampson*, 724 F.3d at 166.

### 2.	The *Sampson* Factors

#### a.	The Juror's Interpersonal Relations

In *Sampson,* addressing the 'interpersonal relationships' factor*,* the First Circuit discussed whether the juror failed to disclose matters that concerned either the juror him or herself or the juror's close family member.  *See Sampson*, 724 F.3d at 166.  To explain this factor, the *Sampson* Court cited *United States v. Columbo*, 869 F.2d 149 (2d Cir. 1989) and *United States v. Scott*, 854 F.2d 697, 698-700 (5th Cir. 1988).  In *Columbo*, the juror failed to reveal that her brother-in-law was an attorney for the government, 869 F.2d at 151, and in *Scott*, the juror failed to reveal that his brother was a detective and a deputy sheriff in the sheriff's office that performed some of the investigation in that case.  854 F.2d at 698.  Here, Juror 86 failed to reveal information about her sons and, to a lesser extent, about herself and her husband.  This factor weighs in favor of the Defendants.

#### b.	Juror's Ability to Separate Her Emotions from Her Duties

In *Sampson*, a death penalty case, the juror committed a "litany of lies" during jury voir dire.  724 F.3d at 161.  The juror in *Sampson* told repeated lies about her husband, who was often physically abusive to her, and her daughter, who was a cocaine addict and whose drug use was, in the juror's belated admission, killing her and had resulted in her daughter's arrest.  *Id.* at 161-62.  In fact, at voir dire, the juror refused to even acknowledge she had a daughter.  *Id.* at 162.  The *Sampson* Court noted that when questioned about her multiple lies, the juror had "evinced her emotional pain and humiliation; she was visibly distraught when discussing [her

husband] and [her daughter], crying and incoherently attempting to excuse her mendacity." *Id.* at 163.

In contrast to the juror in *Sampson*, Juror 86 was remarkably unemotional and calm throughout her testimony on February 1, 2019. She acknowledged that she was shocked and very upset when FD Beneman contacted her, but, having had the opportunity to evaluate Juror 86 in a stressful situation, the Court finds that Juror 86 would have been able to separate her emotions from her duties as a jury. This factor favors the Government.

### c.    Similarity of Experience

In *Sampson*, the First Circuit cited *United States v. Torres*, 128 F.3d 38 (2d Cir. 1997) and *Burton v. Johnson*, 948 F.2d 1150 (10th Cir. 1991) as cases addressing the similarity of experience factor. In *Torres*, the defendants were convicted of engaging in a conspiracy to launder the proceeds of a heroin trafficking scheme, and the juror, it turned out, had herself been involved in structuring cash transactions as a part of her employment. 128 F.3d at 41-42. The Second Circuit upheld the trial judge's decision to excuse the juror for cause. *Id.* at 48. In *Burton*, the defendant was convicted of murder in the first degree for killing her husband and had asserted a defense of battered woman's syndrome. 948 F.2d at 1151. After trial, it came out that several of the jurors had either experienced spousal abuse themselves, or close family members had experienced spousal abuse, which they failed to reveal during voir dire. *Id.* at 1151-59.

There is some facial similarity between Juror 86's sons' criminal possession of marijuana and the Defendants' conspiracy to produce marijuana, in that the drug in all these instances was marijuana. But the similarity is limited. First, Juror 86 did not herself face criminal charges for marijuana, which differs from the experience of some of the jurors at issue in *Burton*, who firsthand experienced spousal abuse. 948 F.2d at 1151-59. Juror 86's younger son was charged with the possession of "a small amount of pot," *Tr.* 19:4-5, and her older son was convicted of possession of marijuana and trafficking in marijuana. There is no evidence of what happened in her younger son's case. Her older son received a suspended sentence on one charge, was sentenced to seven days in jail, placed on probation, and fined on another, and received only a fine on the third charge.

The charges to Juror 86's sons were distinct from the federal charges in this case, as the Defendants here were involved in a sophisticated, large-scale marijuana production conspiracy complete with the hiring and harboring of illegal aliens as workers. Absent the marijuana trafficking charge against the older son, the Court would find the balance favors the Government. But when the marijuana trafficking charge is considered, the Court concludes that the similarity here slightly favors the Defendants.

### d. The Scope and Severity of the Juror's Dishonesty

In *Sampson*, the First Circuit cited *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) (en banc) and *Scott*, 854 F.2d at 699-700, as examples of this factor. 724 F.3d at 166. In *Dyer*, a juror denied that any of her relatives had ever been the victim of a

crime and it turned out that the juror knew that her brother had been pistol-whipped, shot in the back of the head, and murdered. *Id.* at 972-73. The juror told numerous other lies as well. *Id.* at 980 (describing the juror's false account of her brother's death as "just the tip of Pinocchio's nose"). In *Scott*, the Fifth Circuit concluded that the juror lied about his brother's employment with the sheriff's office because he had witnessed two earlier jurors dismissed when they revealed their relatives were in law enforcement, because he wanted to serve on the jury, and because he feared he would not be allowed to do so if he revealed his brother's employment. 854 F.2d at 699. Furthermore, in *Scott*, the Fifth Circuit wrote that the juror did not simply misunderstand the question, did not forget the question, and did not forget his brother's employment; instead, the juror "consciously censored the information." *Id.*

Although the Defendants believe that Juror 86's failure to accurately answer Question 3 rises to the *Dyer* and *Scott* levels, the Court finds that on balance the scope and severity of her inaccuracies is not of the magnitude of those cases. The Court views this factor slightly, though not entirely, favoring the Government.

### 3.  Motive

Finally, the Court turns to the question the First Circuit directed it to answer: what was Juror 86's motive behind her inaccurate answers, and what does her motive say about her ability to be a fair and impartial juror and about whether she would and should have been dismissed for cause? Having had the advantage of assessing Juror 86's credibility in person, the Court is left without an answer to this critical question. The Court does not know why Juror 86 failed to accurately and honestly

answer Question 3 in October 2013, why she did not reveal this information during voir dire in January 2014, and why she testified in such a contradictory and confusing manner in February 2019.

There are several potential explanations for Juror 86's failure to accurately respond to Question 3. First, it is possible, as the Defendants contend, that Juror 86 is simply a liar. *French Reply* at 2 ("Juror 86's lack of memory, combined with her mendacity during jury selection and her continued mendacity at the February 1, 2019 evidentiary hearing respectfully also leaves this Court with no other option but to grant a new trial"). Having observed Juror 86 on February 1, 2019, the Court does not find that Juror is a genetically congenital liar. Juror 86 was truthful and accurate in completing the information in the juror information form and some of her answers on the incomplete jury questionnaire were accurate. If she was a deliberate liar, it is odd that she would have left the back of the juror questionnaire blank, an act that invited scrutiny. Having had the opportunity to evaluate Juror 86 in person, the Court does not find that Juror 86 is someone who would rather lie than tell the truth.

Second, it is possible that Juror 86 has an iconoclastic view of government, including judicial proceedings, and as a matter of principle would not reveal anything personal to the government, including the judiciary. But Juror 86 had retired from a job in state government after having worked in government for more than thirty-six years. *Tr.* 57:19-58:18. There is nothing in the record to suggest that she harbored anti-government political or philosophical sentiments that could have motivated her deceptive completion of the juror questionnaire.

Third, it is possible that Juror 86 deliberately hid information from the Court and counsel so that she could be seated on the jury. This was the situation in *Scott*, 854 F.2d at 699. But unlike *Scott*, there is no evidence here that Juror 86 wished to be on the jury, that she had relatives in law enforcement who might commend her for a guilty verdict, or that after the verdict, she boasted to anyone about the verdict or attempted to gain from her participation on the jury. When directly questioned about whether she had a "burning desire" to be on the jury, Juror 86 denied that she did. *Tr.* 62:21-22. The Court accepts Juror 86's testimony on that point and does not find that Juror 86 lied to be seated on this jury.

A fourth possibility is that she completed the form hastily without much thought. Even though the Defendants say that this conclusion would be speculative, the Court disagrees. Juror 86 failed to complete the second page of the form and failed to sign it. Again, having had the opportunity to assess Juror 86, she does not strike the Court as someone who – if she had noticed the second page – would have left it blank. By contrast, she completed all the questions on the jury information form. It remains possible that she rushed through the form and did not give it the time and consideration it merited.

A fifth possibility is that, somewhat like *Sampson*, she recalled the information but was embarrassed by the family dysfunction the answers would have revealed and chose not to reveal them. The answers revealed her sister's difficulty raising her daughter, leading to her niece's placement with Juror 86; her older son's theft from her, and his drug problems that lasted even into his late twenties; and her younger

61

son's less significant problems with the law. The Court views this possibility as unlikely because Juror 86 was direct and remarkably unembarrassed throughout the February 1, 2019 hearing.

A sixth possibility is that she repressed this information and when she read Question 3, it simply did not trigger an accurate response. Both the DHHS proceeding and the juvenile matter are confidential under Maine law. 15 M.R.S. § 3307, § 3308; 22 M.R.S. § 4008. As regards her sons' marijuana problems, she may have been in denial and simply refused to recall them.

A seventh possibility is that Juror 86 remembered the accurate information, but she simply did not think that the federal court would be interested in her family troubles, such as they were. At one point, during Attorney Hallett's cross-examination, the following dialogue took place:

Q. Now you don't remember, sitting here today, whether you were thinking to yourself that, jeez, my second son went to court for marijuana, right? You don't recall thinking that.

A. No.

Q. You don't recall thinking that I was divorced and had to go to court?

A. No.

Q. And that I got custody of my sister's daughter through court?

A. No.

Q. You didn't think of any - - you can't remember thinking of any of those things, right?

A. Correct.

62

Q. And you can't think of the fact - - you didn't think of the fact that your son had been in jail in 2003, right?

A. Right.

Q. And you didn't think of the fact that he had been in trouble in 2010 and you had to pay some money, or at least write checks, to Lenny Sharon?

A. Correct.

Q. You don't remember thinking of any of that stuff, right?

A. No, because at that time, I did not feel it was relevant - -

Q. You do remember.

A. - - because - -

Q. Is that right? You do remember it and you think it's not relevant?

A. At - - no.

Q. Well, ma'am, it's either you don't remember any of those things, thinking about any of those things at the time you filed out that questionnaire, or it's you remember thinking of all of those things and deciding it wasn't relevant. Those are the options.

A. No, I do - - I did not think of those things when I was completing those forms.

Q. You specifically remember not thinking of those things when you were completing the forms? I am not trying to trick you here, ma'am. All I'm asking is, when you completed those forms, right - - and you don't remember completing them - -

A. Correct.

Q. - - if you don't remember completing them, is it fair to say that you didn't think of any of those things while you were completing it because you don't remember completing it?

A. Yes.

Q. All right. So you have no recollection.

A. No, I don't.

*Tr.* 31:1-32:21.

In this sequence, the Court understands that Attorney Hallett was pointing out that Juror 86 could not logically testify about why she did something she does not remember. But in the partial response that he cut off, Juror 86 may have been explaining why she now thinks these matters did not come to her mind, namely that she did not think they were "relevant." Even if Juror 86 could not recall completing the juror questionnaire, questions about her attitude toward the revelation of personal information might well have been illuminating.

A final possibility, one the Court views as the most likely, is that Juror 86 retained a view about the limits of the government's right to demand or her obligation to reveal personal family information to others. Having evaluated Juror 86, the Court does not find, as noted above, that her reticence was based on embarrassment. Rather, the Court senses that Juror 86 possesses a strong personal view that there should be limits in what the government should be able to force its citizens to reveal to strangers, even in a court proceeding. This view of the limits of government inquisitiveness may flow from Juror 86's earlier experience with the custody issues with her niece, her maternal instinct to protect the privacy of her sons, her long-term employment with the Maine Department of Health and Human Services, and other factors. However, none of this was explored at all during Juror 86's questioning.

Therefore, the Court acknowledges that its hunch is not drawn from any direct evidence and certainly does not tip into being a more likely than not finding.

The bottom line is that after the February 1, 2019 evidentiary hearing, the Court is left without an understanding as to Juror 86's motivation behind her inaccurate answer to Question 3. In fact, the Defendants anticipate this conclusion and agree that the evidence does not allow a logical determination about Juror 86's motivation in completing the jury questionnaire. In Mr. French's memorandum, he writes:

> *French*, 904 F.3d at 116, and *Sampson*, 724 F.3d at 1654-66, instruct that this Court must evaluate "the reason behind the juror's dishonesty," and this Court cannot do that because Juror 86's memory has faded. Juror 86 was steadfast in her testimony that she could not remember what she was thinking when she completed the written questionnaire or during voir dire. Juror 86 could not tell this Court why she failed to answer the questionnaire accurately and honestly or why she failed to respond to anything during voir dire.

*French Mem.* at 16-17. Mr. Russell writes:

> Rodney Russell contends that the evidence adduced at that hearing reveals that Juror 86's memory concerning her participation as a juror in this case manifests a problem which has not been solved on remand, and which leaves the state of the record in a posture which cuts against the government.

*Russell Mem.* at 1. This leads to the significance of the Court's determination that the evidence does not allow to answer the First Circuit's question: what was Juror 86's motivation in providing an inaccurate answer to Question 3.

## C.    The Juror 10 Issue

To address Mr. Russell's point about Juror 10, the Court does not view Juror 10 as similar to Juror 86 for purposes of a for-cause challenge. Juror 10 first

responded to an inquiry from the Magistrate Judge. *Tr. of Proceedings*, *Jury Trial*, *Jury Selection* 20:12-20 (ECF No. 396) (*Jury Selection Tr.*). Juror 10 confirmed that although she had not talked with anyone about the case, she had read accounts in the Bangor Daily News about the case. *Id.* 66:11-20. Upon questioning, she stated that she had no opinion about the facts from reading the articles. *Id.* 66:23-67:2. The Magistrate Judge turned to the next juror. *Id.* 67:3 ("All right. Juror 33 - -").

Later AUSA Casey stated that the Government wanted to follow up with Juror 10. *Id.* 68:23-24. The Magistrate Judge replied, "Oh, yeah, we'll get there." *Id.* 68:25. After a moment, she called Juror 10 to sidebar. *Id.* 69:20-25. The following dialogue ensued:

> THE COURT: And you say you don't have any preformed opinions about this case.
>
> JUROR NO. 10: No, not about the facts. I have opinions - -
>
> THE COURT: Can you tell us - -
>
> JUROR NO. 10: - - about how I feel about the case already, though.
>
> THE COURT: What's your opinion about how you feel about the case?
>
> JUROR NO. 10: Well, I don't - - I don't - - I think marijuana should be legalized, and I don't believe we should be spending money persecuting - - or prosecuting somebody for what I don't believe is a - -
>
> THE COURT: a crime.
>
> JUROR NO. 10: Well, I know it's a crime because it's against the law, but I don't think it should be against the law. There's a lot more other things I think that are important. That's how I feel.
>
> THE COURT: So because you hold these opinions regarding legalization of marijuana, do you feel it would be difficult for you to be a fair and impartial juror?

JUROR NO. 10: I think it might.

THE COURT: You think that might interfere with your ability to judge these facts and apply the law to these facts - -

JUROR NO. 10: Yes.

THE COURT: - - as it exists now - - the law as it exists.

JUROR NO. 10: Yeah, because I don't know - - civil disobedience, how else are you going to change the laws unless - -

THE COURT: Okay. Any follow-up questions?

MR. CASEY: In your questionnaire, you mentioned that your son had been - -

JUROR NO. 10: Hm-hmm.

MR. CASEY: - - prosecuted for possession of marijuana.

JUROR NO. 10: Hm-hmm.

MR. CASEY: Does that also affect your opinion about this case?

JUROR NO. 10: Well, I already had that opinion before that.

MR. CASEY: Okay.

JUROR NO. 10: Just - - you know, he's just smoking a joint in his car and got in trouble.

MR. CASEY: Okay. When you talk about civil disobedience and how else are you going to change the law, do you mean civil disobedience in the - - in the context of being a juror, like sending a message, that sort of civil disobedience?

JUROR NO. 10: Oh, no, I just meant as in maybe by bringing up this case and things won't be found guilty, you know - - I don't know. I was just taught in high school, way back when, that that's how you change laws, right? Civil disobedience, you break the law and you go to trial and you get - - right, isn't that true?

THE COURT: I don't think we need to go into what happens in those cases.

JUROR NO. 10: But, yeah.

THE COURT: Mr. Gandhi and Mr. Mandela could tell you what happens.

JUROR NO. 10: I know, I know, but that's - -

THE COURT: Okay. You think it might be - - you have certain - -

JUROR NO. 10: I would not lie or - - or make things up or anything. I mean, I just feel that I think this is a waste of taxpayers' money. That's just my opinion.

THE COURT: Okay.

MR. CASEY: As you've been talking about this today, ma'am, I get the sense that you - - you got very emotional at one point where you were talking about - -

JUROR NO. 10: Just I'm nervous standing around all these suits here; I'm a little bit shaky. I'm not going to cry or anything; I'm just like - -

THE COURT: I have no suit.

JUROR NO. 10: - - you know.

MR. CASEY: Okay. Thank you.

THE COURT: Any other follow-up?

MR. SILVERSTEIN: No, Your Honor.

MR. PETERSON: No.

THE COURT: Would you - - would you stand back by that - -

JUROR NO. 10: Okay. All right.

THE COURT: - - that rail there.

(Juror left sidebar.)

MR. McKEE: I move that we try this case in front of that juror only.

MR. PETERSON: I think this is - -

THE COURT: Denied.

MR. PETERSON: - - why Mr. Casey has all his preemptories.

MR. CASEY: That's right. We would ask that she be dismissed for cause, Your Honor.

THE COURT: Let's excuse her for cause. I think two - - over objection. I'll note everyone's objection. But two reasons: First is her son, I think she was clearly emotional about that issue and his possession; and her - - her responses were, shall we say, hard to track what the point was.

*Id.* 70:3-74:1.

Based on stark differences in the facts involving Jurors 10 and 86, the Court rejects Mr. Russell's twice-pressed argument that if the Court excused Juror 10 for cause, it would have excused Juror 86 for cause. First and most significantly, Juror 10 stated that her views on marijuana might make it difficult for her to be a fair and impartial juror. By contrast, Juror 86 repeatedly testified that she was and could be neutral and impartial. Second, although it is necessary to read between the lines, it seems that Juror 10 became emotional when she was describing her son's marijuana prosecution; both the Magistrate Judge and AUSA Casey referred to her as emotional state when addressing her son's prosecution. By contrast, whatever else might be said, Juror 86 has been remarkably detached from her sons' marijuana prosecutions. Third, Juror 10 expressed personal opinions against the criminalization of marijuana and the prosecution of those involved with marijuana. By contrast, Juror 86 testified that she had no opinion about the legalization or criminalization of marijuana and

that the issue did not matter to her. Fourth, Juror 10 went further and discussed in somewhat oblique terms, the obligation to engage in civil disobedience to change the law. She said that she thought people (presumably including the defendants) had the right to disobey the marijuana laws as an act of civil disobedience and, when asked whether she would find it difficult to be fair and impartial as a juror, she responded, "Yeah, because I don't know - - civil disobedience, how else are you going to change the laws unless - -" *Id.* 71:6-8. Juror 10's responses led the Magistrate Judge to refer to Mahatma Gandhi and Nelson Mandela, two icons of civil disobedience. *Id.* 72:12-13. Juror 10's responses raised an obvious concern about whether she could faithfully follow the law and impartially judge the facts. By contrast, Juror 86 testified that she had no bias either against defendants charged with marijuana crimes and repeatedly stated that she could be fair and impartial.

Even though Mr. Russell forcefully argued and reargued that Juror 10 represents a direct analogy to Juror 86, the Court rejects his argument. The two jurors were fundamentally dissimilar, and the for-cause exclusion of Juror 10 does not suggest that the Magistrate Judge would have excused Juror 86 for cause.

**D.      The Law on For-Cause Challenges**

To determine whether Juror 86's dishonesty would have been a proper basis for a for-cause challenge, the Court reviews the legal standards for making successful for-cause challenges. As explained in Wright and Henning, there is an old distinction between challenges for cause and challenges for favor: the former being based on a failure of a juror to meet the statutory standards and the latter being based on bias.

70

2 Charles Alan Wright & Peter J. Henning, Federal Practice and Procedure § 382 (4th ed. 2009). Although "lost on the recent generation of lawyers," the distinction is useful because it emphasizes the proper inquiry in a challenge for cause that is not statutorily based: whether the prospective juror can be impartial. *Id.*

For biased-based challenges for cause, the overriding point is that the law accords a trial judge a wide range of discretion in deciding whether to excuse a potential juror for cause. In *United States v. Gullion*, 575 F.2d 26 (1st Cir. 1978), the First Circuit quoted the Second Circuit:

> There are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empaneling of a jury.

*Id.* at 29 (quoting *United States v. Ploof*, 464 F.2d 116, 118, n.4 (2d Cir. 1979)). The First Circuit has written that it grants "special deference" to the district court's determination of jury impartiality. *United States v. Delgado-Marrero*, 744 F.3d 167, 201 (1st Cir. 2014). Nor is there an objective test a trial judge is required to apply to evaluate impartiality. In *United States v. Wood*, the United States Supreme Court wrote:

> Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.

299 U.S. at 145-46.

## E.     The Magistrate Judge's Handling of For-Cause Challenges

The Magistrate Judge's handling of jury selection in this case does not dictate the result in this remand, because the standard is that of a reasonable judge, not that

of the particular judge who conducted the challenged voir dire. *French*, 904 F.3d at

116 ("The outcome of this inquiry depends on whether *a reasonable judge . . .* would

[have struck the juror for cause]") (emphasis supplied). Still, it is useful to review

how the Magistrate Judge addressed for-cause challenges during the jury selection

in this case. *See Tr. of Proceedings*, *Jury Selection* 1-157 (ECF No. 396). In addition

to the discussion about Juror 10 set forth above and the Magistrate Judge's excusing

her for cause, the transcript of the jury selection reveals:

1) <u>Juror 123</u>: Juror 123 worked at a mill in Old Town, Maine. He said that he
had read media accounts of the events in the distant past and that some of
the people at work might have known some of the people involved in the
case or members of their families. Although he acknowledged that he could
get pressure from some people in the mill, he said that his knowledge would
not prevent him from being fair. There was no challenge for cause and the
Magistrate Judge did not exclude Juror 123. *Id.* 22:1-27:2.

2) <u>Juror 158</u>: Juror 158 was employed as a dispatcher for the Maine State
Police and had heard something about the case through work. She may
have been the dispatcher on duty when the state police, MDEA, the forestry
department and the warden service were called to the fire in this case. She
also dispatches for officers, including some of the officers involved in this
case, on a daily basis. The defense lawyers challenged Juror 158 for cause
and, although she said it was close, the Magistrate Judge excused Juror

158 for cause. *Id.* 29:16-34:17 ("I don't know. It's a little - - I think it's a little close, and I'll grant the challenge and excuse her . . ..").

3) <u>Juror 138</u>: Juror 138 was the neighbor of one of the defendants, Kendall Chase, and he had both sold logs for Mr. Chase and bought lumber from him. He thought it would be difficult for him to be a juror. AUSA Casey challenged Juror 138 for cause and, without objection from defense counsel, the Magistrate Judge excused him for cause. *Id.* 35:2-36:3.

4) <u>Juror 90</u>: Juror 90 worked in the school system with Kendall Chase's wife. She said she knew Ms. Chase well and had corresponded with her over the summer after Ms. Chase had gotten in an accident. She said it would be difficult for her to be a juror. AUSA Casey challenged Juror 90 for cause and, without objection from defense counsel, the Magistrate Judge excused her for cause. *Id.* 36:21-38:4.

5) <u>Juror 151</u>: Juror 151 knew Barbara Haynes, the President of Haynes Timberland, one of the defendants, and a person whose name was going to come up at trial. Juror 151 knew Ms. Haynes from being a student in the same small school; she was a year or two ahead of Juror 151. He said that Barbara Haynes' involvement in this case could pose a problem for him. Upon agreement of all counsel, the Magistrate Judge excused Juror 151 for cause. *Id.* 38:20-42:2.

6) <u>Juror 30</u>: Juror 30 had read newspaper accounts and heard media reports about the case. He did not know anyone associated with the case. He said

that he thought he could be impartial but noted that nobody can be completely impartial because they bring their life experiences to the jury room. However, he thought he could be impartial. He was not challenged for cause and the Magistrate Judge did not excuse him. *Id*. 42:8-50:14.

Later Juror 30 revealed that he did business with Verizon, with Bangor Savings Bank, with UPS, each of which was listed as a potential witness, and he had sold equipment to Don Dorr, one of the witnesses. He stated that he thought he could be fair and impartial. *Id*. 96:2-96:19-22. He was not excused for cause on this basis.

Still later Juror 30 revealed that he knew Scott Lufkin through his father. He thought he could be fair and impartial. *Id*. 101:21-23. He was not excused for cause.

Juror 30 revealed that he knew Paul Cook, a listed witness. *Id*. 104:1-105:2. When Juror 30 closed his business, he sold a number of items to him. *Id*. He thought he could be fair and impartial. *Id*. He was not excused for cause on this basis.

Juror 30 also knew Joseph Burke, one of the listed witnesses. *Id*. 106:24-107:22. He thought he could be fair and impartial. *Id*. He was not excused on this basis.

7) <u>Juror 149</u>: Juror 149 said that she had read something in the newspaper about the event and she had discussed it with her husband who owns timberlands. After some discussion, it was cleared up that a person named

Scott McPherson, who was involved in the case, was not related to the McPherson family she knew. She had previously served on a jury in the Panama Canal Zone, when her husband served there in the Air Force. The case involved people bringing in drugs and, in her view, they were caught red-handed. She had also served on a state of Maine jury involving shoplifting from a convenience store. *Id.* 50:15-57:5.

Juror 149 then stated her opposition to marijuana, saying that she did not believe people should use it, that it had not been legalized by the state of Maine, that she did not want to be on the road with people high on it, and that she was prejudiced against marijuana. *Id.* 57:7-59:19 ("I mean, I don't use it and never have, have no use for it"). After some discussion, she reiterated that she could be fair and impartial. *Id.* 60:11-62:1. Defense counsel moved to challenge for cause and the Magistrate Judge overruled their request, noting that "that's why you have all those peremptories." *Id.* 62:4-5.

8) <u>Juror 167</u>: Juror 167 said she worked in a general store in Springfield, Maine, and she knew the Haynes name as a big name. She said it would be hard for her to be fair and impartial. When counsel pointed out that she had said she could not be fair and impartial, the Magistrate Judge replied, "Yeah. I thought we would stop there." *Id.* 65:12-14. The Magistrate Judge excused Juror 167 for cause.

9) <u>Juror 33</u>: Juror 33 said that he was a police officer for ten years, that his brother was a police officer for 30 years, that his other brother works in corrections, and that he had a lot of friends who are police officers. He said that it would be hard for him to be fair and impartial. Without objection, the Magistrate Judge excused him for cause. *Id.* 67:3-68:17.

10) <u>Juror 91</u>: Juror 91 had read media accounts of the case and perhaps had seen something on television news. Other than knowing that there was a lot of marijuana, he knew nothing about the case. He thought he could be fair and impartial. He was neither challenged nor excused for cause. *Id.* 74:14-75:19.

Later Juror 91 said that he knew Michael Crabtree, one of the listed witnesses. *Id.* 106:2-107:21. He said that Mr. Crabtree was a police officer and that their children go to the same school and are friends. *Id.* He thought he could be fair and impartial. *Id.* He was not challenged for cause on this basis.

11) <u>Juror 134</u>: Juror 134 knew Attorney McKee's parents as casual acquaintances but had no connection with anyone else in the case. *Id.* 76:15-77:9. He was not excused for cause on this basis.

Later Juror 134 said that he dealt with all the telecommunications companies, which were listed as witnesses, as vendors to his customers. *Id.* 94:20-95:23. He stated that he still thought he could be fair and impartial. *Id.* He was not excused for cause.

12) <u>Juror 122</u>:  Juror 122 worked for Great Northern Paper Company which had dealings with Haynes Timberland.  *Id.* 77:11-78:11.  His personal involvement with Haynes Timberland was roundabout and he felt he could be fair and impartial.  *Id.*  He was not excused for cause.

13) <u>Juror 44</u>:  Juror 44 said that Attorney McKee had been an expert witness in a case in which her husband had been a party, either a plaintiff or defendant (she was not sure).  *Id.* 78:14-79:20.  Attorney McKee confirmed that he had acted as an expert witness on a post-conviction review involving a criminal Department of Environmental Protection violation and he had opined that the prior attorney had not done a job commensurate with his duties.  Attorney McKee indicated that her husband had probably paid him.  *Id.* 80:1-81:4.  AUSA Casey challenged for cause and the Magistrate Judge granted the challenge.  *Id.* 81:7-14.

14) <u>Juror 61</u>:  Juror 61 was coughing during jury selection and she said that she had an abscessed tooth and her head was pounding.  *Id.* 81:21-83:25.  She said she was not feeling good at all and, as a single mother, she said she would have difficulty finding anyone to watch her children for a long trial.  She was taking medication for her physical problems.  *Id.*  No one objected to her being excused for cause and the Magistrate Judge did so. *Id.*

15) <u>Juror 118</u>:  Juror 118's significant other of fifteen years had recently purchased timberland through Haynes Timberland and Haynes had helped him finance the purchase.  *Id.* 84:17-87:20.  The juror said that she would

hate to see the company get into financial trouble because her significant other owed money to Haynes, but she said she thought she could be fair and impartial. *Id.* After some discussion, it seemed that Juror 118 was confusing Haynes Timberland with another Haynes company unrelated to Haynes Timberland. *Id.* The Government moved to exclude for cause, but the Magistrate Judge refused to do so. *Id.* 87:23-88:17 ("This is why the government has preemptories").

16) <u>Juror 37</u>: Juror 37 said that she was buying a piece of property from Haynes. *Id.* 88:20-89:12. It turned out to be the other Haynes company and Juror 37 said that she thought she could be fair and impartial. *Id.* There was no challenge for cause. *Id.*

Later, Juror 37 said that she knew three of the potential witnesses, including Jay Haynes from whom she was buying property and Scott Lufkin from whom she had bought hay and with whom she had worked in the hayfields. *Id.* 98:17-101:16. She said she thought she could be fair and impartial. *Id.* She was not excused for cause.

Still later, Juror 37 revealed that she was taking methadone and Percocet, and that she went into Suboxone treatment at a local psychiatric hospital. *Id.* 125:13-127:20. She thought it was a couple of years ago. *Id.* Juror 37 was not taking any substances at the time of jury selection and had not been charged or investigated criminally. *Id.* Her problem began when she was prescribed medication for back pain. *Id.* She denied any strong views

about medical marijuana. *Id.* She said she could be fair and impartial. *Id.* Juror 37 was not excused for cause.

17) <u>Juror 109</u>: Juror 109 knew two of the witnesses. One witness was a close friend of her husband's. *Id.* 91:25-92:16. She said she could be fair and impartial and she was not challenged for cause. *Id.* 92:22-93:1. She also knew another witness's parents and grandparents. *Id.* 93:8-94:2. She thought she could be fair and impartial. *Id.* Counsel did not challenge Juror 109 and the Magistrate Judge did not excuse her for cause.

18) <u>Juror 114</u>: Juror 114 stated that he or she was a Bangor Savings Bank customer and could remain impartial. *Id.* 97:7-11. She was not excused for cause.

19) <u>Juror 156</u>: Juror 156 stated that he or she had a bank account at TD Banknorth and could remain impartial. *Id.* 97:113-19. Juror 156 was not excused for cause.

20) <u>Juror 120</u>: Juror 120 said that he or she used to work at Bank of America and could remain impartial. *Id.* 97:21-98:8. Juror 120 was not excused for cause.

21) <u>Juror 139</u>: Juror 139 said that he or she thought he or she might know Jamie Russell but would still be fair and impartial. *Id.* 102:25-103:20. Juror 139 was not excused for cause.

22) <u>Juror 123</u>: Juror 123 knew Michael Griffin, an attorney, who was a listed witness. *Id.* 108:10-25. Juror 123 knew Mr. Griffin because Juror 123's

parents were his neighbors. *Id.* Juror 123 could be fair and impartial. *Id.*
*Id.* 42:8-50:14. Juror 123 was not excused on this basis.

23) <u>Juror 125</u>: Juror 125 knew Sheriff Donnie Smith as the Sheriff of Washington County. *Id.* 109:2-110:4. Juror 125 could be fair and impartial. *Id.* Juror 125 was not excused on this basis.

24) <u>Juror 169</u>: Juror 169 was a retired law enforcement officer from the Connecticut Department of Corrections. *Id.* 111:8-15. She had been an officer and investigator. *Id.* She initially said that she thought the law enforcement witnesses would be telling the truth and that her prior employment might affect her ability to be fair and impartial. *Id.* 111:16-23. But she also said that she understood that law enforcement witnesses could lie and that she could go by the facts presented at trial. *Id.* 112:16-18.

Over the objection of all defense counsel, the Magistrate Judge allowed Juror 169 to remain and declined to excuse her for cause. *Id.* 112:25-115:19. The Magistrate Judge explained that "I think the juror gets by a challenge for cause. She - - you know, she worked with law enforcement, so she may have that in her blood, so to speak, but I think the witness answered truthfully that she could assess the testimony. She acknowledged that law enforcement officers can lie. She can be a fair and impartial juror, and we only have three left." *Id.* 115:2-8.

Juror 169 later stood up when the Magistrate Judge questioned the venire about attitudes toward marijuana. *Id.* 117:7-118:3. Juror 169 said she had

strong views about illegal substances.  *Id.*  She said she is against drug abuse because she has seen how it destroys peoples' lives and causes disease.  *Id.*  Juror 169 said both that she did not think she could be impartial and then immediately said she thought she could be impartial. *Id.* 117:19-118-3.  Over the Government's objection, the Magistrate Judge granted a challenge for cause and excused Juror 169.  *Id.* 119:11-14 ("There was a combination of factors there, just as there's a combination of factors in this case, as well.  So I'm going to grant their challenge").

25) Juror 159:  Juror 159 was a licensed alcohol and drug abuse counselor and the manager of the Hope House, a homeless shelter in Bangor.  *Id.* 119:25-124:16.  Juror 159 said she saw many people with addictions and stated that although she would hope her background would not make it difficult for her to be impartial, she thought it could.  *Id.*  She said she had a lot of respect for law enforcement and for the people in MDEA and would tend to give them credibility.  *Id.*  She agreed that law enforcement could color their testimony and she said she would be willing to discount their testimony if she thought they were embellishing.  *Id.*  She said she could judge the case on the evidence.  *Id.*  She agreed that she would not tend to find someone guilty because they had been charged with a drug crime.  *Id.*

The defense attorneys challenged Juror 159 for cause.  *Id.* 124:19-125:6. The Magistrate Judge rejected the challenge, noting that she thought Juror 159 "was a thoughtful, careful juror who would assess testimony and

evidence based on what she heard, and she is probably a law-abiding citizen. That's what I got out of it. I don't think that's a disqualification." *Id.* 125:7-11.

26) <u>Juror 140</u>: Six years prior, Juror 140 worked for TSA at the Bangor International Airport and would occasionally have to confiscate marijuana and turn it over to the police. *Id.* 127:23-128:25. Juror 140 was not, however, involved in any investigations or prosecutions. *Id.* Juror 140 said that he or she could be fair and impartial. *Id.* Juror 140 was not excused for cause.

27) <u>Juror 118</u>: Juror 118 said she was an elementary school teacher, and every year, she deals with parents who put their own drug needs ahead of their children's emotional and financial needs and she found it extremely distressing. *Id.* 129:11-130:18. She acknowledged that if the allegations involved the wholesale manufacturing of marijuana, she might be affected by the allegations. *Id.* Without objection, the Magistrate Judge excused her for cause. *Id.* 130:21-131:4.

28) <u>Juror 31</u>: Juror 31 stated that she believed that marijuana should not be legalized and she thought the nature of the charge could be a problem for her in being fair and impartial. *Id.* 133:23-134:21. She did not know if her "beliefs would get in the way with everything else." *Id.* She was excused for cause. *Id.* 135:21-136:11.

29) <u>Juror 154</u>: Richard Rolfe, one of the law enforcement witnesses, was Juror 154's uncle. *Id.* 136:16-140:5. Even so, she thought she could be fair and impartial. *Id.* It turned out that Mr. Rolfe was Juror 154's aunt's third husband so she was not that close to Mr. Rolfe. *Id.* Juror 154 was in her twenties when her aunt married Mr. Rolfe. *Id.* She supposed that if the jury found the defendants not guilty, it could be a little uncomfortable at family functions. *Id.* But she later said she did not think it would bother her at all. *Id.* Juror 154 had a husband who worked as a corrections officer, her father was a corrections officer, and she had other relatives who were corrections officers. *Id.* Yet she understood that not everyone is truthful. *Id.* The Magistrate Judge overruled defense challenges for cause. *Id.* 141:4-15.

**F.      Observations About the Magistrate Judge's Voir Dire**

Twenty-nine potential jurors responded affirmatively to one or more of the Magistrate Judge's questions. The Magistrate Judge excused eleven for cause. Of the eleven jurors, one was excused for illness. Three of the remaining ten were neighbors and/or friends with two of the Defendants. Two of the remaining seven were employed in a law enforcement capacity. One was a state police dispatcher who had been on call when the events in this case took place; another had served as a police officer for thirty years, had many police officer friends, and said it would be hard for him to be impartial. The husband of one of the remaining five had employed one of the defense lawyers as an expert witness in a case. One of the remaining four said that she knew Haynes Timberland as a business and could not be fair and

impartial. The three remaining potential jurors were excused for cause after each told the Magistrate Judge that he or she had personal views about marijuana that would make it difficult for them to be fair and impartial as a juror. The Magistrate Judge overruled motions from both the Government and defense counsel to excuse three potential jurors for cause.

The Magistrate Judge's rulings are significant because they suggest how she would have ruled on a motion to excuse for cause in Juror 86's case. For each juror, if the person told the Magistrate Judge that he or she could not be fair and impartial, the Magistrate Judge excused the juror. Yet, even if the juror had strong feelings about drugs, including marijuana, if the potential juror told the Magistrate Judge that he or she could be fair and impartial as a juror, the Magistrate Judge denied the motion to excuse for cause. For example, Juror 169 was a former corrections officer who expressed respect for law enforcement and had experience with people with addictions, but represented that she could still be fair and impartial. The Magistrate Judge denied a defense motion to excuse for cause. In addition, Juror 149 stated her opposition to marijuana, opined that the state of Maine should not legalize it, and expressed prejudice against marijuana. Yet, Juror 149 represented that she could be fair and impartial. The Magistrate Judge denied a defense motion to excuse Juror 149 for cause. Most directly relevant was Juror 37, who revealed that she herself had been on methadone and Percocet and had undergone drug treatment at a local psychiatric hospital. Despite this personal history, she denied any strong views about

medical marijuana and said that she could be a fair and impartial juror. The Magistrate Judge did not excuse Juror 37 for cause.

### G.    Juror 86's Testimony About Being Fair and Impartial

On direct examination, FD Beneman asked Juror 86 about the Magistrate Judge's voir dire question:

> Is there anyone on the jury panel who themselves personally or a close family member has had any experiences involving controlled substances, illegal sub - - illegal drugs, specifically marijuana, that would affect your ability to be impartial?

*Voir Dire Tr.* 26:9-14. The following dialogue ensued:

> Q.  Do you remember responding to that question that the judge asked?
>
> A. No.
>
> Q. Would there be a reason that you wouldn't have responded to that?
>
> A. I felt it did not pertain to me.
>
> Q. Why?
>
> A. Because I stay neutral; I don't form judgments prior to knowing the full story.  Am I answering the question you asked?
>
> Q. So is your understanding that the judge asked if any exposure by you or a close family member to drugs, including marijuana, would affect your ability to be impartial?  And you feeling was that?
>
> A. It was that, no, um my participation on the jury panel would not affect my decision or - - or anything towards that case.
>
> Q. And knowing that both of your sons had had past matters resolved that involved marijuana, you didn't feel affected your impartiality?
>
> A. No, not at all.

*Id.* 26:15-27:10.

FD Beneman referred Juror 86 to another question asked by the Magistrate

Judge:

> Is there anyone on the jury panel who has strong beliefs about the legalization or continued illegality of marijuana, either way, that would affect your ability to be fair and impartial in rendering a verdict in this case?

*Id.* 27:11-18. FD Beneman asked the following questions:

> Q. Do you recall responding to the judge on that?
>
> A. No.
>
> Q. Why would you have not responded to the judge on that?
>
> A. Because I did not have an opinion either way.
>
> Q. In 2013, do you recall holding any views about marijuana that would affect your ability to be fair and impartial as a juror in a case that might involve marijuana?
>
> A. No.

*Id.* 27:19-28:1. Juror 86 testified that she "felt she could be fair and impartial" and

affirmed that there was nothing that made her feel she could not be a fair and

impartial juror. *Id.* 28:5-29:13.

Upon cross-examination by Attorney Maddox, Juror 86 revealed that she had

smoked marijuana years before for a short time. *Id.* 59:25-60:3. Although she votes

in elections, she did not recall a state of Maine referendum on the legalization of

marijuana. *Id.* 60:6-11. When asked whether she had an opinion about the

legalization of marijuana, Juror 86 responded: "I don't have an opinion one way or

the other. It does not matter to me whether it's legalized or not." *Id.* 60:12-16.

Juror 86 confirmed that she did not know Malcolm French or Rodney Russell before the trial. *Id.* 66:21-23. She denied any bias against people accused of crimes generally, against people accused of drug crimes, and against people accused of growing marijuana. *Id.* 66:24-67:11. Juror 86 affirmed that if she had believed she could not be fair and impartial as a juror, she would have responded affirmatively to the Magistrate Judge's questions. *Id.* 73:5-10.

The Court makes two findings from this part of Juror 86's testimony. First, the Court finds that if during jury selection the Magistrate Judge had asked Juror 86 whether she could be fair and impartial as a jury, she would have affirmatively stated that she thought she could be fair and impartial. Second, the Court finds that Juror 86 subjectively believed she could be fair and impartial despite her sons' encounters with the criminal justice system. The Court bases these findings on its evaluation of Juror 86's credibility when she testified on the question of impartiality. Although the Court has found Juror 86's credibility wanting in respect to her knowledge of her sons' criminal activity, the Court believes her testimony regarding her belief in her own fairness and impartiality.[8]

## H. Juror 86 Would Not Have Been Struck for Cause Based on Her and Her Family's Dealings with the Law

---

[8] In *French*, the First Circuit discussed the Government's contention that Juror 86's background "left her hostile toward government prosecutors," and possibility that "[t]he mother of a drug user arrested for dealing to support his drug habit might have some strong thoughts about those who produce the drugs." *French*, 904 F.3d at 117. Having had the opportunity to evaluate Juror 86, the Court's conclusion is that, regardless of her background and the backgrounds of her family members, Juror 86 was in fact unbiased and impartial as a juror, favoring neither the Government nor the Defendants.

The investigation complete and its findings having been made, the Court reaches the issues that the First Circuit remanded the case to this Court to resolve:

> To obtain a new trial based on a juror's failure to respond accurately to questions asked of prospective jurors prior to their selection to sit as jurors, a party must first demonstrate that a juror failed to answer a material question on <u>voir dire</u>, and then further show that a correct response would have provided a valid basis for a challenge for cause.

*French*, 904 F.3d at 116 (internal punctuation and citation omitted). To answer this question, the Court assumes that if Juror 86 had answered Question 3(a), (b), and (c) accurately, she would have listed her sons' encounters with the criminal justice system, at least those that involved marijuana. Regarding the custody proceedings involving her niece, her older son's juvenile theft and forgery proceedings, her younger son's speeding conviction, her younger son's possession of tobacco by a minor, her husband's divorce, her husband's operating under the influence conviction, and her own divorce proceedings, there is a question as to whether these issues fit within the *French* Court definition of "a material question."[9] *Id.* If these answers are deemed material, the Court finds that none of the answers, if revealed, would have provided a "valid basis for a challenge for cause." *Id.*

Regarding Juror 86's older son's cocaine conviction, although the answer would have been material, the Court finds that Juror 86 did not fail to honestly answer that question because the Court finds that she did not know about her son's cocaine

---

[9] It clearly would have been better if Juror 86, and for that matter, all prospective jurors, were overinclusive in the information they provided the courts for purposes of jury selection. Judges and attorneys are in a much better position to evaluate the materiality of sought information than the prospective juror.

conviction in the fall of 2013 and in January 2014. On this question, the Court concludes she did not fail "to honestly answer a material question."

Regarding her older and younger sons' marijuana convictions, the Court finds that the answers would have been material, that Juror 86 failed to honestly supply information on voir dire, and that she should have revealed those convictions. Moreover, as the criminal charges against Malcolm French and Rodney Russell involved marijuana, the Court concludes that defense counsel should have been made aware of the convictions so they could have explored their impact on Juror 86's impartiality.

The Court turns to whether her sons' prior marijuana convictions would have provided "a valid basis for a challenge for cause." *Id.* The Court concludes that if the Magistrate Judge and counsel had been made aware of Juror 86's sons' marijuana convictions, the convictions would not have provided a valid basis for a challenge for cause. It is common that potential jurors have a wide range of life experiences. Some experiences might be disqualifying, but most would not subject the jury to a challenge for cause so long as the potential juror could still view the case fairly and impartially.

In Juror 86's case, she had herself smoked marijuana in the distant past, and her sons had been convicted of crimes related to marijuana, but she said that she did not have an opinion about whether marijuana should be legalized and she reiterated that she could be fair and impartial as a juror.

The line between an unsuccessful and successful challenge for cause is illustrated in the Magistrate Judge's colloquy with Juror 30. During voir dire, Juror

30 revealed that he had read newspaper and watched media accounts of the case, and a discussion ensued about impartiality. At one point, Juror 30 stated that although he believed he could be impartial, "I'm telling you also I believe that nobody can be completely impartial. You could say you are a Democrat and that might - - may focus me one way or the other - - I don't know how fussy you want to get - - but I just - - I think I could be impartial, but I'm making that distinction." *Tr.* 45:19-24.

The Magistrate Judge addressed this issue in the following discussion:

THE COURT: Well, we all have - - we bring with us the whole - -

JUROR NO. 30: yes.

THE COURT: - - package of our life.

JUROR NO. 30: I agree with you.

THE COURT: Every person does that.

JUROR NO. 30: I agree with you.

THE COURT: All right.

JUROR NO. 30: So I believe - -

THE COURT: That aside, whatever your preformed - -

JUROR NO. 30: Yeah, I believe I could be impartial.

THE COURT: That's what I am asking.

JUROR NO. 30: Okay.

THE COURT: If you can judge evidence that's presented to you fairly and impartially, notwithstanding all your life experiences - -

JUROR NO. 30: Okay.

THE COURT: - - that's going to color - -

JUROR NO. 30: Yeah, I agree.

THE COURT: - - how you might hear a certain thing. Obviously, we all understand that, that everybody's experienced in a different life experience. That's why there's 12 jurors - -

JUROR NO. 30: Okay.

THE COURT: - - not one, deciding a case. The question for you is, can you sit there for three weeks, listen to the evidence, and make your decision based on that evidence that's presented?

JUROR NO. 30: I believe I can.

*Id.* 45:25-47:3. Juror 30 was not challenged for cause. *Id.* 50:8-13.

In the Court's view, as with each other potential juror who said that he or she could be fair and impartial, standing alone, the dealings that Juror 86 and her family had with the legal system would not have constituted a valid basis to challenge her for cause.

## I.     Juror 86's Dishonesty and a Challenge for Cause

This case was not, however, resolved based on the January 8, 2014 revelation of Juror 86's truthful answer to Juror Questionnaire 3. Instead, as the Court found, Juror 86 dishonestly failed to reveal what she knew about her sons' criminal backgrounds. This factual finding does not, however, resolve whether Juror 86's actions would have constituted "a valid basis for a challenge for cause." *French*, 904 F.3d at 116. To answer this inquiry, the Court turns to the next question the First Circuit posed:

The outcome of this inquiry depends on whether a reasonable judge, armed with the information that the dishonest juror failed to disclose

and the reason behind the juror's dishonesty, would [have struck the juror for cause]."

*Id.*

As the Court described, despite holding an evidentiary hearing at which Juror 86 testified and was cross-examined, the Court finds there is no basis to determine Juror 86's motive for her failure to properly answer Question 3. The reason Juror 86's motive matters is that some of her potential motives could well cast a shadow over her ability to be a fair and impartial juror, yet others could have little impact on her ability to be fair and impartial. For example, if Juror 86 treated the juror questionnaire casually and half-completed it in a rush, this fact would have only a minimal impact on her ability to be fair and impartial as a juror and would not be valid grounds to strike her for cause. If—as the Court suspects but cannot find— Juror 86 took a personal view that there was a line of privacy over which the Government should not cross, and revealing her sons' troubles should not be the price for jury service, her motivation as a mother in attempting to protect the privacy of her sons would not, in the Court's view, be a valid basis for a challenge for cause, unless her motivation displayed a firmer determination to substitute her personal code for the rules of the court. Yet, if she had been motivated by a desire to hide information in an effort to be seated on the jury as in *Scott*, or if she is in fact a genetic congenital liar as in *Dyer*, it would be unlikely that she was telling the truth when she said she could be fair and impartial. But the Court does not arrive at a finding on motive because there is no evidence that allows the Court to make such a finding.

Nor was motivation a hidden issue. In its prehearing orders and discussions with counsel in anticipation of the February 1, 2019, the Court placed counsel on notice that it would be required to answer the First Circuit's inquiry about Juror 86's motivation. *Order in Anticipation of Evid.* at 2 (quoting *French*, 904 F.3d at 116) (quoting *Sampson*, 724 F.3d at 165-55). In its January 22, 2019 order, the Court quoted the *French* Court as stating: "The outcome of this inquiry depends upon whether a reasonable judge, armed with the information that the dishonest juror failed to disclose <u>and the reason behind the juror's dishonesty</u>, would [have struck the juror for cause]." Despite highlighting the motivation issue before the February 1, 2019 evidentiary hearing, the hearing is silent on her motivation.

Against the absence of evidence on motivation, the Court is faced with an unclear motive against a clear assertion by Juror 86 herself of her fairness and impartiality. It is true that "the juror's assurances that he is equal to [the] task cannot be dispositive of the accused rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Murphy v. Florida*, 421 U.S. 794, 800 (1975). In other words, "a juror's representations regarding her ability to perform fairly and impartially are not dispositive." *United States v. Barone*, 114 F.3d 1284, 1307 (1st Cir. 1997) (citing *Murphy*, 421 U.S. at 800). This is what the Magistrate Judge in this case was referring to when she stated, "Of course, the juror can't qualify or disqualify herself, that's always been my rule." *Tr.* 118:21-22. The First Circuit has directed the trial court to "make its own determination of the juror's ability to be fair

and impartial." *Barone*, 114 F.3d at 1307. Here, as directed by the First Circuit, the Court evaluated Juror 86 during her testimony, and the Court is convinced that, despite her and her family's background and despite her dishonesty, she was able to be fair and impartial in her role as a juror in this case.

### J. Cuts Against the Government

In their post-hearing memoranda, Mr. French and Mr. Russell both point to the "cuts against" language in the First Circuit's decision in *French* and argue that if the Court finds that Juror 86's memory failed over time, the First Circuit directed this Court to conclude that her lack of memory "cuts against" the Government and the Court should order a new trial. *French Mem.* at 1 ("French contends that the First Circuit's ruling that failure of memory by Juror 86 "cuts against the government" requires a new trial"); *Russell Mem.* at 1 ("Rodney Russell contends that the evidence adduced at that hearing reveals that Juror 86's memory concerning her participation as a juror in this case manifests a problem which has not been solved on remand, and which leaves the state of the record in a posture which cuts against the government"). The Government argues that the First Circuit was focused on the gap between the filing of the motion for new trial and the *French* decision and there is no basis to assume "that the memory of Juror 86 lapsed during the two years between the filing of the motion for new trial and the decision in <u>French</u>." *Gov't's Opp'n* at 14. The Government also points to the First Circuit language as being conditional, namely that if the staleness of memories becomes a problem on remand, such a circumstance should cut against the Government. *Id.*

The Court returns for guidance to the First Circuit opinion:

Cognizant that the passage of time may create problems on remand, defendants suggest that we skip remand altogether and order a new trial. Defendants abandoned this position at oral argument, and wisely so. While we appreciate that the passage of time can cause memories to fade, we are aware of no case in which, faced with a potentially biased juror and the need to investigate further, an appellate court had ordered a new trial without first permitting the district court to investigate. We decline to do so here.

However, to the extent that memories have faded in the two years between the defendants' filing of their motion for a new trial and this decision, we place the responsibility for that possible loss of evidence at the feet of the government, not the defendants. Defendants first became aware of the issue with Juror 86 in March 2016, and filed their motion approximately one month later, all while in the midst of preparing for sentencing. That timeframe exhibits sufficient diligence on the part of defendants. The government then had the option of acquiescing to the defendants' request to bring Juror 86 in for an evidentiary hearing, but elected to oppose it, resulting in now over two more years of litigation on the issue. If the staleness of the memories resulting from that additional two-year period becomes a problem that cannot be solved on remand, we think it only fair for that to cut against the government.

*French*, 904 F.3d at 120-21.

To place this comment in chronological context, Juror 86 filled out the juror questionnaire in the fall of 2013 and jury selection took place in January 2014. Mr. French filed his motion for new trial on April 28, 2016. *Def.'s Malcolm French's Mot. for New Trial Pursuant to F[ed.] R. Crim. P. 33* (ECF No. 674) (*Def. French Mot. for New Trial*). Mr. Russell joined Mr. French's motion for new trial on May 8, 2016. *Mot. to Join Mot. for New Trial* (ECF No. 682). Mr. French's April 28, 2016 motion was only skeletal, and he requested additional time for further investigation. *Def. French Mot. for New Trial* at 1 ("Undersigned has not been able to complete his due diligence investigation of the subject matter of this Motion and requests an additional

21 days for supplemental filings to this Motion").  Mr. French filed his supplemental memorandum on May 19, 2016, *Sealed Supp. Mem. in Support of Def. Malcolm French's Mot. for New Trial Pursuant to F[ed.] R. Crim. P. 33* (ECF No. 685), and Mr. Russell filed his joinder in Mr. French's supplemental memorandum on May 22, 2016. *Def. Rodney Russell's Mot. to Join Def. Malcolm French's Supp. Mem. and Mot. to Seal Supp. Mem. I Support of Mot. for New Trial Pursuant to F[ed.] R. Crim. P. 33* (ECF No. 690).  The Government filed its opposition on May 27, 2016.  *Gov't's Sealed Obj. to the Defs.' Mot. for New Trial* (ECF No. 695).  Mr. French filed a reply on June 14, 2016.  *Def. Malcolm French's Resp. to Gov't's Sealed Obj. to Def.'s Mot. for New Trial Pursuant to F[ed.] R. Crim. P. 33* (ECF No. 702).  Mr. French attached fifteen exhibits containing new information or substantiating prior allegations.  *Id.* Attachs. 1-15.  Mr. Russell joined in Mr. French's reply on June 19, 2016.  *Def. Rodney Russell's Joinder in Def. Malcolm French's Reply to Gov't's Obj. to Mot. for New Trial Pursuant to F[ed.] R. Crim. P. Under Seal* (ECF No. 706).  The Court issued its order denying the motion for new trial on November 16, 2016.  *Order Denying Mot. for New Trial* (ECF No. 734).  The Defendants appealed the denial to the First Circuit on November 16, 2016 and November 17, 2016.  *Notice of Appeal* (ECF No. 735); *Notice of Appeal Revised* (ECF No. 739); *Notice of Appeal* (ECF No. 740).  The First Circuit issued its decision on September 17, 2018, *French*, 904 F.3d at 111, and the First Circuit issued its mandates on October 10, 2018.  *Mandates of the United States Ct. of Appeals for the First Circuit* (ECF No. 790, 791).

Despite the "cuts against the government" admonition in the First Circuit decision, there is no reason to conclude that the period between October 2013/January 2014 and mid-May 2016, when Mr. French filed his supplemental memorandum, or late May 2016, when the Government filed its opposition, should cut against the Government. Assuming the Government would have had the right to review Mr. French's supplemental memorandum and decide whether to accede to his request for an evidentiary hearing for Juror 86, the Court assumes that the proper date for the time which should cut against the Government should begin on May 27, 2016, the date the Government filed its opposition. Realistically, given the complexities that the Court addressed about Juror 86's testimony on remand, even if the Government had acceded to an evidentiary hearing in May 2016, it would have taken some time to schedule the hearing. Finally, the Court does not view the interval between October 10, 2018 and the evidentiary hearing on February 1, 2019 as the responsibility of either the Government or the Defendants.

As directed by the First Circuit, the Court considered the period from May 27, 2016 and October 2018 as cutting against the Government's arguments concerning the impact of Juror 86's failure of memory. But here there is no evidence that this two-year interval had a particular effect on Juror 86's lack of memory in February 2019 about what she was thinking in October 2013 and January 2014. Had she been called as a witness in the summer of 2016, she might or might not have remembered more about what she was thinking in 2013 and 2014. Occasionally, witnesses will be asked whether their memories were better nearer an event than later and most will

97

agree that the passage of time has had an impact on their memory. Sometimes, though rarely, an event will take place, such as an accident or stroke, that affects a witness's ability to recall an event. It is rarely true that a witness might offer that her memory tends to last for a certain amount of time, such as a few weeks, months, or years and then fades.

None of these questions was asked of Juror 86 at the February 1, 2019 evidentiary hearing. Juror 86 was asked and denied that she had a problem with her memory. *Tr.* 30:16-17. She was asked and said that no one has ever questioned her about how good her memory is. *Id.* 60:20-22. But she was not asked any more questions about her memory. Specifically, she was not asked whether she would have been able to remember the events of the fall of 2013 and January 2014 that she could not recall the day of her testimony, had she been called to testify in the summer of 2016.

Moreover, unlike her inability to recall events in 2013 and 2014, the Court views the evidence (or lack of evidence) of Juror 86's motivation as unrelated to the delay caused by the Government's opposition to the motion for new trial. Put differently, the Court does not view Juror 86's motivation in failing to honestly fill out the juror form to be static in the same way as her recollection of filling out the form, or her recollection of the court events she failed to disclose. It would have been possible, for example, for defense counsel to explore her likely motivation in inaccurately answering Question 3 by asking questions about how she feels generally about government involvement in family matters, whether she felt a strong

inclination as a parent to protect the privacy of her children regarding their missteps as young adults, and similar questions. This line of questioning would have called for her own knowledge of her attitudes, biases, and personal philosophy.

Not only did defense counsel fail to ask these types of questions to shed light on her possible motivation in answering dishonestly, they did not ask her even the basic question of why she lied. In fact, faced with a stark contradiction at the February 1, 2019 evidentiary hearing as to whether Juror 86 knew about her sons' marijuana convictions, she was never confronted with the contradiction, never asked which version was true, and never asked to explain why she had contradicted herself.[10]

From the Court's perspective, after giving the Defendants the benefit of the First Circuit's directive and cutting the period from 2016 to 2018 against the Government in terms of Juror 86's memory, to rule that the Defendants are entitled to a new trial on this absence of evidence would be to grant a new trial on speculation. Lastly, the First Circuit wrote that the Court should cut this evidence against the Government, but it did not say that these circumstances changed the allocation of the burden of proof to demonstrate entitlement to a new trial, which it reiterated still rests on the Defendants. *French*, 904 F.3d at 117.

## K.    Burden of Proof

---

[10]     The Court acknowledges that had Juror 86 been asked questions directed toward determining her motivation, she might not have satisfactorily answered the questions. But here, despite being directed by the First Circuit and this Court to attempt to discover her motivation, the questions were never asked.

Finally, the Court considered that the burden of proof to establish that they are entitled to a new trial rests with the Defendants. *French*, 904 F.3d at 117 ("Separate and apart from <u>the showing that a defendant must make to obtain a new trial</u> in such cases, there is the question of process") (emphasis supplied). If the Government bore the burden to prove that Juror 86's motivations did not affect her ability to be fair and impartial, the absence of evidence would fall against the Government. Here, where the burden rests with the Defendants, the absence of evidence falls against them.

## V.      CONCLUSION

On remand from the First Circuit, the Court DENIES Malcolm French's Motion for New Trial (ECF No. 674) and DENIES Rodney Russell's Motion for New Trial (ECF No. 682).

SO ORDERED.

<u>/s/ John A. Woodcock, Jr.</u>
JOHN A. WOODCOCK, JR
UNITED STATES DISTRICT JUDGE

Dated this 7th day of June, 2019