UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:12-cr-00160-JAW-1 |
| | ) | |
| MALCOLM A. FRENCH | ) | |

**ORDER ON MOTION FOR COMPASSIONATE RELEASE**

A defendant serving a one hundred seventy-five month sentence for orchestrating a large-scale marijuana manufacturing and distribution operation, which involved harboring illegal aliens, was released on bail pending appeal, pursuant to 18 U.S.C. § 3143(b). Following an unsuccessful appeal, and while still out on bail, he moved for compassionate release to home confinement and a modification of sentence under 18 U.S.C. § 3582(c)(1)(A). The Court dismissed the motion orally at a telephonic conference of counsel and now memorializes its ruling in a written order.

The Court concludes the defendant's health does not pose an extraordinary and compelling reason warranting a sentence reduction, and the seriousness of his offenses, the relatively short time he has served, and the need for the sentence served to fulfill the sentence imposed preclude his release. The Court dismisses the motion without prejudice.

## I.    PROCEDURAL BACKGROUND

### A.    Trial, Verdict and Sentence

On January 24, 2014, after a twelve-day trial, a jury found Malcolm French guilty on eight counts, including manufacturing and conspiracy to manufacture marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1) and 846, conspiracy to distribute and possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846, maintaining a drug involved place, in violation of 21 U.S.C. §§ 856(a)(1) and (2), and harboring illegal aliens, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and (2). *Min. Entry* (ECF No. 308); *Jury Verdict Form* (ECF No. 311).   On April 21, 2016, after several unsuccessful motions for new trial, Mr. French was sentenced to one hundred seventy-five months imprisonment on five counts and sixty months on three counts all to be served concurrently, five years of supervised release on two counts and three years on six counts all to be served concurrently, an $800 special assessment, and $100,000 fine.   *Min. Entry* (ECF No. 655); *J.* (ECF No. 659).

### B.    Motion for New Trial and First Appeal

On April 28, 2016, Mr. French moved for a new trial, claiming that a juror failed to respond truthfully to her juror questionnaire and to a material voir dire question.   *Def.'s Malcolm French's Mot. for New Trial Pursuant to F.R. Crim. P. 33* (ECF No. 674).   On November 16, 2016, the Court denied the motion for new trial. *Order Denying Mot. for New Trial* (ECF No. 734).   The next day, Mr. French filed a notice of appeal.   *Notice of Appeal* (ECF No. 740).

On September 17, 2018, the Court of Appeals for the First Circuit affirmed the Court in part but concluded that the Court's investigation concerning the answers given by one of the jurors on the jury questionnaire was inadequate. *United States v. French*, 904 F.3d 111 (1st Cir. 2018). The First Circuit vacated the Court's order denying the motion for a new trial and remanded for further proceedings on that motion. *Id.* at 125. The Court received the First Circuit's mandate on October 10, 2018. *Mandate* (ECF No. 790).

## C. Renewed Motion for New Trial, Second Appeal and Release on Bail Pending Appeal

On June 7, 2019, on remand from the First Circuit and after holding a post-conviction evidentiary hearing, the Court denied Mr. French's motion for new trial. *Order on Mot. for New Trial on Remand* (ECF No. 844). On June 12, 2019, Mr. French filed a notice of appeal. *Notice of Appeal* (ECF No. 845).

While that appeal was pending, Mr. French filed an emergency motion for temporary bail with the First Circuit. *Emergency Mot. for Temporary Bail*, *United States v. French*, No. 19-1632 (1st Cir. Mar. 24, 2020). On March 26, 2020, the First Circuit denied Mr. French's motion without prejudice but noted that if Mr. French filed a motion with the district court, the judge should "conduct any necessary proceedings on an expedited basis." *Order of Ct.* at 1 (ECF No. 855). The First Circuit further observed that Mr. French "has raised a substantial question within the meaning of 18 U.S.C. § 3143(b)(1)(B)." *Id.* The First Circuit also noted that the Government had not relied on "any argument that defendant is a danger or a risk of flight." *Id.* The appellate court left "to the district court the question of whether

3

defendant can demonstrate the existence of exceptional reasons why his continued detention would not be appropriate." *Id.* (citing 18 U.S.C. § 3145(c)). The First Circuit directed the district court to make "findings that account for defendant's as-yet-undisputed health conditions, relevant guidance from the Centers for Disease Control, and the protocols of the Bureau of Prisons." *Id.*

On March 26, 2020, Mr. French filed an emergency motion for temporary bail pending appeal with this Court. *Emergency Mot. for Temporary Bail* (ECF No. 856). On March 27, 2020, the Court issued an interim order, resolving some, but not all the issues in the First Circuit order. *Interim Order on Emergency Mot. for Release* (ECF No. 859). On March 31, 2020, the Court made factual findings in line with the First Circuit's guidance and granted the motion, releasing Mr. French on bail pending his appeal. *Order on Emergency Mot. for Release* (ECF No. 869).

On October 7, 2020, the First Circuit ruled on Mr. French's appeal, affirming this Court's denial of his motion. *United States v. French*, 977 F.3d 114 (1st Cir. 2020). This Court received the First Circuit's mandate on November 27, 2020. *Mandate* (ECF No. 881). On March 6, 2021, Mr. French filed a petition for writ of certiorari with the United States Supreme Court, which the Supreme Court denied on May 3, 2021. *French v. United States*, No. 20-1256, 2021 WL 1725207 (Mem) (S. Ct. May 3, 2021).

### D.  Motion to Revoke Bail

On November 16, 2020, after the First Circuit's decision, the Government moved to revoke Mr. French's bail, reasoning that he no longer had an appeal pending

that raised a substantial question of law or fact likely to result in reversal or an order for a new trial, and requested expedited consideration. *Gov't's Mot. to Revoke Defs.' Bail Pending Appeal and Req. for Expedited Consideration* (ECF No. 877). On December 14, 2020, the Court dismissed the Government's request that the Court expedite its consideration of the Government's motion to revoke bail pending appeal, concluding that it was wiser to first resolve Mr. French's motion for compassionate release. *Order on Gov't's Mot. for Expedited Order* (ECF No. 894).

On April 30, 2021, the Court issued an oral order during a telephonic conference of counsel, granting the Government's motion to revoke bail and ordering Mr. French to surrender for service of sentence at the institution designated by the BOP by 2:00 p.m. on May 5, 2021. *Oral Order* (ECF No. 930). At the conference, the Court indicated that it would issue a written order setting forth its reasoning. The Court addresses the motion to revoke bail in a separate written order.

### E.     Motion for Compassionate Release

On December 7, 2020, Mr. French filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). *French's Mot. for Compassionate Release* (ECF No. 883) (*Def.'s Mot.*). The following day, Mr. French filed a declaration from his treating doctor regarding fluid buildup in his right lung. *Decl. of Andrew Dixon* (ECF No. 886). On December 17, 2020, the Government responded in opposition. *Gov't's Obj. to Def.'s Mot. for Compassionate Release* (ECF No. 898) (*Gov't's Opp'n*). Mr. French replied on December 21, 2020. *French's Reply re: Mot. for Compassionate Release* (ECF No. 900) (*Def.'s Reply*). The next day, Mr. French filed a second

declaration from his treating doctor concerning his health. *Second Decl. of Andrew Dixon* (ECF No. 902). Over the next several weeks, Mr. French's counsel filed two letters, updating the Court on a pleural biopsy that was scheduled for January 19, 2021. *Letter from Att'y Jamesa J. Drake to Hon. John A. Woodcock, Jr.* (Jan. 8, 2021) (ECF No. 905); *Letter from Att'y Jamesa J. Drake to Hon. John A. Woodcock, Jr.* (Jan. 19, 2021) (ECF No. 906).

On February 16, 2021, Mr. French's counsel wrote to the Court, attaching the biopsy results from Mr. French's January 19, 2021 biopsy, and explained that "the sample tested for cancer was found to be 'benign.'" *Letter from Att'y Thomas F. Hallett to Hon. John A. Woodcock, Jr.* (Feb. 16, 2021) (ECF No. 909). Mr. French's counsel stated that the diagnosis is "Chronic Fibrosing Pleuritis" and that he "is in the process of trying to schedule a telephone conference with pulmonary specialist Dr. Dixon to review Mr. French's current medical condition and get a prognosis moving forward." *Id.* On February 23, 2021, Mr. French's counsel provided an update, informing the Court that an x-ray taken February 17, 2021 showed that Mr. French "developed another pocket of fluid in the right lung pleural cavity" and was prescribed a two-week course of prednisone, but prednisone was not previously effective in treating his condition. *Letter from Att'y Thomas F. Hallett to Hon. John A. Woodcock, Jr.* (Feb. 23, 2021) (ECF No. 910).

On March 4, 2021, the Court held a telephonic conference of counsel to discuss the status of Mr. French's health conditions, and the Court asked the parties to file a proposed order directing the BOP to perform a medical review of Mr. French's case.

6

The Court's concern was whether the BOP could adequately care for Mr. French if he returned to BOP custody. *Min. Entry* (ECF No. 915). On March 16, 2021, following another conference of counsel, the Government filed a motion requesting an order directing the BOP to review Mr. French's medical records and report back to the Court. *Gov't's Mot. for Order Directing BOP Record Review* (ECF No. 918). On March 17, 2021, the Court granted the Government's motion and ordered Dr. Diane Sommer, Regional Medical Director for the BOP, to review Mr. French's medical records and answer several questions about his chronic fibrosing pleuritis diagnosis, including whether the BOP can care for his condition. *Order* (ECF No. 920).

Meanwhile, on April 8, 2021, the Court ordered Malcolm French to clarify whether he has been vaccinated. *Order* (ECF No. 922). Mr. French responded the next day, informing the Court that he received his first COVID-19 vaccination shot on April 1, 2021 and was scheduled for the second shot on April 22, 2021. *Letter from Att'y Thomas F. Hallett to Hon. John A. Woodcock, Jr.* (Apr. 9, 2021) (ECF No. 923) (*Vaccine Status Update*).

On April 16, 2021, Mr. French's counsel submitted a letter from Dr. Steven M. Simons, an internist/pulmonologist from Beverly Hills, California, who reviewed Mr. French's records. *Letter from Att'y Jamesa J. Drake to Hon. John A. Woodcock, Jr.* (Apr. 16, 2021) (ECF No. 924). Dr. Simons noted that Mr. French has "shortness of breath out of proportion to current physical and x-ray findings" and ordered an additional study to address the possibility of blood clots. *Id.* at 4. Later that same day, Mr. French's counsel filed a letter, informing the Court that she sent copies of

Mr. French's x-rays to Dr. Sommer, and that Mr. French's treating physician ordered a CT scan of the chest, but the date for the CT scan had not yet been set. *Letter from Att'y Jamesa J. Drake to Hon. John A. Woodcock, Jr.* (Apr. 16, 2021) (ECF No. 925).

On April 23, 2021, the BOP filed a letter from Dr. Sommer. *Letter from Dr. Diane Sommer to Hon. John A. Woodcock, Jr.* (Apr. 23, 2021) (ECF No. 926) (*BOP Review Letter*). Upon review of Mr. French's medical records, including x-ray results she received on April 20, 2021, Dr. Sommer was not able to provide specific prognoses for Mr. French's asthma and chronic fibrosing pleuritis. *Id.* at 1. However, she stated that "so long as Mr. French takes his maintenance medication for asthma, he should not experience serious medical complications." *Id.* Furthermore, while the underlying cause of Mr. French's chronic fibrosing pleuritis is unknown, Dr. Sommer noted Mr. French's treating physician counseled him that he "expected him to do well." *Id.* at 1-2. Dr. Sommer concluded that "[b]ased on the information provided to me and my knowledge of the BOP's medical resources, the BOP will be able to provide appropriate care for Mr. French should he be returned to the custody of the BOP." *Id.* at 4.

On April 30, 2021, the Court held a telephonic conference of counsel and issued an oral order dismissing without prejudice Mr. French's motion for compassionate release. *Oral Order* (ECF No. 930). During the conference the Court indicated that it would issue a written order.

## II.   FACTUAL BACKGROUND

The Court draws much of this factual background from Mr. French's Third Revised Presentence Investigation Report (PSR).   *See Restricted U.S. Probation Filing*, Attach. 3, *PSR* (ECF No. 889).   At the sentencing hearing, Mr. French confirmed that the contents of the PSR were accurate and correct.   *Tr. of Proceedings* at 15:23-17:8 (ECF No. 729) (*Sentencing Tr.*).   The Court relied on the PSR to sentence Mr. French.   *Id.*; *Statement of Reasons* at 1 (ECF No. 660).[1]

### A.   Criminal History

Prior to the instant offense, Mr. French had no criminal convictions or other criminal conduct, and the Probation Office (PO) calculated a criminal history score of zero, placing him in Criminal History Category I.   *PSR* ¶¶ 59-61.[2]

### B.   Offense Conduct

#### 1.   The Investigation

The offense conduct was investigated by a combination of authorities from the Maine Drug Enforcement Agency (MDEA), the Drug Enforcement Administration (DEA), the Department of Homeland Security Investigations (HSI), Customs and Border Protection (CBP), the Maine Warden Service (MWS) and the Maine State Police (MSP).   *Id.* ¶ 5.   The investigation began on September 17, 2009, when MSP

---

[1]       The Court adopted the PSR with two changes.   First, the Court found the drug quantity to be 918 kilograms of marijuana for a base offense level of 28.   *Statement of Reasons* at 1.   Second, the Court did not apply the two-level enhancement for possession of firearms.   *Id.*

[2]       The PSR recounts an arrest for criminal mischief from 1979 when Mr. French was only seventeen years old, which resulted in an "informal adjustment," but the PO provides no further information about the incident.   *PSR* ¶ 63.   Given the age of the arrest, Mr. French's young age at the time and the lack of details, the Court does not consider the incident in its compassionate release analysis.

received an anonymous email that a large marijuana growing operation existed on land owned by Malcolm French or one of his corporations, referred to as TW 37, located in rural Washington County, Maine. *Id.* The emailer accused Mr. French and a man named Kendall Chase of being involved with "truckloads" of marijuana, and that gates and camouflage were used to conceal the operation. *Id.*

On September 21, 2009, MWS entered Mr. French's land through an open gate and spoke with a man who told MWS they had no right to be on the property and asked them to leave. *Id.* ¶ 6. During the morning hours of September 22, 2009, MWS and CBP personnel flew an airplane over the property and observed what they believed to be marijuana growing on the property. *Id.* A second helicopter "fly over" confirmed the presence of a marijuana growing operation, observing that the marijuana grow was located deep within a 22,000 acre parcel of land in TW 37 that was owned by Haynes Timberland, Inc., a closely held corporation owned by Mr. French and his wife Barbara. *Id.* As the helicopter hovered over the property, smoke and flames erupted from the area. *Id.* In response to the fire, MWS accessed the property and discovered a marijuana grow compound consisting of nine buildings. *Id.* Two of the buildings had burned and a third structure had been set on fire, but authorities found another six undamaged structures. *Id.* The structures were generally two stories in height and were painted green and/or camouflaged by tarps and nets to avoid detection from the air. *Id.*

A short time later, authorities stopped a pick-up truck driven by Mr. French about two miles from the scene. *Id.* ¶ 7. MDEA interviewed Mr. French, who

admitted having men working in TW 37, and when asked about the marijuana growing operation, he indicated he owned a lot of property and people had grown marijuana on his land for years. *Id.*

A subsequent search of the marijuana grow compound revealed numerous items of paraphernalia related to a large-scale marijuana growing and packing operation, including ten pounds of drying marijuana, marijuana "shake," soil, fertilizer, water, camouflage clothing, agriculture equipment, and six one hundred pound propane heaters used to dry the marijuana. *Id.* ¶ 8. A search of the area, pursuant to state and federal warrants, led to the discovery of eight hundred planters, each containing three to four marijuana plants. *Id.* Each plant was tagged with a label that bore an alphanumeric code, and each plant had a different colored ribbon attached. *Id.* In total, authorities seized 2,943 live marijuana plants, which they estimated to be worth between $3,000,000 and $4,000,000 in resale value, based on the amount of marijuana likely harvested and an average sale price of $2,500 per pound. *Id.* The search also led to the discovery of DNA evidence on numerous items and a motor vehicle registered to Moises Soto, as well as an envelope addressed to Moises Soto, c/o Rodney Russell found at Mr. Russell's address in Bangor, Maine. *Id.*

On September 24, 2009, agents executed a search warrant for Mr. French's home in Enfield, Maine. *Id.* ¶ 9. The search led to the discovery and seizure of three vacuum sealing machines which contained marijuana "shake," dry marijuana "shake" in the attic, two ounces of marijuana in the kitchen area, one ounce of marijuana in a freezer in the basement, one hundred pound propane tanks similar to those in the

marijuana grow compound, pallets and agriculture equipment similar to those in the grow compound, and $9,350 cash. *Id.* Authorities also found numerous firearms inside the residence. *Id.* Searches of the six grow sites in TW 37 revealed wire pots with Pro Mix potting soil, a bunkhouse, drying shacks and Rabbit Guard wire fencing. *Id.* Additional searches at a warehouse owned by Mr. French in TW 31 and at his camp in LaGrange, Maine also revealed evidentiary items consistent with the manufacture of marijuana. *Id.*

### 2.    The Conspiracy

The Government subsequently launched a lengthy investigation into the marijuana manufacturing and trafficking activities of Mr. French, Mr. Russell, and Kendall Chase, as well as Scott MacPherson, who committed suicide in 2011. *Id.* ¶ 10. Testimony from witnesses indicated that initially, Mr. French allowed other individuals to grow marijuana on his property in exchange for a fee. *Id.* Later, he decided to grow marijuana on his own land since he had the business acumen to maximize the profit. *Id.* Mr. Chase contributed to the conspiracy through his knowledge about how to manufacture and harvest high-quality marijuana. *Id.* By no later than 2005, they were growing marijuana together in rural Maine. *Id.*

Testimony described Mr. French as "in charge" and the overall leader of what evolved into a large-scale marijuana growing business. *Id.* It was Mr. French's idea to use migrant workers and illegal aliens as a labor force because he knew he could pay them lower wages, they would not steal the marijuana, they were less likely to contact law enforcement since most of them were in the United States illegally, and

12

they lacked the ability to identify the exact location of the marijuana grow compounds. *Id.* By late 2006, Mr. Russell joined Mr. French and Mr. Chase in the conspiracy. *Id.* Once he joined, Mr. Russell was daily involved with the marijuana grows and he, along with Mr. MacPherson, supervised the migrant workforce. *Id.*

In late 2007, Mr. French recruited Moises Soto into the conspiracy. *Id.* ¶ 11. Mr. Soto was a naturalized U.S. citizen originally from Mexico and fluent in both English and Spanish. *Id.* One of Mr. Soto's roles in the conspiracy was to recruit Mexican laborers for the marijuana growing operation. *Id.* Mr. Soto and others induced the workers to travel to Maine, and in some instances, the workers were recruited under false pretenses. *Id.* For example, they believed they were being hired to work in the Christmas tree industry, not manufacturing or harvesting marijuana. *Id.* Once the workers arrived in Maine, Mr. Soto transported them from where they resided to the marijuana growing operation on multiple occasions each month. *Id.* Mr. Soto also acted as a translator for Mr. French, Mr. MacPherson, and Mr. Russell. *Id.* He instructed the migrant workers on how to move around society and not raise suspicion and stressed the importance that they wash themselves after working in the marijuana fields. *Id.* In addition, Mr. Soto paid the migrant workers weekly and wired money to the workers' families in Mexico. *Id.*

The PSR includes additional pertinent information that certain witnesses provided to the government and/or testified to at trial. *Id.* ¶ 12. One witness, Winston McTague, was initially a social acquaintance and later an employee of Mr. Chase. *Id.* ¶ 13. He joined the marijuana grow operation in TW 37 and

performed a variety of functions. *Id.* In 2005, he participated in the marijuana harvest. *Id.* In 2006, he helped grow marijuana plants from seeds. *Id.* Once the seedlings were mature enough to be transplanted, Mr. McTague helped plant four to seven plants per basket. *Id.* In 2006, he estimated they planted sixty baskets on Mr. French's Wesley, Maine property and twenty-five baskets on Mr. French's LaGrange, Maine property. *Id.* Mr. McTague testified that Mr. French, Mr. Chase and Mike Smith were the "bosses." *Id.* In the winter of 2005 and 2006, he drove Mr. Smith and Mr. Chase around as they delivered marijuana to customers and collected proceeds from the sales. *Id.* Mr. McTague was supposed to be paid $1,000 per week for his efforts, but only received $600 to $800 every other week or every three weeks. *Id.* He also testified that the "bosses got the peons hooked on coke and kept us working for coke." *Id.* Mr. McTague anonymously contacted MSP multiple times. *Id.* ¶ 14.

Amanda Gorrell dated Mr. French's son, Thomas, from 2007 to October 2008. *Id.* ¶ 15. She testified that she accompanied Thomas to buy a large number of plastic trash cans, which Thomas said was related to a salmon restoration project, and they delivered them to a site in LaGrange. *Id.* On another occasion, she went with Thomas to purchase a large amount of chicken wire, supposedly for his grandfather, but Thomas delivered it to his father. *Id.* Ms. Gorrell believed Thomas was being unfaithful, since he was often too busy to spend time with her. *Id.* Thomas explained to her that the real reason he was not spending time with her was because he was busy assisting his father with the manufacture and sale of marijuana. *Id.* He further

14

told her the trash cans and chicken wire were for the marijuana growing operation. *Id.*

Another witness, Derek King, reported that in 2007, he entered Mr. French's land on foot without permission through an open gate. *Id.* ¶ 16. Mr. King stated that Mr. French was visibly angry and directed him to leave the area, following him back to the open gate. *Id.* During the encounter, Mr. King observed a firearm, likely a semi-automatic pistol, on Mr. French's lap. *Id.*

Another witness, Jared Flewelling, testified that in 2007 he learned there was a large amount of marijuana at Mr. French's family camp in LaGrange, Maine. *Id.* ¶ 17. Mr. Flewelling wandered through the woods until he came to the French camp and observed a plastic trash can with several large plastic bags, each containing numerous ziplock baggies of marijuana. *Id.* He took three of the bags, which had an aggregate weight of about thirty pounds of marijuana, and stored them at his house for re-sale purposes. His brief dabbling in the marijuana business ended when his stepfather discovered the marijuana and called the police. *Id.*

Fai Littman was the college roommate of Mr. Russell's son, Neal Russell. *Id.* ¶ 18. Mr. Littman testified that Rodney Russell began supplying him with marijuana in 2008. *Id.* Mr. Littman initially received only a half-pound of marijuana per occasion but eventually began obtaining five pounds of marijuana per transaction. *Id.* Most of the marijuana was delivered directly to Mr. Littman by Rodney Russell, but there were occasions when the marijuana was delivered by either Mr. French or Thomas French. *Id.* There was also an occasion when Mr. Littman went to

Mr. French's home in Enfield, Maine to obtain marijuana. *Id.* The routine sale of marijuana to Mr. Littman stopped in the summer of 2009, but in fall of 2009, for the last time, Mr. Littman went to Mr. Russell's home and obtained three or four pounds of marijuana. *Id.*

Several migrant worker witnesses provided further information. In late 2007, Miguel Angel Roblero-Velasquez was driven by Mr. Soto from Florida to Maine after being told there was employment for "planting pine trees." *Id.* ¶ 19. When they arrived in Maine, Mr. Soto delivered Mr. Roblero-Velasquez to a structure in a rural area, believed to be the warehouse compound in TW 31. *Id.* The migrant workers often worked twelve-hour days, seven days per week. *Id.* The room where he and other migrant workers stayed at the warehouse had no windows, little light, no ventilation, and there was only one door which was locked at night so they could not leave. *Id.* Mr. Soto transported Mr. Roblero-Velasquez to the warehouse compound where he first learned he would be caring for and harvesting marijuana plants. *Id.* Mr. Roblero-Velasquez returned to Mexico at the end of the 2008 harvest season. *Id.* In early 2009, he paid a "coyote" to bring him back to the United States, but he was kidnapped and held for ransom. *Id.* Mr. Soto paid the ransom and returned Mr. Roblero-Velasquez to Maine. *Id.*

Mr. Roblero-Velasquez stated that Mr. French was "in charge," but Mr. Russell and Mr. MacPherson also "gave the orders." *Id.* Mr. Roblero-Velasquez also observed Mr. MacPherson verbally insulting the laborers and wearing a firearm on at least one occasion. *Id.* After the helicopter fly-over in 2009, Mr. Roblero-Velasquez and the

other migrant workers fled and embarked on a multi-hour trek through the woods, led by Mr. MacPherson and Mr. Russell. *Id.* Mr. MacPherson and Mr. Russell coordinated their transportation, and at Mr. French's request, the laborers were eventually picked up by Robert Berg, one of Mr. French's longtime friends. *Id.* Mr. Berg hid the workers in his barn, and within a day or two, Mr. Soto and a man known as "El Negro" drove the workers from Maine to New York, where they were released to "go on their own way." *Id.* Mr. Roblero-Velasquez's account of events was echoed by additional migrant worker witnesses. *Id.* ¶¶ 20-21.

In 2013, the Government interviewed a cooperating individual (CI) who stated that Mr. French recruited him to find migrant workers for Mr. French's marijuana growing operation in late 2007. *Id.* ¶ 22. The CI delivered some of the migrant workers to the garage/storage area where Mr. MacPherson lived, and the CI observed Mr. MacPherson providing instruction to the workers. *Id.* Mr. MacPherson informed the CI that Mr. French was the "one in charge." *Id.* The CI further stated that Mr. Russell and Mr. MacPherson were the people usually "on site." *Id.* The CI was paid to help the migrant workers flee several days after the raid on the grow compound in 2009. *Id.*

Investigators also determined a company, Cold Stream Contracting, in West Enfield, Maine, began purchasing large quantities of peat moss (Pro Mix) in 2006 from Griffin Greenhouse in Gray, Maine. *Id.* ¶ 23. Records show Mr. French was listed as the company contact person, and Mr. French signed the checks to pay for the Pro Mix orders in 2006 and 2007. *Id.* Mr. Russell also placed orders and made

frequent contact with Griffin Greenhouse on behalf of Cold Stream Contracting, on several occasions paying cash for Pro Mix orders that cost between $9,000 and $12,000. *Id.* In 2007 and 2008, at least four truckloads of Pro Mix were delivered to an old abandoned warehouse in Wesley, Maine, where the truck drivers were met by several individuals who unloaded the truck with a forklift and pallet lifter. *Id.* Based on witness testimony, the PO believed three of the individuals involved with the unloading were Mr. French, his son Thomas French, and Mr. Chase. *Id.* Mr. Russell also testified that he assisted Mr. MacPherson and several associates unload one truckload of Pro Mix, and he admitted to signing a delivery slip. *Id.* Griffin Greenhouse records show the sale of 4,590 bags of Pro Mix to Cold Stream Contracting from 2006 to 2009. *Id.* ¶ 24.

Investigators also determined that in 2007, Cold Stream Contracting purchased a large amount of fencing (Rabbit Guard) from Louis Page Company. *Id.* ¶ 25. The total price of the order was about $3,000 and the weight of the order exceeded three thousand pounds, which a company representative testified was the largest single fencing order he had ever handled for the company. *Id.* Records show Mr. Russell signed and paid for the material with a check from Cold Stream Contracting. *Id.*

### 3.   **Drug Quantity**

With respect to drug quantity, the PO concluded that Mr. French was responsible for all marijuana grown by the conspiracy between 2006 and 2009. *Id.* ¶ 26. The PO did not find sufficient evidence to hold Mr. French accountable for

marijuana grown prior to 2006. *Id.* The PO took the position that one-and-a-half bags of Pro Mix were needed to fill each planter. *Id.* Since 3,960 bags of Pro Mix were purchased between 2006 and 2008, that quantity would fill 2,640 planters. *Id.* Using a conservative estimate of three marijuana plants per planter, the total number of plants manufactured from 2006 to 2008 would be 7,920 marijuana plants. *Id.* The PO also noted that 2,943 live marijuana plants were seized in 2009. *Id.* ¶ 27. In total, the PO found Mr. French responsible for a total of 10,863 marijuana plants. *Id.* ¶ 28.

To calculate the total drug quantity, the PO applied guidance from U.S.S.G. § 2D1.1, cmt. (background), which adopts a weight of one hundred grams per plant. *Id.* The result was 1,086.3 kilograms of marijuana. *Id.* No additional drug quantity was attributed to any of the marijuana seized in this case or identified through other sources such as sales to customers. *Id.* The Court ultimately determined the drug quantity to be 918 kilograms of marijuana, for a base offense level of 28. *Statement of Reasons* at 1.

### C.   Guideline Calculations

As a result of his criminal history and offense conduct, the Court determined that Mr. French was a Criminal History Category I with a Total Offense Level of 34. *Statement of Reasons* at 1. The applicable sentencing guideline range was one hundred fifty-one to one hundred eighty-eight months imprisonment, five years of supervised release and a fine between $17,500 and $2,000,000. *Id.* The Court

sentenced Mr. French to one hundred seventy-five months of incarceration, five years of supervised release, a $100,000 fine, and an $800 special assessment. *J.* at 3-7.

## III.   THE PARTIES' POSITIONS

### A.   Malcolm French's Motion

Mr. French asks the Court to "grant his compassionate release from prison pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)." *Def.'s Mot.* at 1. Mr. French first addresses exhaustion, arguing that "this Court should conclude that in light of the fact that [Mr.] French is not in BOP custody, he has no administrative remedies to exhaust." *Id.* at 3. He asserts that "this Court does not need to wait and see whether the BOP will support [his] motion before ruling." *Id.* He acknowledges that his situation is "somewhat unique" because he is not presently in BOP custody and thus has no warden to petition for compassionate release. *Id.* at 4. He cites several cases where he claims "[c]ourts have determined that similarly-situated defendants have no administration requirements to exhaust, and have evaluated the defendants' compassionate release on the merits," and urges this Court to do the same. *Id.* at 4-6.

Mr. French next argues that even if the Court determines Mr. French has not satisfied the exhaustion requirement, it may be excused for equitable reasons. *Id.* at 7. He contends that the exhaustion requirement is non-jurisdictional in nature and asks to Court to conclude that "the waiting period is waivable because Congress cannot have intended it to apply rigidly during a global pandemic." *Id.* at 10. He emphasizes that his situation is "dire" because he would be "forced to submit to BOP custody so that he might wait-out the 30-day period for the warden to respond to his

20

compassionate release request – and the cruel irony is that warden may never respond." *Id.* at 11. Therefore, "this Court should conclude that the statute's exhaustion requirement is not jurisdictional in nature and may be waived in extraordinary circumstances, and the combination of [Mr.] French's poor health and his non-BOP custodial status qualify as extraordinary." *Id.*

Turning to the merits of his motion, Mr. French argues that he is "not well" and states there is a "serious possibility that [he] has lung cancer, and further diagnostic testing, including a biopsy of the lung, is necessary to rule that out." *Id.* at 13. If he has lung cancer, his course of treatment will involve chemotherapy. *Id.* Even if he does not have lung cancer, "further testing and treatment will be necessary to, among other things, determine whether he suffers from autoimmune disease." *Id.* Thus, his "precarious health, including the significant need for immediate and further diagnostic evaluation, constitute extraordinary and compelling reasons for granting compassionate release," especially because "the government can make no guarantee, and this Court cannot (on this record) find, that [he] will receive adequate medical care while incarcerated." *Id.* at 13-14.

Finally, Mr. French argues that the 18 U.S.C. § 3553(a) factors support his release. *Id.* at 15. He emphasizes that he has already served "approximately 74 months in prison or roughly half of his sentence, accounting for projected earned-time credits," he has "no meaningful criminal history," he was a productive citizen with a successful logging business before his arrest, and he has had "no trouble while in prison, and he has had no trouble while out of prison on bail." *Id.* at 16. Furthermore,

21

he has a "solid release plan, which ostensibly involves medical care and convalescence in the marital home he shares with his devoted wife of over 20 years" who "zealously abides by CDC guidelines for mask wearing and the like when outside the home." *Id.* If the Court grants Mr. French's request, "he would remain on supervised released for five years and, to the extent that this Court believes that any risk exists, it can protect the community by imposing additional restrictions and conditions of supervised release." *Id.*

### B.   The Government's Opposition

The Government opposes Mr. French's motion because his motion is "premature," he "has not demonstrated an extraordinary and compelling reason warranting his release," and "analysis of the § 3553(a) factors do not weigh in favor of release." *Gov't's Opp'n* at 1. The Government first outlines the BOP's response to the COVID-19 pandemic, claiming that the BOP "has taken significant measures to protect the health of the inmates in its charge." *Id.* at 2. The BOP is currently in Phase Nine of its Action Plan, which means that "prisoner programs are resuming using precautions to continue to fight the spread of COVID," such as using social distancing modifications, limiting group sizes, and prohibiting group sports and the use of gym equipment. *Id.* at 3. The BOP also screens all newly arriving BOP inmates for COVID-19 symptoms and temperature, restricts contractor access to BOP facilities, and limits social and legal visits. *Id.* at 4. "Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution." *Id.* at 5. "Unfortunately and inevitably, some inmates have become

ill, and more likely will in the weeks ahead," but the BOP must also weigh "other critical considerations." *Id.*

The Government next argues that "[c]ompassionate release is not available to a defendant, like [Mr.] French, who is not in custody," citing numerous cases. *Id.* at 8-9. Relatedly, it argues that Mr. French "has not exhausted his administrative remedies before filing the instant motion." *Id.* at 9. The Government distinguishes *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 U.S. Dist. LEXIS 102045 (D. Me. June 11, 2020), because Mr. French is not in custody, does not have a surrender date, has not served half of his sentence, and chose to seek release on bail pending appeal rather than compassionate release in prison and has resisted attempts to return to custody following the unsuccessful appeal. *Id.* at 10-11.

Proceeding to the merits, the Government argues Mr. French has not established extraordinary and compelling reasons warranting his release. *Id.* at 11. It argues that "[t]he mere existence of the COVID-19 pandemic" is not enough and Mr. French "has not established that he is currently suffering from one of the [CDC's] enumerated chronic medical conditions." *Id.* at 12. While cancer is a qualifying condition, Mr. French "has not submitted any evidence establishing that he has been diagnosed with lung cancer or any other chronic medical condition that renders him at increased risk of serious illness if he contracts the virus." *Id.* at 13. The Government asserts the mere possibility that further testing may reveal cancer and his desire to have diagnosis and treatment done by his own physicians does not constitute an extraordinary and compelling reason warranting his release. *Id.*

The Government contends the 18 U.S.C. § 3553(a) factors similarly caution against release. *Id.* at 14. Specifically, Mr. French was "the mastermind of a significant marijuana trafficking conspiracy who used illegal immigrants to work the operation while enduring 'inexcusably harsh and inhumane treatment,'" and when discovered, he set the compound on fire, risking the lives of firefighters and first responders. *Id.* (citing *Sentencing Tr.* at 109-111, 114-130). Mr. French also "took the witness stand in his own defense and committed perjury." *Id.* The Government argues Mr. French is "wholly unrepentant" and "a sentence reduction is not warranted now for this defendant who has not even served half of his sentence." *Id.*

In conclusion, the Government urges the Court to consider the BOP's efforts to address the spread of COVID-19 and note that a vaccine has been developed. *Id.* It argues that it "should not be the Government's burden to offer evidence concerning BOP's ability to render medical services in response to [Mr. French's] motion." *Id.* at 15. The Government cites the BOP medical records attached to its opposition and notes that its "review of those records reveal no indication that [Mr. French] was denied care." *Id.* Thus, "[t]here is nothing in the record for the Court to endorse [Mr. French's] speculation about the medical care he would receive at a BOP facility." *Id.* at 16.

## C.   Malcolm French's Reply

In Mr. French's reply, he addresses the Government's arguments in order. *Def.'s Reply* at 1. First, regarding the BOP's response to the COVID-19 pandemic, he argues that "despite the BOP's best efforts, the virus is spreading precipitously within

its prisons," noting that at FCI Loretto, the facility where Mr. French was held prior to his release on bail, there are 607 inmates and 25 staff members with COVID-19. *Id.* He responds to the Government's argument that the BOP has been able to meet his medical needs in the past by claiming "those needs have changed" and we know nothing about the BOP's ability to care for his current condition. *Id.* at 3. Moreover, if Mr. French returns to prison, he would first be in the custody of the U.S. Marshals and housed in an unspecified local jail, so the Government's description of BOP protocol is "largely irrelevant." *Id.* Regarding the burden of proof, Mr. French argues that he has tried to find answers to his questions about jail and prison medical care, but has had no success, and "the government is in a far superior position to obtain this information to the extent that it is knowable at all." *Id.* at 4. He claims it is "unimaginable that this Court – or any court – would return a sick person to jail or prison without ascertaining whether that person's medical needs could be adequately addressed, formal burden-allocation notwithstanding." *Id.* at 5.

Regarding exhaustion, Mr. French distinguishes the Government's cited cases because those involved situations "where the defendant was sentenced and then immediately petitioned for compassionate release before the defendant surrendered to custody." *Id.* He "agrees with the government that it makes sense for a court to deny compassionate release to defendants who have never reported to prison: the motion for compassionate release is, in those cases, ostensibly a request that the courts refrain from executing the sentence altogether." *Id.* Mr. French, however, has already served over six years in prison and adopting the Government's position

"transforms this Court's order granting bail into a cudgel to be used against him," which "makes no sense at all." *Id.* at 6. Mr. French contends that "[i]t is not inconsistent for both the government and this Court to simultaneously view the [exhaustion requirement] as a claim processing rule and decide that, under the circumstances, [Mr.] French has done what he can to comply with those requirements." *Id.* at 7. Mr. French repeats his argument that "there is zero evidence that Congress intended inmates who presented such compelling circumstances that they were granted post-conviction bail, must nevertheless return to prison so that they may wait 30 days for a response from a Warden that may never come." *Id.* at 9.

Regarding extraordinary and compelling reasons, Mr. French notes that he has "moderate to severe asthma," which is a condition the CDC recognizes as putting a person at increased risk of severe illness from COVID-19. *Id.* at 9-10. He further notes that he is scheduled to meet with a surgeon and then set a date for surgery. *Id.* at 10. He states that "access to non-emergency hospital procedures has been severely limited by the pandemic" and he has "attended every scheduled doctor's appointment and follow-up visit," but "[Mr.] French's providers – not [Mr.] French – dictate that timetable." *Id.*

Finally, Mr. French rejects the idea that he is "wholly unrepentant," noting "the self-reflection that six years in prison promotes." *Id.* at 11. Mr. French's attorneys have "advised him that anything he says could be used against him" and he argues "[t]here is no need to journey further down the dangerous path that the government's logic leads." *Id.*

## IV.   LEGAL STANDARD

Over the course of the COVID-19 pandemic, the Court addressed the legal

standard for deciding a motion for compassionate release on several occasions.  *See,*

*e.g., United States v. Crosby*, 1:17-cr-00123-JAW-01, 2020 U.S. Dist. LEXIS 199085,

at *16-23 (D. Me. Oct. 27, 2020).  Put succinctly, 18 U.S.C. § 3582(c)(1)(A)(i) permits

a court to modify a term of imprisonment when (1) "extraordinary and compelling

reasons warrant" the movant's release, (2) release is consistent with "the factors set

forth in [18 U.S.C. §] 3553(a)", and (3) release comports with "applicable policy

statements issued by the Sentencing Commission . . .."  18 U.S.C. § 3582(c)(1)(A).[3]

The United States Sentencing Commission issued a policy statement under

United States Sentencing Guideline § 1B1.13 for addressing compassionate release

motions under § 3582(c)(1)(A).[4]  This policy statement requires that the movant must

---

[3]      Section 1B1.13 of the United States Sentencing Commission Guidelines addresses reductions
in the terms of imprisonment under 18 U.S.C. § 3582(c)(1)(A).  But the Commission promulgated these
provisions before Congress enacted the First Step Act.  *See United States v. Brooker*, 976 F.3d 228,
230-34 (2d Cir. 2020) (discussing the history of § 1B1.13 and the First Step Act).  As Judge Hornby of
this District noted, the "Second, Fourth, Sixth and Seventh Circuits have . . . ruled that the Guideline
policy statement applies only to motions brought by the Director of the Bureau of Prisons, not to
motions for relief brought by defendants, and nothing limits judges' discretion in considering 'the full
slate of extraordinary and compelling reasons that an imprisoned person might bring before them in
motions for compassionate release.'"  *United States v. Almeida*, Nos. 2:17-cr-52-DBH-01, 2:11-cr-127-
DBH-01, 2021 U.S. Dist. LEXIS 364, at *4 (D. Me. Jan. 4, 2021) (quoting *Brooker*, 976 F.3d at 235-37
and citing *United States v. McCoy*, 981 F.3d 271, 281-83 (4th Cir. 2020); *United States v. Jones*, 980
F.3d 1098, 1108-11 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)); *see
United States v. Gowdy*, 832 F. App'x 325, 327 (5th Cir. 2020) (describing whether § 1B1.13 applies to
motions for compassionate release as an "open question"); *United States v. Pelloquin*, No. 20-12818-
DD, 2020 U.S. App. LEXIS 39966, at *4 (11th Cir. Dec. 21, 2020) (characterizing the issue as "not
frivolous").

[4]      As the Court has previously discussed, "[t]he Sentencing Commission promulgated this policy
statement before the emergence of the COVID-19 pandemic and before the changes to § 3582 put in
place by the FIRST STEP Act; its provisions are therefore not directly related to the unique
circumstances presented by a global pandemic.  Nevertheless, the Court finds the policy provisions are
a useful starting point for its analysis of the compassionate release motion."  *Crosby*, 2020 U.S. Dist.
LEXIS 199085, at *20 n.1.  Similarly, Judge Hornby of this district has ruled that this policy statement
"'provides helpful guidance' but 'is not ultimately conclusive given the statutory change.'"  *United*

meet the "requirements of subdivision (2)," which provides that a court must determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018) (U.S.S.G.).   Section 3142(g) sets forth four factors that a court must consider before releasing a person pending trial.   They include: (1) the nature and circumstances of the offense, specifically whether the crime is a crime of violence or involves a controlled substance; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).

The policy statement also provides criteria for determining whether "extraordinary and compelling reasons" exist to release the defendant.   U.S.S.G. § 1B1.13 cmt. n.1.  These reasons include certain enumerated terminal illnesses and similar conditions, physical, functional, mental, or cognitive impairments, age, family circumstances, and other unenumerated reasons.   *Id.* § 1B1.13 cmt. n.1 (A-D).   The policy statement further provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."   *Id.* § 1B1.13 cmt. n.2.  Finally, it states that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."   *Id.* cmt. n.3.

---

*States v. Rembert*, No. 2:12-CR-66-DBH, 2020 U.S. Dist. LEXIS 210841, at *1 (D. Me. Nov. 11, 2020) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 U.S. Dist. LEXIS 115388, at *5 (D. Me. July 11, 2019), *aff'd*, No. 19-1785 (1st Cir. July 23, 2020)).  The Court agrees.

The movant bears the burden of proving that he is entitled to a sentence reduction, and "the Court has broad discretion in deciding whether to grant or deny a motion for sentence reduction." *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 U.S. Dist. LEXIS 102045, at *12 (D. Me. June 11, 2020) (quoting *United States v. Britton*, 473 F. Supp. 3d 14, 16 (D.N.H. 2020) (internal citations omitted)).

## V.   DISCUSSION

The Court reviewed Mr. French's motion along with the Government's response and the applicable law.  The Court concludes that notwithstanding the availability of compassionate release or related exhaustion issues, Mr. French's health conditions are not extraordinary and compelling reasons warranting his release.  Moreover, the nature of Mr. French's offense, the relatively short time he has served in relation to his one hundred seventy-five-month sentence, and the need for the sentence served to fulfill the sentence imposed tip the scales against release.

### A.   Availability of Compassionate Release

The parties dispute whether an inmate on bail pending appeal may file a motion for compassionate release.  The Court previously discussed this issue in its order dismissing Rodney Russell's motion for compassionate release.  *United States v. Russell*, No. 1:12-cr-00160-JAW-2, 2021 U.S. Dist. LEXIS 39871, at *33-35 (D. Me. Mar. 3, 2021).   Since the parties submitted their briefs, the Court revoked Mr. French's bail and Mr. French self-reported to prison on May 5, 2021.  Given that Mr. French is no longer at liberty and he has not carried his burden of justifying release, the Court assumes, without deciding, that Mr. French can bring the motion for compassionate release and proceeds to the merits.

### B.   Extraordinary and Compelling Reasons

To grant Mr. French's motion under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must find "extraordinary and compelling reasons warrant[ing]" a reduction in sentence.  According to the Centers for Disease Control and Prevention (CDC), there are several factors that increase a person's risk of severe illness from COVID-19.  Arguably, the most decisive factor is a person's age.   *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited May 6, 2021).  Generally, the risk of COVID-19 increases as a person ages, and over eighty percent of deaths occur in people who are sixty-five or older.  *Id.*  The age-related risk does not disappear when someone is younger than sixty-five.  *See id.* (Table entitled "Risk for COVID-19 Infection, Hospitalization, and Death By Age Group").  At age fifty-nine, Mr. French is not in the highest risk group, but he is still more likely to require hospitalization from COVID-19 than a younger adult.

People with certain medical conditions may be at high risk of getting seriously ill if they contract COVID-19.  The CDC guidelines list a number of medical conditions that "can make [a person] more likely to get severely ill from COVID-19."  *People with Certain Med. Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited May 6, 2021).  By contrast, the CDC lists only one condition, pregnancy, that it says is—as opposed to can be—more likely to make a person severely ill from COVID-19.  *Id.*  The Court

assesses Mr. French's underlying medical conditions against the most recent CDC guidance.

The parties sparred over whether Mr. French provided enough evidence to prove he has cancer. The Government cited Mr. French's most recent consultation with BOP medical staff, a short time before his release, which revealed no chronic medical conditions. *Gov't's Opp'n*, Attach. 2, *February 5, 2020 BOP Clinical Encounter*. The Government also cited the chest x-ray he had prior to his release, which revealed some scarring on Mr. French's right lung but otherwise his chest appeared normal. *Gov't's Opp'n*, Attach. 3, *January 23, 2020 X-Ray*. In response, Mr. French filed several declarations, one from a treating physician's assistant and two from his doctor, and he has twice updated the Court regarding a scheduled biopsy on his lung. Considering the stakes here, the Court concluded it was prudent to wait until Mr. French received the results from his biopsy before ruling on his motion for compassionate release. The Court has now received the biopsy results from the Mayo Clinic, and they indicate that the sample tested for cancer was found to be "benign" and his diagnosis is "chronic fibrosing pleuritis." *Letter from Att'y Thomas F. Hallett to Hon. John A. Woodcock, Jr.* (Feb. 16, 2021), Attach. 1, *Surgical Pathology Report* (ECF No. 909). In other words, based on the record before the Court, the Court finds that there is no probative evidence that Mr. French has cancer.

While Mr. French fortunately appears to be cancer-free, the Court wanted to ensure it had a full picture of Mr. French's medical conditions before returning him to prison. To that end, the Court ordered Dr. Diane Sommer, BOP Regional Medical

Director, to review Mr. French's records and determine whether the BOP could provide appropriate care. *Order* (ECF No. 920). After reviewing all the medical records submitted by Mr. French's counsel, including Mr. French's most recent x-ray results, Dr. Sommer found Mr. French suffered from "mild, intermittent asthma which is controlled with medication, and chronic fibrosing pleuritis." *BOP Review Letter* at 1. Symptoms of asthma include "shortness of breath, wheezing, and cough," and symptoms of chronic fibrosing pleuritis include "chest pain or shortness of breath." *Id.* Dr. Sommer noted that she could not provide specific prognoses but "so long as Mr. French takes his maintenance medication for asthma, he should not experience serious medical conditions." *Id.* The cause of the chronic fibrosing pleuritis is unknown, but Dr. Sommer noted his treating physician "counseled him that he expected him to do well." *Id.* at 1-2. According to Dr. Sommer, neither of the two medical conditions places Mr. French at increased risk from COVID-19 but rather are considered in the "might be of increased risk" category. *Id.* at 2.

Regarding whether the BOP can provide appropriate care, Dr. Sommer found that Mr. French would likely be classified as "medical care level 2," which applies to inmates who are "stable outpatients" that "require clinician evaluation every 1-6 months," and "[e]nhanced medical resources may be required from time to time, but are not regularly necessary." *Id.*; *see id.*, Attach. 1, *Outline of BOP Care Levels and Examples* at 1. Dr. Sommer ultimately concluded that "[b]ased on the information provided to me and my knowledge of the BOP's medical resources, the BOP will be

32

able to provide appropriate care for Mr. French should he be returned to the custody of the BOP." *BOP Review Letter* at 4.

The next step of the Court's compassionate release analysis typically involves consideration of the COVID-19 conditions at the defendant's prison. Even though the Court has ordered Mr. French to self-report to the institution designated by the BOP on May 5, 2021, it is not clear where he will serve the remainder of his sentence. Accordingly, there are no facility-specific statistics for the Court to review. The Court notes, however, that there are currently only 126 federal inmates and 164 BOP staff who have confirmed positive test results for COVID-19 nationwide. *COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited May 6, 2021).

Mr. French's risk of serious illness from COVID-19 is further significantly reduced by his vaccination. Mr. French confirmed that he received the first dose of a COVID-19 vaccine on April 1, 2021 and on April 30, 2021, his counsel confirmed that Mr. French received the second dose on April 22, 2021. *Vaccine Status Update*. According to the CDC, Mr. French was fully vaccinated on May 6, 2021—two weeks after his second dose.[5] *When You've Been Fully Vaccinated*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html (last visited May 6, 2021).

COVID-19 vaccines have proven to be extremely effective. While the vaccines are not one hundred percent effective, the CDC unequivocally says, "COVID-19

---

[5] The Court ordered Mr. French to self-report one day shy of full vaccination. However, this was specifically at his lawyer's request and the Court noted that it did not believe that, as the immunity conferred by the vaccinations was gradually cumulative, the one-day difference should cause the Court to reject Mr. French's request for a May 5 report date.

vaccines are effective at preventing COVID-19 disease, especially severe illness and death." *Id.* (emphasis in original). The Court agrees with Judge Walker of this District, who recently concluded that a fully vaccinated inmate's risk of serious illness from COVID-19 is "substantially reduced, based on publicly available information provided by the [CDC]." *United States v. Pignatello*, No. 1:19-cr-68-LEW, 2021 U.S. Dist. LEXIS 70677, at *2 (D. Me. Apr. 13, 2021). This conclusion is in line with the vast majority of other courts that have concluded "the highly effective available vaccines dramatically affect whether an inmate's medical conditions constitute the 'extraordinary and compelling reason' required to further consider compassionate release." *United States v. Sanders*, Crim. Case No.: SAG-06-087, 2021 U.S. Dist. LEXIS 72967, at *8 (D. Md. Apr. 15, 2021) (collecting cases).

In sum, only two conditions put forth by Mr. French have been determined by the CDC as conditions that "can make [a person] more likely" to get severely ill from COVID-19. Moreover, Mr. French is vaccinated, greatly reducing his risk from COVID-19. The BOP has evaluated Mr. French's conditions and found that it can provide appropriate care for Mr. French while in prison. The Court concludes that Mr. French has not carried his burden to prove the existence of extraordinary and compelling reasons warranting a reduction in sentence.

## C.    Danger to the Community

The Court must also determine whether Mr. French poses a danger to the community, and the Court readily concludes Mr. French is not a danger to the community. Mr. French was successfully released on bail pending trial and did not

34

have any disciplinary actions while incarcerated. *Pretrial Services Report Addendum* at 1 (ECF No. 864). The Probation Office determined that Mr. French "does not present a significant risk of danger to the community," and the Probation Office believed that any risks could be reduced with bail conditions. *Id.* at 2. Furthermore, Mr. French was out of prison for over a year and there is no evidence that he caused any trouble. The Court only adds that if released, Mr. French would still be subject to five years supervised release, and he has said he would "gladly submit" to additional conditions of supervised release if the Court believed any risk exists. *Def.'s Mot.* at 16.

### D. The Section 3553(a) Factors

Finally, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). The Court concludes those factors weigh against release. The Court has given particular weight to the serious nature and aggravating circumstances of Mr. French's offense. The offense conduct involved an extensive and sophisticated marijuana manufacturing and distribution operation, and Mr. French was found responsible for 918 kilograms of marijuana. As the Court previously stated at sentencing, "this was Mr. French's conspiracy." *Sentencing Tr.* at 125:2-3. The Court explained:

> The marijuana was grown on his land. Supplies were purchased through his company. He personally unloaded some of the supplies. He personally sold some of the marijuana. Marijuana was cleaned in his warehouse. Marijuana was stored in his barn. Hiring migrant laborers was his idea. The laborers were hired through his contact. All the important coconspirators were his long-term friends and associates, and when law enforcement ultimately appeared, the migrant laborers fled and hid overnight in his old friend's barn at his desperate request.

*Id.* at 125:5-14.

Mr. French's conduct both during the offense and at trial was deplorable and deserves just punishment. The grow operation involved the "inexcusably harsh and inhumane" treatment of migrant workers, who "spent months locked inside a warehouse processing marijuana day in and day out." *Id.* at 126:23-127:19. *See id.* at 127:25-128:4 ("So it's one thing to hire illegal workers; it's another thing to abuse those illegal workers. And I consider the treatment that each of the defendants must have been aware of, and to some extent participated in, to be deplorable, and it's a mark against each of you"). When law enforcement arrived on the scene of the operation in 2009, Mr. French and co-defendant Rodney Russell carried out plans to burn the evidence, despite the presence of propane tanks throughout the compound, placing the lives of law enforcement officers and firefighters at risk. *Id.* at 128:5-24. Finally, at sentencing the Court considered the fact that Mr. French took the stand at trial and lied under oath. The Court found that Mr. French and Mr. Russell's "deliberate, calculated willingness to lie repeatedly under oath in this federal courtroom before a federal judge and a federal jury is disgraceful, and it is a black mark against both of you." *Id.* at 129:13-16. In fact, when the Court calculated Mr. French's advisory guideline range, it imposed a two-level enhancement for his obstruction of justice based in part on his false testimony. *See Statement of Reasons*, Attach. 1, *Findings Affecting Sentence* at 1 (ECF No. 660).

When the Court sentenced Mr. French over four years ago it imposed a sentence that was "sufficient but no greater than necessary" in the middle of the

guideline range. *Sentencing Tr.* at 109:16-22. The Court reviewed its prior determination and reaffirms in full. The Court received no new information that would alter its reasoning at the time of his sentencing hearing. The Court only adds that Mr. French has been incarcerated for less than half of his fourteen-and-a-half-year sentence. Release at this point would fail to reflect the seriousness of the offense, promote respect for the law, provide just punishment, or afford adequate deterrence.

### E.   Summary

Mr. French has not carried his burden of proving entitlement to compassionate release. While he is not a danger to the community, his health conditions do not present extraordinary and compelling reasons warranting release. Furthermore, given the nature and circumstances of his offenses, the § 3553(a) factors weigh strongly against his release. Despite its decision not to grant compassionate release to Mr. French, the Court wishes him well and hopes that he will complete his sentence without incident and that he returns to society a productive and law-abiding citizen.

## VI.   CONCLUSION

The Court DISMISSES Malcolm French's Motion for Compassionate Release (ECF No. 883) without prejudice.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 6th day of May, 2021

37